**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JEFFREY BARHAM

BRIAN MCATEER

LAURY SALIGMAN                                Civil Action No. 02-CV-2283 (RMU)
                                              **Jury Trial Demanded**
MILES SWANSON

(Class Action Plaintiffs follow below)

MARY CANALES

WILLIAM DURHAM

NOAH FALK

JORGE GARCIA-SPITZ

MARK ALLAN JACKSON

CASEY LEGLER

CHARLCIE LEGLER

SALLY A. NORTON

JOHN PASSACANTANDO

JOSEPH PHELAN

NICOLE PRICHARD

MORGAN RESS

MACDONALD SCOTT

JERI WOHLBERG

LESLEY WOOD

SAMANTHA YOUNG

STEPHEN ZIMMERMAN

    on behalf of themselves and others
    similarly situated

    Plaintiffs,

        v.

CHIEF CHARLES H. RAMSEY
*in his individual and official capacities*

MAYOR ANTHONY WILLIAMS
*in his individual and official capacities*

DISTRICT OF COLUMBIA

DC METROPOLITAN POLICE DEPARTMENT

RICHARD MURPHY
c/o Department of the Interior
*in his individual and official capacities*

PETER A. NEWSHAM
*in his individual and official capacities*

GALE A. NORTON
*in her official capacity*

ALBERTO GONZALES
*in his official capacity*

UNITED STATES OF AMERICA

UNIDENTIFIED OFFICERS, SUPERVISORS
AND LAW ENFORCEMENT AGENCIES
*in their individual and official capacities*

    Defendants.

_____

2

## THIRD AMENDED COMPLAINT
### (First Amendment, Fourth Amendment, Fourteenth Amendment; False Arrest and Imprisonment; Conversion; Negligence)

### OVERVIEW

1.      On September 27, 2002, the D.C. Metropolitan Police Department in joint action with federal law enforcement agencies (and unidentified other local or federal agencies) once again deployed its Civil Disturbance Units to disrupt political protest in the Nation's Capital; and to punish with unlawful detention and false arrest those who engaged in lawful civil dissent on this first day of a weekend of planned demonstrations, as well as those interested non-protesters or political sympathizers who approached the demonstrations to hear the political message or engage in political discussion.

2.      The F.B.I. used these mass arrests as a mass intelligence gathering operation. Working in conjunction with federal law enforcement agencies, including the F.B.I., the D.C. police department compelled identification information from those it falsely arrested as a condition of the arrest, confinement and release. The F.B.I. and other local and federal law enforcement agencies collected intelligence and identification information on lawful political activists, their activities, and others who associated with or were in proximately to the demonstrations.

3.      This lawsuit challenges what have become systematized mechanisms of government disruption of free speech and assembly to criminalize dissent, and in particular the tactics, deployment, and use of Civil Disturbance Units by the D.C. Metropolitan Police Department acting in conjunction with federal and other law enforcement authorities, against peaceful protesters. These units, as a matter of practice and policy, employ

3

unconstitutional tactics to disturb, disrupt, infringe upon and criminalize constitutionally protected speech and assembly.

4.    This complaint is the most recent in a series of lawsuits with a shared factual allegation: That the D.C. Metropolitan Police Department's Civil Disturbance Units maintain and execute unconstitutional tactics to disrupt lawful protest and assembly including specifically the routine use of mobile police lines to interfere with freedom of association, assembly, speech and free movement; and the use of administrative detention, false imprisonment and false arrest tactics in which the CDUs will trap protesters (and others in physical proximity) on all sides, seize, detain and arrest those trapped/seized in the absence of probable cause. These actions are accomplished through the use of paramilitary force and threat of force in order to deprive, interfere with, and deter the exercise of constitutionally protected rights

5.    The earliest filed now-pending case alleging the existence of these unconstitutional disruption strategies and tactics is <u>International Action Center, et al. v. USA, et al.</u>, CA 01-00072, which arose out of the deployment of these tactics during the Bush Inauguration demonstrations in January, 2001. The existence of these tactics was also alleged in the subsequently filed litigation <u>50 Years is Enough, et al. v. District of Columbia, et al.</u>, CA 01-00811, which arose out of the deployment of these tactics during the April, 2000 International Monetary Fund protests.

6.    At each of these demonstrations, the D.C. MPD actions have been coordinated and executed in conjunction with the Federal Bureau of Investigation, among other U.S. agencies.

7.      The conduct challenged herein is neither aberrational nor the consequence of overzealous but well intentioned law enforcement. It was the implementation of a pre-designed plan to engage in unconstitutional preemptive arrests intended to round-up political activists and lock them up in the absence of probable cause.  U.S. Capitol Police Chief Terrance Gainer testified - - before the protests - - that he and D.C. police had discussed preemptive action against protesters.

8.      When one plaintiff asked why she was being arrested and whether she could please go free, one officer candidly explained that she was being arrested because she was displaying political "propaganda." Others were let out apparently based on their perceived loyalty to the government. The *Washington Post* reported that police lines yielded for at least one detainee when he displayed a Department of Justice identification card.

9.      This complaint additionally alleges that police treat and process those (falsely) arrested in connection with targeted mass political activity differently from those who are arrested for other minor offenses. Plaintiffs were subjected to more harsh treatment in custody and were hogtied wrist-to-ankle for hours. They were subjected to intentional sleep deprivation and were not released in a matter of hours as would normally be the case, but were held into the night and overnight, for up to 30 hours. The purpose of these arrests was not to enforce laws, but to take protesters off of the streets on the first day of a weekend of planned political events.

10.     The District of Columbia maintains a policy, practice and/or custom of denying to those arrested in targeted mass political round-ups the option to be released and "post and trial." This option allows an arrestee to be quickly released from jail or custody by posting

collateral and receiving a trial date on which to challenge the legality of the arrest. The MPD is advising persons caught in targeted mass political sweeps that they must remain in jail or police custody for an extended period of time or may secure release only by "post and *forfeit*," which means the arrestee forfeits the collateral and does not receive the opportunity to challenge the legality of the arrest. This disparate treatment, disallowing the post and trial option in the case of political round-ups, denies those arrestees equal protection under the law, and also subjects those who wish to challenge the legality of their arrest to greater pre-arraignment jail or police custody simply because they seek to exercise their constitutional right to defend against an unlawful arrest.

11. Federal agencies coordinate with the MPD in connection with mass political arrests for, among other reasons, using the arrests to collect photographs, fingerprints and other information about political activists and their associations. The Federal Bureau of Investigation, among other unidentified federal agencies, collects such data and places it in information databases and, on information and belief, disseminates and makes such personal information available to other entities.

12. Those who are forcibly arrested and deprived of their liberty suffer great fear, harm, and personal injury. The stigma of having been arrested carries on beyond the immediate personal and physical consequences of the deprivation of liberty. The collection and dissemination of personal information and political associations effects an invasion and loss of privacy, as well as a profound loss of Constitutional right to be protected when engaging in or associating with First Amendment protected activity.

13. These round-ups and mass arrests of political activists are anathema to democracy. It is

not merely remarkable that such round-ups happen repeatedly in Washington, D.C., but
that policy makers emphatically ratify such blatantly unconstitutional tactics.

14.     "Ain't it a thing of beauty," Chief Ramsey stated on September 27, 2002, as he reviewed
the officers about to mass arrest hundreds in Pershing Park, "to see our folks up there
ready to go."

15.     These challenged police actions create a substantial chilling effect and deterrent to future
First Amendment protected activity as the exercise of one's political rights in
Washington, D.C. now carries with it the risk of arrest, of being wrongfully subject to the
criminal process of the state, of being threatened with physical harm by the police, being
bound with handcuffs, having one's identification and political activities be collected and
recorded - -  for no reason other than having political associations that have been targeted
by the federal government or by the local chief of police or mayor.

16.     This complaint seeks, in addition to monetary compensation, injunctive relief enjoining
defendants from engaging in the challenged conduct in the future.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction to hear this complaint pursuant to 28 U.S.C. § 1331 (federal
question), 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction), and 28 U.S.C. § 1367
(supplemental jurisdiction).

