**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Paul Bame,<br>Gregory Keltner, and<br>Ivan Welander.<br><br>Plaintiffs,<br>on behalf of themselves and all<br>other similarly situated | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| vs. | ) | Civil Action No. 1:05CV01833 (RMC)<br>No scheduled hearings. |
| John F. Clark, et al.<br><br>Defendants | )<br>)<br>) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

Plaintiffs Paul Bame, *et al.*, by undersigned counsel, hereby oppose and otherwise

respond to Defendants' motion to dismiss or, in the alternative for summary judgment [Docket

Number 30]. Plaintiffs show herein that, with one exception, none of defendants' points are well

taken and the motion should be denied.

The one exception is that plaintiffs hereby agree to dismissal of John F. Clark and Steve

Conboy as official capacity federal defendants herein and to the dismissal of Claims Three and

Four which pertain solely to them in the Amended Complaint [8].[1]

---

[1]The Amended Complaint containing the two dismissed claims, Claims Three and Four,
was filed October 28, 2005, which was two weeks before the D.C. Circuit issued its opinion in
*Settles v. U.S. Parole Commission*, 429 F.3d 1098 (D.C. Cir. 2005). This opinion denies 42
U.S.C.§1983 (§ 1983) liability against federal officials sued in their official capacity when acting
under color of D.C. law. The full scope of this holding is unclear, but it is unlikely that a §1983
official capacity claim for a single episode of strip searching a group on one day can be made out

1

## INTRODUCTION

Defendants' analysis of plaintiffs' claims in their motion is fact-starved, that is the motion's analysis of plaintiffs' claims is neither confined to the factual allegations of the First Amended Complaint as required by F.R.Civ.P. Rule 12(b)(6) nor supplies facts grounded in admissible evidence placed before the Court in exhibits attached to the motion, as required by F.R.Civ.P. Rule 56.  Instead, the motion proceeds to present arguments about the law applicable to this case that are not grounded in factual material actually before the Court.  These factual deficiencies are discussed below in connection with each of the arguments raised by defendants.  This aspect of the motion leaves the Court, in plaintiffs' respectful view, with no choice but to deny the motion as failing to comply with these two rules.  Also, in an effort to move the litigation forward, the plaintiffs submit contemporaneously with this opposition their motion to take discovery under F.R.Civ.P. Rule 56(f).

Although defendants' motion ignores much of  the factual context of plaintiffs' claims, this context is highly significant for proper legal analysis of defendants' motion.  Named plaintiffs and the other class members[2] were arrested during a demonstration involving hundreds of protesters, which was peaceful but which the MPD pictured as likely to present acts of violence, when in fact the protests resulted in essentially no reported incidents of violence. Ex. 12, pp. ii, iv, 54, and *passim* (Patterson Report).  They are challenging the very legality of their

---

against a federal official.  The decision, however, as discussed below, supports certain claims against a federal official pursuant to §1983 when sued in his individual capacity for actions taken under color of D.C. law.

[2]        Plaintiffs' motion for class certification [18] is pending resolution by the Court. Plaintiffs will refer to the class in this motion normally as if it had been certified.  Plaintiffs are aware, of course, that the certification has not been acted upon by the Court.

arrests in other litigation.  Exhibit 13: *Catherine Burgin, et al. v. D.C., et al.*, Civ. A. No. 03-02005(EGS) (D.D.C.).  *See also*, Ex. 12, p. 2.[3]  They were arrested in groups numbering hundreds of persons on charges involving very minor infractions, "incommoding" and "failure to obey", i.e. they were arrested for protesting, not even for traffic violations. Ex. 1 to motion for class certification[18] ("lock up lists"). They were not arrested for possession of drugs, weapons, involvement in prostitution, or any other crime which might form basis for a strip search. Id. No record have been presented by defendants to date of any form of contraband or weapon being found by police on any class member, or indeed, on any of the protesters.

Every class member, including Bame, was released after a matter of hours in custody. Bame affidavit, Ex. 6.  Plaintiffs Welander and Keltner were simply released by the police after their arrest records apparently were misplaced by the police, and they were not even required to appear in court to secure their arrest. Amended Complaint [8], para. 5-6, and Welander affidavit, Ex. 7.  The police simply let them go directly back on to the street from the holding cells. *Id.*

The named plaintiffs and class members never were held at, or passed through, the D.C. Jail or any other facility housing non-protester prisoners or detainees. Amended Complaint. Bame aff. Ex. 6.

They were never placed in confinement with more "normal" prisoners and detainees.  The police and detaining officials apparently had no plans to mix the named plaintiffs and class members with a more "normal" prison population.[4]

---

[3]Plaintiffs continue the numbering of their exhibits in support of this motion from the numbering started with their exhibits in support of their motion for class certification.

[4]Plaintiffs are requesting discovery on this issue in their accompanying motion.

There is reason to believe that the class and other protesters had been under intelligence surveillance for several days in advance of the arrests, providing the police with some opportunity to learn whether any member of the class would be armed or carrying contraband. Exhibit 12 (Patterson Report, p. vi).