18.     Venue is appropriately vested in this Court pursuant to 28 U.S.C. § 1391, as the District
of Columbia is a judicial district in which all defendants reside, and, independently
because a substantial part of the acts or omissions giving rise to the claims herein
occurred in the District of Columbia.

## PARTIES

19. Plaintiff JEFFREY BARHAM is a law student at the George Washington University School of Law and a resident of the District of Columbia. On September 27, 2002, Mr. BARHAM, in his capacity as a National Lawyers Guild Legal Observer, was peaceably and lawfully observing political demonstrations in the vicinity of Vermont Ave. and K Street when, without notice or warning, police surrounded him with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested Mr. BARHAM in the absence of probable cause.

20. Plaintiff MARY CANALES is a Registered Nurse, and a resident of the state of Vermont. On September 27, 2002, Dr. CANALES was in Washington, D.C. to attend a nursing conference. Dr. CANALES saw a political assembly in Pershing Park and entered the park to associate with the demonstrators and to see if there was a speaker to listen to. Dr. CANALES was peaceably and lawfully standing in the park when, without notice or warning, police surrounded her and the park with pop up police lines, boxed her in, closed off all avenues of exit, and falsely detained and arrested her in the absence of probable cause.

21. Plaintiff WILLIAM DURHAM is a law student at Georgetown University Law Center and resident of the District of Columbia. On September 27, 2002, Mr. DURHAM was peaceably and lawfully protesting in Pershing Park when, without notice or warning, police surrounded him and the park with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

22. Plaintiff NOAH FALK is a law student at the George Washington University Law School

8

and a resident of the District of Columbia. On September 27, 2002, Mr. FALK, in his capacity as a National Lawyers Guild Legal Observer, was peaceably and lawfully observing political demonstrations in Pershing Park when, without notice or warning, police surrounded him with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

23.     Plaintiff JORGE GARCIA-SPITZ is a cook at Il Radicchio in Arlington, VA, and a resident of Virginia.  On September 27, 2002, Mr. GARCIA-SPITZ lawfully rode his bicycle with about sixty other cyclists to convey, by way of example, his support for, and the effectiveness of non-fossil fuel based modes of transportation. In the vicinity of Pershing Park, Mr. GARCIA-SPITZ was confronted by a police line that had popped up obstructing his movement, he was ordered off of his bike and into Pershing Park where, without notice or warning, police surrounded him with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

24.     Plaintiff MARK JACKSON is an independent contractor with the Underground Railroad and Freedom Center, and works with a curator at the American History Museum.  He is also an adjunct professor at the George Washington University, and a resident of the District of Columbia. On September 27, 2002 Mr. JACKSON walked over to Pershing Park where there was a political assembly. When he tried to move on to work, Mr. JACKSON realized that without notice or warning, police had surrounded him with pop up police lines, boxed him in, and closed off all avenues of exit. He was falsely detained and arrested in the absence of probable cause.

9

25.    Plaintiff CASEY LEGLER is a resident of Washington, DC. On September 27, 2002, Ms. LEGLER lawfully rode her bicycle with about sixty other cyclists to convey, by way of example, her support for, and the effectiveness of non-fossil fuel based modes of transportation. In the vicinity of Pershing Park, Ms. LEGLER was confronted by a police line that had popped up obstructing her movement, she was ordered off of her bike and into Pershing Park where, without notice or warning, police surrounded her with pop up police lines, boxed her in, closed off all avenues of exit, and falsely detained and arrested her in the absence of probable cause.

26.    Plaintiff CHARLCIE LEGLER is a student at George Mason University and waitress at the Tabard Inn and a resident of Virginia. On September 27, 2002, Ms. LEGLER lawfully rode her bicycle with about sixty other cyclists to convey, by way of example, her support for, and the effectiveness of non-fossil fuel based modes of transportation. In the vicinity of Pershing Park, Ms. LEGLER was confronted by a police line that had popped up obstructing her movement, she was ordered off of her bike and into Pershing Park where, without notice or warning, police surrounded her with pop up police lines, boxed her in, closed off all avenues of exit, and falsely detained and arrested her in the absence of probable cause.

27.    Plaintiff BRIAN McATEER is a high school student, a reporter for the Independent Media Center, and a resident of Maryland. He was lawfully videotaping political activity near the intersection of Vermont Avenue and K Streets, NW on the morning of September 27, 2002 when, without notice or warning, police surrounded him with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested

10

Mr. McATEER in the absence of probable cause. As has happened to other independent media reporters with recurring frequency at demonstrations in Washington, D.C., his video camera and tape were seized by the D.C. MPD and confiscated while in the custody of the MPD.

28. Plaintiff SALLY NORTON is a Registered Nurse, an Assistant Professor at the University of Rochester School of Nursing, and a resident of the State of New York. On September 27, 2002, Dr. NORTON was in Washington, D.C. to attend a nursing conference. Dr. NORTON saw a political assembly in Pershing Park and entered the park to associate with the demonstrators and to see if there was a speaker to listen to. Dr. NORTON was peaceably and lawfully standing in the park when, without notice or warning, police surrounded her and the park with pop up police lines, boxed her in, closed off all avenues of exit, and falsely detained and arrested her in the absence of probable cause.

29. Plaintiff JOHN PASSACANTANDO is the Executive Director of Greenpeace and is a resident of the District of Columbia. Mr. PASSACANTANDO was peaceably and lawfully bicycling to work on September 27, 2002 when he entered Pershing Park to observe the political activity there. Thereafter, the police surrounded him and the park with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

30. Plaintiff JOSEPH PHELAN is a student at Hunter College and a resident of the state of New York. On September 27, 2002, Mr. PHELAN was peaceably and lawfully protesting in Pershing Park when, without notice or warning, police surrounded him and

the park with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

31.  Plaintiff NICOLE PRICHARD is an administrative assistant at the Arca Foundation and a resident of the District of Columbia.  On September 27, 2002, Ms. PRICHARD was riding her bicycle around Washington DC when she found herself amidst the group of bicycling protesters. She was forced by the police department into Pershing Park.  She was peaceably and lawfully standing in Pershing Park when, without notice or warning, police surrounded her and the park with pop up police lines, boxed her in, closed off all avenues of exit, and falsely detained and arrested her in the absence of probable cause. Her bicycle lock was destroyed and her bicycle was confiscated by the MPD.

32.  Plaintiff MORGAN RESS is a photographer associated with ABC No Rio, an artists' space in New York City, and a resident of the State of New York.  On September 27, 2002, he was present in Washington, D.C. to participate in political demonstrations by photographing those events with the intention of later sharing these political images with others. Plaintiff RESS was peaceably and lawfully standing in Pershing Park when, without notice or warning, police surrounded him and the park with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

33.  Plaintiff LAURY SALIGMAN is an employee of Conservation International and a resident of the District of Columbia. On the morning of September 27, 2002, she had been riding her bicycle as part of her routine bicycle race fitness training. She was peaceably and lawfully pausing to rest from her training and observing nearby protesters

12

when, without notice or warning, a police line began forming near her. As she tried to exit the block, the police violently pushed her and knocked her off of her bicycle and then arrested her.

34.     Plaintiff MACDONALD SCOTT is a Canadian citizen and resident of the State of New York, where he is employed as Membership Coordinator for the National Lawyers Guild. On September 27, 2002, Mr. SCOTT was peaceably and lawfully protesting in Pershing Park when, without notice or warning, police surrounded him and the park with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

35.     Plaintiff MILES SWANSON is a law student at the University of the District of Columbia David A. Clarke School of Law, and a resident of the District of Columbia. On September 27, 2002, Mr. SWANSON, in his capacity as a National Lawyers Guild Legal Observer, was peaceably and lawfully observing political demonstrations in the vicinity of Vermont Ave. and K Street when, without notice or warning, police surrounded him with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested Mr. SWANSON in the absence of probable cause.