In short, the arrests, the facts surrounding the arrests, and the conditions of detention, were completely bare of any reasonable bases recognized by case law, discussed below, for conducting a strip search on any class member, including any named plaintiff.  Yet the marshals took it upon themselves late in the detention process on September 28, 2002 to conduct strip searches on every class member, and thereby engaged in a violation of clearly established Fourth Amendment law.

## POINT I

### DEFENDANTS ENJOY NO QUALIFIED IMMUNITY DEFENSE TO PLAINTIFFS' CLAIMS.

Defendants contend that the plaintiffs' *Bivens* claim and §1983 claim are barred by qualified immunity because "[a]t the time of the alleged strip searches in this case, the law was not clearly established and remains unclear today, whether one refusing a lawful request to identify himself can be presumed to be hiding something about himself, and whether that reasonably could be interpreted as a penchant to hide weapons, drugs or any form of contraband." P. 22. (numbers listed following a statement of defendants' argument refer to the page numbers in defendants' brief in support of their motion to dismiss[30]).   Defendants rest their contention on two main factual predicates.  First, "Bame et al failed to identify themselves to law

enforcement authorities by giving true names and were identified only as John Does".[5] This point is conceded by named plaintiffs, although the factual record is unclear at this stage of the proceedings as to whether all class members failed to identify themselves by name to police. Moreover, Bame did provide his name in connection with his court arraignment. Ex. 6, ¶ 6.

Second, the defendants claim that "the protest was intended to shut down the city".[6] This point is not conceded by plaintiffs. Defendants cite to a single website that makes reference to this phrase, without making a showing that any class member was aware of this website, or agreed with its contents, or even that the website was prepared by participants in the protests. Defendants have fallen well short of making a showing that these plaintiffs and the plaintiff class had any plan or intent to "shut down the city". Defendants' allegation here continues a practice noted by the D.C. Council Patterson Report on the protests, of the MPD and other police officials making the protests out to be violence prone, when they were in fact not. Patterson Report, Ex. 12. As noted, plaintiffs submit contemporaneously with this Opposition a motion to conduct discovery pursuant to F.R. Civ. P. Rule 56(f) to determine, *inter alia*, defendants' evidence with regard to their understanding as to whether the named plaintiffs and plaintiff class had any intent to "shut down the city", and whether and to what extent this information entered into the deputy marshals' decisions to conduct the strip searches. More significantly, the street protests had ended by Friday night, September 27, 2002, well before the deputy marshals conducted the strip searches in question. Thus, whatever fears the deputies may have imagined about these

---

[5]     Defendants' Statement of Material Facts as to Which There is No Factual Dispute, Material Fact #3.

[6]     Defendants' Statement of Material Facts as to Which There is No Factual Dispute, Material Fact #4.

protestors being violent should have been attenuated by the fact that the protest had ended peacefully several hours before the searches were actually conducted.

The parties are not in dispute as to the standard law underlying what makes for a qualified immunity defense, namely that the relevant law must have been sufficiently clearly established prior to the action taken by the officials so as to put the allegedly offending officials on notice that what they were doing violated applicable law.

In fact, the law governing the power of the deputy marshals to conduct the searches at issue here was clearly established well before September, 2002, especially in the District of Columbia, and in a manner clearly binding on the deputy marshals themselves. Furthermore, plaintiffs show that whether or not the arrestees in this case identified themselves by name to the MPD or the deputy marshals who searched them provides no basis to support defendants' efforts to make out a qualified immunity defense.


*Clearly established law in the District of Columbia was sufficient to place every officer on notice that he was violating Fourth Amendment rights in conducting the 2002 searches.*

The seminal case on the conduct of strip searches is the Supreme Court's decision in *Bell v Wolfish,* 441 U.S. 520 (1979). *Bell* considered several aspects of the conditions in a New York City detention facility holding hundreds of persons, both convicted prisoners and pretrial detainees, including whether and when such persons might be subjected to strip searches in order to maintain security within that facility. *Bell* is read to require a balancing of a number of factors as to when a search conforms to Fourth Amendment standards. The *Bell* factors are: "...the scope of the particular intrusion, the manner in which it is conducted, the justification for

initiating it, and the place in which it is conducted." 441 U.S. at 559.

Based on analysis of these four factors, nine of the twelve federal circuits[7] had held, well prior to the event date of September 28, 2002, that it is a violation of the Fourth Amendment to strip search persons arrested for non-violent, non-drug related offenses while in detention awaiting arraignment, without the officers having reasonable, individualized suspicions for each arrestee that the particular arrestee might be concealing weapons or contraband. Such suspicions might arise, even for an arrestee detained for a minor, non-drug related, non-violent offense, from other officers finding contraband elsewhere at the scene of the arrest, or if the detainee had been housed during detention with detainees or prisoners held for more serious crimes. Neither situation applies to the plaintiff class here.