36.     Plaintiff JERI WOHLBERG is a graduate student in a family nurse practitioner program in Vermont, and is also a resident of that state. On September 27, 2002, Ms. WOHLBERG was in Washington, D.C. to attend a nursing conference. From her hotel, Ms. WOHLBERG saw and heard the political assembly in Pershing Park, and went across the street to the Park to participate. Ms. WOHLBERG was peaceably and lawfully standing in the public park when, without notice or warning, police surrounded her and

13

the park with pop up police lines, boxed her in, closed off all avenues of exit, and falsely

detained and arrested her in the absence of probable cause.

37.    Plaintiff LESLEY WOOD is a Canadian citizen and resident of the State of New York,

where she is a doctoral candidate at Columbia University.  On September 27, 2002, Ms.

WOOD was peaceably and lawfully protesting in Pershing Park when, without notice or

warning, police surrounded her and the park with pop up police lines, boxed her in,

closed off all avenues of exit, and falsely detained and arrested her in the absence of

probable cause.

38.    Plaintiff SAMANTHA YOUNG is a chef at the Tabard Inn and a resident of Virginia. On

September 27, 2002, Ms. YOUNG lawfully rode her bicycle with about sixty other

cyclists to convey, by way of example, her support for, and the effectiveness of non-fossil

fuel based modes of transportation. In the vicinity of Pershing Park, Ms. YOUNG was

confronted by a police line that had popped up obstructing her movement, she was

ordered off of her bike and into Pershing Park where, without notice or warning, police

surrounded her with pop up police lines, boxed her in, closed off all avenues of exit, and

falsely detained and arrested her in the absence of probable cause.

39.    Plaintiff STEPHEN ZIMMERMAN is a law student at the George Washington

University Law School and is a resident of the District of Columbia. On September 27,

2002, Mr. ZIMMERMAN, in his capacity as a National Lawyers Guild Legal Observer,

was peaceably and lawfully observing political demonstrations in Pershing Park when,

without notice or warning, police surrounded him with pop up police lines, boxed him in,

closed off all avenues of exit, and falsely detained and arrested him in the absence of

14

probable cause.

40.　Defendant CHARLES H. RAMSEY is Chief of the District of Columbia Metropolitan

Police Department. He is a policy maker for the District of Columbia and the D.C.

Metropolitan Police Department. Chief RAMSEY was physically present at the site of the

mass arrests and political roundups and, on information and belief, planned in advance

and gave the orders at the scene for officers to engage in the conduct challenged herein.

Mr. RAMSEY is sued in both his official and individual capacity.

41.　Defendant ANTHONY WILLIAMS is the Mayor of the District of Columbia and a policy

maker for the District. Mr. WILLIAMS has approved and ratified the unconstitutional

conduct challenged herein. He is sued in both his official and individual capacity.

42.　Defendant DISTRICT OF COLUMBIA is a municipal corporation and constitutes the

local government of Washington, D.C.

43.　Defendant D.C. METROPOLITAN POLICE DEPARTMENT has law enforcement

authority within the District of Columbia and engaged in the conduct challenged herein.

44.　Defendant RICHARD MURPHY was the Acting Commander of the Special Forces

Branch of the U.S. Park Police. He ordered officers under his command to enclose the

Pershing Park plaintiffs in the park and to prevent them from leaving. He is sued in his

individual and official capacities.

45.　Defendant Assistant Chief PETER NEWSHAM, ESQ. is in charge of the Office of

Professional Responsibility (OPR), an office which is described by the MPD as "the

guardian of the Metropolitan Police Department's reputation. Assistant Chief

NEWSHAM was physically present at the site of the mass arrests and political roundups

15

and, in joint action with others, participated in the giving of the orders on the scene for officers to engage in the unconstitutional and unlawful conduct challenged herein. NEWSHAM is sued in both his individual and official capacities.

46.     Defendant GALE A. NORTON is head of the Department of the Interior, the federal agency encompassing the U.S. Park Police and the National Park Service, which maintains jurisdiction over certain parks and land located within the District of Columbia including Pershing Park, and is alleged to have engaged in joint action with the other defendants in the acts challenged herein.

47.     Defendant ALBERTO GONZALES is U.S. Attorney General and head of the Department of Justice, the federal agency encompassing the Federal Bureau of Investigation, which is alleged to have engaged in joint action with the other defendants in the acts challenged herein, including but not limited to, for the purpose of collecting and disseminating intelligence information related to the plaintiffs' and demonstrators' political actions and associations.

48.     Defendant UNITED STATES OF AMERICA encompasses all federal agencies that had any role in the violations alleged herein.

49.     Defendant UNIDENTIFIED OFFICERS, SUPERVISORS AND LAW ENFORCEMENT AGENCIES are individuals who, and agencies which, engaged in joint action with the named defendants to deprive plaintiffs of their clearly established constitutional rights. The as yet unidentified defendants engaged in the mass arrests and political roundups notwithstanding the absence of probable cause or lawful justification. The officers and their responsible supervisory chain of command are sued in their individual and official

16

capacities.

**STANDARDS REFLECTED IN THE MPD MASS DEMONSTRATION HANDBOOK**

50.     As a matter of policy, practice and custom, the MPD in joint action with federal and other

agencies, intentionally disrupts and disperses certain targeted mass political assembly and

demonstrations in the absence of cause or justification.

51.     As a matter of practice, custom, and informal policy the MPD routinely violates its own

established standards and engages in constitutionally impermissible mass arrests and

political round-ups of targeted political demonstrators and activists engaged in mass

assembly and political activity and others associating with them.

52.      The MPD has issued the "Metropolitan Police Department Handbook for the

Management of Mass Demonstrations" (hereinafter the "Mass Demonstration

Handbook"). According to the MPD, the Mass Demonstration Handbook is the standard

operational guide for dealing with mass demonstrations, and the handbook establishes

what the MPD claims to be proper standards, procedures and MPD obligations in that

context.

53.     According to the MPD Mass Demonstration Handbook, where police intend to disperse a

crowd engaging in a political demonstration, the field commander shall instruct unit

commanders "to issue warnings to the crowd to disperse."

54.     The MPD Mass Demonstration Handbook requires as follows:

[A] [1]  The issuance of warnings shall be of such amplification and repetition as to be
         heard by the entire assemblage.
[2]      Issuances shall be made by the unit commander from stationary vantage points
         which are observable to the crowd, or to a large number of participants.
[3]      Additional warnings, where necessary, shall be given from police vehicles,
         equipped with public address systems, moving around the crowd.

17

[4]    The warning shall consist of an announcement citing the offenses or violations which are being committed by participants and a request or order, whichever is applicable, that the crowd disperse. Whenever possible, this warning shall be written out prior to announcement, to ensure clarity and accuracy, and consistency, if the warning is repeated.

[5]    The entire warning process shall be documented by means of an audio-visual recording, if available.

[B]    As a first means of dispersing a crowd under static conditions, the unit commander shall attempt to verbally persuade the crowd to disperse of its own accord by announced available exit routes.

[C][1]    If, after a reasonable time following the initial warning, the crowd refuses to disperse, the unit commander shall issue a final warning ordering the participants to disperse or be subject to arrest.

[2]    If, after a reasonable amount of time following the final warning, the crowd continues in its refusal to disperse, the unit commander shall direct that violators be arrested.

55.    None of the plaintiffs were afforded benefit or protection of the standards described above in the MPD-issued Mass Demonstration Handbook. The MPD violated these standards with respect to plaintiffs and hundreds of others.

## THE DEFENDANTS' PLAN FOR
## POLITICAL ROUNDUPS AND "PREEMPTIVE" ARRESTS

56.    The MPD and other defendants had advance knowledge that there was planned a weekend of political demonstration activity beginning on Friday, September 27, 2002.

57.    Federal and local law enforcement agencies discussed and planned in advance a strategy of "preemptive" action against protesters, as was reported in the Saturday, September 21, 2002 *Washington Post*.

58.    Capitol Police Chief Terrance W. Gainer participated in these discussions with D.C. and federal law enforcement officials. Treating the protesters as presumptively criminal, and indicating a willingness to act absent probable cause, Gainer explained, "I don't know why we have to wait until after they've inflicted damage."