The consensus is found in these cases: *Roberts v. Rhode Island*, 239 F.3d 107, 112 (1st Cir. 2001)(strip search of arrestee for minor offense held unconstitutional); *Weber v Dell*, 804 F.2d 796, 803 (2d Cir.1986)("Fourth Amendment precludes prison officials from performing strip searches of arrestees charged with misdemeanors or other minor offenses absent reasonable suspicion that the arrestee is concealing weapons or other contraband."); *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981) (strip search of a woman charged with driving while intoxicated was unconstitutional); *Stewart v. County of Lubbock*, 767 F.2d 153 (5th Cir. 1985)(holding strip search policy unconstitutional as applied to misdemeanants awaiting bond absent reasonable suspicion); *Masters v. Crouch*, 872 F.2d 1248 (6th Cir. 1989)(police may not strip search individuals arrested for non-violent minor offenses when there is no reasonable basis for believing that the arrestee is carrying weapons or contraband); *Mary Beth G. v. City of Chicago*,

---

[7] Excluding the Federal Circuit.

723 F.2d 1263, 1272 (7th Cir. 1983)(striking down Chicago's strip search policy as applied to

misdemeanors); *Jones v. Edwards*, 770 F.2d 739, 741 (8th Cir. 1985) (body cavity search of

individual charged with misdemeanor ruled unconstitutional); *Giles v. Ackerman*, 746 F.2d 614,

617 (9th Cir. 1984)(strip search of individual arrested for minor traffic offense held

unconstitutional absent reasonable suspicion that arrestee carrying or concealing contraband);

*Hill v. Bogans*, 735 F.2d 391 (10th Cir. 1984) (strip search of individual with expired car tags

unconstitutional where no circumstances indicated he might have been concealing contraband or

weapons); *Wilson v. Jones*, 251 F.3d 1340 (11th Cir. 2001)(strip search of woman arrested for

drunk driving unconstitutional).[8]

   The United States Court of Appeals for the Third Circuit had not addressed the issue prior

to 2002, but several lower courts in that circuit had done so, with similar results.  *See, e.g.,*

*DiLoretto v. Borough of Oaklyn*, 1990 U.S. Dist. LEXIS 11040 (*citing, O'Brien v. Borough of*

*Woodbury*, 679 F. Supp. 429 (D.N.J. 1988)); *Newkirk v. Sheers*, 834 F. Supp. 772, 787-89 (E.D.

Pa. 1993) (strip searches of minor females arrested for criminal trespass at animal rights protest

were unconstitutional).

   The United States Court of Appeals for the District of Columbia Circuit has not reached

this issue, perhaps because it has not had to in light of the strength of the law from elsewhere and

as found in court decisions below.  Instead, the U.S. District Court for D.C. has issued rulings

that such searches of this category of persons are prohibited.  Indeed, this Court held that

searches of nine women arrested in D.C. for protesting fur coat sales at a Nieman Marcus store

---

[8]These cases are cited and relied upon in *Helton v. D.C.*, 191 F.Supp. 2d 179, 185
(D.D.C. 2002) and the summaries of the cases are drawn from that decision.

violated the standard set forth in the circuit court opinions cited above in a ruling issued against the U.S. Marshals themselves in April, 2002. *Helton v. D.C.*, 191 F.Supp.2d 179 (D.D.C. 2002).[9]

Moreover, the U.S. Marshals Service in the District of Columbia, together with the MPD, has been operating as of September, 2002 under the full force of a court-ordered consent degree, entered by this Court in 1982, forbidding the strip searches of females in Superior Court detention following non-violent, non-drug related offenses, absent reasonable individualized suspicion for doing so. *Morgan v. Barry,* unreported, copy attached as Plaintiffs' Exhibit 6; later related decision reported at 596 F. Supp. 897 (D.D.C. 1984).

Thus, with this consensus of decisions from nearly every federal Circuit, together with the *Morgan* consent decree binding on the U.S. Marshals Service, and the recent ruling against them in *Helton*, every deputy marshal, MPD officer, and jail official was on clear notice in September, 2002 of the rule against a strip search of plaintiff class members without having some reasonable basis for a suspicion that each individual was harboring on their person weapons or some form of contraband. Indeed, the defendants do not dispute this consensus, and do not attempt to ground a qualified immunity defense in their motion on the existence of such reasonable suspicions about weapons and contraband. Defendants produce no reports concerning the conduct of this series of searches to show the existence of such suspicions.[10]

---

[9] "There is a significant body of case law holding that police or prison officials may not strip search an individual arrested for misdemeanors or other minor offenses unless there is reasonable suspicion that the individual is concealing contraband or weapons. Most federal courts of appeals have ruled -- some dating back over two decades -- that strip searches of individuals arrested for minor offenses violate the Fourth Amendment unless the individual is reasonably suspected of concealing weapons, drugs, or other contraband." 191 F.Supp.2d at 184.

[10] Plaintiffs are requesting such reports, if they exist, in their motion for discovery.

Instead, the defendants contend that the plaintiffs' failure to give their names was a reasonable enough basis for suspicion in itself, because the deputy marshals' lack of knowledge of the names meant they might be handling detainees with dangerous criminal backgrounds. P. 21. Then, defendants contend that because the courts have not considered this issue, they are entitled to qualified immunity on this point. Pp. 22. These contentions do not survive thoughtful analysis.