18

59.     The local and federal plan was, in fact, implemented on September 27, 2002. As

        evidenced by its implementation, the plan consisted of political round-ups at multiple

        locations and mass arrests of hundreds of peaceful protesters and any others in their

        vicinity with no regard as to whether such persons were, in fact, breaking any law.

60.     On September 27, 2002 District officials made it a crime to be a protester in Washington,

        D.C., and a crime for others to come near to hear the protesters' message or to join in.

### FACTS RELATED TO THE ROUND-UPS NEAR FRANKLIN SQUARE PARK

61.     On the morning of September 27, 2002 a political assembly of approximately 200 - 300

        persons gathered in the area of Franklin Square Park.

62.     By approximately 6 - 7 a.m. there was a substantial police presence in the area because of

        the anticipated assemblage.

63.     Plaintiff McATEER, who was age seventeen at the time, came to the area as an

        independent journalist. McATEER was intending to videotape the anticipated political

        events for publication through the Independent Media Center or other press outlets.

64.     McATEER had not even reached Franklin Park when he was detained by an MPD officer,

        who demanded to know "Are you going to the protest?" The officer searched

        McATEER's backpack before ultimately releasing him. There was no cause for searching

        McATEER's belongings, and he expressly stated that he did not consent to the search of

        his belongings.

65.     Plaintiff SALIGMAN is a bicycle racer. She had been riding her bicycle as part of her

        routine racing and fitness training. At the end of her training ride when she saw some

        demonstrators who were peaceably walking onto the block together, she paused her bike

for the purpose of observing their political activities. Without notice or warning, a police line popped up. Observing this line forming, Ms. SALIGMAN decided to move on so she could shower and go to work. Without any warning, without even an order to "move back," a police officer violently pushed her and knocked her off of her bicycle. The police grabbed her by the scruff of her neck and said "we're taking you in," and arrested her.

66. Plaintiffs BARHAM and SWANSON went to the Franklin Park area in their capacities as National Lawyers Guild Legal Observers. Such legal observers are routinely at the site of political assemblages and demonstrations for the purpose of observing events, including police misconduct.

67. Plaintiffs BARHAM and SWANSON were clearly identified as Legal Observers and each wore a high-visibility green flourescent baseball cap and a green identification tag that identified each as a Legal Observer.

68. On this morning, a group of protesters moved from Franklin Park along K Street and one block north along Vermont Avenue.

69. The MPD erected a police line at the intersection of Vermont and L Streets, blocking northbound passage.

70. The MPD then erected a police line at the intersection of Vermont and K Streets, blocking southbound passage.

71. Movement eastbound and westbound was also blocked by police and/or buildings.

72. Police used force and/or threat of force to impede movement outside of this area.

73. The area within the police lines became a detention zone, within which scores of demonstrators, observers, and bystanders were thus seized and arrested within the

20

meaning of the 4th Amendment to the Constitution of the United States, without probable cause.

74. Plaintiffs BARHAM, MCATEER and SWANSON were boxed-in by the police lines and had no avenue to exit the scene.

75. The police issued no directives other than to "move back" - a directive that was often issued simultaneously with a blow from a baton.

76. Riot police used their batons offensively and aggressively, yelling at protesters to "move back." Police crammed the detainees into a smaller and smaller area, closing their perimeter with force and violence. This created an atmosphere of increasing fear, provocation and tension.

77. At one point, a storefront window broke and shattered when the police, wielding their batons offensively, pushed a trapped and tightly compressed group of arrestees into the window. The police had ignored the arrestees' pleas to stop the compression.

78. At no time did plaintiffs BARHAM, McATEER or SWANSON fail to obey a police order.

79. After surrounding plaintiffs BARHAM, McATEER and SWANSON with police lines, the police then without probable cause or lawful justification, arrested BARHAM, McATEER and SWANSON along with hundreds of others, mostly political activists and demonstrators.

80. An MPD officer approached Plaintiff BARHAM, who was wearing legal observer identification. The officer asked if BARHAM was a law student and then threatened BARHAM that his arrest should prevent him from being admitted to the bar.

81.    At no point did any MPD officer do any of the following, as is required by the MPD Mass

       Demonstration Handbook:

   a.    issue a warning for the political demonstration or for others in proximity to the
         political assemblage to disperse;

   b.    issue any warnings to disperse through the use of amplification and with such
         repetition for the entire assemblage to hear;

   c.    issue any warning to disperse from stationary vantage points observable to the
         crowd or to a large number of participants;

   d.    issue additional warnings given from police vehicles, equipped with public
         address systems, moving about the crowd.

   e.    make an announcement citing the offenses or violations which were allegedly
         being committed and issue a request or order that individuals disperse.

82.    The MPD *prevented* dispersal through the actual and threatened use of force, and through

       unyielding police lines.

83.    At no time was there probable cause to arrest plaintiffs BARHAM, McATEER,

       SALIGMAN or SWANSON.

84.    This unconstitutional mass arrest and round-up was directed and approved by D.C. and

       MPD policy makers. MPD policy makers and high-ranking officials present during the

       mass arrest included Chief of Police Charles Ramsey, Sgt. Joseph Gentile, and Lt. Jeffrey

       Herold, among others.

**FACTS RELATING TO THE ROUND-UPS OF PERSONS LAWFULLY RIDING
BICYCLES IN SUPPORT OF ALTERNATIVES TO FOSSIL FUEL USAGE**

85.    On September 27, 2002 approximately sixty to seventy persons met at Union Station for

       the purpose of engaging in a lawful bicycle ride and to demonstrate, by way of example,

22

their support for alternatives to oil and gasoline consumption and the pollution caused by such fuels.

86. By law and regulation, bicycles are allowed to traverse the roadways in the District of Columbia.

87. At approximately 8:30 a.m. on September 27, 2002 plaintiffs JORGE GARCIA-SPITZ, CASEY LEGLER, CHARLCIE LEGLER, and SAMANTHA YOUNG met at Union Station.

88. It was the intention of plaintiffs GARCIA-SPITZ, LEGLER, LEGLER and YOUNG to embark upon this lawful bicycle ride from Union Station over to the Freedom Plaza area, where they understood a political demonstration was to take place, and from there to go their separate ways, to work or school or elsewhere.

89. The police were aware of this well publicized bike ride, and they maintained a substantial presence in the vicinity of Union Station.

90. At approximately 8:30 a.m., the bicyclists began their ride. None of the law enforcement officers directed the bike riders to not ride their bikes, and the police did not obstruct the start of this lawful and political endeavor.

91. As soon as the bike ride started, however, mobile police lines popped up - - consisting of officers on bicycles and on motorcycles and in motor vehicles - - surrounding these plaintiffs and the bicyclists on all sides.

92. By virtue of their police lines, the police controlled the movement of the bicyclists. When police wanted to stop the bicyclists, the front line of officers would wave and direct that those following behind them should stop. Those who sought to leave the bike ride by

23

exiting through the side mobile police lines would be prevented from doing so. In this regard, the bicyclists were already seized by the police as they were riding in a mobile detention zone. However, the presence of the mobile police lines was interpreted by some as an escort and it did not interfere with plaintiffs GARCIA-SPITZ, LEGLER, LEGLER and YOUNG's original and lawful intention to traverse the roadways peaceably and lawfully upon their bikes.

93.    The bicyclists obeyed all traffic laws during this bike ride, including obeying all directives from the police.

94.    There was no attempt by the police to obstruct the bike ride as it proceeded, nor did the police suggest that there was even any problem. Some of the cyclists even misinterpreted the police escort as a measure of support or success.

95.    As the bike ride entered its final leg near the Freedom Plaza and Pershing Park area the cyclists were confronted by a stationary police line in their way.

96.    The police forced the bicyclists into Pershing Park which is across from Freedom Plaza and which held about 300 demonstrators at that time. The police ordered them off of their bicycles. The cyclists complied, as this was about where they intended to terminate their ride, and many initially thought there was nothing wrong.