*Arrestee failure to give names here does not support a qualified immunity defense.*

The Court may note, first, that defendants have not provided in their motion the necessary factual predicates to serve as bases for delving into an analysis of this issue.  For example, defendants have not come forward in their motion with affidavits from the marshals conducting the searches to show that they made a decision to conduct the searches based on the lack of the detainees' names.  Instead the motion simply assumes that this might be the case, leaving before the Court an unclear record as to whether the factor of lack of names is ripe for consideration by the Court, or if it perhaps be merely hypothetical.

If the deputies conducting the searches actually had no reasonable suspicions that class members were harboring weapons or contraband then the qualified immunity defense does not exist in this particular case.  Alternatively, if the deputies in fact had suspicions about the presence of weapons and contraband based on the lack of names, they still were required by the state of the case law to weigh that one factor (the lack of names) against the other factors surrounding the arrests and detentions of these particular class members in order to make individualized determinations that there was a sufficient likelihood that the detainees were

harboring weapons or contraband upon which to ground what are concededly enormously intrusive strip searches.[11]    Yet, defendants' motion adduces no evidence about this point as required by the then extant case law and instead leap ahead to argue that lack of names might have meant to the deputies that these arrestees might have been dangerous persons and therefore might be harboring weapons and contraband.  Such speculation is premature until the Court has a record before it upon which to ground its analysis of this defense.

As stated, the defendants ask the Court simply to assume a series of material facts not in evidence.  Defendants point for evidence to the "lock-up lists" which list many of the detainees as "John Does".  The bare existence of this list proves little as to what "reasonable, individualized determination" was actually used by the deputy marshals on the scene to justify undertaking the searches.  Such speculation is premature until the Court has a record before it upon which to ground its analysis of this defense: the search must have been reasonable at the time, regardless of any post-hoc rationalization.

Also, as stated, the core of the defendants' point seems to be that the class members might have been dangerous persons or security risks and that their danger could have been determined on the spot, if only the class members had provided their names.  This makes no sense since defendants make no showing in their motion that the deputies had access to some list of names or a database of persons who were considered dangerous or involved with drugs, and some means to compare the names of the arrestees with the names on the "dangerous" list.

---

[11]    *Cf. Bell, supra, 441 U.S. 520; Washington v U.S.*, 594 A.2d 1050, 1052 (D.C. 1991)(commenting on the extremely intrusive nature of strip searches); *Mary Beth G. v. City of Chicago,* "visual strip searches are...demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *723 F.2d, supra, at 1272.*

Moreover, it appears that class members who did provide their names were perhaps also strip searched.  Again, plaintiffs' motion to obtain discovery requests this information.

As stated above, plaintiffs submit with this Opposition a motion to conduct discovery pursuant to F.R. Civ. P. Rule 56(f) to determine, *inter alia*, the identities of the deputy marshals who made the determination to conduct the searches, and the factors, if any, which entered into making those determinations. Without this evidence, the Court will have before it no factual bases for determining the validity of the searches.

The implication of defendants' argument is that, if a class member's name somehow revealed that he was a dangerous person, he would then be strip searched. If not, he would not be searched.  However, again, defendants' motion fails to make any showing that this factual analysis of the potential risks posed by the lack of a detainee's name entered into the consideration of the deputy marshal's individualized, reasonable determination of whether or not to conduct a search.

The defendants' concerns about the risks posed by the class members are minimal. If the deputy marshals in any sense genuinely believed these detainees to be risks to the court or the detention facility, why did the Superior Court immediately release all of them?  If the class members might have posed such a risk, as defendants now argue, why did the deputy marshals not ask at the time that they be detained until their criminal backgrounds had been determined based on fingerprints and photographs taken earlier in the processing?  The simplest reading of the situation on September 28, 2002 is that there was in fact no connection between the potential results of a strip search, and any reduction in risk to anyone, nor any more likelihood that one of the class members was harboring contraband as a result of not giving their names.  Reasonable,

rational consideration of the circumstances surrounding the events of the detention of the class, as required by *Bell*, reveals no justification for initiating a search on this basis.

The existing case law plainly required the deputy marshals to undertake a balancing of factors in weighing whether or not they had reasonable bases for suspicions upon which to base a strip search or not. No evidence is adduced by defendants in their motion that this balancing was undertaken nor that these other strong factors weighing against conducting such intrusive searches were ever considered by the deputies. Instead, the deputies apparently simply conducted a blanket search of all the class members, leaving open the question of whether they had other reasons besides a reasonable suspicion about the possible presence of contraband to inflict the searches.

Defendants try to make much out of a D.C. statute making it a minor crime for a pedestrian to fail to give their names to an arresting officer in connection with commission of a traffic infraction, citing D.C. Code § 50-2303.07, a provision of the traffic laws of D.C. Pp. 14. They contend that plaintiffs were breaking "the law" by failing to provide their names to the marshals.