97.    However, a few minutes later when plaintiffs CASEY LEGLER and her partner SAMANTHA YOUNG attempted to leave Pershing Park because they had to go to work later that day, they were told by the police that "no one is allowed to leave the park."

98.    The police had surrounded these plaintiffs and the park, using police lines that had popped up on all sides, and refused to let anyone leave the park.

24

99.    One officer told CASEY LEGLER and YOUNG that they were not allowed to leave because their bikes were displaying "propaganda." The officer told them that they could leave if they removed the propaganda, which consisted in part of a sign displaying a women's symbol. They complied with the officer's request removing their First Amendment protected materials. The officer took their signs and destroyed them, and then continued to refuse to let them leave.

100.    CASEY LEGLER and YOUNG approached an MPD Lieutenant and asked why they were not being allowed to leave and if they were being arrested.

101.    The Lieutenant advised that "At this point in time Ma'am, we are just following orders."

102.    The defendants refused to allow plaintiffs GARCIA-SPITZ, LEGLER, LEGLER and YOUNG to disperse or leave the park and subsequently falsely arrested each in the manner described below.

**FACTS RELATING TO THE ROUND-UPS OF PERSONS IN PERSHING PARK**

103.    Demonstrators began gathering in parkland near the intersection of 14th Street and Pennsylvania Avenue, NW, between approximately 8:00 - 9:00 a.m. on September 27, 2002.

104.    Demonstrators had planned to engage to protest in Freedom Plaza, which is adjacent to Pershing Park. However, police officers directed demonstrators into Pershing Park and the political assemblage gathered there.

105.    Pershing Park is a public forum under the jurisdiction of the United States Department of the Interior, National Park Service.

106.    Plaintiffs MARY CANALES and SALLY NORTON are each registered nurses who were

in Washington, D.C. for the purpose of attending a nursing conference, "Advancing

Nursing Practice Excellence: State of the Science," which was being held at the Marriott

Hotel that is near Pershing Park.

107.    Drs. CANALES and NORTON decided to leave the Marriott Hotel to get breakfast,

which they did at approximately 8:30 a.m. They were aware, from news reports, that there

were demonstrations anticipated in Washington, D.C. that day, and they saw that

demonstrators were gathered at Pershing Park. After picking up coffee, they entered the

park in order to listen to any political speakers that might be giving a speech there.

108.    There was an evident police presence, but no indication to Doctors CANALES or

NORTON that there was a problem. They passed by the police and entered without event.

109.    At about the same time, plaintiff JERI WOHLBERG, a graduate student in nursing who

was presenting research at the conference at the Marriott, decided that she wanted to

participate in the demonstration in Pershing Park. She knew of the demonstration from

the media coverage and wished to support its political message. She could hear and see

the demonstration from the Marriott. She, too, entered the park passing by the police who

were not indicating any imminent police round-up or similar problem. Ms. WOHLBERG

met up with plaintiffs CANALES and NORTON in the park.

110.    Plaintiffs WOHLBERG, CANALES and NORTON all observed what was occurring in

Pershing park at that time, just before the mass arrest and political round-up: dancing,

singing and assembly. Some people were rhythmically beating drums. Many protesters

held signs protesting corporate globalization and greed. Other signs advocated for peace,

against war in Iraq, and bore messages such as "bread not bombs." Clearly it was a

26

gathering of individuals engaging in political speech, assembly and camaraderie.

111.  At a time between 9:00 a.m. and 9:30 a.m., the bicyclists were forced into the Park, and shortly thereafter police lines were erected without any notice or warning. Many of those surrounded had no immediate awareness that they had been trapped and seized.

112.  A session of the nursing conference was set to begin at 9:45 a.m. CANALES, NORTON and WOHLBERG found, however, that they had been surrounded by these police lines that had silently popped up on all sides. They found unyielding police lines in every direction, with many officers in intimidating, black, full riot gear. They attempted to leave and asked permission to leave of no less than five separate officers. They explained they had to attend the conference, and displayed their conference tote bags.

113.  This was similar to the experiences that other plaintiffs who happened also to be in the park were having.

114.  Plaintiff WILLIAM DURHAM went to Pershing Park as a protester. He arrived at the park, and observed a drum circle there with people cheering and chanting. Soon thereafter, he and others realized that police lines had popped up on all sides. The police refused to allow DURHAM to leave.

115.  Plaintiff NOAH FALK is a law student at the George Washington University School of Law. He was in Pershing Park in his capacity as a National Lawyers Guild Legal Observer, and was clearly identifiable as such based on the flourescent green Legal Observer cap and green badge he was displaying. FALK was lawfully standing in the park when he found himself surrounded by police lines.

116.  Plaintiff MARK JACKSON is an independent contractor with the Underground Railroad

27

and Freedom Center, and works with a curator at the American History Museum. He was not protesting, but had walked over to the park and planned to head to work when he found himself surrounded by police lines that had quietly popped up. He asked to be allowed past the police line, but the police refused him passage, explaining "we can't let you out."

117.   Plaintiff JOHN PASSACANTANDO had been riding his bicycle to work that morning to avoid what had been predicted to be difficult traffic. He stopped near Pershing Park to observe the protest. Thereafter he, too, found himself surrounded by police lines on all sides with police refusing to let him leave. PASSACANTANDO asked no less than a dozen officers at different locations to be allowed to leave and go on his way, but he was told repeatedly that he was not allowed to leave. A number of the officers advised that they were acting under "orders."

118.   Plaintiff JOSEPH PHELAN is a student at Hunter College in New York, and was present in Pershing Park to participate in the protests.  When he sought to leave the park, MPD officers told him he could not leave.  He asked one officer "Am I being detained" and was told "no."  When he then said, "So we can leave," the officer stated "If you try to leave, you'll be arrested."

119.   Plaintiff NICOLE PRICHARD was riding her bicycle around the City when she found herself amidst the group of protesters on bicycles.  She was almost immediately thereafter forced into Pershing Park, where she found herself surrounded by police lines on all sides and, when she sought to leave, was told by an MPD officer "no one goes in and no one goes out unless on that [mass arrest] bus."

28

120. Plaintiff MORGAN RESS is an artist who works with ABC No Rio, an artist space on the lower east side of Manhattan, NY. RESS was in Pershing Park as a demonstrator and as a photographer and artist. He heard the sound of protest drums in the park, entered the park, and soon found that the police had formed lines around the park. He asked multiple officers if he could please leave, and each refused to let him go. Some officers were silent, others told him to go to another police line. When he did so he would either be directed to go to yet another police line or would be met with silence. One officer explained, "Our orders are no one leaves the park."

121. Plaintiff MACDONALD SCOTT is employed as the Membership Coordinator for the National Lawyers Guild in New York City. He was peacefully protesting in the park when he found himself surrounded on all sides by police lines. He requested of at least five police officers that they allow him to leave the park, and each time was refused.

122. Plaintiff LESLEY WOOD is a doctoral candidate at Columbia University. She was peacefully protesting in Pershing Park when without notice or warning the police formed lines around the park. She requested of at least five police officers that they allow her to leave the park, and each time was refused.

123. Plaintiff STEPHEN ZIMMERMAN is a law student at George Washington University Law School and was a National Lawyers Guild Legal Observer present in Pershing Park when police surrounded the park. He tried to leave, but was not allowed.

124. At no time did any of plaintiffs CANALES, DURHAM, FALK, GARCIA-SPITZ, JACKSON, LEGLER, LEGLER, NORTON, PASSACANTANDO, PHELAN, PRICHARD, RESS, SCOTT, WOHLBERG, WOOD, YOUNG, or ZIMMERMAN fail to

29

obey a police order.

125. The police actions in the vicinity of Pershing Park were executed by MPD police, U.S.

Park Police under the jurisdiction of the Department of the Interior, and other as-yet-

unidentified law enforcement agencies and officers.

126. After surrounding plaintiffs CANALES, DURHAM, FALK, GARCIA-SPITZ,

JACKSON, LEGLER, LEGLER, NORTON, PASSACANTANDO, PHELAN,

PRICHARD, RESS, SCOTT, WOHLBERG, WOOD, YOUNG and ZIMMERMAN with

police lines, the police then without probable cause or lawful justification, arrested each

of them along with hundreds of others, mostly political activists and demonstrators.