In fact, defendants fail to point to any law that requires this particular class of plaintiffs to reveal their names to the marshals. The defendants cite to the D.C. statute which requires pedestrians stopped on the street to state their names during an arrest itself for a traffic violation, so that the arresting officer can properly fill out the traffic citation with the person's name. Thus, defendants bring forth no facts showing that any class member was arrested for a traffic infraction. Indeed, the lock up lists show that the men were arrested for "failing to obey", which has no clear reference in the penal code, and "incommoding", which usually refers to a form of

13

protest that disrupts public access under 18 U.S.C. §231.[12]  Neither of these phrases used on the

lock up lists refer to pedestrian traffic violations.  There is no reasonable connection between the

need of an officer correctly to fill out a traffic citation and the blanket strip searches conducted by

defendants.

In addition, defendants adduce no evidence that any of the marshals was in the position of

having been an arresting officer for these class members during the course of an occurrence of a

traffic infraction, as required by D.C. Code § 50-2303.07.  Finally, nothing in the traffic statute at

issue permits the arresting officer to strip search the offending pedestrian upon his failure to

provide his name to the arresting officer.  Defendants are simply grasping at straws to support

their qualified immunity argument by making reference to the provision of the D.C. traffic

ordinances requiring a pedestrian to provide his name on the spot of the arrest to the arresting

officer.

Finally, the defendants' motion and their opposition to plaintiffs' motion for class

certification apparently reveals that the deputies conducting the searches of the plaintiff class

members prepared no reports on the results of the searches of the plaintiff class members.  The

lack of any reports is significant, since the marshals' standard practice is to prepare a report

whenever a search was conducted and contraband was found.  Presumably if any contraband had

been found as a result of the searches, the defendants would have produced these reports and

filed them with the Court to show that contraband was in fact present on the persons of the class

members.

_____

[12] *Odum v D.C.*, 565 A.2d 302 (DC 1989)(held that "incommoding" was not a traffic violation.

14

The lack of any such reports supports the conclusion that these were blanket searches of a group of persons, and precisely not searches based on reasonable, individualized suspicion about each of the arrestees in the class, and thus were in violation of the clearly established law discussed above.

The law was crystal clear well before September, 2002 that this class of arrestees could not lawfully be strip searched by the deputies in the situation presented.  No ambiguity in that law is introduced by defendants' evidence-starved position based on arrestees' refusal to give their names.   The defendants' qualified immunity defenses collapses under such thoughtful scrutiny.  The Court may consider either promptly rejecting the qualified immunity defense as unfounded in law, or make a determination at a later time, when and if the defendants ever come forward with evidence showing that the imagined qualified immunity defense has some basis in the facts of this case and is not simply a hypothetical defense dreamed up after the fact. [13]

## POINT II

## THREE YEAR STATUTE OF LIMITATIONS APPLIES TO THE *BIVENS* CLAIMS

---

[13]Defendants contend that persons processed through a Superior Court cell block historically have at times been found to have concealed contraband. Pp. 22.  However, defendants make no showing that the plaintiff class members were at any time mixed in with regular arrestees, and Bame's affidavit makes no mention of being in a cell block with anyone other than fellow protestors.  Ex. 6.  Moreover, as noted in plaintiffs reply brief in support of their motion for class certification, only a tiny fraction of persons processed through the cell block have historically  been found to be concealing contraband. This historical data for other periods hardly give rise to the kind of individualized suspicion required by the law. On defendants' theory, every person coming through the cell block should be strip searched on the basis of a history of occasional searches turning up contraband.  Defendants thus effectively argue for blanket, rather than individualized strip searches.  This position has been long ago rejected by unanimous circuit court decisions.

Defendants contend that the *Bivens* claims herein are governed by a one year statute of limitations (p. 12), and that, since this lawsuit was filed just short of three years after the claims arose, the claims are time barred. Defendants cite *Doe v U.S. Dept of Justice*, 753 F.2d 1092 (D.C. Cir.1985) for its holding that a one year statute of limitation ("SOL") should be applied to a *Bivens* claim. However, in that case the claim was based upon deprivation of a liberty interest without Due Process, which the court held was similar to a D.C. claim for "defamation", which falls under D.C. Code 12-301(4).

Defendants' position is not well founded in existing case law. *Bivens* claims are not a form of claim grounded in statute, but solely in case law. The District of Columbia Circuit stated in *Banks v C&P Telephone Co.*, 802 F.2d 1416, 1429 (D.C. Cir. 1986) that its prior decision in *Hobson v Wilson*, 737 F.2d 1 (D.C. Cir. 1984) had held that the applicable SOL both for most *Bivens* actions and for all 42 U.S.C. §1983 claims would be the same as for personal injury under D.C. law, namely three years, under D.C. Code 12-301(3), unless the nature of the *Bivens* claim is closely analogous to a claim specified elsewhere in the D.C. SOL.[14] The *Doe v USDOJ* decision applies this reasoning, i.e., that the *Bivens* claim in that case was closely analogous to a defamation claim, which has a one year SOL under D.C. law, and, thus is not in conflict with *Banks* or with a finding of a three year SOL in the instant case. Thus, the plaintiffs' claims raised herein are not time barred.