127. At no point did any MPD officer do any of the following, as is required by the MPD Mass

Demonstration Handbook:

    a.    issue a warning for the political demonstration or for others in proximity to the
political assemblage to disperse;

    b.    issue any warnings to disperse through the use of amplification and with such
repetition for the entire assemblage to hear;

    c.    issue any warning to disperse from stationary vantage points observable to the
crowd or to a large number of participants;

    d.    issue additional warnings given from police vehicles, equipped with public
address systems, moving about the crowd.

    e.    make an announcement citing the offenses or violations which were allegedly
being committed and issue a request or order that individuals disperse.

128. The MPD and other police *prevented* dispersal through the actual and threatened use of

force, and through unyielding police lines.

129. Captain MURPHY ordered U.S. Park Police forces "to enclose the demonstrators . . . in

30

Pershing Park with Metropolitan Police." MURPHY also ordered and advised U.S. Park Police forces to "keep the crowd inside Pershing Park. We're not going to allow them to come through the police line. We're working with [D.C.] Metropolitan [Police] on this."

130. At no time was there probable cause to arrest any of plaintiffs CANALES, DURHAM, FALK, GARCIA-SPITZ, JACKSON, LEGLER, LEGLER, NORTON, PASSACANTANDO, PHELAN, PRICHARD, RESS, SCOTT, WOHLBERG, WOOD, YOUNG or ZIMMERMAN.

131. The police used pop up police lines to unlawfully seize and detain hundreds of political activists and those who associated with them or were within physical proximity of their political assemblage. The police then executed a new phase of the police plan.

132. Riot police used their batons offensively and aggressively, yelling at protesters to "move in, move in!" and telling them "You cannot leave, move, move!" Police crammed the detainees into a smaller and smaller area, closing their perimeter with force and violence. This created an atmosphere of increasing fear, provocation and tension.

133. It appeared to some that the police were trying to provoke a violent reaction from those they were abusing.

134. Protesters responded by yelling at each other "Do what they say!" and "Cover your head!"

135. Police continued pushing protesters with violence and force. At points the perimeter was collapsing inward with such a fierce pace that different officers were ordering people to move in different directions.

136. All of the plaintiffs obeyed the police's unlawful orders.

137. The arrestees were tightly compacted in the Southwest corner of the Park.

138.  Small groups of MPD officers began a process of crossing the police line, grabbing an individual, dragging that individual to the outside of the police line, violently throwing him or her face down to the ground, using three of four officers to exert force upon the non-resisting arrestee, handcuffing him or her, and placing him or her on a bus.

139.  This happened to the first four or five people in a row, until the most violent officers were restrained by other officers and told to calm down.

## CLASS ACTION ALLEGATIONS
### (proposed class to encompass those falsely arrested in Pershing Park)

140.  The proposed class is: All persons who were arrested on September 27, 2002 as part of the mass arrests of persons that took place in Pershing Park.

141.  The proposed class and their claims, satisfy the requirements of Rules 23(a) and (b)(3).

142.  The class of persons subject to the mass arrest in Pershing Park on September 27, 2002, which is composed of more than 400 persons, is too numerous for joinder.

143.  These individuals' claims that their First, Fourth and Fourteenth Amendment rights and their common law rights against false arrest and false imprisonment were violated raise common questions of law and fact.

144.  By arresting virtually all of the participants in, and onlookers at, a peaceful political assemblage without probable cause or lawful justification, defendants acted on grounds generally applicable to the class.

145.  According to Peter Lavalee, the D.C. Corporation Counsel's communication director as quoted in the *Washington City Paper*, "We no-papered everything in Pershing Park. We did not feel in the cases that came from Pershing Park – that the witness statements and

the evidence that we had [presented] probable cause that a crime was committed and/or that a specific individual committed a crime."[1]

146.   The claims of the named plaintiffs are typical of the claims of this class, as they were lawfully present in Pershing Park when they were arrested without basis on April 15 as part of the same police sweep.

147.   The named plaintiffs will fairly and adequately represent the interests of the members of this class.

## FACTS COMMON TO THE PROCESSING OF ALL PLAINTIFFS

148.   The plastic handcuffs placed on many individuals were excessively tight.  All plaintiffs experienced pain, and many experienced swelling and numbness from the handcuffs.

149.   Arrested individuals were held on busses for many hours, with their hands handcuffed behind their backs.

150.   Sequential busloads of arrested individuals were eventually taken off the bus and brought into the gymnasium of the Institute for Police Science at Blue Plains.  They were then shackled and hog-tied with their right wrists handcuffed to their left ankles.  Some were left in this position for many hours.

151.   Inside the gymnasium, law enforcement officials photographed the individuals arrested. Photographs were taken of some arrestees that were in addition to their "mug shots." Some demonstrators with political statements on their clothing were singled out and

---

[1] Jason Cherkis, "Boss Hogtie: Police Chief Charles Ramsey had a plan for the more than 400 people in Pershing Park last September: Arrest them all, detain them for hours, and then tie them wrist to ankle for 12 hours. He says he'll do it again," *The Washington City Paper*, January 17-23, 2003 at 20, 23.

photographed with greater scrutiny.

152.   The Department of Justice and the Federal Bureau of Investigation, whose agents

sometimes displayed FBI identification, participated in this mass collection of data. This

data has been recorded and collected in databases, record-keeping or other information

systems and, on information and belief, has also been disseminated or made available to

unknown agencies and entities.

153.   The MPD maintains a policy, practice or custom of treating persons arrested in

connection with mass political arrests differently than others who have been arrested for

similar minor offenses.

154.   The MPD maintains a policy, practice and custom of preventive detention for targeted

persons or groups engaged in political activity. By way of example, documents secured

through subpoena in International Action Center, et al. v. U.S.A., et al. include

production notes for an MPD training video related to mass demonstrations, in which the

section on "Police Tactics and Issues" includes "Tactics - Locking up the troublemakers

on the first night."

155.   The MPD maintains a policy, practice and custom of holding targeted political arrestees

who have been (falsely) charged only with minor offenses for extended periods of time, in

order to take them off of the streets and prevent them from engaging in further political

dissent on subsequent days of demonstration, and to induce fatigue through sleep

deprivation. By way of example, documents secured through subpoena in International

Action Center, et al. v. United States of America, et al. include production notes for an

MPD training video related to mass demonstrations, in which the section on "Police

34

Tactics and Issues" includes "Tactics - Sleep deprivation tactics."

156.    The MPD ordinarily allows qualified persons to "post and trial" - -  which means that the

arrestee can post collateral in order to secure prompt release and can return for a future

trial date on which the arrestee may challenge the legality of her arrest.

157.    However, similarly situated persons as part of a mass political arrests or roundups are

refused this option, to "post and trial." Instead, it is the policy, practice and/or custom of

the MPD that targeted political arrestees are offered only the option to "post and *forfeit*"

collateral. Police advise targeted political arrestees that, should they opt to challenge the

legality of their arrest, they will <u>not</u> be released for an extended period of days. The

period of threatened additional confinement and jail ranges arbitrarily from between two

days to a week or more.

158.    Plaintiffs were confined by defendants into the middle of the night or until the following

day, for approximate periods of time ranging from no less than 14 hours to over 30 hours.

### Unconstitutional Policies of the MPD

159.    The MPD, and those federal agencies which act jointly with the MPD and its "Civil

Disturbance Units," maintain the policy, practice and/or custom of abusing their state

authority to disturb and disrupt targeted civil political assembly and mass demonstrations.

160.    The CDUs also accomplish their disruption strategy through their established practice and

policy of preventive detention of political activists, in which the CDUs will trap, seize

and arrest groups of protesters by closing off all avenues of exit with riot gear clad police.

161.    The MPD and its CDUs maintain the policy, practice and/or custom of deploying police

lines where circumstances do not justify such deployment and for the purpose of

35

disrupting First Amendment protected assembly, speech and petition activities.