Other cases support this analysis and conclusion, as follows.

First, the Department of Justice itself recently took the position that a *Bivens* claim for

---

[14]    *Cf. Minor v CSX Transportation*, 626 A.2d 908 (DC 1993) (SOL for a personal injury claim under D.C. law is three years.

search unlawful under the Fourth Amendment was governed by a three year SOL. *Weaver v*

*Bratt*, Civil Action No. 00-01099(RCL), unreported,(D.D.C.March 16, 2006)(claim that DOJ

violated Fourth Amendment in searching plaintiff's offices).

Second, the Supreme Court has ruled that claims under 42 U.S.C. §1983 are governed by

the state SOL governing personal injuries. *Wilson v Garcia*,  471 U.S. 261 (1985).  In turn, at

least six federal circuits, in addition to the D.C. Circuit, have held that *Bivens* claims are

governed by the same SOL as govern 42 U.S.C. §1983 claims.  *Kurinsky v. United States*, 33

F.3d 594, 599 (6th Cir. 1994);  *Bieneman v. City of Chicago*, 864 F.2d 463, 469-70 (7th Cir.

1988); *Sanchez v. United States*, 49 F.3d 1329 (8th Cir. 1995)(*Bivens* has same SOL as §1983

actions); *Van Strum v. Lawn*, 940 F.2d 406, 410 (9th Cir. 1991); *Industrial Constructors Corp. v.*

*United States Bureau of Reclamation*, 15 F.3d 963, 968-69 (10th Cir. 1994); *Kelly v Serna*, 87

F.3d 1235(11th Cir 1996).

Thus since the D.C. Circuit has already held that §1983 claims are governed by the D.C.

three year statute of limitations, that limitation should apply to this case.

From a policy perspective, a three year limitation is more appropriate for an unlawful

search and seizure form of *Bivens* claim, because of the time that may be required for the plaintiff

to gather information and analyze a complex search claim, rather than a claim based on an

intentional tort, such as an assault. *See, e.g.  Hobson v. Brennan*, 625 F.Supp. 459, 467 (D.D.C.

1985).

In conclusion, plaintiffs' claims herein are governed by the D.C. three year statute of

limitations.

**POINT III**

**PLAINTIFFS HAVE STANDING TO REPRESENT THE WHOLE CLASS**

Defendants contend that the named plaintiffs do not have standing to represent the entire

class, since the named plaintiffs did not provide their names at a certain point in their processing,

while other class members did give their names, and, thus, according to defendants, the two

groups are not similarly situated.  P. 14.

In response, plaintiffs submit that this is a distinction without a difference, as discussed

above in Point I herein.  Defendants have failed to show any requirement that any plaintiff class

member provide his name to the deputy marshals, since the traffic laws do not apply to the

plaintiff class.  Moreover, the deputy marshals' lack of knowledge of a class member's name

made no difference with respect to forming a lawful basis for conducting a strip search.  Hence,

the claims of the named plaintiffs are closely similar, or even identical, to the claims of the class

members who did not provide their names for the lock up lists.

Defendants, somewhat confusingly, seem to mix the law on standing in with class action

law on whether a named plaintiff has claims are typical of the whole class and that are common

to the whole of a class.  Plaintiffs have already responded to defendants' contentions with regard

to typicality and commonality in the briefing submitted in support of the motion for class

certification herein, now pending before the Court.  Plaintiffs' responses need not be reiterated

here.

Even if there were a legal requirement that plaintiffs' reveal their names to the MPD

officers, or whoever asked for their names, named plaintiffs' still have standing, as such, to

represent the claims of all the class members.  The named plaintiffs, like all the members of the

18

class have standing as defined in *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 180-81 (2000), i.e., each person suffered injury as a result of the strip searches, the injury is fairly traceable to the actions of the defendants, and the injury can be redressed by relief directed against the defendants.  If some class members were to be free of the failure-to-name defense raised by these defendants, that might affect the Court's analysis of typicality and commonality elements in its decision on whether to certify the class, but standing as such is still present.

### POINT IV

### DILLARD AND DEPUTY MARSHALS ARE LIABLE UNDER §1983

Defendants contend that 42 U.S.C. §1983  ("1983") may not serve as a basis for claims under color of federal law against federal agencies and federal officials sued in their official capacities.  Plaintiffs have no quarrel with this doctrine.  "Every schoolboy knows" this fundamental point.  Plaintiffs in this action are proceeding against the marshals because they were acting at all relevant times under color of D.C. law.