162.   These riot squads use force and the threat of force to enforce this preventive detention, in which they arrest and hold detainees for a significant period of time. Absent intervening circumstances, the detainees will be placed on mass arrest busses and held for significant periods of time, typically overnight.

163.   Preventive detention signifies that individuals are being arrested not for engaging in illegal activity but for engaging in political activity, and constitutes a severe violation of First and Fourth Amendment rights when applied against political demonstrators.

164.   The use of disruption and disturbance tactics by the MPD is an established custom, policy and practice of the MPD, as evidenced by the repeated use, the approval of, and the acquiescence in the use of such tactics by policy making officials of the District of Columbia.

165.   DC policy maker Mayor Anthony Williams has stated his approval of the MPD's tactics, referring to arrest tactics of the MPD, as executed on April 15, 2000 (and repeated on Inauguration Day 2001 and on September 27, 2002) as "preventative" and "proactive." Preventive detention and false arrest, whether referred to as "preventative arrest" or "proactive arrest," when applied to a targeted group of persons seeking to exercise constitutionally protected rights, in the absence of probable cause, is unconstitutional.

166.   MPD policy makers approve of these tactics, which they have used repeatedly, and which are the subject of pending litigation related to their use on Inauguration Day (*International Action Center et al. v. United States et al.*, 01-CV-72) and on April 15, 2000 (*Fifty Years Is Enough et al. v. District of Columbia et al.*, 01-CV-811). In the

alternative, MPD policy makers have acquiesced to these unconstitutional tactics.

167. On September 27, 2002, the CDUs and other MPD officers were deployed for these unconstitutional purposes.

168. On September 27, 2002, the Department of the Interior deployed U.S. Park Police to act jointly with the MPD in carrying out this unconstitutional disruption strategy. Additional other individual officers and outside agencies which have yet to be identified also engaged in the same joint action.

169. The MPD maintains the policy, practice and/or custom of processing and treating disparately those persons arrested for minor offenses in connection with political mass arrests or round-ups. The disparate processing and treatment includes confinement for extended period of time including often overnight for alleged minor offenses, and the failure to offer political mass arrestees the post and trial option.

170. The above-referenced policies and customs, and also the failure to properly train its officers, constitute deliberate indifference on the part of policymakers of the District of Columbia to the constitutional rights of protesters in the Nation's Capital, as well as all those who would associate with such protesters or report on them as media.

171. The actions of the above-referenced defendants violated the following clearly established and well settled federal constitutional rights:

    a.    Freedom from the unreasonable seizure of one's person;

    b.    Freedom from government disruption of, interference with, or retaliation for, engagement in free speech, assembly, association, petition and free press activities.

172. The challenged actions and omissions constitute deliberate indifference on the part of the

District of Columbia, the federal defendants and other defendants to the constitutional rights of protesters in the Nation's Capital.

173.    As a direct and proximate result of the acts or omissions of the defendants identified in this complaint and the other unidentified agents and agencies acting jointly, each of the plaintiffs has suffered monetary and non-monetary harm including deprivation of constitutional rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution, loss of liberty, as well as physical harm, emotional pain and suffering.

**Ongoing Injury to Plaintiffs**

174.    Plaintiffs all suffer continued adverse and deterrent effects from the above-referenced conduct.

175.    Defendants' illegal conduct subjects protesters and observers and all those who associate with protesters to unconstitutional obstacles to the exercise of their rights. There is an intended, ongoing and continued deterrent effect caused by defendant's conduct, in that protesters and others must face the reasonable fear that merely by assembling and exercising their right to free speech (or to listen to speech), they will risk being subject to the unlawful tactics of the MPD and federal law enforcement, the risk of false imprisonment and false arrest and preventive detention, as well as the exposure to force and the threatened use of force by officers working with the mobile police lines.

176.    Plaintiffs intend to, in the future, engage in or associate with First Amendment protected activities in Washington, D.C. and seek injunctive relief to prevent future unconstitutional disruption.

# CLAIMS

## COUNT I
### False Arrests at Vermont Avenue
### (First Amendment; Fourth Amendment; False Imprisonment; Fourteenth Amendment)

177.   Paragraphs 1 - 176 are incorporated by reference as if set forth herein.

178.   Defendants' actions in deploying law enforcement units to disrupt First Amendment protected activity and subjecting plaintiffs BARHAM, McATEER, SALIGMAN AND SWANSON to false imprisonment and arrest violated the Fourth Amendment rights of those individuals seized, constituted false imprisonment and false arrest under District of Columbia law, and violated the First and Fourteenth Amendment rights of each of the aforementioned plaintiffs.

## COUNT II
### False Arrests at Pershing Park
### (First Amendment; Fourth Amendment; False Imprisonment; Fourteenth Amendment)
### (Individual and class claims)

179.   Paragraphs 1 - 176 are incorporated by reference as if set forth herein.

180.   Defendants' actions in deploying law enforcement units to disrupt First Amendment protected activity and subjecting plaintiffs CANALES, DURHAM, FALK, JACKSON, GARCIA-SPITZ, CASEY LEGLER, CHARLCIE LEGLER, NORTON, PASSACANTANDO, PHELAN, PRICHARD, RESS, SCOTT, WOHLBERG, WOOD, YOUNG and ZIMMERMAN and those SIMILARLY SITUATED IN THE PROPOSED CLASS to false imprisonment and arrest violated the Fourth Amendment rights of those individuals seized, constituted false imprisonment and false arrest under District of Columbia law, and violated the First and Fourteenth Amendment rights of each of the

39

aforementioned plaintiffs and class members.

## COUNT III
## (Equal Protection Clause; Due Process Clause; First Amendment; Fourth Amendment)

181.   Paragraphs 1 - 176 are incorporated by reference as if set forth herein.

182.   Defendants' actions in processing and treating differently those adult persons, including all adult plaintiffs, who are arrested for minor offenses in connection with mass political arrests violate the Equal Protection Clause, the Due Process Clause, and the First, Fourth and Fourteenth Amendment rights of those so deprived.

## COUNT IV
## (conversion; trespass to chattel)

183.   Paragraphs 1 - 176 are incorporated by reference as if set forth herein.

184.   Upon arresting plaintiff McATEER, defendant District of Columbia seized plaintiff's video camera and related items and never returned the video camera and related items and converted them to its own use.

185.   Upon arresting plaintiff SCOTT, defendant District of Columbia destroyed plaintiff's backpack by cutting through the arm straps, thereby converting it to its own use.

186.   Plaintiffs CHARLCIE LEGLER and GARCIA-SPITZ had lawfully locked their bicycles outside of Pershing Park prior to entering and their subsequent arrest.  Defendant District of Columbia destroyed their bicycle locks and damaged their bicycles in the subsequent seizure of their bicycles, converting the bicycle locks to its own use and committing a trespass to the bicycles.

## Count V
## (negligence and negligent supervision)

40

187. Paragraphs 1 - 176 are incorporated by reference as if set forth herein.

188. The as-yet-unidentified individual officers and supervisors involved in these unlawful arrests had the duty to exercise reasonable care in the conduct towards plaintiffs.

189. The individual supervisors, including Chief Ramsey and his downward chain-of-command had the duty to exercise appropriate command authority in their supervision of their subordinates.

190. Individual officers and supervisors were both negligent in the exercise of these duties of care owed to plaintiffs.

191. As a direct and proximate cause of these defendants' negligence, plaintiffs suffered the harms complained of herein.

**Count VI**
**(deliberate indifference to constitutional rights by supervisors, actionable under 42 U.S.C. §1983)**

192. Paragraphs 1 - 176 are incorporated by reference as if set forth herein.

193. The individual supervisors, including Chief Ramsey and his downward chain-of-command had the duty to exercise appropriate command authority in their supervision of their subordinates. They failed to exercise appropriate command authority relating to the officers who engaged in the unconstitutional deprivations complained of herein.

194. The individual supervisors, including Chief Ramsey and his downward chain-of-command had the duty to intervene to prevent or halt unlawful and/or unconstitutional police conduct related to the Inaugural Parade. They failed to intervene to prevent the unlawful and unconstitutional deprivations complained of herein.