Defendants' motion fails to acknowledge the frequency with which courts have permitted §1983 claims to proceed against U.S. deputy marshals acting under color of state law, or in concert with state or local officials acting under color of state law.  *Estate of Brooks v. U.S.,* 197 F.3d 1245 (9th Cir. 1999)(§1983 claim allowed against deputy marshal); *Wilson v. Blankenship*, 163 F.3d 1284 (11th Cir. 1998)(§1983 action against U.S. marshals barred on ground of qualified immunity); *Cunningham v. Eyman*, 11 F. Supp.2d 969 (N.D. Ill. E.D. 1998); *McNally v. DeWitt*, 961 F.Supp. 1041 (W.D. Ky. 1997)(claim against deputy marshal allowed under §1983 for police

activity taken outside his federal duties); *Brown v. Stewart*, 910 F. Supp. 1064 (W.D. Pa. 1994)(prisoner may bring §1983 action against deputy marshals for false arrest).

In other cases, marshals and private entities were held not liable under a §1983 claim, not because they were federal agents, but because the plaintiffs in those cases failed to show that the marshals or private entities were proceeding under color of state law in taking the actions giving rise to a claim. *Cureton v U.S. Marshals Service*, 322 F.Supp.2d 23 (D.D.C. 2004) (plaintiff failed to allege marshals were proceeding under color of state law); *CCNV v Unknown Agents,* 791 F.Supp. 1 (D.D.C. 1991).

Federal officials other than marshals have been subject to §1983 claims, provided they were proceeding under color of state law. *Settles v. U.S. Parole Commission*, 429 F.3d 1098 (D.C. Cir. 2005)(U.S. Parole Commission members sued in individual capacity are liable for damages under §1983 while acting under color of D.C. law); *Fletcher v Parole Commission*,  370 F.3d 1223(D.C. Cir. 2004)(U.S. Parole Commission members sued in individual capacity are liable for damages under §1983 while acting under color of D.C. law);  *Melo v Hafer*, 912 F.2d 628 (3rd Cir, 1990);  *Hampton v Hanrahan,* 600 F.2d 600 (7th Cir. 1979)(federal officials sued under §1983 for claims arising from conspiracy with state officials.); *Martinez v Winner*, 771 F.2d 424 (10th Cir. 1985) (Federal officials in their official capacity who conspired with state officials in prosecution of a criminal case may be held liable under §1983).  *Cf. Richardson v. U.S. Dept of Interior*, 740 F.Supp. 15 (1990)(§1983 claim against U.S. Park Police dismissed when plaintiff failed to allege defendants were proceeding under color of D.C. law).

Other courts have held that private entities may be held liable under §1983 when proceeding in some manner under color of state law. *Dennis v. Sparks*,  449 U.S. 24 (1980)

(private parties conspiring with a government official may be held liable under §1983 even though the official, a state court judge, was immune from suit.); *Lugar v Edmondson Oil*, 457 U.S. 922 (1982)(discussing when a non-state party may be found to be proceeding under color of state law); *NCAA v Tarkanian*, 488 U.S. 179(U.S. 1988)[15]; *West v. Atkins*, 487 U.S. 42 (1988) (private physician employed in as a contractor to provide medical care in a state prison facility held liable under §1983);  *Kletschka v Driver*, 411 F.2d 436 (2d Cir. 1969); *Gabriel v Corrections Corporation of America,* 211 F.Supp.2d 132, 137 (D.D.C. 2002)(citing with approval the statement: "[u]nder 42 U.S.C. § 1983, a state prisoner may sue a private prison for deprivation of constitutional rights"); *Woodward & Lothrop v. Hillary*, 598 A.2d 1142 (D.C.1991) (Security guards acted "under color of state law" for §1983 purposes in subduing, arresting and detaining customer who entered store after closing time; in acting as public officers, they assumed all powers and liabilities attaching thereto.)

        In summary, that U.S. Marshals are federal agents who are employed, supervised, and paid by a federal agency does not *per se* shelter them from liability under §1983 when they are proceeding under color of state, or in this case, D.C. law.  Defendants do not in fact contest this key point and in fact they recognize two situations in which non-state employees may be held to be acting under color of state law. P. 10.

        The cases cited above held several approaches to be valid under which this Court may hold deputy marshals liable in their individual capacities for damages under §1983 in this case.

---

        [15] §1983 liability could be found against a non-state entity or person: "if the State creates the legal framework governing the conduct...; if it delegates its authority to the private actor...; or sometimes if it knowingly accepts the benefits derived from unconstitutional behavior....Thus, in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." 488 U.S. at 192.(citations and footnotes omitted).

Three are offered as especially pertinent.

First, the District of Columbia has created a legal framework[16], jointly with the U.S. Marshals Service ("USMS"), within which the marshals temporarily keep custody of pre-arraignment detainees, such as the class members.  A series of D.C. Code provisions apply under which the marshals assume a wide variety of local police duties in the District of Columbia, including the duties of keeping custody of pre-arraignment detainees within the D.C. Superior Court system, separate and apart from the federal courts in D.C.  This legal framework is set forth, *inter alia*, in provisions including D.C. Code §§ 5-133.16 (governing Memorandum of Understanding's between the MPD and other police forces operating within D.C. 13-302, 16-703, 23-501[17], 23-561, and 23-581 and are referenced in the First Amended Complaint.  Para. 41. In addition, there exists a memorandum of understanding between the District and the USMS which helps create the legal framework within which deputy marshals operate while handling D.C. arrestees.[18]  The marshals may be federal employees, and governed by certain federal statutes and regulations, but their actions as jailors of detainees are also strictly governed by D.C. law.  As such, the marshals are placed within the ambit of §1983.