41

195.    Additionally, and in the alternative, the individual supervisors, including Chief Ramsey

and his downward chain-of-command directed, encouraged and/or participated in the

unlawful and unconstitutional conduct complained of herein.

196.    These actions and omissions constituted gross negligence and deliberate indifference to

the constitutional rights of the plaintiffs.

197.    As a direct and proximate result of the said acts or omissions of the individual

supervisors, the plaintiffs have suffered monetary and non-monetary harm including the

deprivation of constitutional rights under the First, Fourth and Fourteenth Amendments to

the U.S. Constitution, physical and emotional pain and suffering, as well as injuries

described elsewhere in the complaint.

### Count VII - Claims Against Defendant MURPHY
### (claims arising under the U.S. Constitution, applicable as <u>Bivens</u> claims and in the alternate under 42 U.S.C. §1983)

198.    Defendant MURPHY is expressly excluded from claims arising in connection with

existing Counts I through VI. The only claims asserted against MURPHY are those set

forth in Claim VII herein.

199.    The allegations set forth in paragraphs 1 through 176 are incorporated by reference as if

set forth herein.

200.    MURPHY became involved in these arrests at the request of the Metropolitan Police

Department.

201.    MURPHY's actions in deploying U.S. Park Police to disrupt and subject plaintiffs

CANALES, DURHAM, FALK, JACKSON, GARCIA-SPITZ, CASEY LEGLER,

CHARLCIE LEGLER, NORTON, PASSACANTANDO, PHELAN, PRICHARD, RESS,

SCOTT, WOHLBERG, WOOD, YOUNG AND ZIMMERMAN, and those SIMILARLY SITUATED IN THE CLASS, to false arrest violated the First and Fourth Amendment rights of those individuals seized.

202.   At no time did MURPHY even make an assessment as to whether probable cause existed to arrest the hundreds of class members in Pershing Park. MURPHY has testified that "[i]t was not my position to identify probable cause."

203.   MURPHY knew that arrests for demonstrating without a permit violated protocol in the absence of notice, opportunity to disperse and refusal to disperse. He turned a blind eye to the unconstitutional and unlawful nature of the conduct in which he participated, and in which he ordered others to engage.

204.   MURPHY had no knowledge from which to objectively and reasonably believe that the hundreds of people inside Pershing Park had failed to obey an order. MURPHY did not know even what specific order the class members ostensibly disobeyed, and he did not make any inquiries either. He had no knowledge as to in whose presence such alleged offenses may have ostensibly been committed, and he made no inquiries to secure this information.

205.   MURPHY also knew that the composition of the group assembled or present inside the park was in flux, as he observed people coming and going into the park prior to the encirclement and arrest.

206.   It was objectively unreasonable for MURPHY to believe or claim that probable cause existed to arrest the plaintiff class.

207.   Yet, MURPHY's officers formed portions of a series of interconnected police lines that

43

surrounded Pershing Park, deprived the plaintiff class of the freedom to leave and effected their mass arrest.

208. MURPHY caused and participated in the unlawful and unconstitutional conduct complained of herein, specifically the false arrest of the Barham class and disruption of First Amendment protected activity.

209. Independently, and in the alternative, MURPHY's actions constituted deliberate indifference to the rights of the Barham class.

210. In the alternative, MURPHY conspired with and/or engaged in joint action with the District of Columbia, and with the encouragement of District officials who exercised the coercive power of the District of Columbia through MURPHY in the execution of the false arrests and constitutional violations.

211. MURPHY is sued for constitutional torts pursuant to Bivens and, in the alternate, pursuant to 42 U.S.C. § 1983 for acting in concert with District officials to deprive the individuals in the Barham class of their civil rights.

212. As a direct and proximate result of the acts or omissions of MURPHY, the Barham class and its representatives have suffered monetary and non-monetary harm including the deprivation of constitutional rights under the First and Fourth Amendments to the U.S. Constitution."

**PRAYER FOR RELIEF**

213. WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the following relief:

A. Entry of a declaratory judgment that the disruption and preventive arrest

44

tactics of the MPD and its Civil Disturbance Units and law enforcement

authorities constitute violations of the First and Fourth Amendments;

B.     Entry of a permanent injunction to enjoin and prohibit defendants from

executing the unlawful disruption and preventive arrest tactics as are

employed by the MPD and its Civil Disturbance Units and law

enforcement authorities in conjunction with federal law enforcement

including but not limited to the unconstitutional use of pop-up police lines

and the unconstitutional boxing-in tactic;

C.     Entry of a permanent injunction mandating that the MPD offer the "post

and trial" option to those persons arrested for minor offenses in connection

with mass political arrests as are offered to non-political arrestees, and

ordering the MPD to provide in writing to all mass protest arrestees a clear

and accurate statement of their rights to release, and ordering the MPD to

make periodic reports to plaintiffs and the Court documenting that this

injunction is being abided by;

D.     Entry of a permanent injunction barring the MPD from subjecting to a

more harsh and/or longer period of processing and confinement to those

persons arrested for minor offenses in conjunction with mass political

arrests, and ordering the MPD to maintain written documentation as to the

period of confinement before release of all mass protest arrestees, as

compared to all arrestees;

E.     Entry of a permanent injunction barring the MPD from threatening or

45

actually jailing for longer periods those persons arrested in connection

with mass political arrests who wish to challenge the legality of their arrest

by seeking a trial date (as distinguished from those who choose to forfeit

collateral);

F.      Entry of an order that all arrest records, including all photographs,

        fingerprints and other identification or descriptive information regarding

        plaintiffs be sealed; that disclosure be made in writing to plaintiffs and the

        Court as to all entities and agencies to which such material has been

        disseminated and by whom gathered; and that all records disseminated be

        collected and sealed, including all copies of such disseminated records that

        may have been subject to further dissemination by others;

G.      Entry of a permanent injunction barring the Department of Justice,

        including the Federal Bureau of Investigation, and other federal agencies

        from taking or accessing identification and other information compelled by

        political arrests by local law enforcement authorities;

H.      Compensatory damages against the District of Columbia and the unknown

        named police departments for violations of federal rights pursuant to 42

        U.S.C. § 1983, in an amount appropriate to the proof adduced at trial;

I.      Compensatory damages against the District of Columbia, for violations of

        common law rights, pursuant to *respondeat superior*, in an amount

        appropriate to the proof adduced at trial;

J.      Compensatory damages and punitive damages against Ramsey, Williams,

and the unknown named police officers sued in their individual capacities

for violations of federal rights, pursuant to 42 U.S.C. § 1983 (if they are

D.C. or state actors or in joint action with state or D.C. actors) or pursuant

to Bivens v. Six Unknown Named Agents of the Federal Bureau of

Narcotics (if they are federal agents or in joint action with federal agents)

in an amount appropriate to the proof adduced at trial;

K.      Compensatory damages and punitive damages against MURPHY for

violation of federal rights pursuant to Bivens v. Six Unnamed Agents of

the Federal Bureau of Narcotics and, in the alternative, pursuant to 42

U.S.C. § 1983, in an amount appropriate to the proof adduced at trial.

L.      Compensation by the responsible parties for the value of property that was

damaged or destroyed or converted;

M.      Compensation by the responsible parties for negligence and negligent

supervision;

N.      An award of plaintiffs' reasonable attorneys' fees, costs and expenses

pursuant to 42 U.S.C. § 1988, the Equal Access to Justice Act, and any

other applicable statute or rule of law; and

O.      Such other and further relief, including all appropriate equitable relief, as

to the Court may seem just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE**

47

Respectfully submitted,

_____
Carl Messineo (#450033)
Mara Verheyden-Hilliard (#430031)
PARTNERSHIP FOR CIVIL JUSTICE, INC.
NATIONAL LAWYERS GUILD
    MASS DEFENSE COMMITTEE
1901 Pennsylvania Avenue, NW
Suite 607
Washington, DC 20006
(202) 530-5630
(202) 530-5634 - facsimile

*Counsel for Plaintiffs*