---

[16]*NCAA v Tarkanian*, *supra*.

[17] "As used in subchapters II, IV, and V of this chapter –  (2) The term "law enforcement officer" means an officer or member of the Metropolitan Police Department of the District of Columbia, or of any other police force operating in the District of Columbia; an investigative officer or agent of the United States; animal control officer employed by the District of Columbia; or the Fire Marshal and any member of the Fire and Arson Investigation Unit of the Fire Prevention Bureau of the Fire Department of the District of Columbia, for the purpose of enforcing arson and the fire safety laws of the District of Columbia, who is so designated in writing by the Fire Chief.

[18]Plaintiffs do not have a copy of this MOU, and are requesting a copy of it in their motion under Rule 56(f) to be filed with this opposition.

22

Second, the theory of joint action applies where state actors and private or federal actors undertake some activity jointly to accomplish some state purpose, sometimes for the purpose of carrying out a police action against suspected criminal activity.[19]  The First Amended Complaint sets forth the event in September, 2002 where the MPD and USMS for D.C., within the D.C. Superior Court system, were performing the tasks of processing of MPD detainees prior to their arraignment, in according with a pattern of cooperation apparently stretching back many decades. The marshals did not take custody of the class members in September, 2002 in order to carry out some federal purpose separate and apart from the District's needs.  For a variety of reasons, the District of Columbia has chosen to employ deputy marshals for the handling of certain of its detainees and prisoners at various stages of their processing before the D.C. Superior court system including plaintiff class members, as the First Amended Complaint alleges.  The detainees were never being handled for federal purposes and were being arraigned in Superior Court, not this federal Court.  The defendants' motion comes forward with no facts tending to show that the deputy marshals were acting for any purpose other than the handling of D.C. prisoners within the D.C. court system for the purpose of processing D.C. criminal charges.

Third, where "private [including federal] parties can be viewed as acting under color of state law when state or municipal officials substituted the judgment of private parties for their own judgment", the private parties may be subjected to §1983 liability.  *Melo v Hafer*, 912 F.2d 628, 637-639, ftnt 12 (3d Cir.,1990).  In the claims alleged in the First Amended Complaint, the District of Columbia had chosen, as it had for many decades and for whatever reason, to make

---

[19]*E.g., Cunningham v Eyman*, *supra,* 11 F. Supp.2d 969 (N.D. Ill. E.D. 1998)*; Brown v Stewart*, *supra*, 910 F. Supp. 1064 (W.D. Pa. 1994)

use of the personnel of the USMS D.C. office to handle the custody of the pre-arraignment detainees for several hours between the time of arrest and initial detention, and the initial D.C. court arraignment appearances of the detainees. The District substituted the judgment of the deputy marshals, for that of its own police personnel, as to how to handle those detainees, the class members, prior to arraignment in a D.C. court.

Defendants have utterly failed to come forward with any facts to show that the defendant deputy marshals were acting outside the ambit of D.C. law and authority to carry out some federal purposes with regard to the plaintiff detainees.  Instead, defendants ground their defense on the bald assertion that they were federal employees of a federal agency.  Defendants' motion ignores the well-established law which provides that when non-state actors proceed under any of the many theories found in the cases adjudicating in this area, the non-state actors, who here happens to be federal employees, may be held liable for individual damages relief under §1983. Defendants motion with respect to plaintiffs' §1983 claims should be denied.


**CONCLUSION**

For the reasons set forth herein, defendants' motion should be denied or held in abeyance pending the resolution of the discovery requests filed by plaintiffs contemporaneously with this Opposition.

Respectfully submitted,

/s/ Lynn E. Cunningham
Lynn E. Cunningham, Esq.
D.C. Bar No. 221598
P.O.  Box 1547
Dubois, Wyoming 82513

24

Phone: 307-455-3334/3374
Fax: 307-455-3334
Email: lcunningham@law.gwu.edu

Zachary Wolfe, Esq.
D.C. Bar No. 463548
People's Law Resource Center
1725 I Street, NW, Suite 300
Washington, DC 20006
Phone: 202 265 5965
email: zwolfe@peopleslawresourcecenter.org

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing Plaintiffs' Opposition to Defendants' Motion to Dismiss, and a proposed Order has been made through the Court's electronic transmission facilities on this 2d day of June, 2006.

/s/ Lynn E. Cunningham
Lynn E. Cunningham, Esq. (D.C. Bar No. 221598)
Attorney for Plaintiffs

Plaintiffs' Exhibits

| | |
|---|---|
| 12 | D.C. Council Report dated March 24, 2004 (Patterson Report) |
| 13 | Amended Complaint, *Catherine Burgin, et al. v. D.C., et al.*, Civ. A. No. 03-02005(EGS) (D.D.C.).   , filed 12/05/03 |