# Council of the District of Columbia
**Report**

1350 Pennsylvania Avenue, NW   Washington, D.C.  20004

To:             All Councilmembers

From:           Kathy Patterson, Chairperson, Committee on the Judiciary

Date:           March 24, 2004

Subject:        Report on Investigation of the Metropolitan Police Department's
                Policy and Practice in Handling Demonstrations in the District of
                Columbia

## Executive Summary

The investigation by the Committee on the Judiciary into the policies and practices of the Metropolitan Police Department in handling demonstrations in the District of Columbia has found:

- Metropolitan Police Department use of undercover officers to infiltrate political organizations in the absence of criminal activity and in the absence of policy guidance meant to protect the constitutional rights of those individuals being monitored. (See page 75)

- A pattern and practice of misrepresentation and evasion on the part of leaders of the Metropolitan Police Department with regard to actions by the Department. (See page 88)

- Repeated instances of what appear to be preemptive actions taken against demonstrators including preemptive arrests. (See pages 32 and 50)

- Failure of the Metropolitan Police Department to effectively police its own members for misconduct associated with demonstrations. (See page 34)

- Failure of the Metropolitan Police Department to acknowledge and to protect the rights of individuals to privacy, and to free speech and assembly.

- Repeated instances of violating the Department's own guidelines for handling demonstrations contained in the *Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances, and Prisoner Processing* including guidelines on use of force in defensive situations, de-escalation in crowd control, and predicates required for mass arrests. (See page 100)

The Committee recommends legislation setting out clear guidelines for the Metropolitan Police Department with regard to mass demonstrations and police surveillance and infiltration of political organizations (see page 117). The Committee's findings and recommendations follow, and are also contained in bold type within the text of the report.

**Case Study: April 2000 and the Convergence Center**

On April 15, 2000, officials of the Fire and Emergency Medical Services Department and Metropolitan Police Department closed down the headquarters (convergence center) of the demonstrators using of fire code violations as the rationale.

*Findings*

- Actions taken by the Metropolitan Police Department and Fire and Emergency Medical Services Department to close the convergence center the day of the anti-globalization demonstrations violate prohibitions on infringement of free speech.

- The circumstances surrounding the inspection of the convergence center raise serious questions as to whether the action was a pretextual criminal law enforcement search in violation of the Fourth Amendment.

- An MPD videotape taken during the convergence center raid highlighted names, phone numbers, and addresses of individuals participating in the anti-globalization activities. While the videotape may have been within legal boundaries pertaining to information in plain and public view, its existence and maintenance raise additional questions about police intent in terms of surveillance of protected political activities.

- MPD officials provided erroneous and misleading information to the public concerning what was found and confiscated at the convergence center, in a manner that suggests an attempt to characterize demonstrators as prone to violence.

**Case Study: The 2001 Inauguration, Pepper Spray, and MPD Self-Policing**

On Inauguration Day in January 2001, an MPD officer pepper sprayed a group of demonstrators. The officer was exonerated by an incomplete and contradictory MPD internal investigation. Other internal investigations reviewed by the Committee were also incomplete.

*Findings*

- The Metropolitan Police Department has failed in several instances to demonstrate effective self-policing by either failing to initiate investigations when they are called for by compelling evidence, or by initiating investigations that are themselves incomplete, contradictory, and in some cases not consistent with the facts, with the result that officials are not held accountable for misconduct.

- The Metropolitan Police Department failed to investigate the inauguration day pepper spray incident until well after it occurred and only when forced to take the occurrence seriously by both ongoing litigation and this Committee's oversight, giving rise to the perception that misconduct within the ranks is tolerated.

- The investigation itself ignored the conflicting evidence presented by an amateur videotape that clearly shows Investigator Cumba acting as the aggressor with the crowd in his use of pepper spray. The investigation's report failed to address the point of the discrepancy in the officers' own statements versus the visual record of the videotape.

- The investigation failed to move up the chain of command to ascertain why the officer used pepper spray in this manner and failed to ascertain if this was, as alleged, an instance of serving as *agent provocateur*, a practice the department leadership officially decries.

- The investigation of allegations by Adam Eidinger, Margaret Luck and David Curtis similarly were not carried to their logical conclusion in questioning the policy and practice of conducting surveillance on political activists, the inappropriate use of motorcycles during demonstrations, and the seriousness of making a wrongful arrest of a demonstrator.

- The department failed to initiate its own investigation of the Pershing Park arrests based on highly critical internal after-action reports sent up the chain of command to the General Counsel and Executive Assistant Chief (see "Case Study: The Pershing Park Investigation").

- The failure of the Department to initiate investigations into the pepper spray incident and the Pershing Park arrests gives rise to the perception that misconduct is investigated only when it becomes a political liability for the Department.

*Recommendations*

- The pepper spray incident should be re-investigated by an independent authority. Options include the Department of Justice (DOJ) Independent

Monitor overseeing implementation of DOJ's memorandum of agreement with MPD on the use of force, or the DOJ Inspector General.

## Case Study: The Pershing Park Arrests, September 2002

On September 27, 2002, approximately 400 people were unlawfully arrested during a demonstration in Pershing Park.

*Findings*

- Facts on the record point to a decision to make preemptive mass arrests at Pershing Park. Through his public statements and directions to MPD commanders, Chief Ramsey set a tone that allowed for and approved of preemptive arrests. MPD created an expectation of violence, directed individuals into the park, and failed to permit persons to leave.

- The rationale for the arrests at Pershing Park was based on alleged unlawful activity earlier that morning, but MPD commanders did not have probable cause to arrest everyone in the park on the basis of those allegations.

- If the rationale for the arrests is that demonstrators failed to disburse or were on an un-permitted march, the arrests were still unlawful because MPD arrested demonstrators at Pershing Park (as well as at Vermont Avenue and K Streets) without first giving orders or warnings, in violation of MPD policy.

- Chief Ramsey is responsible for the arrests at Pershing Park, though he initially testified before the Judiciary Committee that he was not a part of that decision.

- The official version of what occurred and what went wrong at Pershing Park as presented in the testimony of Executive Branch witnesses fails to acknowledge the fundamental flaws in MPD's execution and interpretation of its mass arrest policy that day. This failure has consequences in terms of MPD's commitment to protecting First Amendment rights during future demonstrations, as well as its ability to objectively review its own policies and procedures.

## Case Study: The Pershing Park Investigation

In November 2002, at the prompting of the Council and Mayor Williams, MPD conducted an internal investigation into the arrests at Pershing Park.

*Findings*

- The Metropolitan Police Department violated its own general orders by failing to promptly initiate a formal investigation of the wrongful arrests and detention when questions about their legality were raised immediately by MPD officials, the Office of Corporation Counsel, the media, and the Council.

- At the direction of Chief Ramsey and in violation of MPD general orders, changes were made to the investigative report after it was completed by the Office of Professional Responsibility. The changes served to weaken criticism of the Department and alter the nature of the arrests.

- The decision to have Executive Assistant Chief Fitzgerald interview Assistant Chief Newsham was a clear conflict of interest given EAC Fitzgerald's role during the arrests. It also appears to have violated a general order giving the right to interview officials to the investigating officers, as well as the MPD's Memorandum of Agreement with the Department of Justice on use of force.

- The interview conducted by EAC Fitzgerald was incomplete.

- The investigation and release of the final report were marked by evasions and misstatements by senior officials including Chief Ramsey, giving rise to the appearance of an attempt to cover up Chief Ramsey's role in ordering the Pershing Park arrests.

- The Department created a conflict of interest by assigning Assistant Chief Newsham, Director of the Office of Professional Responsibility, to an operational role during the September 2002 demonstrations, a conflict that continues to exist.

*Recommendations*

- Any questions about the legality of mass arrests, excessive force, or information indicating a violation of MPD policies contained in mass demonstration after-action reports should be automatically referred to the Office of Professional Responsibility and investigated immediately and thoroughly. This likely requires a more formalized interaction between the office of the Assistant Chief, Special Services, and the office of the Assistant Chief, Office of Professional Responsibility, following a mass demonstration.

- Investigations of actions of Assistant Chiefs and the Chief of Police should be referred to the Office of the Inspector General and not handled internally by the Department.

- The Assistant Chief of the Office of Professional Responsibility should not have an operational role during mass demonstrations.

- MPD units and individuals outside of the Office of Professional Responsibility (OPR) should not participate in OPR investigations in any operational way.

- Officials reviewing investigative reports should denote, in writing, their comments and recommended changes to reports and requests for further investigation, pursuant to MPD policy.

**Emerging Issues: Surveillance and Infiltration of Demonstration Organizations**

Since 2000, MPD has used undercover officer to infiltrate political organizations.

*Findings*

- MPD assigned undercover officers to conduct surveillance of political organizations and activists in the absence of criminal activity.

- MPD assigned undercover officers to conduct surveillance of political organizations and activists without giving those officers any relevant training or policy guidance. MPD did not issue any guidelines in this area until December 2002, over two years after it started using undercover officers for this purpose. Current guidelines are not sufficient.

- The Committee found no clear evidence that MPD maintains dossiers on individual political activists, but MPD does document political activity in the absence of policy guidance.

- The Committee found no evidence that MPD has a *policy* of using *agents provocateur*, though specific allegations of this kind of activity have not been sufficiently investigated.

*Recommendations*

- MPD should conduct intelligence operations solely for a legitimate law enforcement purpose.

- Before police undertake surveillance of any group engaging in constitutionally protected expression or freedom of association, there should be reasonable suspicion to believe that the group is engaging in, planning to engage in, or about to engage in criminal activity.

- MPD should be prohibited from using undercover officers to conduct surveillance of individuals or organizations based solely on the content of their political speech or ideology.

- Surveillance in this context should be expressly approved by the Assistant Chief for Special Services, be time-limited in duration, and be conducted in a manner that is not more extensive or intrusive than is justified by its purpose.

- MPD should be required to have an internal oversight mechanism once an undercover operation is underway that, on a regular basis, reviews the activity of and information gained by undercover officers and determines whether undercover surveillance is still warranted.

- Officers engaged in surveillance should report regularly to the Assistant Chief for Special Services.  MPD should immediately cease such surveillance once facts made known to officers no longer support reasonable suspicion.

- MPD should be prohibited from maintaining files or dossiers on individuals in the absence of criminal activity and be required to purge files unrelated to criminal activity.

- MPD should be expressly prohibited from using *agents provocateur*.

**Emerging Issue: Failures in Leadership Accountability**

During the course of the Committee's investigation, members of the senior ranks of the Department sought to evade direct answers to important questions and, in some instances, misrepresented the record and their role in Departmental actions.

*Findings*

- In February 2003 testimony before the Council Chief Ramsey denied that he had a role in the decision to arrest individuals in Pershing Park in September 2002.

- There has been a persistent effort by MPD leadership to exaggerate the numbers of and threat posed by anti-globalization demonstrators.

- Both Chief Ramsey and Assistant Chief Alfred Broadbent, Jr. expressly denied that the Department directed protesters into Pershing Park, yet the record shows that the opposite is the case.

- Chief Ramsey testified that following the Office of Professional Responsibility investigation into the Pershing Park arrests, he implemented certain requirements in MPD policy and procedure, but some of those requirements have existed in MPD policy since 1976.

- Assistant Chief Brian Jordan testified that he did not participate in discussions among command staff members prior to the arrests at Pershing Park, information contradicted by four witnesses, including three MPD officials in their sworn testimony.

- Chief Ramsey and Assistant Chief Broadbent in Council testimony denied or sought to diminish the seriousness of alleged violations of the rights of political activists.

- Senior officials in the Department displayed a pattern of evasion in their depositions by claiming not to recall certain events – claims that are implausible on their face.

- Several MPD officers and officials provided truthful and careful testimony, some perhaps at risk to themselves and their careers and despite a climate of fear within the department that does not encourage such cooperation.

**Emerging Issue: Departing from Best Practice in Managing Demonstrations**

The Committee evaluated MPD's policies and practices generally in handling demonstrations.

*Findings*

- Under current leadership, the Metropolitan Police Department has failed to effectively manage controversial political demonstrations, giving rise to concern about its ability to manage these events in the future.

*Recommendations*

- Consistent with the original Office of Professional Responsibility Pershing Park report as submitted to Chief Ramsey, all police executives need to be Civil Defense Unit (CDU) trained or re-trained.  It is important that those charged with incident command during demonstrations be those most experienced in crowd management.

- MPD should streamline its communication structure during mass demonstrations so that one Incident Commander is consistently making field command decisions.

- MPD should evaluate its technological capacity for handling a large volume of prisoners, include information technology staff in planning prior to events with a potential for mass arrests, and periodically conduct exercises to test this capacity.

- MPD should release people charged with offenses for which citation and immediate release are appropriate within a reasonable period of time.  If prisoners are held beyond four hours, MPD should document the reasons for the delay.

- MPD should provide arrestees with written descriptions of release options that include a complete range of options provided by District of Columbia law and regulation, arrestees' rights under the law, and accurate information about fine amounts.

- MPD should follow its policy and District of Columbia law regarding the collection, maintenance and distribution of prisoner property.

- The Committee endorses the Citizen Complaint Review Board's recommendation that MPD modify its arrest procedure to ensure that all citizens who pay to resolve their arrest through post and forfeit are provided with written notice about the collateral forfeiture process and its consequences and that they sign an acknowledgment of their choice to pay the collateral.

- MPD use of physical restraints against individuals arrested during demonstrations should be limited to what is necessary to secure and control them.

- The MPD General Counsel and an attorney from the Office of Corporation Counsel should be on the scene of mass demonstrations that have the potential for mass arrests.

- MPD should issue a clear, written policy on the treatment of media during mass demonstrations and this policy should be incorporated into the SOPs and training curriculum on mass demonstrations.

- Consistent with MPD policy, police officers should honor press credentials and not make ad hoc judgments as to press legitimacy. As is the case with other persons, credentialed reporters should not be arrested unless they are specifically observed breaking the law.

**Conclusion: The Need for Statutory Guidelines**

The Committee recommends legislation containing guidelines for Metropolitan Police Department practice in two areas: conducting surveillance and infiltration of political organizations and handling problematic mass demonstrations

Recommendations:

- Prior to each mass demonstration, the police chief should issue a directive saying that MPD's overall mission during mass demonstrations is to protect demonstrators' First Amendment right to assemble and protest, and that in the event that individuals engage in unlawful behavior, those individuals shall be arrested without abridging the rights of others lawfully assembled.

- Consistent with current MPD policy, MPD should not disperse nonviolent demonstrators in the absence of unlawful activity.

- Consistent with current MPD policy, MPD should not arrest nonviolent demonstrators for failure to disburse or failure to obey an order without first giving multiple and clearly audible warnings and an opportunity for demonstrators to comply with police orders.

- MPD should not arrest nonviolent demonstrators solely for failure to have a parade permit unless 1) there is another permitted demonstration planned for the same location 2) the demonstrators are blocking buildings or traffic 3) the demonstrators are acting disorderly.

- MPD should not use police lines to surround and detain nonviolent demonstrators.

- Consistent with current MPD policy, when conducting arrests during a mass demonstration, MPD should, through the use of field arrest forms and commander event logs, contemporaneously record facts necessary to establish probable cause for the arrests.

- Individuals arrested during mass demonstrations should receive copies of their field arrest forms.

- Consistent with current policy, when conducting mass arrests, when practical, MPD should film police actions in their entirety, including giving warnings and dispersing or arresting demonstrators, in accordance with existing regulations governing the use of Closed Circuit Television cameras.

- MPD should not conduct a mass arrest based on the unlawful conduct of a few demonstrators. When arrests are necessary, MPD should only arrest those demonstrators responsible for the unlawful conduct.

- MPD should follow its current use of force policy that: 1) the use of force, including riot batons, OC spray and chemical agents be used according to strict standards; 2) force should only be used as authorized by the highest ranking official on the scene, or, in the case of chemical agents, only as authorized by the chief of police; 3) the use of force should be documented and such documentation should be made available to the public consistent with the reporting requirements of MPD's Memorandum of Agreement with the Department of Justice.

- MPD should follow its current policy of using riot gear only at the authorization of the highest ranking official on the scene and only when there is reason to anticipate violence.

- During mass demonstrations, all uniformed officers should be plainly identified by their badge numbers, which should be displayed in large numbers emblazoned on their jackets so as to be clearly visible to the public.

- Uniformed officers should never remove their badges or any other identifying emblem, and supervisors should never authorize such removal, or be subject to disciplinary action.

- Consistent with current MPD policy, plain-clothes officers should be required to identify themselves before taking any police action.

- MPD should notify the Office of Citizen Complaint Review (OCCR) in advance of demonstrations in which mass arrests may be reasonably anticipated.  OCCR should monitor each such demonstration, and should then issue a public assessment of police performance, identifying any police misconduct.

# TABLE OF CONTENTS

Executive Summary ................................................................. p. i

I.  INTRODUCTION .......................................................... p. 2

II.  CONTEXT FOR THE COMMITTEE INVESTIGATION

Context: Across the Country ................................................. p. 8
Context: Demonstrations in the District of Columbia ................... p. 18

III.  CASE STUDIES

Case Study: April 2000 and the Convergence Center ................... p. 28
Case Study: The 2001 Inauguration, Pepper Spray,
and MPD Self-Policing ....................................................... p. 38
Case Study: The Pershing Park Arrests, September 2002 .............. p. 48
Case Study: The Pershing Park Investigation ........................... p. 62

IV.  EMERGING ISSUES

Emerging Issue: Surveillance and Infiltration of Demonstration
Organizations ................................................................. p. 82
Emerging Issue: Failures in Leadership Accountability ................. p. 96
Emerging Issue: Departing from Best Practice in Managing
Demonstrations .............................................................. p. 108

V.  CONCLUSION: The Need for Statutory Guidelines ................. p. 126

VI.  COMMITTEE ACTION .................................................. p. 130

VII.  APPENDICES

Appendix A: Summary of Hearing Testimony ......................... p. 132
Appendix B: Case Law Memoranda ................................... p. 142
Appendix C: Status of Lawsuits Filed Against
the District of Columbia .................................................. p. 161

# INTRODUCTION

The Committee on the Judiciary initiated an investigation into the policies and practices of the Metropolitan Police Department in handling demonstrations based on police actions that appeared to violate the U.S. Constitution starting in April 2000 and continuing into early 2003. The Committee stepped in with an investigation because other branches of government – the U.S. District Court and the Executive Branch of the District government, respectively -- have not been in a position to, or failed to act timely, on matters before them. Lawsuits filed in U.S. District Court in the wake of questionable police actions in April 2000 had not yet even gone to trial four years after the fact. The Williams Administration has continually voiced its support for police actions that appeared to others to clearly violate the U.S. Constitution as well as D.C. law and Metropolitan Police Department regulations.

With regard to such matters the Council of the District of Columbia has an added responsibility: all of the same law enforcement issues were raised in the 1970s.  As recounted in the *Context* section of this report, the massive May Day 1971 anti-war demonstrations in Washington led to two major lawsuits against the District based on charges of wrongful arrest and police overreactions. Accusations of domestic spying against D.C. political leaders by local and federal law enforcement were raised in the same period of time. In the 1970s and 1980s the Council and the courts relied on the Executive Branch to right the wrongs that were proven on the public record. In 2004 the Council cannot make the same assumptions and the same mistakes of omission that were demonstrated by Council predecessors in the earlier era.

The Committee approved the investigation, which authorized the issuance of subpoenas, by resolution on April 28, 2003. The committee found that "allegations made on the public record concerning preemptive actions in April 2000, wrongful arrests made on September 27, 2002, and excessive use of force in April 2003 by the Metropolitan Police Department warrant the conduct of an investigation by the Committee to ascertain the validity of the allegations."

The resolution set out issues for examination including:

Issues raised in media reports, testimony, court filings, and other information concerning the period in April 2000 when demonstrations were scheduled to protest policies of the International Monetary Fund and World Bank during meetings of those organizations in the District including actions allegedly taken by the Metropolitan Police Department to preemptively prevent the exercise of freedom of speech and assembly.

Issues raised by the September 27, 2002, arrests of persons assembled in Pershing Park and their detention including the findings of the MPD

Office of Professional Responsibility as to failure of department officials to follow the law and Departmental orders…

Whether Metropolitan Police Department policies reflect best practices in managing large demonstrations such that public safety and individual civil rights and civil liberties are protected, including a comparison of current practice with policies and practice in the 1970s and 1980s when the Department had a national reputation for effectiveness in this area of law enforcement.

In June the Committee secured the services of two special counsel to assist in the investigation: Mary Cheh, professor of law at the George Washington University Law School and an expert in constitutional law and criminal procedure, and David Schertler, an attorney in private practice and former head of the homicide division of the Office of the U.S. Attorney for the District of Columbia. As the investigation proceeded over the summer Mr. Schertler's law practice demanded his full time and his participation in the investigation ceased.

The Committee also set out to evaluate MPD's polices and practices, generally, in handling and preparing for demonstrations.  To assist this process, the Committee reviewed all of MPD's related written policies, researched relevant constitutional case law, related legislative history, and national best practices.  To get a better understanding of the nature of the current complaints against MPD in this area, the Committee reviewed all of the relevant litigation currently pending against the city.

The investigation proceeded through the use of case studies including the alleged preemptive closing of demonstrators' headquarters, "the convergence center" on April 15, 2000; the allegation of an undercover officer using pepper spray against demonstrators during the 2001 inauguration parade; the UNLAWFUL arrest of nearly 400 persons at Pershing Park in September 2002; and the MPD investigation into those arrests.  The case studies were presented at the hearings and are included in this report.

The Committee issued a series of document subpoenas beginning in July and reviewed over 5000 pages of documents.  The Committee began conducting a series of oral depositions in executive session in the fall and issued subpoenas for written depositions to MPD Chief Charles Ramsey and Department of Fire and Emergency Medical Services Chief Adrian Thompson.  On December 4, 2003, the Committee met in executive session under Committee and Council rules and reported out of executive session certain documents, testimony and information that are now part of the public record.

The Committee held two days of investigative hearings on December 17 and 18, 2003, and information placed on the record in the hearings as well as information gleaned from the depositions and subpoenaed documents is reflected

3

in this report. The Committee met again in executive session on March 4, 2004 and voted certain other information onto the public record and that information, also, is included in this report.

In addition to the case studies presented in the hearing and in the sections that follow, three other, related issues emerged from the Committee's work: (1) the surveillance and infiltration of political organizations by the Metropolitan Police Department; (2) a pattern and practice of misrepresentation and evasion on the part of Chief Ramsey and others in senior command; and (3) a serious weakening in the Department's professionalism in managing controversial political demonstrations, giving rise to concerns that public safety and First Amendment rights could be at risk in future events. Each of these is addressed in the *Emerging Issues* section of the report.

It should be noted that, while the investigation's authorizing resolution referenced MPD's handling of "demonstrations," the majority of the Committee's work has been focused on a small number of demonstrations where MPD has used tactics that merit Council review.  The Committee primarily examined MPD's policies and practices handling anti-globalization and anti-war demonstrations since April 2000.  Since January 2000, MPD has managed approximately 500 demonstrations.  According to testimony, in 2003 alone, MPD managed 291 demonstrations, and there were permits for only 49 of them.  The vast majority of demonstrations in the nation's capital take place without incident and are handled well by MPD.  When there has been a breakdown in policy and procedure, it has occurred during the more provocative demonstrations where police believe there is a likelihood of civil disobedience and the potential for civil disturbance.  These are the demonstrations that the Committee has reviewed in detail.

It should also be acknowledged that the Committee, in its criticism of MPD's handling of demonstrations in recent years, is not ignoring the challenges created for law enforcement by large protests that include participation by individuals prone to breaking the law. Much has been made of the violence that occurred during the World Trade Organization meetings in Seattle in November 1999 – violence largely the result of poor planning on the part of the police department and other government entities. In the wake of public concern over the management of mass demonstrations following Seattle, the Metropolitan Police Department had clear responsibility to prepare for subsequent mass demonstrations to the best of its ability.

The Committee is also cognizant of the specific problems that have been faced by MPD during anti-globalization mass demonstrations in the District in recent years.  For example, Lt. Jeffery Herold, who commands the Special Operations Division's Security Operations Branch, testified that in April 2000, a burning dumpster was "hurled at a police line."  He also testified about a group that broke off during the main demonstration and "broke into the dorms at George

4

Washington University, emptied these dorms of all furnishings, put them in the street, blocked streets to prevent police access." Sergeant Keith DeVille, who supervises the civil disturbance training unit, testified:

> We've had M80s, fire crackers thrown at us. I, personally, was struck with a bottle in the face at the Inaugural.....I know a sergeant from SOD that had her jaw broken by an iron pipe, and I witnessed that.

The United States Attorney's Office sought to prosecute twenty-six arrests made during the April 2000 demonstrations, including nine charges of possession of implements of a crime conspiracy, eleven unlawful entry charges, one charge of dumping, three charges of assault on a police officer, one charge of theft, and one charge for possession of a molotov cocktail. The individual arrested for possession of a molotov cocktail entered into a plea agreement and was sentenced to time served, a term of supervised probation and psychological treatment and counseling in June 2001. In addition, the Office of Corporation Counsel papered 54 misdemeanors as a result of the arrests made on September 27, 2002.

Indeed, the Committee does not take issue with MPD responding to actual illegal activity with arrests. But there have been instances in recent years when MPD has taken preemptive action based on the *potential* for illegal activity, or on provocative political speech, rather than on law breaking. As Art Spitzer of the American Civil Liberties Union of the National Capital Area testified:

> We are not suggesting that there is any legal right to engage in civil disobedience. Violating a valid law exposes the violator to arrest, prosecution, conviction and punishment. But non-violent civil disobedience does not justify police violence, and it certainly does not justify the arrest of hundreds of people who have *not* broken any law. Nor does the *threat* of civil disobedience, or even the threat of some vandalism, justify the *preemptive* arrest of people who have not broken any law.

It is these latter instances cited by Mr. Spitzer that are of concern to the Committee, and that prompt the Council to review MPD's policies and practices in handling demonstrations.

What follows in this report are sections that provide both the national context and the historical context in the District of Columbia including a discussion of MPD's handling of the 1971 May Day demonstrations and resulting litigation. The report includes sections on the case study of the closing of the convergence center; the case study of the pepper spray incident as an example of MPD failure at self-policing; the case study of the unlawful Pershing Park arrests in September 2002; and a section detailing the department's investigation of the

Pershing Park arrests, with Committee "findings" at the end of each section. The three "emerging issues" noted above are then addressed, followed by a conclusion to the report that sets out the Committee's recommendation for legislation to provide statutory guidelines on handling demonstrations and political surveillance. The report includes a series of appendices with additional background on these issues.

The Judiciary Committee has been assisted in this investigation by George Washington University law professor Mary Cheh, who served throughout as Committee special counsel, and to whom the Council owes its profound thanks. The Committee has also been ably assisted by John Hoellen, assistant general counsel in the Office of the General Counsel. The Committee staff lead for the investigation has been Amy Mauro with staff assistance also provided by Tameria Lewis and Committee Clerk Renee McPhatter. The panel was also assisted by two law school interns, Josh Harris and Alina Morris, and the Committee extends its thanks to them as well.

*Obstacles to the investigation*

In conducting this investigation, the Committee's work has been hindered throughout by the refusal of the Williams Administration to respond timely and completely to Judiciary Committee subpoenas. From the issuance of the first subpoena in July 2003 to date the Committee has granted extensions of time, rescheduled depositions, and granted requests that information not be placed on the public record though such action is within the Committee's discretion. Beyond the lack of timeliness and completeness, the Williams Administration has consistently withheld information, citing "law enforcement privilege" even though such privilege is not relevant to a Council investigation. The lack of respect for the law evidenced in the Williams Administration's actions with regard to this investigation mirror the Committee's findings with regard to the actions of the Metropolitan Police Department in violating constitutional rights as well as D.C. law.

Prior to the December hearings the Committee chair reiterated the need for certain documents included in subpoenas but provided only in heavily redacted form. In an exchange of emails, the Office of Corporation Counsel, speaking on behalf of the Williams Administration, raised a concern that if materials are provided to the Committee they could be sought and received by parties in litigation against the District. While the Council General Counsel opined that the OCC was in error as a matter of law in this instance, Councilmember Patterson agreed to present clarifying legislation to the Council to address the administration's concern. That legislation, the "Disclosure of Information to the Council Emergency Act of 2004," was approved on an emergency basis by the Council on February 3, 2004.

Notwithstanding this good faith action by the Council, the Williams Administration continued to withhold documents from the Committee. Having no other option, the Council on February 17, 2004, approved a resolution authorizing the general counsel to go to D.C. Superior Court to seek enforcement of the document subpoena. In moving the resolution to enforce the document subpoena, Councilmember Patterson noted the record of the Judiciary Committee's request, the receipt of heavily redacted documents, and the assertion of privilege by the administration, an assertion rejected by counsel. The Council approved the resolution unanimously.

At close of business the same day the Office of Corporation Counsel provided additional documentation to the Committee, far short of the total of five documents for which subpoena enforcement was approved. In good faith, again, Committee Chair Patterson reviewed the documentation, and, again, reduced the amount of material required for completion of the investigation, and offered to refrain from court action if certain materials were made available to the Committee. Following the intercession of City Administrator Robert Bobb on March 4, 2004, certain additional documents were made available, though the administration continued to assert "law enforcement privilege" with regard to items redacted. The information newly available permitted the Committee to complete its report, while continuing to consider whether the items withheld constitute sufficient ground to seek court action to enforce the subpoenas.

It is the Committee's view that the failure to respect the Council's authority throughout eight months of an investigation is part of a larger whole that includes the violation of constitutional rights of political activists through infiltration, surveillance, preemptive actions and wrongful arrests. Failing to acknowledge the rights and responsibilities of the elected legislature is not as egregious as bringing physical and emotional harm to District residents, but it is nonetheless an egregious executive branch failure on the part of Mayor Williams and his subordinates.

## II. CONTEXT: ACROSS THE COUNTRY

The Judiciary Committee has reviewed Metropolitan Police Department policy on demonstrations against a national backdrop of efforts by law enforcement agencies, state and local officials, and the Bush Administration to change both law and practice in the name of safety and security, all in the continuing shadow of the September 11, 2001 terrorist attacks. Local and federal actions to monitor, investigate, and in some instances prohibit activities long protected by the First Amendment have prompted widespread concern over the potential negative impact on civil liberties.

While acknowledging that there are at times tradeoffs between public safety and freedom of speech and assembly, the Committee concurs with the view of the Gilmore Commission (the congressionally appointed Advisory Panel to Assess Domestic Response Capabilities for Terrorism Involving Weapons of Mass Destruction) that what is needed today is "a long-term sustainable approach to security that protects not just lives but also our way of life." [Appendix E: Civil Liberties in a Post-9/11 World]. The Gilmore Commission, in its final report in December 2003, revisited the views of the original framers of the U.S. Constitution, who "recognized that civil liberties and security are mutually reinforcing." The Commission continued: "Security clearly ensures the freedom to exercise our liberties, but it is also true that the exercise of our civil liberties and our way of life contributes to our strength and security."

Through legislation and litigation U.S. police entities, including the Federal Bureau of Investigation, are blurring the distinction between intelligence and law enforcement as an outgrowth of the war against terrorism. This important and wide-ranging development includes questioning the continuing validity of the requirement, heretofore, that criminal activity or the reasonable suspicion of criminal activity must precede police use of certain types of investigation. Earlier prohibitions on creation of dossiers on individuals based on their political activities have been weakened in the name of an expanding definition of "law enforcement." Some police departments apparently are following the lead of the FBI in using "disruption" techniques, borrowed from intelligence practices overseas and applied locally to prevent or minimize protest activity. Some local jurisdictions, as well as the Secret Service, have used buffer or "no protest" zones at public events as a security tool, a practice that has been challenged for having a chilling effect on civil liberties.

On Sunday, February 8, 2004, the *Washington Post* ran a 3-paragraph wire service story from Des Moines, Iowa, about a federal court ordering Drake University to refrain from disclosing information about a federal investigation into an antiwar seminar held on the college campus the previous fall. Des Moines press accounts described four antiwar activists called before a federal grant jury. The local United States attorney declined to comment on the nature of the investigation. Also targeted: the National Lawyers Guild, which has participated

8

in scores of lawsuits against police departments around the country based on alleged violations of constitutional rights of political activists. Within a matter of days the prosecutor clarified that the sole issue under investigation was allegations of trespassing on National Guard property, leaving unclear why the federal prosecutor was interested in an on-campus political rally.

News stories like the one from Iowa are part of the national context within which the Judiciary Committee has conducted its investigation of police practices here. That context includes changing policies throughout the country both prior to, and in the wake of, the September 11, 2001 terrorist attacks. It includes litigation arising from major events that drew protests and police responses in Seattle, San Francisco, Philadelphia, Los Angeles, and – most recently – Miami.

The national backdrop includes a movement by law enforcement to move away from policies adopted in the aftermath of controversies over police use of "Red Squads" to infiltrate political organizations in the 1960s and 1970s. Local officials in Chicago and New York City have recently petitioned the courts to rescind or weaken orders governing police activities seen to infringe on civil liberties.  That movement was given new energy after September 11 through enactment of the federal Patriot Act and other policies by the Department of Justice and Federal Bureau of Investigation that have had the effect of limiting the exercise of free speech and free assembly. This section surveys the landscape for those specific events that make up the wider national debate.

*Protests & Litigation*

<u>San Francisco</u>

On April 28, 1992, a southern California jury acquitted Los Angeles police officers in the beating of Rodney King. The next day a demonstration in downtown San Francisco led to several violent injuries. The city reacted by imposing restrictions on demonstrations in the downtown area. Part of the mayor's order required officers to, among other things, implement a policy of custodial arrests instead of citations in order to disperse gatherings whenever the officer had reason to believe the gathering would endanger, or was likely to endanger, persons or property. The next day a group assembled in downtown San Francisco. Police ordered dispersal. As people moved away from the central area they were surrounded and arrested. Between four and five hundred persons were arrested; some were held up to 55 hours.

A class action lawsuit, *Collins v. Jordan*, was filed in U.S. District Court charging the city, county, mayor, police chief and individual police officials with violating the First and Fourth Amendment rights of those gathered in the downtown area and subsequently arrested. The court found that the earlier violence fell far short of "the type of occurrence that could have led any reasonable official to believe that it would be constitutional to impose a city-wide

ban on all demonstrations and that the law to that effect was clearly established."
The *Collins* decision underscored earlier decisions that unlawful conduct must be
addressed after it occurs, and that acting before demonstrators broke a law was
presumptively a violation of First Amendment rights.

<u>Seattle</u>

In his deposition before the Judiciary Committee, Assistant Chief Alfred
Broadbent said, "everything changed with Seattle." He referred to the World
Trade Organization meetings in Seattle, Washington from November 29 to
December 3, 1999. Broadbent assumed his duties overseeing the MPD's special
services in January 2000. He told the Committee that an immediate task was
preparing for the meeting here of the International Monetary Fund and World
Bank in anticipation that the anti-globalization protests evident in Seattle would
move next to the nation's capital for the IMF-World Bank meetings.  The
international organizations had held twice-yearly meetings in Washington for
several years.

In his testimony before the Committee in December, Chief Broadbent
referred to the events in Seattle:

> The face of demonstrators, the organization's planning, and the tactics
> exhibited by the demonstrators changed dramatically from the
> department's experience with such events over the last 25 years. The
> department subsequently learned that the history of the demonstrators in
> Seattle 1999 was a direct result of political actions transpiring throughout
> Europe during the past several decades. Such large-scale disruptive civil
> disobedience had not been experienced by law enforcement in this
> country....

> The demonstrations, which occurred in Seattle, sent a clear message to law
> enforcement. There was widespread looting, uncontrolled civil
> disobedience and over 3 million dollars in property damage and
> destruction to downtown Seattle...There was a loss of confidence by the
> community that the government could not protect innocent citizens from
> unwarranted disruption of their livelihoods....

> Because of the Seattle unrest, the department was uncertain what to
> expect, and wisely prepared for the worst possible scenario, which would
> be a repeat of demonstrators planned civil unrest in Seattle.

Because the events in Seattle loom large in the Metropolitan Police
Department's approach to demonstrations, particularly anti-globalization
demonstrations, the committee sought to gain a better understanding of what
actually took place in December 1999. What emerges from the record in several
after-action reports is a complicated blend of poor planning, a local police force

overwhelmed by the number of anti-globalization activists, a small number of violent actions by a minority of demonstrators, and broad overreaction by both civilian and police authorities.

The WTO conference "became one of the most disruptive events in Seattle's history" according to the Seattle City Council's World Trade Organization Accountability Review Committee final report.  That report describes what happened in Seattle as "the disastrous week of tear gas, burning dumpsters, and injured citizens." The Seattle Police Department's after-action report said there were 631 arrests associated with the demonstrations, most of them for obstruction of traffic and failure to disperse. Local newspapers put the financial costs at $3 million in property damage and $17 million in lost sales during the 5-day conference.

The Seattle Accountability Review Committee report notes that prior to the WTO decision to meet in Seattle, local officials were briefed about "the riots that occurred at the 1998 WTO Conference in Geneva," but appeared to dismiss that information. "If SPD believed the threat assessments," the report notes, "then they would know that 600 commissioned police officers would not be enough to adequately monitor 50,000 demonstrators, much less prevent violent activities and/or arrest and detain those who participated in civil disobedience."

The Review Panel found that:

The WTO Conference deteriorated into chaos and violence due to: (1) Poor planning and preparation;  (2) Limited coordination among Mayor Paul Schell, the Seattle Police Department, and the Seattle Host Organization; and (3) A pattern of leaders at every level abdicating their responsibilities throughout the planning process.

With specific reference to the police department, the report concludes: "Chief Stamper's failure to provide leadership and to ensure fiscal accountability contributed to the lack of proper planning, which placed the lives of police officers and citizens at risk and contributed to the violation of protestors' constitutional rights."

More than a dozen lawsuits resulted from the events in Seattle. One case brought against King County by two individuals who were pepper sprayed while seated in their car was settled at a cost of $100,000 for the two plaintiffs. Two other litigants, also claiming to have been pepper sprayed by police, settled for $2,500 each. Several press photographers settled for from $25,000 to $32,000 each in cases arising from use of tear gas and, in one instance, a photographer being knocked to the ground and arrested. In the major class action arising from the WTO conference events, *Victor Menotti, et al., v. City of Seattle, et al.*, a U.S. District Court essentially sustained the Seattle Police Department's use of "no-protest zones" and the plaintiffs appealed that decision to the 9th Circuit Court of

Appeals where the case is pending. The same court required the department to reform its policies for public disclosure of information. In terms of other outcomes from the Seattle demonstrations: the police chief resigned under fire and the mayor failed to gain reelection two years later.

Political Conventions: Los Angeles and Philadelphia

In the weeks leading up to the Democratic National Convention in Los Angeles in August 2000 a group of political activists including unions sought an injunction to prevent the Los Angeles Police Department from enforcing a "secured zone" of more than the 8 million square feet around the Staples Center, site of the convention. The city and convention planners proposed that all demonstrations take place in a protest site some 260 yards from the center, based on security concerns. In *Lawyers Guild v. City of Los Angeles*, the U.S. District Court granted the injunction, finding that "the sidewalks and streets contained within the designated 'secured zone' are traditional public fora for the exercise of First Amendment rights." The Court also found that municipal regulations were unconstitutional because they constituted a lengthy pre-filing requirement and gave officials "unbridled discretion" on an "impermissible content-oriented basis."

In a later settlement in Los Angeles, journalists who had been hit with police batons and rubber bullets during the convention received damages and the Los Angeles Police Department agreed to policies assuring journalists the right to cover events even after police issue orders to disperse.

A lawsuit, *International Action v. the City of Philadelphia et al.*, stemming from the 2000 Republican National Convention in Philadelphia led to a federal court order in July 2003 that Philadelphia refrain from enforcing regulations on permits for special events when marches, demonstrations and rallies are protected by the First Amendment.

Miami 2003

A *Washington Post* report from Miami published November 21, 2003, stated, "Police in riot gear fired rubber bullets and canisters of chemical spray Thursday to disperse thousands of demonstrators gathered in the shadow of downtown skyscrapers to protest the proposed formation of a Western Hemisphere free-trade zone." Diplomats from western countries gathered in Miami for trade discussions, hosted by the Bush Administration, and the Miami community reportedly sought to display its suitability as a possible permanent home for a new trade organization. The Congress approved $8.5 million in federal funds to support the meeting, including reimbursements for security costs.

In the days following the Miami meetings a host of national organizations called for Justice Department and/or Congressional inquiries into "the massive

and unwarranted repression of constitutional rights and civil liberties" according to a letter to Attorney General John Ashcroft from AFL-CIO President John Sweeney.  The United Steelworkers of America called on the U.S. Congress to investigate the police department and the Sierra Club asked the Department of Justice for an investigation. The AFL-CIO asked both DOJ and the state of Florida to investigate the "intimidation and abuse of peaceful protesters."

In testimony before the Judiciary Committee in December, AFL-CIO chief international economist Thea Lee described the planning by 90 organizations concerned with "global justice issues" for a week of seminars and other events, culminating in a march and rally on November 20. She said the labor organizations and other groups estimated their presence would be between 10,000 and 20,000 persons, but police repeatedly estimated that demonstrators would total up to 100,000. That exaggeration, she said, created concern for the public and permitted the police jurisdictions to essentially "over-prepare" and create an atmosphere of hysteria.

She said the AFL-CIO negotiated for months over arrangements for the permitted march and rally, taking particular concern for the comfort of senior citizens – 25 busloads of seniors were expected at the rally at the Bayside Amphitheater sponsored by the Alliance for Retired Americans. That morning, however, she said they awoke to a "militarized zone" with the entrance to the amphitheater blocked by tanks and water cannon. Buses were prevented from dropping the seniors off near the event, as previously arranged while other buses of seniors from throughout Florida were kept well away from the downtown area. She said previously credentialed AFL-CIO marshals were told their credentials were invalid and participants "were denied access to rental toilets and 10,000 bottles of water we had purchased."

After the rally she described actions by police lines to move rally participants away from the amphitheater down a side street. "Police in riot gear then began firing rubber bullets directly into the crowd." The experience in Miami, she said, "was something beyond any of the previous demonstrations" at trade meetings around the country. While noting the presence of many courteous and professional law enforcement officers, she said, "our quarrel is with police management and the top city officials." The leadership, she said, was responsible for "obstruction; intimidation; harassment; excessive, unnecessary and unprovoked use of force; possibly illegal search and seizure, and arrests."

As of mid-December the ACLU had gathered more than 130 reports of protester injuries, including 19 confirmed head injuries, and indicated plans to file at least three and as many as a dozen lawsuits against the Miami-area police departments, cities, and counties.

*Police Department Retrenchment*

13

In recent years as national and local groups have challenged law enforcement actions during demonstrations, police departments have sought to remove rules and regulations that have governed their surveillance of political organizations since the 1960s when police "Red Squads" were faulted for Constitutional violations.  Prior to the September 11, 2001 terrorist attacks, police officials in Chicago and New York City sought, and eventually succeeded, in amending procedures agreed to in the wake of domestic spying scandals in the 1960s and 1970s.

<u>Chicago</u>

Antiwar protesters and others filed suit in 1974 accusing the Chicago Police Department and its so-called "Red Squad" of violating the rights of antiwar groups, religious activists, and others based on the content of their speech. A U.S. District Court consent decree resulted, limiting domestic surveillance unless an organization had demonstrated actual criminal intent.  In 1999 the city of Chicago and Chicago Police Department asked the U.S. District Court to relax the restrictions negotiated in the 1970s, and in January 2001 the 7th Circuit Court of Appeals ruled that the regulations were an impediment to law enforcement.

In March of that year the U.S. District Court accepted a modified decree that acknowledges First and Fourth Amendment protections, essentially approves "reasonable time, place and manner regulations supported by an appropriate governmental interest," and protects against "government intrusion not justified by an appropriate governmental interest or function." The decree enjoins the Chicago Police Department from violating First Amendment guarantees adding "nothing shall enjoin reasonable investigative or law enforcement activities that are permitted by the First Amendment."

A departmental general order issued in October 2001 restates the language of the court decree. The policy statement includes:

> Department members may not investigate, prosecute, disrupt, interfere with, harass, or discriminate against any person engaged in First Amendment conduct for the purpose of punishing, retaliating, or preventing the person from exercising his or her First Amendment rights.

The 2001 general order permits "investigations directed toward First Amendment-related Intelligence" that are not part of a criminal investigation with the approval of a senior official, with a time limit of 120 days, and based on having "a proper law enforcement purpose." Examples cited: (1) someone hands out fliers supporting the bombing of targets in the U.S. and an investigation pursues the source of the literature; (2) a website promotes violence in furtherance of pro-life goals and the investigation monitors the number of hits the website receives. The policy permits infiltration approved by the Superintendent of Police

and, if permitted longer than 30 days, progress reports every 30 days. The General Order includes another example of a situation that does not warrant investigation:

> An organization advocating worldwide disarmament opens an office in Chicago and a sworn member suggests raiding its offices to determine if it advocates violence. This raid could not be authorized as there is no evidence to even suggest that a violation of any law has or will occur. Additionally, if literature reflecting the group's views can be obtained through other means, the raid would violate this directive's requirement of minimization procedures. Any search of nonpublic areas would also violate the Fourth Amendment if performed without a warrant and in the absence of consent or exigent circumstances.

<u>New York City</u>

The U.S. District Court in New York City ruled in February 2003 that "fundamental changes in the threats to public security" warranted modifying another long-standing court order that restricted the New York Police Department's ability to conduct surveillance of political groups. A 1971 lawsuit, *Handschu v. Special Services Division,* charged harassment of political organizations by the New York Police Department's "Red Squad." In 1972 the U.S. District Court for the Southern District of New York held that the department's intelligence gathering operations involving political activists did constitute injury by creating a chilling effect on First Amendment activities. While noting that informers and infiltrators constituted valid techniques, the court placed restrictions on their use. After that decision the parties negotiated a consent decree known as the *Handschu Guidelines.*

The federal judge last year relaxed but did not terminate the Handschu Guidelines, indicating that the earlier agreement's constitutional protections "are unchanging." The court required the department to adopt internal guidelines, and the department's "Guidelines for Investigations Involving Political Activity" were issued later in the year. According to the cover memorandum issued to all commands in the department, "These guidelines eliminate many of the restrictions of the former Handschu Guidelines and provide the Department with the authority and flexibility necessary to conduct investigations involving political activity, including terrorism investigations."

As is the case with the Chicago policies, the NYPD guidelines state that "matters investigated be confined to those supported by a legitimate law enforcement purpose" and may be initiated "in advance of unlawful conduct." The "general principles" include:

> When, however, statements advocate unlawful activity, or indicate an apparent intent to engage in unlawful conduct, particularly acts of violence, an investigation under these guidelines may be warranted, unless

it is apparent, from the circumstances or the context in which the statements are made, that there is no prospect of harm.

The guidelines also stipulate that "investigations shall be terminated when all logical leads have been exhausted and no legitimate law enforcement purpose justifies their continuance."

More recently, however, the same federal judge criticized the New York Police Department for interrogating war protesters and brought the department's surveillance policies back under court review.

The actions in Chicago and New York City to modify consent decrees dating to the 1970s that placed limits on police actions may represent a first step toward loosening similar law enforcement regulations and oversight in other cities. A draft of the federal Domestic Security Enhancement Act of 2003, also known as "Patriot Act II" prepared for introduction in the U.S. Congress, includes a provision that would discontinue all existing consent decrees that place limits on police department surveillance of political organizations on the grounds that such restrictions impede terrorism investigations.

The Congress acted in a similar fashion several years ago to reverse court mandates governing conditions at correctional facilities. The Prison Litigation Reform Act of 1996 which allows court orders addressing past practices that were deemed to be unconstitutional to be lifted unless a correctional facility continued to violate prisoners' constitutional rights. This was the case with regard to the Central Detention Facility (the D.C. Jail) which had been under court order for years until the court oversight, including a population cap and annual health and sanitation inspections, ended as a result of the new federal law.  If Congress enacts "Patriot Act II" it would have similar effect: dismantling court oversight of police departments that were challenged in court in the past for violating First and Fourth Amendment rights.

*Federal Activities/California Guidelines*

The intersection of national anti-terrorist planning and actions with local police practices with regard to demonstrations is evident in both a Federal Bureau of Intelligence directive, and issuance of guidelines on political surveillance issued by the California attorney general.

An account in the November 23, 2003, *New York Times* detailed a memorandum sent to local law enforcement officials by the Federal Bureau of Investigation, marking the first corroboration of "a coordinated, nationwide effort to collect intelligence regarding demonstrations." The memorandum, according to the Times, urged local police to "be alert to these possible indicators of protest

16

activity and report any potentially illegal acts" to the Bureau's joint counterterrorism task forces throughout the country.

One month earlier California Attorney General Bill Lockyer moved in a different direction and issued guidelines to police and sheriffs' offices throughout the state recommending limits on law enforcement surveillance and infiltration of political organizations. The guidelines, entitled "Criminal Intelligence Systems: A California Perspective," were a response to controversy and litigation that arose from law enforcement actions targeting antiwar activities. One such event occurred in Oakland on April 7, 2003 at the start of the war in Iraq. According to press accounts, police seeking to disperse demonstrators fired wooden dowel projectiles, bean-bag rounds and other "less than lethal" ammunition into a crowd of demonstrators at the Port of Oakland.

In June two lawsuits were filed in U.S. District Court seeking monetary damages and court ordered-policy changes to preclude such actions in the future. The American Civil Liberties Union claimed that the Oakland Police Department took such drastic action against unarmed demonstrators based on information provided by the California Antiterrorism Information Center within the state attorney general's office, which the ACLU contended was an illegal assault on First Amendment rights. In response to the Oakland case and other instances in which local authorities apparently used "tips" from the state-level anti-terrorism office against political activists, in October Lockyer issued the new guidelines in an apparent effort to draw "the appropriate balance between public safety and fundamental rights such as free speech, assembly, and privacy."

# CONTEXT:
## DEMONSTRATIONS IN THE DISTRICT OF COLUMBIA

A copy of a general order dated October 24, 1863 from the Office of Superintendent of Police in Washington, D.C. to the Sergeants of the force announced an upcoming procession in the city.  The general order stated:

> The whole thing is entirely new in our community, and fears have
> been expressed that proper protection would not be accommodated
> to those engaged, because of their being colored men.  I am very
> desirous to show that their fears are unjust, and that in this District
> all persons behaving themselves in an orderly manner will be
> protected, and to this end you are hereby directed to place your
> men on the beats along the line of the proposed procession, in such
> a way as to afford the most complete protection, and guard against
> any and every kind of disturbance[1].

This snapshot from the history of demonstrations in the nation's capital is illustrative of one of the Committee's most significant findings – that of history repeating itself.  Over many years, the District of Columbia has experienced the ebb and flow of judicial and legislative scrutiny of the police department and its handling of First Amendment issues.  In particular, the Judiciary Committee's investigation has raised constitutional issues concerning the handling of mass demonstrations and the use of undercover officers to monitor political activists that are almost identical to those that were examined by the courts and the Council during the Vietnam war era thirty years ago.  The following is a brief summary of this local historical context and how it relates to today's debate.

*Handling Mass Demonstrations*

As noted earlier in this report, MPD Assistant Chief Alfred Broadbent testified that after the protests against the World Trade Organization in Seattle in 1999, "the face of demonstrations in this country changed forever."  This sentiment was repeated several times by MPD officials interviewed by the Committee, including Chief Charles Ramsey, who used anti-globalization activists' threats to "shut down the city" as a justification for why anti-globalization demonstrations in recent years have demanded preemptive treatment from MPD.

In fact, throughout its history, Washington, D.C. has hosted demonstrations whose organizers have threatened to disrupt the city in different ways, and in several instances, MPD's reaction has tested the constitutionality of its policies and practices for handling mass demonstrations.  As Lucy Barber,

---

[1] A copy of this general order was provided to the Committee by Robert Klotz, former Deputy Chief of Police, Commander, Special Operations and Traffic Division.

author of <u>Marching On Washington: the Forging of An American Political Tradition,</u> testified before the Committee, anti-globalization demonstrators' threats to shut down the city do not represent a new paradigm in the history of demonstrations in this country. While the anti-globalization movement may represent a new sophistication in its level of organization and use of technology, its anti-authoritarian rhetoric and reliance on civil disobedience are not without precedent.

The most obvious parallel in recent history can be found in the May Day demonstrations in 1971 that protested the Vietnam war. Prior to those demonstrations, organizers similarly threatened to shut down and disrupt the city with acts of civil disobedience. In 1971, MPD preemptively dispersed the demonstrators who had converged on Haines Point the night before the major demonstrations; rounded up thousands of individuals, including uninvolved bystanders, and arrested them without cause; and held those arrested for unreasonable periods of time under harsh and unsanitary conditions. In addition, the police chief at the time suspended MPD's use of the field arrest form, so demonstrators were arrested without any documentation of the circumstances. Costly and protracted lawsuits were filed against the city following the May Day arrests that alleged unconstitutional policies and practices.

A review of the May Day era litigation reveals striking similarities between MPD practices that were found to be unconstitutional in the 1970s and MPD practices used to handle anti-globalization demonstrations in recent years. In the case *Lyle Tatum, et al v. Rogers C.B. Morton, et al*, the United States District Court for the District of Columbia found MPD's arrest of 144 individuals demonstrating in front of the White House on April 25, 1971 to be unconstitutional. MPD Inspector William Trussell testified that the demonstrators were "apparently a law abiding group and there was no indication there would be any police problems at all really." Two other officials also testified that there was no violence before the establishment of the police lines.

Nonetheless, Inspector Trussell "concluded there was justification for establishing police lines due to the imminent danger of property damage and personal injury due to the influx of 'outsiders' into the vigil lines." He believed that the "outsiders" were some of the same anti-war demonstrators who were responsible for destruction of property earlier in the day at the Washington Monument, although he did not actually observe any of those arrested destroy any property or commit any other illegal acts. The court found that "as a matter of law, based upon the undisputed facts of this case, this Court is unable to find that Inspector Trussell acted with a reasonable belief of impending violence such as to necessitate the imposition of police lines."

Thirty-one years later, a similar rationale was given for approximately 400 arrests made in Pershing Park during a protest against the policies of the IMF/World Bank on September 27, 2002. Assistant Chief Newsham, who gave

the order to arrest that day, testified that although the demonstrators in the park were not violent or committing any property damage immediately prior to the arrests, he based the order on the fact that the demonstrators, as a general group, did not have a permit, had broken windows several blocks away earlier in the morning, and had then broken traffic laws on their way to the park. Yet Assistant Chief Newsham could not be sure that all of the individuals arrested in Pershing Park were responsible for the earlier violations of law. In the end, he gave the order out of concern over what the demonstrators would have done had they been allowed out of the park. The following is an excerpt from Assistant Chief Newsham's deposition before the Committee:

> Another thing that was weighing heavily on my mind when I made that decision was the intelligence that I received that this particular group was intent on doing destructive things. I felt that if they were able to leave the park I think they would have gone out and did some of these things because of their behavior before entering the park.

As discussed in more detail later in this report, an MPD internal investigation subsequently found that the Pershing Park arrests were made in violation of MPD policy and that bystanders not even involved in the demonstrations were arrested that day. The District has initiated settlement discussions in some of the lawsuits filed against the city over the Pershing Park arrests.

This comparison between the *Tatum* case and Pershing Park arrests is helpful in making the point that the courts have repeatedly found that demonstrators cannot be arrested based on what police may fear is a *potential* for law breaking.

The courts have also reviewed MPD policy and practice in handling demonstrations more broadly. In the case *Washington Mobilization Committee, et al v. Maurice J. Cullinane, et al*, in 1974, the U.S. District Court found several aspects of MPD's handling of the May Day demonstrations to be unconstitutional and took particular exception to the department's use of a police line ordinance to disperse crowds. It found the ordinance "unconstitutional as applied to demonstration activities in which First Amendment rights are being asserted."

The ordinance (Article VI Section 5(a) of the Police Regulations of the District of Columbia) includes language that "every person present at the scene of such occasion shall comply with any necessary order or instruction of any police officer." The court noted, "the scope of the ordinance is expansive, to say the least. Limits on police discretion are virtually nonexistent." It gave a police officer "unfettered discretion to issue any order he thinks reasonable and then is allowed to initiate criminal proceedings against a person who disobeys the order," and harkened to Justice Hugo Black's concurrence in *Gregory v. Chicago*, "to let

a policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than laws."

The Court enjoined the department from erecting police lines and initiating sweeps of areas during demonstrations "until the police department or the District of Columbia government specifies the scope and limits on the department's power to clear a public area, sufficient to inform both the police and the public of their responsibilities." In addition:

- MPD was "enjoined from attempting to regulate the conduct of persons exercising their First Amendment rights by ordering them to 'move on' unless a breach of the peace involving a substantial risk of violence has occurred or will occur";
- MPD was "enjoined from instituting mass arrests without the contemporaneous completion of field arrest forms or other administrative device or procedure for recording information necessary to establish probable cause for the arrest";

The Court also:

- Ordered all relevant arrest records destroyed;
- Invalidated all the May Day arrests; and
- Ordered MPD to formulate a "comprehensive, written plan (preferably in the form of a manual or handbook) which clearly states the policies and procedures to be followed by the police department in mass demonstration situations."[2]

Other points made in the 1974 U.S. District Court decision that resonate today:

- "Criticism of police activities originating from outside the department is handled in a variety of ways. Information critical of the CDU[3] which is presented by the news media or litigation is never made the subject of an internal, disciplinary investigation," a point made in testimony by Police Chief Jerry Wilson on April 8, 1974.

- With regard to charges of disorderly conduct, the Court said, "The fact that police officers sometimes seem to be unwilling to enforce these laws in a proper manner does not necessitate the conclusion that the law is so poorly drafted as to be incapable of constitutional application." The Office of Citizen Complaint Review just recently took the MPD to task for making charges of disorderly conduct when the elements necessary, under law, had not been met.

---

[2] 400 F.Supp 186, 218-219
[3] Civil disturbance unit

- The Court revisited the issue of whether an officer acting in good faith serves to nullify any other wrong in an arrest. "The mere assertion of good faith by an arresting officer does not obviate the need to also prove the reasonableness of his belief that his actions were constitutional."

After a three-judge panel of the U.S. Court of Appeals reversed the District Court's ruling, plaintiffs in the case challenged the action, asking the full nine-member U.S. Court of Appeals to rehear the case and to reinstate the District Court's ruling. In a September 1977 decision, five of the nine judges issued opinions taking issue with some aspects of the three-judge panel's reversal. Rather than having a rehearing, however, they decided to rely on new leadership at MPD to change its mass demonstration policies and practices

Judge Bazelon concurred with many if not most of the U.S. District Court's findings, including "its unchallenged findings that the police used excessive force and made unlawful arrests" which were "more than sufficient grounds for the injunctive relief it ordered."

Bazelon and Levanthal directed scathing criticism toward the leadership of the MPD, citing the lower court ruling. "These findings of the District Court amply support its crucial factual conclusion that 'many examples of misconduct by CDU and PCC officers were the direct result of policies and procedures authorized by defendants and of defendants' failure adequately to train, supervise and coordinate the activities of subordinates," Bazelon wrote. He also noted that the case concerned police misconduct in handling demonstrations and that "there is likely to be a chilling effect on individuals' protest activities unless the police are restrained from similar misconduct in the future." Levanthal said the case "presented evidence of either participation by the police chief and supervising officials or knowing toleration of misconduct."

The Court sought to explain its decision to deny a new hearing while essentially concurring that the Department should move forward with reforms.

Judge Leventhal wrote:

Whether to exercise en banc discretion is particularly likely to turn on whether recurrent problems are visualized. With indications that the police department has been advancing its low-key approach, and with the reasonable expectation that it will reflect on the various decisions involving mass arrests, it makes sense on prudential grounds to let the smoke clear so far as the court en banc is concerned.

Judge Bazelon noted:

> Although I agree with Judge Leventhal that the proposed police
> manual may not be able to guarantee appropriate police behavior
> when 'coping with a massive shutdown effort,' this limitation is no
> justification for vacating the District Court's order. Without
> written policies, there is even less hope that the Civil Disturbance
> Unit will avoid these same errors in the future[4]...

Following this decision, in January 1978, MPD issued a handbook on
mass demonstrations. The Committee has reviewed several versions of the
manual that have been produced since 1978, and the same handbook, designed to
respond to the concerns of the courts in the mid-1970s, are essentially in effect
today.

In the 22 years following issuance of the manual, MPD handled thousands
of demonstrations without major controversy and, in the process, gained an
international reputation for handling demonstrations well, without incident or civil
disturbances. Among the more provocative demonstrations handled by MPD
during this time were a group of farmers who drove their tractors around the
Capitol and parked them on the Mall in 1978 "in defiance of traffic regulations";[5]
regular anti-abortion marches that attract counter marches; a Ku Klux Klan march
in 1991; and the Million Man March on the Mall in 1995. Each of these events
caused anxiety within government and the community over the potential for
disruption or violence, real or perceived, but each was handled without mass
arrests or major controversy. A review of court records over this time period
reveals no litigation filed against the District over MPD's handling of
demonstrations prior to the April 2000 anti-globalization demonstrations.

After the demonstrations against the World Trade Organization in Seattle
in November 1999, MPD's handling of anti-globalization demonstrations would
bring about a new era of critical opinion of MPD's performance in this area: harsh
criticism on the part of the activist community and international acclaim within
law enforcement for preventing the kind of civil disturbances that have followed
international trade meetings elsewhere in the world.

*Use of Undercover Officers to Monitor Political Activists*

The Committee's review of MPD's current use of undercover officers to
conduct surveillance of political activists also has a historic precedent. In 1975,
the Washington Post reported that during the late 1960s and early 1970s, MPD
used undercover officers to monitor and keep files on local political activists and
politicians, including former Councilmembers Marion Barry, Julius Hobson and

---

[4] 566 F .2d 107
[5] p. 224, Lucy Barber, <u>Marching on Washington: the Forging of an American Political Tradition,</u>
2002

Sterling Tucker and former D.C. Delegate to Congress Walter Fauntroy.[6] An
unnamed source of the Post claimed that undercover agents sought details on
activists' sexual habits, drug use and finances. A former police informant
reported that he was instructed to act as an agent provocateur and to steal mail,
break into buildings, and "disrupt legitimate demonstrations of the anti-war
movement."[7] Police officials at the time admitted to the surveillance but denied
that agents recorded information about activists' personal lives or engaged in
illegal activity, and said that all of the questionable files were shredded.

A civil action, *Hobson v. Wilson*, was filed against the District and MPD
by several Washington-area protestors alleging that members of the MPD
Intelligence Division served as *agents provocateur* as part of a joint FBI-MPD
conspiracy, in furtherance of its stated mission to gather information on "persons,
groups, and organizations whose activities might be detrimental to the proper
functioning of local, state or national governments." In a 1984 decision, the D.C.
Court of Appeals overturned a lower court ruling by finding that there was
insufficient evidence that the MPD or the District of Columbia participated in a
conspiracy to violate plaintiffs' constitutional rights either within MPD itself or
between MPD and the FBI. The court did affirm liability against the FBI, ruling
that there was enough evidence that the FBI actively participated in unlawful
COINTELPRO activities to justify the lower court's finding of liability, and noted
four categories of illegal activity on the part of the FBI.

The Council held several public hearings on the issues reported in *The
Washington Post* and considered three pieces of legislation intended to prevent
similar surveillance from occurring in the future. Council Chairman Sterling
Tucker introduced Bill 1-76, "the Police Intelligence Safeguards Act of 1975,"
which established a temporary Police Intelligence Policy Commission to conduct
a review of the policies and procedures employed by MPD for intelligence
gathering activities and recommend to the Council new guidelines as it deemed
necessary. The bill also prohibited three classes of information from being
maintained by MPD on individuals, including non-criminal personal information,
financial information and any information related to political, religious or social
views. It also allowed individuals to request to review MPD files on themselves.

Councilmember Julius Hobson introduced Bill 1-287, "the Non Criminal
Police Surveillance Act of 1976," which defined "unlawful surveillance,"
proscribed limitations on the interception of conversations, and prohibited any
official or agent of the District from disrupting lawful activities or inciting others
to engage in unlawful activities. It provided a cause of action for anyone injured
by a violation of the legislation.

Councilmember Hobson then introduced Bill 1-362, "the Police Records
Act of 1976." This act attempted to control what types of records MPD could

---

[6] "Files on Politicians Kept, Police Admit," *The Washington Post,* February 13, 1975
[7] Ibid

maintain and disseminate and established a Records Review Board, charged with enforcing limitations on police records-keeping practices through semi-annual auditing procedures; promulgating regulations; and making determinations on whether individuals should be able to review records about themselves unless there was clear and convincing evidence that such inspection would threaten the integrity of an ongoing investigation.

All three bills were criticized by law enforcement and some provisions were even criticized by the local chapter of the ACLU as unworkable and too broadly written.  According to press reports, in response to the controversy, then police chief Maurice Cullinane conducted a review of the practice of MPD's Intelligence Unit and established new policies and procedures for police surveillance with a July 1976 general order.  The new general order mandated that all intelligence be obtained through lawful methods and be related to criminal activity or persons or events that present threats to life or property.  It expressly prohibited the maintenance and collection of intelligence information related to social, religious or political views, family associates and finances unless directly related to criminal conduct.  After the issuance of Chief Cullinane's order, the Council apparently decided to allow MPD to regulate itself in this area, much as the federal courts had done.  Each of the bills died in committee.

During the course of its current investigation, the Judiciary Committee subpoenaed any current or former general orders that may have been related to the 1976 Cullinane general order, but MPD responded that no such policies could be located.  The Committee can only assume that the Cullinane order was at some point repealed by MPD.  Ironically, the *Washington Post*, while commending the issuance of the general order, warned of this possibility at the time.  In a July 23, 1976 editorial, the Post noted:

> There are, of course, limits to the force of any internal directive, even one that attempts to spell out policies and officers' obligations so carefully.  For one thing, an order is not a law; its weight depends almost entirely on the chief's commitment and the department's ability to police itself.  Future commanders could change or ignore the rules at any time[8].

Another editorial expressed a similar sentiment:

> There will be, no doubt, trouble again some time in the future with police intelligence operations…with the passage of time, some of the lessons learned from the last decade will be forgotten.  But, it seems to us, Chief Cullinane is in the process of getting the police department off the wrong road and channeling its intelligence efforts into places where they can be more productive and less troublesome.  The real test is whether the community pays enough

---

[8] "Controlling Police Surveillance," *The Washington Post,* July 23, 1976

attention to make sure that shift is completed and, once completed, maintained[9].

In the 1970s, both the courts and the Council discovered serious problems with MPD's handling of important issues related to First Amendment activity – primarily its handling of mass demonstrations and its undercover surveillance of political activists. In each instance, following debate and consideration of the issues, discretion was left to MPD to fix problems internally and to self-regulate. With the passage of time, it seems that critical and hard-learned lessons were indeed forgotten. Considering the District's history in this area and the increasing threats to civil liberties across the nation caused by post-September 11th local and federal security policies, now, more than ever, the Council has a responsibility to act, through both oversight and legislation.

---

[9] "Intelligence Work and the District Police," *The Washington Post,* March 14, 1975

### III. CASE STUDY: APRIL 2000 AND THE CONVERGENCE CENTER

In April 2000, thousands of demonstrators converged on Washington, D.C. for a weekend of protests against the policies of the International Monetary Fund and World Bank. Since this was the first major anti-globalization demonstration since the November 1999 meetings of the World Trade Organization in Seattle, there was much concern expressed by District government officials, law enforcement, and residents, about the potential for violence in the District similar to that experienced in Seattle. The Metropolitan Police Department responded to this concern by preparing for the IMF-World Bank meetings for months in advance, seeking and securing significant federal funding for security including a closed-circuit television system, getting manpower assistance from other police departments, asking the courts to be prepared for mass arrests, and by mobilizing the entire department.

On Saturday, April 15, 2000, the day before the largest scheduled anti-globalization demonstration, Fire and Emergency Medical Services (FEMS) officials and MPD officers entered the headquarters, or "convergence center," of the anti-globalization organizations at 1328 Florida Avenue, N.W.; issued multiple fire code violation notices; and closed down the center, ordering all of the individuals inside to vacate the premises. This raid of the convergence center disrupted the organizational plans of the demonstrators and displaced many anti-globalization activists from out of town who were staying at the center while visiting the District.

Demonstrators as well as some residents criticized the District's actions at the convergence center, and accused MPD of orchestrating the event for the purpose of frustrating the constitutional rights of the demonstrators. An April 16, 2000 *New York Times* article, "Police Move Against Trade Demonstrators," characterized the raid as "a pre-emptive show of force." Councilmember Patterson, joined by Councilmember Jim Graham, wrote to Council Chair Linda Cropp and Judiciary Chairman Harold Brazil to request an oversight hearing on the police actions. In April, 2001, a lawsuit[10] was filed against the District of Columbia that included allegations that the District's actions at the convergence center were unconstitutional.

The Committee examined the convergence center raid as a case study of MPD's policies and practices in handling demonstrations, particularly its practices with respect to intelligence tactics. The Committee subpoenaed documents related to the raid on the convergence center and deposed four individuals: FEMS Chief Adrian Thompson, FEMS Deputy Chief James N. Short, MPD contract employee Neil Trugman, and Intelligence Unit Sergeant Jeffrey Madison. In April 2000, Chief Thompson was the Fire Marshall, Deputy Chief Short was a Battalion Chief and Assistant Fire Marshall with the Fire Prevention Division,

---

[10] *Alliance for Global Justice, et al v. District of Columbia, et al*

Neil Trugman was a detective assigned to MPD's Intelligence Unit, and Sgt. Madison was, as he is now, a supervisor assigned to MPD's Intelligence Unit.

The following is a chronology of the events leading up to and during the raid on the convergence center, based on the information collected by the Committee.

During the week prior to the IMF-World Bank meetings, Chief Ramsey and then-Executive Assistant Chief (EAC) Terrance Gainer provided a briefing for Councilmembers and staff on plans for addressing public safety concerns associated with the meetings and demonstrations. The department, in conjunction with the two international organizations and the federal government, essentially closed off certain areas of the city including areas immediately surrounding the IMF offices and the headquarters of the third police district. The police executives showed Councilmembers a videotape of incidents that took place in Seattle the previous December, and voiced their own determination that such events would not take place in the District of Columbia.

Chief Ramsey told the *Washington Post* on April 8, 2000, "They ain't burning our city like they did Seattle." Three days later Assistant Executive Chief Terrance Gainer told the *Post*, "Arrests will be quick, swift and certain. We won't be caught sleeping."

During the days leading up to the IMF-World Bank weekend, MPD monitored the convergence center. An April 3, 2000 memo from Intelligence Unit Lieutenant Lorraine Kittrell to Chief Ramsey described, in minute detail, the layout of the convergence center, a schedule and description of the events that were to take place from April 8 to April 15, and information about the ownership of the building.

According to the testimony of Mr. Trugman, during the course of this monitoring, MPD became concerned about potentially hazardous conditions inside the convergence center, including the presence of propane tanks, demonstrators sleeping on staircases, and over-crowding. He indicated that MPD discussed securing a search warrant of the premises. Mr. Trugman was asked in his deposition if he had reason to believe there was illegal activity at the center, and he said there were "bits and pieces" of information.

Q: I take it that you did not have enough to get a warrant to go into the convergence center. Is that correct?

A: I think we did.

Q: But as far as you know, no one attempted to get a warrant to go into the convergence center, did they?

29

A: I'm – I think there may have been discussions with the U.S. Attorney's office, and they were not going to go ahead with a search warrant.

Apparently it was decided that the department did not have sufficient cause to secure a search warrant. MPD officials turned to potential administrative actions. The department invited representatives of FEMS, including Deputy Chief Short, to a meeting on or about April 13, 2000. Sergeant Madison and Mr. Trugman participated in this meeting.

During the meeting, MPD officials showed Deputy Chief Short news media videotape footage of the conditions inside the convergence center, including footage of propane tanks and, according to Deputy Chief Short, "a large number of people in a very small area inside the building." Deputy Chief Short was asked if he saw anything improper in the video footage and he stated that what he saw was "not allowed under the Fire Code." After seeing these violations, he stated that he "had to take some action" and it was decided within the fire department that the District's Nuisance Abatement Task Force[11] would conduct an inspection of the building.

It was not, however, until at least two days later, on the morning on April 15, 2000, that Deputy Chief Short conducted the inspection with FEMS Captain Richard Fleming, fire inspector Ronnie Elam, a Department of Consumer and Regulatory Affairs (DCRA) inspector, and a Department of Public Works (DPW) inspector. There is a discrepancy in testimony on whether the Task Force entered the building simultaneously with members of the MPD. According to the deposition testimony of Deputy Chief Short, Mr. Trugman and Sgt. Madison, MPD did not enter the building until Deputy Chief Short became concerned that the demonstrators were not clearing out of the property or abating the fire code violations noted by the Task Force. Deputy Chief Short testified that "a great deal of time passed between the initial being allowed to come in and conduct the inspection until the police officers that I saw were on the scene."

In apparent contradiction to that statement, videotape viewed by the Committee clearly shows MPD officers, including Sgt. Madison and Mr. Trugman, entering the building at 8:45 a.m. Chief Thompson's written deposition states that the Task Force entered the building at 8:45 a.m. Deputy Chief Short testified during his deposition that the time was either 8 a.m. or 8:45 a.m. and he could not be sure of the exact time.

MPD intelligence officers, including Sgt. Madison and Mr. Trugman, were aware that the inspection was taking place and were on hand to respond to

---

[11] The Nuisance Abatement Task Force is an inter-agency task force, typically made up of representatives of multiple agencies, including MPD, DCRA, DPW and FEMS, that conducts simultaneous housing, fire and code inspections of buildings.

any request for assistance from the Task Force.  The following is an excerpt of Mr. Trugman's testimony on this point:

> A: I know that they went in – they went into the building first, and if they needed our help, they were going to call for our help, and we responded after the call.  We didn't go in with the fire department.
>
> Q: The timing is such that it appears as though the MPD knew when the fire department was going in.  Is that correct?
>
> A: Yes, we did know.
>
> Q: So, it wasn't as if you were sort of out there and then suddenly you got this call, can you come over and help us?
>
> A: No.  We knew when they were going to go in.

Deputy Chief Short and Chief Thompson testified that upon entering the building, the Task Force found hazardous conditions inside, including overcrowded conditions, improper use of propane tanks for cooking purposes, make-shift electrical wiring, improper storage near exits and in stairways blocking egress, and storage of large quantities of paint and bedding materials in utility areas.  When describing the scene and his attempts to clear demonstrators out of the building, Deputy Chief Short testified:

> I would say to them, this is a very dangerous situation and if you don't shut down the cooking, the propane, then someone could die in here.  It's imminent danger.  Propane explosions are some of the most dangerous in the world.  And when you have over 100 pounds in close proximity within side of a building, it wouldn't take much to melt the building.

Several fire code violation notices were issued to the owner of the building, Douglas Development Corporation[12], and the demonstrators were cleared out of the building by 12:30 p.m.

The Committee sought clarification on the role of the MPD's Intelligence Unit in closing down the convergence center. Fire officials acknowledged that the presence of intelligence officers at a building inspection was highly unusual.  In

---

[12] An April 17, 2000 letter from Douglas Development Corp. to Chief Thompson stated, "Douglas Development Corp was led to believe that several non-profit groups were organizing a training workshop for puppet making, and allowed at no cost a sublease of the space for a two-week period.  We are outraged at this gross misrepresentation and can assure you that, has we been aware of the true motives of this group, we would never have permitted their assembly at **any** of our properties."

response to the Committee's October 16, 2003 written deposition question, "Do MPD Intelligence Unit officers typically accompany Fire and Emergency Medical Services Department inspectors during inspections?  If yes, under what circumstances?," Chief Thompson stated "To my knowledge no MPD intelligence unit officers accompany Fire and Emergency Medical Services Department inspectors during fire inspections."  Deputy Chief Short was also asked this question during his deposition:

> Q: Would it be unusual to have intelligence officers accompany you or be [present] at a place when you [are] conducting an inspection?
>
> A: Very unusual.

As indicated above, Mr. Trugman testified that MPD initially wanted a search warrant to look for items such as molotov cocktails or sleeping dragons -- none of which was found on the premises – but did not have probable cause to obtain a search warrant. The next question became what purpose was served by intelligence unit members being on hand for the fire inspection. Had there been a concern about public safety generally, the normal course would have been use of uniformed officers, not intelligence officers. The allegation in litigation has been that the intelligence unit was on the premises for the specific purpose of gathering intelligence information on demonstrators for law enforcement purposes.

As stated above, Deputy Chief Short testified that he only called MPD officers to the scene to get assistance with clearing the building.  Sgt. Madison also testified that he responded to the convergence center out of concern for the safety of the inspectors.  But this version of events is not consistent with Mr. Trugman's testimony that intelligence officers entered the building with the specific intent of looking for illegal activity.

The following is an excerpt of the transcript of Mr. Trugman's deposition on both the issue of the warrant and MPD's intentions upon entering the building:

> Q: And when you were on the scene, what was… the purpose of intelligence officers being on the scene with the fire department to conduct a fire inspection?
>
> A: To make sure there was no illegal activity going on inside that was going to become a police concern.
>
> Q: Did you have reason to believe there would be illegal activity inside?
>
> A: We had information that was – there was a lot of bits and pieces, and one of them was a thing called sleeping dragons, which

32

is used to block streets, possible molotov cocktails, things of that nature.

Q: Now, prior to going into the convergence center, though, apparently you had enough information for a specific house to actually get a warrant to go in to get certain pipes and things to make these sleeping dragons, what-have-you. But I take it that you did not have enough to get a warrant to go into the convergence center. Is that correct?

A: I think we did.

Q: But as far as you know, no one attempted to get a warrant to go into the convergence center, did they?

A: I'm – I think there may have been discussions with the U.S. Attorney's office, and they were not going to go ahead with a search warrant.

Q: So then your entry into the convergence center was sort of derivative on the entry by the fire department. Is that right?

A: Well, it's also because it was a severe safety hazard. I mean, it would have been tragic with all these kids in that place smoking cigarettes…

A: We were also aware of what to look for. We were there to look for molotov cocktails, if there were – excuse me – if there were any, sleeping dragons, which was totally new to this area. And a lot of the officers, no matter how you can describe them, may have not known what they were looking for.

Q: Did you find any?

A: Not in that building.

Q: Now, when you say that the intelligence unit was there because they could, you know, have a look at – for certain of these items, I take it that is something you were hoping to do via a search warrant, right?

A: Correct.

Q: But having failed to get the search warrant, this was the second best way to have a look?

A: Well, this actually turned out to be the best way for safety.

33

The assertion that MPD intelligence officers arrived at the convergence center for the purpose of collecting information on demonstrators is further bolstered by some of their actions once they arrived. In response to a subpoena issued to MPD, the Committee obtained a videotape containing footage taken by MPD intelligence officers during the inspection of the convergence center. At several points during the video, the camera pans over crowds of demonstrators, inside and outside of the building, at times zooming in on individuals. At another point on the tape, for approximately 20 minutes, the camera zooms in on, and scans, the entirety of a bulletin board containing political posters and fliers as well as hand-written personal notes containing the names, phone numbers and other personal information presumably on demonstrators who used the center's bulletin board as an information exchange.

In his deposition testimony, Mr. Trugman suggested that the purpose of the footage was to cross reference the names of anyone who had been "troublemakers" in other cities, like Seattle, with the names of the people attending the demonstrations in Washington:

> Q: So that was part of the intelligence that you would gather in those circumstances?
>
> A: Exactly. Now, was information gathered from that? I don't remember any.

Sgt. Madison testified that the videotape was taken by an Electronic Surveillance Unit (ESU) officer who usually accompanies MPD on drug-related search warrants issued pursuant to a criminal investigation. In those instances the ESU's typical practice is to collect as much information from a scene as possible; for example, information about suspected drug dealers and their acquaintances. Sgt. Madison testified that the convergence center videotape was not used, or possibly not even watched, for any purpose after the inspection of the convergence center. Craig Broyles, a civilian analyst assigned to the Intelligence Unit, also testified that the unit did nothing with the information contained on the videotape. In response to questions about this practice during the public hearing, Chief Ramsey stated that "the taping of that bulletin board was not necessary. It was regrettable." Asked specifically if the tape had been given to other law enforcement authorities such as the Federal Bureau of Investigation, Ramsey assured the Committee that it had not.

Two documents obtained by the Committee underscore the contention that the convergence center raid was an MPD law enforcement operation designed to thwart the activities of the demonstrators, and has continued to be viewed in that manner by District officials. The Committee issued a subpoena to the Fire Department for any documents relative to 1328 Florida Avenue, N.W. and, in response, received a document labeled "DC Fire Department Real Estate Property Profile." The document contains the following statement:

34

> On 4/15/00, the NATF [nuisance abatement task force] closed this building down due to numerous fire code violations.  This was IMF Protestors Headquarters.  The closing of this building helped assist MPD with the rioters during the IMF Talks.  This location was the main headquarters for the IMF protestors.  Removal of propane tanks and other illegal weapons[13], help stop a repeat of Seattle, Washington.

Deputy Chief Short, when asked about the document, responded, "I do not have an answer on that; I actually do not know who that was."  Nonetheless, the connection between the fire inspection, the closing of the center, and the intent to assist MPD's law enforcement efforts is clear.

The second item is a document attached to the original complaint filed by plaintiffs in *Alliance for Global Justice, et al v. District of Columbia, et al*.  The document is a memorandum from MPD employee Steve Gaffigan, Senior Executive Director for Quality Assurance, to SRB Productions, a television and video production company, outlining a prospective MPD training video relevant to handling demonstrations.  The memo states, "We will then go on to look at the footage of MPD's Intelligence Unit shutting down the convergence center during the 2000 IMF protests, finding bottles with rags.  We will explain the significance of such a tactic."

This statement regarding "bottles and rags" brings up another and final issue regarding the convergence center inspection.  After the inspection, Chief Ramsey and Executive Assistant Chief Gainer claimed to have confiscated materials to make pepper spray and molotov cocktails[14], statements not corroborated in the Fire/EMS records on materials actually recovered at the convergence center.  No one interviewed by the Committee up to and including the police and fire chiefs testified that any illegal or criminal items were found at the convergence center. It is regrettable that the opposite was reported externally and internally by MPD officials.

*Findings*

**Actions taken by the Metropolitan Police Department and Fire and Emergency Medical Services Department to close the convergence center the day of the anti-globalization demonstrations violate prohibitions on infringement of free speech.**

---

[13] According to the witnesses interviewed by the Committee, no illegal weapons were found in the convergence center.

[14] During an April 17, 2000 television story by *The News with Brian Williams,* Chief Ramsey stated "They were making homemade pepper spray."  An April 15, 2000 Associated Press story reported "officers seized a plastic container with a rag stuffed inside and what looked like a wick, said executive assistant chief Terry Gainer.  He said it 'looks like a Molotov cocktail."

**The circumstances surrounding the inspection of the convergence center raise serious questions as to whether the action was a pretextual criminal law enforcement search in violation of the Fourth Amendment.**

The agencies effectively closed down the convergence center not primarily for public safety reasons, but for other reasons that presumably include disrupting the planned demonstrations and securing, for law enforcement purposes, information on those participating in the demonstrations. The center posed a danger to inhabitants or it did not; if it did present imminent danger, as Deputy Short testified, it should have been closed immediately when officials first noticed the violations. The time allowed to lapse between the meeting attended by MPD and FEMS and the actual raid belies that there was, in fact, a public safety concern.

In addition, the District should have given the activists 24 hours to abate the fire code violations and return to the center, prior to the largest scheduled anti-globalization demonstrations.  Failure to do so supports the contention of litigants that the raid was designed to frustrate the operations of the activist organizations, something clearly prohibited by First Amendment protections.

**An MPD videotape taken during the convergence center raid highlighted names, phone numbers, and addresses of individuals participating in the anti-globalization activities.  While the videotape may have been within legal boundaries pertaining to information in plain and public view, its existence and maintenance raise additional questions about police intent in terms of surveillance of protected political activities.**

**MPD officials provided erroneous and misleading information to the public concerning what was found and confiscated at the convergence center, in a manner that suggests an attempt to characterize demonstrators as prone to violence.**

## CASE STUDY: THE 2001 INAUGURATION, PEPPER SPRAY, AND
## MPD SELF-POLICING

The January 29, 2001, issue of the *LA Weekly*, an alternative newspaper published in Los Angeles, included this description from along the parade route in Washington D.C. on Inauguration Day, 2001:

> Two undercover cops, who had been posing as parade-goers, began grabbing randomly at people, one of them spraying protesters in the face with a small canister of either pepper spray or Mace. Both were immediately mobbed by the crowd, and had to be pulled to safety by uniformed officers in riot gear.

A *Washington Post Style* section piece profiling Mara Verheyden-Hilliard and Carl Messineo, lawyers and founders of the Partnership for Civil Justice, includes this variation on the incident:

> Two men in street clothes -- one wearing a black ski mask -- were captured on amateur videotape roaming through the inauguration crowd. They shove bystanders and one pepper-sprays people seemingly at random. After two years of pressing by the Partnership, the District acknowledged the men were on-duty police officers. One has admitted pepper-spraying, but both deny anything they did was improper.

On March 15, 2001, two months after the inauguration of George W. Bush as the president of the United States, the International Action Center and Justice Action Movement plus six named plaintiffs filed suit against the United States, the Metropolitan Police Department, and other government entities alleging constitutional violations, assault and battery, and false arrest and imprisonment. Among the charges: that undercover police pepper sprayed the crowd at the Navy Memorial along the Pennsylvania Avenue parade route. The court filing, sections 105 through 113, follow:

> Undercover agents, who declined to identify themselves as law enforcement, at times struck into the crowd, beating people with their fists and radios. Protesters repeatedly asked, "Are you cops" of the government agents who were beating their associates with batons and fists. The government agents declined to answer.

> After what appeared to be a signal by a uniformed officer, a team of three undercover operatives maneuvered themselves into a crowd of peaceful demonstrators. One wore a black ski mask. Two of the agents began, without explanation or justification or provocation, to beat and spray a chemical agent, presumably pepper spray, onto the faces of the peaceful persons assembled there. The third agent followed behind, providing protection to the other two.

38

Plaintiff Elizabeth Ayer was standing by peacefully, when one of the agents came up to her and pulled off a muffler she was wearing. He punched her. He then sprayed her face and mouth with pepper spray at close range.

These agents wandered freely, without intervention from law enforcement, spraying pepper spray in wide circular berths in the faces of the peaceful protesters, and striking others. The peaceful protesters ran in terror, yelling warnings that undercovers were using pepper spray. The agents continued to strike forward into crowds of persons standing by, spraying the chemical agent into protesters' faces. This continued for some period of time, after which a uniformed officer engaged the agents in a mock arrest. The uniformed police subsequently released the agents who were later observed wandering freely among crowds of protesters.

The officer who used pepper spray along the inaugural parade route was MPD Investigator Patrick Cumba working in plain clothes that day for the Intelligence Unit. The lawsuit describing the pepper spray incident was amended on October 11, 2002, with Investigator Cumba and his Inauguration Day partner, Detective Jed Worrell, and their immediate superiors, named as additional defendants.

The amended filing added this information:

10. Defendants Cumba and Worrell deliberately concealed their identities from plaintiffs. Both dressed in plain clothes for the assaults, notwithstanding being on official MPD duty. Neither displayed any badge, name tag or other insignia publicly identifying them to be government agents or MPD officers. Officer Patrick A. Cumba concealed his identify (and increased the psychological fear of his assault) by wearing a hood and a balaclava – a black ski mask concealing all but his eyes and bridge of his nose. Officer Jed Worrell also wore a hood and additionally concealed his characteristics with a full head hat pulled down low to his eyes. To date, neither has come forward notwithstanding this lawsuit.

In response to being named a defendant in the lawsuit, Investigator Cumba provided the following answer to the amended complaint, which was filed with the federal court on January 17, 2003:

8. Defendant Cumba admits that on January 20, 2001, he did use a chemical agent known as pepper spray while in the area of the Navy Memorial but denies that he used pepper spray as described in this paragraph of the second amended complaint.

All of the other allegations against the officers were denied in the January 2001 filing.

39

Nearly two years after the Inauguration and 22 months after the lawsuit was filed alleging the pepper spray incident, the MPD Office of Professional Responsibility initiated an investigation of the officer's actions that day. The OPR Force Investigation Team interviewed Investigator Cumba on December 12, 2002.

The MPD lead investigator, Detective Elisa Brown, interviewed Investigator Cumba and Detective Jed Worrell. Investigators spoke to the plaintiffs' attorney, Verhayden-Hilliard, but did not interview the plaintiffs because, the report states, the plaintiffs' attorney would not permit the interviews. Nor did the investigators interview anyone else on hand at the Navy Memorial on inauguration day, which included representatives of the U.S. Park Police, several persons interviewed by the news media including *The Washington Post*, and individuals who subsequently wrote to *The Washington Post* about what they saw and heard at the Navy Memorial. The investigators indicated that they were unable to talk with Cumba's superior, retired Sgt. James Staples because he did not respond to a letter sent to his Forestville, Md., home address.

The MPD report on the investigation indicates that Detective Brown viewed the protester's videotape. That tape, also shown during the Committee's December 17 hearing, shows Investigator Cumba wearing dark warm-up pants and a black and orange coat striding through the crowd along the parade route. Uniformed police officers are plentiful in and alongside the crowd. Cumba's face is hidden by a black ski mask and a white hood. Though the picture is slanted and jerky, it clearly shows Cumba holding a can in his right hand. He is seen walking through the crowd, and he shoves someone out of his way to his left. In two series of shots he appears to hold the can and spray its contents at other persons in the crowd. Onlookers run away from him and he follows them, apparently continuing to spray. At one point he changes direction, and walks toward another part of the crowd, spraying again. He is seen being taken into custody by Park police. At no time is there any indication that the officer announced he was a police officer, as is required by department policy (MPD general order 308.13) that states an officer working out of uniform should identify himself as an officer if he is required to take police action.

The department's policy on use of pepper spray, contained in the May 2003 *Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances and Prisoner Processing*, states that canisters of Oleoresin Capsicum (OC or pepper spray) "shall be employed against crowds only as necessary in a defensive capacity, unless no other crowd management weapons are readily available." Any offensive use "shall be only upon approval of the Field Commander and/or her designee[15]."

---

[15] p. 23, *Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances and Prisoner Processing*, May 2003

Cumba's account of the incident given as part of the MPD investigation, contrasting sharply with the version included in the litigation and what is plainly visible on the videotape, and given 23 months after it occurred, follows:

I was assigned to NSID[16], but detailed to the Intelligence Branch. We were to gather intelligence by calling in problems by the protesters such as rocks, bricks, bottles, being thrown. I heard a 1033 over the police radio from Park Police at the Navy Memorial. I went over in that direction, and as I started to get over there, there were four to six Park Officers pinned down at the base of the memorial. People were throwing sticks and anything they could get their hands on at the officers. They were also kicking the officers.

I worked my way through the crowd to give them any assistance that I could give them. I started clearing the crowd by pushing the crowd back. At that point I tried to work my way back to my original location, about a half block away. The protesters had then locked their arms together so that you couldn't get through. I then lifted my jacket displaying my badge and told the protestors that I was a police officer and to let me through. Then then cursed me and refused to allow me to pass.

I again tried to get through by pushing the protesters out of the way. They again refused my passage. I then used my pepper spray in an effort to clear the protesters, after which a guy swung at me with a pole. I remember deflecting it and pepper sprayed him with my right hand. I then tossed the pole to the side. I again tried to find an escape route but was unsuccessful.

The crowd started yelling undercover, undercover, jump them. I could also see a couple of protesters coming at me with what appeared to be pepper spray canisters in their hands. I kept hearing the crowd yell undercover and to get Jed and me. I again used my pepper spray at the protesters coming at me with canisters in their hands.

We were then able to back up towards the uniform units when they grabbed me. I remember somebody yelling that I was a police officer and then they pulled me behind their lines. They asked me if I was okay and if I needed to go to the hospital. One of the officers, Park police officer, said I saw you get hit with the pole, do you want an ambulance. Again he asked me if I were okay I told him yes and he let me walk off.

Cumba indicated that he reported use of pepper spray to his sergeant but did not know if Sgt. Staples filed a use of force report. The investigators apparently found no record of a report within the department. The investigator consulted with Assistant U.S. Attorney Sherri Berthrong in July 2002, wrote that the AUSA viewed the videotape, and four days later the department received a

---

[16] Narcotics and Special Investigations Division

41

letter from the U.S. attorney declining criminal prosecution for the use of pepper spray.

The result of the internal MPD investigation: "On January 14, 2003, the Use of Force Review Board reviewed the use of service weapon incident by Major Narcotics Branch Investigator Patrick Cumba. After careful consideration the board concluded that the officer's use of force was justified." The board also determined this was a "tactical improvement opportunity," that is, Investigator Cumba was recommended for "personalized tactical improvement opportunity training" at the police academy.

At the Committee's hearing December 17 Assistant Chief Broadbent, whose purview includes the Intelligence Unit, was asked what the officers were doing the day of the inauguration. He said he did not know.

To reach the conclusion in the investigative report, MPD investigators appear to have relied solely on statements by Cumba and Worrell. They do not explain the stark difference between their accounts and what is clearly visible on the amateur videotape, or the discrepancies between the accounts of Cumba and Worrell. Beyond what appears on the videotape to be illegal use of pepper spray by a plain clothes officer, the pepper spray incident and resulting investigation raise serious concerns about the willingness and capacity of the Metropolitan Police Department to investigate misconduct within its own ranks.

Chief Ramsey was questioned about this incident and the department's investigation in a November 14, 2003 deposition in one of the lawsuits, *International Action Center, et al, v. the United States of America, et al*. He testified that he first became aware of the pepper spray incident "a couple of weeks ago" when he also viewed the amateur videotape. Asked if he was aware of the internal investigation, he said, "I just became aware of that recently…through my attorney, in preparation for this" deposition. Excerpts of the testimony that followed:

Plaintiffs attorney Mara Verheyden-Hilliard: Having viewed that video, did it appear that their actions were in conformity with their constitutional obligation as the MPD?

Ramsey: [following an objection by his attorney] I am unable to determine based on the footage that I saw.

Verheyden-Hilliard: Can you describe what the footage was that you saw?

Ramsey: An individual had a liquid substance. There was a crowd of people, a liquid substance spraying into the air. I don't know

what prompted it, unable to see anything going on around or
hearing anything so I don't know what prompted it.

Verheyden-Hilliard: What did the individual look like that you
saw?

Ramsey: I don't recall. I only saw the tape once.

Verheyden-Hilliard: Do you recall seeing an individual who was
wearing a balaclava or a black mask?

Ramsey: There were a lot of people in that tape that had on black
masks…

Verheyden-Hilliard: Since you have been made aware of the issue
of the use of OC spray at the Navy Memorial have you undertaken
any investigational review of that incident?

Ramsey: Our Force Investigation Team looks into any discharges
of OC spray now. I don't get involved in investigations until they
come to me for final determination.

The attorney and Chief Ramsey go through a series of questions on the
level of oversight of MPD Office of Internal Affairs and Force Investigation
Team investigations. Verheyden-Hilliard asks, "what safeguards are in place to
ensure that the police officer is not essentially let off the hook?" and "If there is
no adverse action taken against that officer, is there any safeguard to ensure that
that was the correct determination?" Ramsey describes the command channel
review. It is made very clear on the record that when an investigation concludes
that the officer acted within MPD policy, as was the case with the pepper spray
incident, there is no second-level review up the chain of command.

Verheyden-Hilliard: Do you intend to take any action to
investigate or ensure that there is investigation of the use of OC
spray at the Navy Memorial on Inauguration day?

Ramsey: Since there is pending civil litigation in this matter, we
certainly will look into it to make sure that it falls within
department guidelines that existed at the time the incident took
place.

In December during the Committee's hearings, Assistant Chief Broadbent
was asked about the videotape showing the pepper spray incident. He said he had
not seen the Force Investigation Team report, but took for granted that the
investigation was "complete and comprehensive."

The prevalence and quality of internal MPD investigations was not initially an issue within the scope of the Judiciary Committee investigation. The committee, nonetheless, has no choice but to comment and make recommendations concerning this critical aspect of police work: it is imperative that the D.C. Council, and the public generally, be able to have confidence that law enforcement leaders hold themselves and their subordinates accountable.

There is no evidence that the pepper spray incident was even considered as an issue by MPD until the litigation forced the Department to acknowledge its occurrence. There is no evidence Investigator Cumba filed a report on use of pepper spray; there is no evidence Sgt. Staples was aware or did anything about the use of force; the Office of Professional Responsibility investigator failed to pursue even the basic step of contacting Sgt. Staples in person to pursue this aspect of the investigation, let alone other basic police work such as interviewing persons known on the public record to have been on hand where the incident occurred. Not only was a report on the use of force required, and not filed, but, according to the SOP on mass demonstrations, "members who observe other members engaging in misconduct against citizens shall report such misconduct to an official as soon as possible." That, too, did not occur.

The Committee's concern with the ability of the MPD to police itself was underscored a second time in the course of this investigation by receipt on December 16, 2003 of another Office of Professional Responsibility report on three allegations brought to the department's attention in April by Committee Chair Patterson. The allegations were summarized as follows in a memorandum to the Assistant Chief of Police, Office of Professional Responsibility, signed on Sept. 9, 2003, and received by Councilmember Patterson on December 16, 2003:

> Mr. Adam Eidinger complained that six police officers followed him on Friday, March 28, 2003, as he rode his bicycle from Dupont Circle to Visions Theater, located at Connecticut Avenue and Florida Avenue, Northwest. Mr. Eidinger stated that one of the police officers told him that Lieutenant Jeff Herold directed them to follow him.

> Ms. Margaret Luck complained that members of the MPD used poor tactics on Saturday, April 12, 2003, when they rode their motorcycles through a crowd of protesters at 9th and F Street, Northwest. She stated that her complaint was not about the conduct of a particular officer, but about the commanding officer that directed the officers to ride their motorcycles through the crowd of protesters.

> Mr. David Curtis complained that while participating in a protest on Monday, March 31, 2003, he was forced from his bicycle and arrested for Assaulting a Police Officer.

While the Committee notes and appreciates the due diligence shown by the Office of Professional Responsibility in treating these allegations sufficiently seriously to have conducted an investigation, the end result is inadequate. That is, the memorandum report does not disagree with, but also does not explain why Eidinger was followed by six MPD officers. And it does not indicate any action taken whatsoever in the wake of MPD having wrongfully arrested David Curtis for assaulting a police officer.

With regard to the claim about motorcycles riding into a crowd, the investigators were unable to sustain the charge, but also did not take several steps that might have been indicated, including asking local television stations to view their video footage from that day of demonstrations. One videotape reviewed by the Committee shot by an independent journalist showed large numbers of MPD officers on motorcycles in the downtown area along Pennsylvania Avenue and side streets leading up to Pennsylvania, using the vehicles to butt their way through a crowd of anti-war protesters. The journalist interviewed a local attorney who described motorcycles driving into demonstrators. "He hit me on the back of my leg with his motorcycle," the lawyer said, but indicated he was not seriously injured. He said in the 900 block of E Street eight motorcycle officers used their vehicles to move demonstrators into the streets. While not precisely the scene described by Ms. Luck, the description was similar, and based not on a law enforcement investigation but, rather, on the Committee simply reviewing tapes of police conduct during the April 2003 anti-war demonstrations.

On the Eidinger complaint, the report notes, "Lieutenant Herold reported that the bicycle riders were followed so that he would know if and when the bicyclists were going to rejoin one another and begin an illegal Critical Mass Bike ride." Why were six officers tailing a single bicycle rider? What kind of deployment of resources did that represent, and was that defensible or worth challenging as a matter of policy and poor decision-making?

With regard to the Curtis arrest, the memorandum recounts reviewing the arrest/prosecution report which "appears to lack the basic elements for an Assault on a Police Officer." The arrest was no-papered, that is, prosecution for the alleged crime did not go forward. And the narrative in the memorandum indicates that Curtis along with other bicycle protesters was stopped and asked to show his bike registration; when he sought to ride off an officer grabbed the back bike tire and the officer's hand was injured. The arresting officer, Robert Hay, "stated that he became verbally abusive," when asked for the registration. He was "removed from his bicycle and placed under arrest for assault on a police officer."

A review of the prosecution report "revealed that at no time did Mr. Curtis actually assault the officers" and, rather, "it appears that Mr. Curtis failed to obey the officers' commands and attempted to escape." As to the individual being arrested for a crime he did not commit, the memorandum simply says: "Officer Hay has since resigned from the Metropolitan Police Department and it is

therefore recommended that no further action be taken regarding his part in the arrest." Investigators did not question or review the apparent policy of seeking bicycle registrations of individual engaged in protected First Amendment political activity. As has been the case with other incidents reviewed by the Committee, the department's leadership does not use complaints lodged by residents to evaluate the performance of members of the department or of tactics generally used during demonstrations.

The third and final aspect of the Committee's investigation that points to failures at self-policing is discussed in greater length in the section on the Pershing Park investigation. As shown there, a series of after-action reports by MPD officials made very clear that there were serious issues with the arrests effected that day. "The mass arrests at Pershing Park were total confusion," wrote Capt. Andrew Solberg. "I was not confident of the legality of our arrests….That a great number of the failure to obey cases were no-papered indicates the USAO also felt uncomfortable with the charges and/or the arrests."

Another after-action report by Commander Abraham Parks noted, "officers showed up to paper cases and informed the papering attorneys they did not know why the demonstrators were arrested." That memorandum is dated October 2, 2002. A handwritten note on the memo states: "Send copy to EAC Fitzgerald, Terry Ryan, Esq." and is signed by Assistant Chief Alfred Broadbent. Chief Fitzgerald is second in command in the department; Terry Ryan is General Counsel. When asked in his deposition about after-action reports that highlighted issues with the arrests, Broadbent insisted he was not aware of those critical reports, his own signature on one of them notwithstanding. In his deposition, Executive Assistant Chief Fitzgerald stated that he was not aware of any problems with the Pershing Park arrests until sometime after the Council received testimony on the issue on October 24, 2002.

During the hearing December 17 and 18 Chief Broadbent and Chief Ramsey were asked about the failure of the department to follow up immediately on the mistaken arrests when after-action reports indicated serious problems. Neither gave a satisfactory answer.

*Findings:*

**The Metropolitan Police Department has failed in several instances to demonstrate effective self-policing by either failing to initiate investigations when they are called for by compelling evidence, or by initiating investigations that are themselves incomplete, contradictory, and in some cases not consistent with the facts, with the result that officials are not held accountable for misconduct.**

**The Metropolitan Police Department failed to investigate the inauguration day pepper spray incident until well after it occurred and only when forced**

46

to take the occurrence seriously by both ongoing litigation and this Committee's oversight, giving rise to the perception that misconduct within the ranks is tolerated.

The investigation itself ignored the conflicting evidence presented by the amateur videotape that clearly shows Investigator Cumba acting as the aggressor with the crowd in his use of pepper spray. The report failed to address the point of the discrepancy in the officers' own statements versus the visual record of the videotape.

The investigation failed to move up the chain of command to ascertain why the officer used pepper spray in this manner and failed to ascertain if this was, as alleged, an instance of serving as *agent provocateur*, a practice the department leadership officially decries.

The investigation of allegations by Adam Eidinger, Margaret Luck and David Curtis similarly were not carried to their logical conclusion in questioning the policy and practice of conducting surveillance on political activists, the inappropriate use of motorcycles during demonstrations, and the seriousness of making a wrongful arrest of a demonstrator.

The department failed to initiate its own investigation of the Pershing Park arrests based on highly critical internal after-action reports sent up the chain of command to the General Counsel, and Executive Assistant Chief (see "Case Study: The Pershing Park Investigation").

The failure of the Department to initiate investigations into the pepper spray incident and the Pershing Park arrests gives rise to the perception that misconduct is investigated only when it becomes a political liability for the Department.

<u>Recommendation:</u>

The pepper spray incident should be re-investigated by an independent authority. Options include the Department of Justice (DOJ) Independent Monitor overseeing implementation of DOJ's memorandum of agreement with  on use of force, or the DOJ Inspector General.

## CASE STUDY:
## THE PERSHING PARK ARRESTS, SEPTEMBER 2002

On September 27, 2002, the Metropolitan Police Department arrested well over 600 persons in connection with anti-war and anti-globalization demonstrations throughout downtown Washington D.C. The Committee's investigation has focused on the arrest of nearly 400 persons in Pershing Park that day as a case study of MPD practices in order to assess whether the department adheres to its own policy, to legal requirements, and to best practices in assuring civil rights while protecting public safety.

*Planning*

MPD began preparing for the fall 2002 meetings of the International Monetary Fund and World Bank several months in advance including development of a comprehensive operations plan for the weekend of events. Political activists announced plans for both anti-war and anti-globalization events on Friday, Saturday, and Sunday, September 27-29.

In a July 21, 2002 e-mail to members of the command staff, Assistant Chief Broadbent warned "preliminary intelligence is that this will be the worst we ever faced" in terms of demonstrations. In preparation for the meetings, the department was fully mobilized, and MPD asked for manpower assistance from several local and federal police departments.

On September 23, 2002, Chief Ramsey briefed Councilmembers and Council staff on the upcoming weekend's events. He said that MPD was expecting 20,000-30,000 demonstrators. He said MPD was most concerned about non-permitted events planned for Friday, September 27th. Chief Ramsey urged people to take public transportation to work that day, and to expect delays if driving. He said that a group called the Anti-Capitalist Convergence was planning protests for that Friday, perhaps gathering around Freedom Plaza at around 10 a.m. Chief Ramsey shared information from the websites of some of the groups involved that he said had indicated they planned to "shut down the city."

By contrast to the Council briefing and similar updates provided to the media, the Department's own operations plan indicates that the department did not expect more than 4,000 demonstrators at any event over that weekend. A September 27, 2002 Intelligence Unit undercover activity report indicates MPD had a clear picture of the schedule of the demonstrators that day. That report notes that a "snake march" would begin at 7 a.m. in Franklin Park at 14th and K Streets, N.W., that a "Critical Mass bike ride" would begin at Union Station at 7:30 a.m., and that a "People's Strike" would begin at 9 a.m. at Freedom Plaza.

The MPD operations plan for Friday, September 27, 2003, describes the People's Strike as a "call for protestors to blockade various major intersections throughout Washington, D.C. in an effort to shutdown the downtown area" and describes the "Bike Strike" as a ride to "protest global capitalism and environmental destruction" through the streets of downtown, during rush hour, "in an effort to shut down the city."

*Sequence of Events*

The Committee has reconstructed the events of September 27, 2002 by reviewing live media footage of that day as well as published press reports, listening to MPD radio runs, reviewing MPD after-action reports and the Department's "running resume" that logs events reported throughout the day, and interviewing MPD officials. The record shows that mass arrests were ordered throughout the downtown area either in the presence of or with the approval of Chief Ramsey throughout the morning.

Throughout the morning of September 27th, there were groups of demonstrators ranging in size from 30 to more than 150 people converging at different locations across the city, from downtown to Dupont Circle. There were also unsubstantiated reports of small disturbances at different points across the city. For example, local televisions stations reported that burning tires were reported to be seen on the 14th Street bridge at around 7 a.m. According to MPD radio tapes, at 8:48 a.m., 35 demonstrators were throwing debris on Dupont Circle. And at 8:55 a.m., a report came over the radio of demonstrators destroying property at 16th and P Streets, N.W. The Committee did not confirm the factual basis of these reports.

There were also several mass arrests made that morning. The arrests started at 6:55 a.m. when approximately 21 demonstrators were arrested for blocking traffic at the intersection of 14th Street and Independence Avenue, SW, at the exit/entrance to the 14th Street bridge. Five of these demonstrators linked themselves to each other through "sleeping dragon" devices[17] and were extracted by the Fire and Emergency Medical Services Emergency Services Team.

At 7 a.m. roughly 400 demonstrators congregated at Franklin Park at 14th and K Streets, N.W. and then started marching out into K Street. Assistant Chief Brian Jordan was one of four command staff officials given a geographical area of responsibility, including 14th and K[18].

---

[17] A "sleeping dragon" is a device by which two or more people can lock their arms together, usually with a securing device inside steel or polyvinyl chloride (PVC) piping to inhibit the effectiveness of removal by saws.
[18] In his deposition testimony that is contradicted by the operational plan outline of anticipated events, including the snake march to start at Franklin Park, Jordan said: "Friday was a real unclear day that there was specific requests for the Thursday, the Saturday, and the Sunday, but Friday there wasn't any clear information and the responsibility was just for the area commanders to be ready for their areas."

49

He testified that demonstrators began marching in the street without regard for traffic, creating "a dangerous situation." He said, "I decided that we had to make arrests because if they continue there could be possible serious danger in terms of pedestrians being struck." His civil disturbance units (CDU) surrounded and attempted to cut off the demonstrators without success.

According to MPD's running resumé for the day, Chief Ramsey arrived on the scene at 7:27 a.m.

Once the march got to Vermont Avenue, the CDUs blocked in the demonstrators. According to Assistant Chief Jordan's commander's log, at 7:35 a.m., "civil disobedience that could have possible lead to serious injuries to pedestrians, drivers, protesters and police. Decision to effect mass arrests made for marching without a permit." At 7:40 a.m., additional CDUs were deployed to 14th and K Streets and at 7:46 a.m., smoke bombs were thrown at the police. Skirmishes then broke out between demonstrators and police officers. Images of police officers striking demonstrators aired on local television stations.

Assistant Chief Jordan testified that his CDUs formed a cordon around the demonstrators to prevent them from getting back to K Street. Within the area surrounded by police, the window of a business was broken at 7:49 am. At 7:52 a.m., the arrest order was given and approximately 178 arrests were made, all on charges of failure to obey a lawful order of a police officer. Assistant Chief Jordan testified that he gave the order to arrest. This testimony was confirmed by Commander Tom McGuire, who was one of the assistant commanders in charge of that area.

Assistant Chief Jordan testified that he did not give warnings. "With regard to the march, warnings were impractical and to the point of giving someone directions, impossible." He described the situation as "fluid" until the police lines stopped the marchers. He was asked, "even though at that point there was a line in front of them and a line in back of them even though in your own mind you had made a decision to arrest, where was the danger?" Jordan responded, "The action stopped the danger. If they were allowed to continue the danger would continue." Notwithstanding that view, the department's primary policy guidance on the issue of crowd control requires warning and dispersal orders prior to mass arrests "when time and circumstances permit."

There were multiple mass arrests made elsewhere in the city that morning. For example, according to radio tapes and media coverage, at 8:22 a.m., a group of protesters were contained on the 900th block of 12th Street, NW. At 8:32 a.m., Chief Ramsey arrived at this scene. At 8:37 a.m., approximately 70 protesters were arrested at this location. At 8:48 a.m. there were reports of fireworks being lit up and of demonstrators writing on the sidewalk with chalk on the 1200th block

of Connecticut Avenue. By 8:58 a.m., according to the radio tapes, everything was orderly at this location. Yet at 9:10 a.m., a group of demonstrators was stopped and contained by CDU units at 1025 Connecticut Avenue, N.W, and at 9:12 a.m., 42 arrests were made with individuals charged with Failure to Obey.

The largest mass arrest that morning took place at Pershing Park on Pennsylvania Avenue between 14th and 15th Streets, N.W. Beginning at approximately 8:40 a.m., demonstrators and police officers began converging at Freedom Plaza between 13th and 14th Streets and at Pershing Park. According to radio tapes, at 8:47 a.m., 150 demonstrators were headed south on 13th Street crossing over G Street, NW.

At 9 a.m., a call came over the radio for all transport buses to report to the 1400th block of Constitution Avenue, N.W., a block south of Pershing Park. Transport buses are the means used by the police to transport prisoners after effectuating mass arrests.

By 9:06 a.m., the southern and eastern sides of Pershing Park were closed off by MPD civil disturbance units. As demonstrators began to converge on this location, a large group began to walk north on 14th Street. Fearing they were losing control of the group, according to Captain McLean, MPD officers cut those demonstrators off at 14th and F Streets and directed them back down 14th Street and into Pershing Park.

These were not the only demonstrators ushered into the Park by MPD. One of the demonstrators arrested at Pershing Park, retired Army Lieutenant Colonel Joseph Mayer, was interviewed by MPD as part of its internal investigation into the Pershing Park arrests. During that interview, he described arriving at Freedom Plaza to participate in the protest:

> The police then were surrounding the plaza, told us we could not enter Freedom Plaza, and directed us across 14th Street, to Pershing Park, where they indicated the demonstration was going to take place. So, we crossed 14th Street to Pershing Park, which was also surrounded by police, and the police were at that point along the curbline surrounding the park, and we went up on the sidewalk, the edge of the sidewalk closest to the park. And we had a cloth banner which we stretched out parallel to 14th Street, so the traffic could see it, opposing the war in Iraq, and we stood on the sidewalk with our banner for ten or fifteen minutes, not long. And at that point, the police who were along the curb line, danced across the sidewalk and pushed us in the park, we said to the police wait a minute, we want to stand on the sidewalk where our banner could be seen by the traffic. He said get in the park, so we moved into the park about ten or fifteen feet.

51

At 9:06 a.m., a group of approximately 75 to 100 demonstrators on bicycles arrived in the vicinity of Freedom Plaza. These "bike demonstrators" had set off from Union Station at 7:30 a.m. and rode around the city for approximately 90 minutes. Captain Andrew Solberg was in command of the CDU bike units that followed the bike demonstrators that morning. Capt. Solberg testified that he accompanied the bike demonstrators to the vicinity of Pershing Park and then the demonstrators ended up in the park.

According to Sergeant Darrick Ross, who was riding with one of the CDU bike units, the bike demonstrators had ridden past the park when the CDU officers were ordered to push the bike demonstrators back into the park. Given the fact that MPD had just pushed a large group of demonstrators into Pershing Park from 14th Street, it is likely that the bike demonstrators had no access to 14th Street and, indeed, were directed into the park. A September 28, 2002 The Washington Post article[19] described it this way:

> After steering from Pennsylvania Avenue onto 15th Street, NW about 9:10 a.m., they encountered a wall of police that wasn't going to budge. Quickly, the wall collapsed on the riders and moved them into Pershing Park. The ring of officers around the park constricted, forcing the bicyclists to commingle with a couple of hundred other demonstrators who had been corralled there.

One of the riders, Michael Eichler, testified before the Judiciary Committee on October 24, 2002 about his experience:

> I decided to linger in the park for a few minutes to listen to the drums being played, to soak in the excitement and energy coming from the peaceful activists and listen to their message. But before I knew it, the entire park was surrounded by police: MPD, US Park Police, riot police from Fairfax County, the MPD bicycle squad…I cautiously approached the police line and asked if I could leave. I was denied. I feverishly rode my bike around the inner perimeter of the park looking for a way out. I could not find one.

Similar testimony was provided by Julie Abbate:

> The bike strikers began to arrive. They appeared to be outnumbered by the bike police. The police flanked the bike protesters on both sides and funneled them into the park. At that time I noticed that the police presence was increasing, and I decided to leave…I was told that I could not leave.

By approximately 9:15 a.m., a full half hour before the decision to make a mass arrest was made, Chief Ramsey and Executive Assistant Chief Michael

---

[19] "A Day of Tightly Controlled Chaos," Monte Reel Washington Post, September 28, 2002

Fitzgerald had arrived at Pershing Park. MPD's tactical strategy of intentionally directing demonstrators into the park was confirmed by Chief Ramsey. In an interview with washingtonpost.com that morning, Chief Ramsey said:

> There were folks that were in the street earlier, we told 'em to get out, they didn't, so we moved 'em back into the park, and now we're in the process of making arrests for failure to obey. We held 'em until we had enough buses and vans and people to move in.

At 9:42 a.m., all four sides of Pershing Park were closed off and demonstrators were not allowed to leave. During the approximately thirty minutes prior to MPD's closing off the remaining two sides of the park, demonstrators and others within the park were not given any orders to disperse or warnings that they would be arrested. This has been substantiated by both the Committee's and MPD's own investigation, and by the testimony of Captains Andy Solberg and Ralph McLean, Lieutenant Herold, and numerous public witnesses. Assistant Chief Newsham testified that he believed that warnings had been given to demonstrators earlier that morning, and that that, in addition to the fact that two of the sides of the Park were open for a period of time, was sufficient warning to those inside the park that arrests would be made.

The decision to conduct a mass arrest had not yet been made when Chief Ramsey and EAC Fitzgerald arrived. According to the deposition testimony of EAC Fitzgerald, Assistant Chief Newsham, who was in charge of the area, approached Chief Ramsey and EAC Fitzgerald when they arrived on the scene and described the situation. Several witnesses interviewed by the Committee observed this conversation, which took place at the southeast corner of the park, at the intersection of 14th Street and Pennsylvania Avenue. The following are relevant excerpts from Assistant Chief Newsham's deposition about this conversation:

> Q: We have had sworn testimony that the chief directed you, instructed you to arrest the protesters, is that correct?
>
> A: I wouldn't say that's correct, no.
>
> Q: Well, when you advised him about what was going on did he have questions about what was going on?
>
> A: Yes.
>
> Q: And did you inform him about what you thought was the appropriate course of action?
>
> A: Yes.

Q: And I take it that you took his involvement as some sort of approval?

A: Yes…I know I briefed the Chief and I told him.  I said I think they're arrestable.  Like I said, Chief Fitzgerald was right there and I felt when I left that group that I had the authority to make the arrests….

Q: When you described to Ramsey what you saw in a situation such that you said subsequently in your testimony you felt you had his approval, in your conversation with him did you directly seek that approval?

A: I would say yes.

According to Captain McLean's deposition testimony, after this conversation with Chief Ramsey, Captain McLean and Assistant Chief Newsham discussed what the demonstrators should be charged with.

In his public hearing testimony before the Committee, Chief Ramsey confirmed that he gave approval for the order to make the arrests at Pershing Park.

At approximately 10:25 a.m., the demonstrators inside Pershing Park began to be arrested and loaded onto buses.

Findings

**Facts on the record point to a decision to make preemptive mass arrests at Pershing Park. Through his public statements and directions to MPD commanders, Chief Ramsey set a tone that allowed for and approved of preemptive arrests. MPD created an expectation of violence, directed individuals into the park, and failed to permit persons to leave.**

In statements to the media throughout the morning of September 27, 2002, Chief Ramsey indicated that he anticipated civil disobedience and that any law-breakers would be quickly arrested.  The arrests made throughout the downtown area that morning showed that there would be no tolerance for any non-permitted, spontaneous demonstrating.  Arrests were swift and, at times, preemptive, indiscriminate and in violation of MPD policy.

In the case of Pershing Park, it is clear from the testimony of Assistant Chief Newsham that arrests were made in anticipation of what may occur if protesters were allowed to continue demonstrating.  The decision to make arrests was consistent with a preemptive tone set by Chief Ramsey in preparation for the demonstrations.  Commander Tom McGuire testified during his deposition that

54

there were discussions among command staff "about us setting the tone because of the way that the information was coming out that the protesters, again, wanted to take the city over, they wanted to shut the city down. And I think that the police department wanted to set the tone that we weren't going to allow that to happen in the nation's capital." Commander W. E. Dandridge in his after-action report notes: "The option to start mass arrests early on Friday morning proved highly effective and set the tone for the remaining days of the detail."

On the evening of the Pershing Park arrests, Chief Ramsey responded to a reporter's question about the arrests with this statement:

> Remember, they had no business being in the street. There was no parade. You can't just take over Pennsylvania Avenue. You just can't take over 15th Street. For the last four months, these folks been talking about shutting down the city. When they do something like that and they fail to move, I can only presume that's what they intended to do. And that happens to be illegal. And we took the action that was appropriate.

According to the deposition testimony of some MPD witnesses, including CDU training Sgt. Keith DeVille, the size of anti-globalization demonstrations has decreased since April 2000. This testimony is consistent with information provided to the Woodley Park community from a representative of the IMF, Pat Davies, during a community meeting in August 2002, one month before the Pershing Park arrests. Davies told the community that, particularly since September 11th, the "ferocity of violence" associated with anti-globalization demonstrations "is significantly reduced." Yet the rhetoric from MPD concerning the threat posed by anti-globalization demonstrations has remained the same since 2000.

The Committee subpoenaed documents from George Washington University (GWU) and received in response a copy of an internal e-mail recounting a conversation with IMF security that contained speculation on this issue:

> [Individual's name] just got a call from his contact at the IMF in charge of security. This person has heard nothing about violence. He suspects that Chief Ramsey is just trying to clear the streets. He said there may be political reasons as well.

According to George Washington University (GWU) campus police, GWU informed its students that "All of the indicators are that the protests will be nonviolent in nature and the majority of guests, including protesters, will peacefully exercise their first amendment rights."

At the Committee's December 18, 2003, public hearing Chief Ramsey was asked about the discrepancy between his public announcement that from 20 to 30,000 protesters were expected in the city and the department's own internal estimates that no more than 4,000 persons were expected at any individual event. He responded that MPD makes the most accurate crowd projections it can for upcoming demonstrations, and refused to acknowledge that the information the Department distributed internally differed from the information it shared with the public.

There can be serious consequences to releasing inaccurate information about the potential for civil disturbances during demonstrations. First, it is a violation of the public trust to release misleading information to the public. Second, there is a risk that law enforcement may over-react as a result of "over-preparing" for a crowd that is portrayed to be larger and more threatening than it is in reality. The massive over-reaction by the police during the international trade talks in Miami is an example of this phenomenon. According to the public hearing testimony of AFL-CIO chief international economist Thea Lee, who helped organize meetings of the AFL-CIO during the international trade talks in Miami in November 2003, labor organizers repeatedly gave crowd estimates for demonstrations of 10,000-20,000 people, yet Miami police officials made public statements projecting that 70,000-100,000 demonstrators would be in attendance.

Despite Chief Ramsey's testimony during the public hearing that MPD had no idea that the demonstrators would end up in Pershing Park, it is in fact the case that intelligence reports contained information about the three major events planned for that morning – the convergence and march at 14th and K Streets, the bike ride, and the convergence at Freedom Plaza at 9 a.m. At each location, MPD amassed resources necessary for arrests in advance. And at each location, mass arrests were made.

**The rationale for the arrests at Pershing Park was based on alleged unlawful activity earlier that morning, but MPD commanders did not have probable cause to arrest everyone in the park on the basis of those allegations.**

Assistant Chief Newsham testified that MPD had probable cause to make the mass arrest based on the fact that those arrested were demonstrating without a permit. He testified that earlier in the morning, he observed demonstrators turning over newspaper boxes and ignoring orders of MPD officers to get out of the street. He also testified that he had heard that demonstrators broke a window at Vermont Avenue and K Street earlier that morning. But Assistant Chief Newsham could not be sure that the people inside Pershing Park were responsible for the earlier activity. In response to an observation during his deposition that "it's very possible that the people who were parading without a permit or who had knocked over something or who had perhaps been involved over at Vermont and K that they went away," Assistant Chief Newsham testified:

I wouldn't agree with that and I'll tell you why because the people
who participate in IMF demonstrations are very distinct looking
people in that they dress alike and they're generally of a certain
age range and they're generally carrying something that's
indicative of being a protester, whether it be a drum or a sign.

The assumption that all of the individuals in the park, based on their
appearance, were responsible for breaking the law earlier in the morning does not
constitute probable cause to arrest them.  Relevant constitutional case law, as well
as MPD policy, requires that during mass demonstration situations, there must be
probable cause that *each* of the demonstrators being arrested has broken the law.
This point was reiterated by the testimony of Robert Klotz, a retired Deputy Chief
of Police, Commander, MPD Special Operations and Traffic Division
commander.  Mr. Klotz testified that if a few people participating in a
demonstration break the law, the police need to arrest only the law breakers, not
all of the demonstrators.  This is the mass arrest policy and practice of MPD as
articulated by the testimony of Sergeant Keith DeVille, who supervises the civil
disturbance training unit, and Lieutenant Jeff Herold, who is the commanding
officer of the Domestic Security Operations Branch of MPD's Special Operations
Division.  Both Sgt. DeVille and Lt. Herold testified that MPD's mass arrest
policy was applicable to the circumstances at Pershing Park.

**If the rationale for the arrests is that demonstrators failed to disburse or
were on an un-permitted march, the arrests were still unlawful because MPD
arrested demonstrators at Pershing Park (as well as at Vermont Avenue and
K Streets) without first giving orders or warnings, in violation of MPD
policy.**

The Pershing Park arrests also violated MPD policy because warnings
were not given in advance of MPD's closing the park and making arrests.  The
MPD mass arrest manual states:

When the intensity level of a crowd rises and unlawful disruption,
either through violent or passive means, is occurring to the extent
that the Field Commander determines there is a need to make a
positive police response, he/she will instruct the affected unit
commanders, when time and circumstances permit, to issue
warnings to the crowd to disperse.  In issuing such warnings the
following procedures shall be utilized by unit commanders.

a.    Issuance of Warnings

1) The issuance of warnings shall be of such amplification
and repetition as to be heard by the entire assemblage.

2) Issuances shall be made by the unit commander from stationary vantage points that are observable to the crowd, or to a large number of participants.

3) Additional warnings, where necessary, shall be given from police vehicles, equipped with public address systems, moving around the crowd.

4) The warning shall consist of an announcement citing the offenses or violations that are being committed by the participants, and a request or order, whichever is applicable, that the crowd disperse. Whenever possible, this warning shall be written out prior to the announcement, to ensure clarity and accuracy, and consistency, if the warning is repeated.

5) The entire warning process shall be documented by means of an audio-visual recording, if available. If this is not available, then written documentation must be retained and made a part of any arrest files.

Again, Assistant Chief Newsham's belief that actions on the part of MPD officers earlier that morning constituted enough warning that demonstrators would be arrested does not constitute compliance with the manual's mass arrest procedures. Further, Assistant Chief Newsham himself described the circumstances as static, so presumably circumstances would have permitted warnings. Contemporaneous press accounts corroborate the static nature of the crowd.

The timing of the arrests at Pershing Park is also important to evaluating their appropriateness. Even if, as Assistant Chief Newsham has testified, the arrests were made on the basis on demonstrators' failure to obey orders earlier in the morning, the fact remains that MPD did not take any positive police action immediately following the alleged violations of law. A significant period of time elapsed before the park was sealed off and the arrests made, and during that time period, MPD did not give demonstrators' any indication that there would be consequences for the earlier violations.

The Committee received expert testimony on this point from Robert Klotz. Mr. Klotz testified that during a mass demonstration situation, if the police overlook minor violations of law for a period of time, it is important to communicate a fair amount of notice before the police change tactics and begin to enforce the violations of law. At Pershing Park, no communication of this kind – including a warning consistent with MPD policy – took place during the 30 minutes between MPD's partial closure of the park and its final action to seal off the park and make arrests. The fact that bystanders totally uninvolved with the demonstration, as well as reporters, were swept up in the arrests, further substantiates this point. Julia Abbate, who wandered into Pershing Park to observe the demonstration, testified that, in fact, she followed every order given

by police that morning, and that if she had heard any order to disperse, she would have.  But no order was given and she was trapped inside the park and arrested.

**Chief Ramsey is responsible for the arrests at Pershing Park, though he initially testified before the Judiciary Committee that he was not a part of that decision.**

As the testimony of both Assistant Chief Newsham and Chief Ramsey confirms, Chief Ramsey was a full participant in the decision to conduct a mass arrest at Pershing Park.  But in testimony before the Judiciary Committee on February 25, 2003, after the completion of MPD's Force Investigation Team report finding Assistant Chief Newsham responsible, Chief Ramsey testified that he was not a part of the decision.  The following is a transcript of that testimony:

Councilmember Patterson:  "And whose decision was it to make the arrests in Pershing Park that day?"

Chief Ramsey: "Assistant Chief Newsham was assigned to that particular sector that we had, that area that we had.  All the assistant chiefs were given areas of responsibility and that happened to be his area."

Councilmember Patterson: "And you were not a part of that decision making yourself?"

Chief Ramsey: "No. When I came up on the scene, actually, that was already practically in progress.  I was all over the various locations where we had incidents taking place … But I was there when the arrests were taking place."

Further, according to MPD policy and District regulations, since Chief Ramsey was on the scene at Pershing Park, he was the official in charge.  MPD's manual on mass demonstrations states that the highest ranking official on the scene is the "field commander," and is, therefore, in charge.  Section 800 of Title 6A of the D.C. Municipal Regulation's states:  "The Chief of Police shall, when necessary, immediately proceed to the scene of any riot, tumultuous assemblage, or other unusual occurrence and take command of the force and direct its efforts in the work at hand."

**The official version of what occurred and what went wrong at Pershing Park as presented in the testimony of Executive Branch witnesses fails to acknowledge the fundamental flaws in MPD's execution and interpretation of its mass arrest policy that day.  This failure has consequences in terms of MPD's commitment to protecting First Amendment rights during future demonstrations, as well as its ability to objectively review its own policies and procedures.**

What is most striking about the mass arrests at Pershing Park is that the executive branch has repeatedly attempted to minimize the nature and extent of the mistakes that were made. During their public hearing testimony, Deputy Mayor for Public Safety and Justice Margret Kellems, Chief Ramsey, Assistant Chief Newsham, and Office of Corporation Counsel attorney Tom Koger refused to retreat from the position that the arrests themselves were not unlawful. To the extent that particular actions on that day were deemed problematic by these hearing witnesses, they were presumed to be the result of individual error, rather than the result of policy flaws. According to the department and the Williams administration, the blame for the Pershing Park mass arrests falls almost entirely on Assistant Chief Newsham, who was deemed guilty of not following procedure because of the failure to issue warnings and of using the wrong charge – failure to obey a police order instead of parading without a permit. They testified that Assistant Chief Newsham was correct in ordering the arrests, but his mistake was in not following procedure.

All of this creates the false impression of an action that was only technically incorrect, not fundamentally flawed. This belief does not bode well for the protection of First Amendment rights during demonstrations in the District in the future. Nor would it give rise to a thorough review of the Department's policies and procedures in handling demonstrations. This final consequence is most clearly illustrated by MPD's internal investigation into the Pershing Park arrests, an investigation discussed in detail in the next section of this report.

## CASE STUDY: THE PERSHING PARK INVESTIGATION

A factor in the decision by the Judiciary Committee to conduct an investigation of policies and practices of the Metropolitan Police Department in handling demonstrations was the failure of the department to conduct a thorough and objective internal review of the problematic arrests in Pershing Park in September 2002.

The need for a review of the Pershing Park arrests was clear almost immediately. On the evening of September 27, 2002 at approximately 5 p.m. Mayor Williams held a press conference attended by Deputy Mayor for Public Safety and Justice Margret Kellems, and Chief Ramsey. A reporter asked about the manner in which the arrests at Pershing Park were made. The following reflects an excerpt from videotape of the press conference:

Reporter: "A number of the protestors have said they were never given warnings before they were corralled by your officers and arrested. How do you answer that?"

Chief Ramsey: "Well, I mean we gave warnings. I mean, when you've got large groups like that, obviously, I mean there's a lot of noise and things like that. But we gave warnings, we followed everything by the book."

Reporter: "Did your officers use bullhorns at 15th and Pennsylvania Avenue?"

Chief Ramsey: "I wasn't there at the time but we gave verbal commands…people to get out of the street. But remember, they had no business being in the street. There was no parade. You can't just take over Pennsylvania Avenue, you can't just take over 15th Street… "[20]

Television media reports on the evening of September 27, 2002 included interviews of a woman who did not participate in the demonstrations but was swept up and arrested by MPD as she biked to work. The same evening broadcast included reports of technology breakdowns at the police academy contributing to delays in the release of those arrested. Newspaper coverage of the arrests the next day and for weeks following, contained allegations of illegal arrests, excessive use of force, and other improprieties on the part of MPD[21].

---

[20] FOX 5, 5 p.m. News, September 27, 2002
[21] "Police Arrest Hundreds in Protests; Anti-Capitalism Events Cause Few Disruptions," Manny Fernandez and David A. Fahrenthold, *The Washington Post*, September 28, 2002
"A Day of Tightly Controlled Chaos," Monte Reel, *The Washington Post,* September 28, 2002
"Did Police Go Too Far?," *The Washington Post*, October 1, 2002

In a September 30, 2002 letter to Mayor Williams, Councilmember Patterson objected to the level of resources spent on the demonstrations, noting that preparations for 20,000 – 30,000 demonstrators were made when only a couple thousand participated.  She objected to the "*de facto* militarization of the city" and the arrest of nonviolent demonstrators, without warning, at Pershing Park.  Mayor Williams responded to Councilmember Patterson's letter and noted how proud he was of MPD and its partner agencies, stating that they "worked cooperatively to uphold our city's great tradition of protecting the rights of peaceful and lawful protest, while ensuring public safety at the event sites and in our neighborhoods."  He also objected to Councilmember Patterson's characterization of the *de facto* militarization of the District.  He wrote that MPD "moved decisively to prevent [the shutting down of the city] from happening.  In any given situation, the MPD rightfully uses its discretion in responding to non-permitted demonstrations.  In this instance, the MPD chose not to tolerate such actions, and I support that decision."

In addition to press accounts and concerns raised by the D.C. Council, concerns about the arrests were also expressed internally within the department.  Fourth District CDU Captain Andrew Solberg submitted an October 12, 2002 after-action report through his chain of command with the following observation:

> As a CDU Captain, I was not confident of the legality of our arrests.  I had been following the bicycle riders for their entire ride, and at no time did I ever hear or see any MPD officer give an order to clear sidewalks, streets or intersections, meaning that the charge of "Failure to Obey an Order" was not a valid charge.  That a great number of the Failure to Obey cases were no papered indicates the United States Attorney's Office also felt uncomfortable with the charges and/or the arrests.

The Office of Corporation Counsel (OCC) did not paper (i.e., forward for prosecution) any of the Pershing Park arrests because, according to media reports, they "felt they had no probable cause to connect the protester to a particular crime[22]."

Four MPD after action reports included relevant observations raising questions about the validity of the arrests. In an October 2, 2002 memo to Assistant Chief Alfred Broadbent, Commander Abraham Parks, then-Director of MPD's Court Liaison Division, listed a number of reasons OCC did not paper the arrests, including  "Officers showed up to paper cases and informed the papering attorneys they did not know why demonstrators were arrested."  A number of

---

"City's Quandary: Peaceful Streets Vs. Right to Assemble," David A. Fahrenthold and Manny Fernandez, *The Washington Post,* October 17, 2002

[22] "City's Quandary: Peaceful Streets Vs. Right to Assemble," David A. Fahrenthold and Manny Fernandez, *The Washington Post,* October 17, 2002

after action reports submitted by command officials made similar observations, including the following:

- "One large underlying problem remains the fact that arresting officers arrive at the prisoner processing sites with what appears to be temporary amnesia. Some officers state that they have no knowledge pertaining to the arrests." – Assistant Chief Shannon Cockett, October 11, 2002 memo to Executive Assistant Chief (EAC) Michael Fitzgerald through Senior Executive Director Nola Joyce.

- "Each CDU platoon should have a captain that is responsible for monitoring activities to ensure that arresting officers are made aware of the facts and circumstances leading to arrests and be able to identify same." – Assistant Chief Brian Jordan, October 10, 2002 memo to EAC Fitzgerald.

- "It is recommended that an in-house committee be established to conduct an extensive and immediate review of all the components of our mass arrest procedures and processes; the operational handbook be updated accordingly, and the related training be designed and provided." – Commander Joe Griffith, October 11, 2002 memo to Assistant Chief Alfred Broadbent through EAC Fitzgerald.

Between September 27 and October 24, 2002, the Judiciary Committee received additional information in letters and e-mails from persons arrested at Pershing Park and detained for 24 hours or more. The panel was urged to hold an oversight hearing on the issue.

On October 24, 2002, the Committee on the Judiciary held a previously-scheduled public hearing on pending legislation pertaining to personnel practices within the police and fire/EMS departments. Among the witnesses at that hearing were three individuals who recounted serious allegations of improper arrest and excessive force on September 27, 2002.

Based on that testimony, Councilmember Patterson immediately contacted Mayor Williams and urged him to initiate an investigation of the arrests and detentions. Mayor Williams, in a letter dated November 6, 2002, directed Chief Ramsey to conduct an investigation to be completed within 10 days. In a November 12 response, Chief Ramsey indicated that the Department's Office of Professional Responsibility would conduct the investigation, a decision that, in and of itself, became a matter of controversy.

To assist the Department, the Judiciary Committee provided a copy of the October 24 testimony in both written form and in a videotape of the hearing provided to the office of Deputy Mayor Kellems. Councilmember Patterson also provided a second videotape of the testimony to Assistant Chief Peter Newsham,

Director of the Office of Professional Responsibility (OPR), who was at that time on administrative leave. On November 22, 2003, Acting OPR Director Inspector Stanly Wigenton called the Judiciary Committee for assistance in locating the October 24 witnesses, and Amy Mauro of the Committee staff provided the police department with the telephone number of the ACLU of the National Capital Area to facilitate the police department investigation.

Upon receiving the directive from Chief Ramsey to investigate the allegations of the Judiciary Committee hearing witnesses, Inspector Wigenton assigned the matter to Inspector Ederheimer, who in turn assigned the investigation to Captain Klein, commander of the Force Investigation Team (FIT). Captain Klein assigned the investigation to FIT Sergeants James McCoy and James McGuire, who conducted the investigation, reviewing the appropriate documents and conducting interviews.

Shortly after the start of the investigation, Sergeants McCoy and McGuire learned that Assistant Chief Newsham was the official in charge of the area surrounding Pershing Park on September 27, 2002, and that the investigation would focus primarily on decisions made that day by him. Because Assistant Chief Newsham is the highest ranking supervisor of Sergeants McCoy and McGuire, this presented an issue for the investigators. According to their deposition testimony, Sergeants McCoy and McGuire discussed this issue and felt that it would not be appropriate for the FIT to continue the investigation. Sgt. McGuire made this point to his lieutenants, Captain Klein, and Inspector Ederheimer. In addition, he said that, to his knowledge, the FIT had never before investigated an official at the rank of assistant chief or higher. Sergeant McCoy also testified that he had never investigated an official at the rank of assistant chief.

When asked about this issue, Inspector Ederheimer said he recalled some discussion about whether the FIT should continue with the investigation. He said that he could not recall the FIT conducting any investigation of an official at the rank of assistant chief or higher in the past, but that it would not have been conventional to refer such a matter to the Office of the Inspector General. In response to a question about this issue in an October 10, 2003 written deposition from the Committee, Chief Ramsey responded:

> The investigation was not assigned to the Office of the Inspector General because under the memorandum of understanding between that office and MPD, "allegations for criminal or administrative misconduct by employees of the MPD brought forth to, or discovered within the MPD, will be investigated by the MPD's Office of Professional Responsibility or as determined by the Chief of Police." Additionally, Assistant Chief Newsham at the time was on administrative leave with no clear date when he would return to duty. Accordingly, *it was not inappropriate to have OPR*

> *investigate this matter* since the investigating officials would not
> be reporting to Assistant Chief Newsham as they would under
> normal circumstances [emphasis added].

Finally, Chief Ramsey stated:

> The investigation was not assigned to any other outside
> organization because *it was apparent to me that all decisions made
> during this event were made in good faith and were not criminal in
> nature.* [emphasis added]

When it came time for the investigators to interview Chief Newsham, Sergeants McCoy and McGuire were informed by Captain Klein that they would not be interviewing the assistant chief, despite the fact that the sergeants had conducted every other interview related to the investigation. Instead, they were directed to write a list of the questions they had for Assistant Chief Newsham and were informed that EAC Fitzgerald would conduct the interview. According to Inspector Ederheimer, he attended a meeting with Chief Ramsey, EAC Fitzgerald, Inspector Wigenton, Commander Ponton, and MPD General Counsel Terry Ryan, when this issue was discussed. At this meeting, Inspector Ederheimer recommended that the sergeants not interview Assistant Chief Newsham because it would be "awkward" for members of the FIT to interview their commanding officer. It was then agreed that Terry Ryan would conduct the interview.

According to Chief Ramsey's response to the October 10, 2002 written deposition, he subsequently "determined that Executive Assistant Chief Fitzgerald would interview Assistant Chief Newsham." He "initially felt that Assistant Chief Newsham should be questioned by the General Counsel. However, upon further discussion and reflection, [he] decided that Assistant Chief Newsham should be questioned by a ranking official rather than the General Counsel." This decision apparently was made notwithstanding the earlier determination that it "was not inappropriate" for the FIT to investigate the actions of Chief Newsham.

The decision to have EAC Fitzgerald interview Assistant Chief Newsham brought an official who was not assigned to the FIT into a confidential investigation, an action inconsistent with typical investigative practice. During his September 26, 2003 deposition, EAC Fitzgerald was asked about this decision.

> Q: "Do you know why you were asked to conduct the interview of
> Chief Newsham?"

> A: "Because I was a senior officer, senior official."

> Q: "I ask because obviously you're outside of the Office of
> Professional Responsibility."

A: "Yes, ma'am."

Q:  "It's my understanding that typically during an OPR investigation only OPR investigating officials conduct interviews; is that right?"

A: "Yes, ma'am."

Q:  "So why would you conduct interview in this instance?"

A:  "I was instructed to do the interview."

EAC Fitzgerald also indicated that he did not take any steps to familiarize himself with the investigation, according to his deposition testimony.

Q: " – did it occur to you to speak to the investigators in the case to find out more about the situation so you could conduct a full and complete interview?"

A: "No, ma'am."

Q: "So you didn't speak to anybody investigating the case prior to your interview of Assistant Chief Newsham?"

A: "I may have spoke to Inspector Wigenton before, but I did not speak to any of the sergeants, or lieutenants, or captains if that's what you're asking me."…

Q:  "Okay.  So not with Sergeant McCoy or Sergeant McGuire?"

A: "No"

Q: "And not with Captain Klein?"

A: "No."

Q: "Okay."

A:  "Nor would I have."

Q:  "Did you – were you able – how did you determine in your mind as you prepared for this interview what questions to ask Mr. Newsham?"

A:  "I don't recall."

In fact, during EAC Fitzgerald's interview of Newsham, he asked a majority of the 44 questions prepared by the FIT investigators. Among the prepared questions he failed to ask, however, was this: "Did any chief within the police department, including Chief Ramsey, order the arrests of the protesters in Pershing Park?"  In his deposition EAC Fitzgerald was asked twice whether he asked Newsham if he had consulted with anyone else about the decision to arrest. Twice he responded that he had not asked that question.

EAC Fitzgerald's own presence at Pershing Park before and during the arrests was also not referenced in the report or in the decision concerning who would undertake the questioning of Chief Newsham. Another excerpt from the EAC Fitzgerald deposition:

Q:  "So you had conversations prior to the order to arrest with Assistant Chief Newsham and the Chief of Police?"

A: "Yes, ma'am."…

Q:  "And did you remain on the scene while the persons were arrested?"

A:  "Yes ma'am."

Q:  "And did you remain on the scene the entire time until the park was cleared, while people were arrested?"

A:  "I was – I was on the scene the majority of the time, yes, ma'am.  I can't – I don't know if I stayed there until the last person was taken out of the park, but I know I was there the majority of the time."…

Q:  "So is it fair to say you agreed with his judgment to place them under arrest?"

A: "Based on what he – based on what he told me, yes, I do."…

Q: "Do you think looking back on this now that there was a conflict for you having been on the scene and heard Chief Newsham's reasons at the time for ordering the arrests and signaling that you agreed with it at that time and then questioning him about his decision to do the order of arrest?"

A:  "No, sir."

68

Q: "And why would you not see a conflict in that?"

A: "Because I'm a professional police officer. I've been here 32 years. He's been a professional for 15 years. As the investigation has pointed out, it's still (inaudible) based on any of the rights and wrongs that were involved in reference to that."

After the sergeants finished their investigation, Captain Klein wrote the investigative report. According to the deposition testimony of Inspector Ederheimer and Captain Klein, Klein, instead of the investigating sergeants, wrote the final report because it was an important matter, because Inspector Ederheimer wanted the report done well, and because Inspector Ederheimer had confidence in Captain Klein's ability to do a good job.

Captain Klein then wrote the report, signed it, and submitted it to his supervisors. The signed report had the subject line, "Final Report Relative to Complaints of Alleged Misconduct Made at the October 24, 2002, Hearing of the Committee on the Judiciary of the Council of the District of Columbia Concerning the IMF/World Bank Protests." Earlier unsigned drafts of the report that were provided to Chief Ramsey had the subject line "Update Relative to Complaints of Alleged Misconduct Made at the October 24, 2002, Hearing of the Committee on the Judiciary of the Council of the District of Columbia Concerning the IMF/World Bank Protests."

Shortly after completing what was at the time his final signed report, Captain Klein was called into a meeting with Chief Ramsey, Commander Ponton, and Inspectors Wigenton and Ederheimer. According to the deposition testimony of each, during this meeting, several changes to the report were recommended and/or directed. After the meeting, Captain Klein returned to his office and made the directed changes and forwarded one or more revised versions of the report to Chief Ramsey's office. Inspector Wigenton, at the request of Commander Ponton, subsequently asked Captain Klein for an electronic version of the report on disk, which Captain Klein provided to Inspector Wigenton.

At that point additional changes were made to the report in Chief Ramsey's office. The document was sent to Deputy Mayor Margret Kellems who, in turn, shared the report with Councilmember Patterson. The "final report" that ultimately went to Deputy Mayor Kellems and was forwarded to Councilmember Patterson had only one signature on it, that of Inspector Josh Ederheimer. It had no additional signatures despite the fact that it contained blank signature blocks for Inspector Wigenton and Captain Klein. This is due to the fact that the report did not go back through the chain of command after the final version was produced in Chief Ramsey's office, a fact verified by the testimony of Commander Ponton.

When Inspector Ederheimer was asked how his signature came to be on the final version of the report when he had not reviewed the final version until after it was provided to Deputy Mayor Kellems and Councilmember Patterson, he stated that he did not know:

> Q: That is your signature on that report?
>
> A: That's my electronic signature.
>
> Q: And you say that that is not the report you sent up the chain of command?
>
> A: Correct.
>
> Q: Can I ask how it is that your signature appears on it?
>
> A: I don't know.

Inspector Ederheimer's electronic signature is on the report because it was on the disk Commander Ponton used to print out the final version of the report. Commander Ponton testified that he did not share the final version of the report with the chain of command prior to sending it to the Mayor's office because he assumed that all of the officials agreed with the changes made. He also stated that the changes he made to the electronic version were changes in format only. The report sent to the Mayor and Council was represented as having the imprimatur of Inspector Ederheimer and others although neither Inspector Ederheimer nor the other officials approved or actually signed the final version of the report.

In interviews the Committee raised questions about this chain of events as it is highly unusual for a confidential OPR investigative report and a violation of MPD general orders. MPD General Order 1202.1 Part I. E. 3. Review of Investigation states:

> Officials who receive reports and recommendations, shall review the reports and recommendations and either concur or not concur, stating reasons for non-concurrence. Within three (3) workdays after receipt of these materials, the report and recommendation, together with the reviewing comments, if any, and all additional documents relating to the investigation, shall be forwarded, through channels, to the Commanding officer. Reviewing officials may order further investigation. However, *no official shall change any investigation officials' recommendation.* [emphasis added]

MPD officials have defended this course of events. Captain Klein testified that he was not troubled with making any of the changes recommended by Chief Ramsey or anyone else, because he agreed with them, and because the changes

did not alter the overall thrust of the investigation, which is that the arrests at Pershing Park were made in violation of MPD policy. Captain Klein testified that "nothing jumped out at me to say this is different than what the findings were… My overall point and my overall conclusions were still being made in the report so that did not concern me."

Chief Ramsey defended his actions. In response to the Committee's October 10, 2003 written deposition, he stated:

> Yes, I suggested some changes to the report submitted by OPR. I requested that materials be added to the report such as the photos of arrestees restrained by flexi-cuffs wrist to ankle and photocopies of flyers and materials protestors disseminated threatening to shut down the city. The report was incomplete and I directed that the focus should be on the facts related to the events of Pershing Park.

During the Committee's public hearing, Chief Ramsey re-iterated that it was his prerogative to direct the changes because this was an important investigation affecting the department and requested by the Mayor. With regard to the general order, read into the record by Councilmember Patterson, Ramsey cited a later section of the same general order, Part I. E. 5. Bureau Commanders, which states:

> Bureau commanders who receive disciplinary reports and recommendations shall review such reports and recommendations and shall either concur or not concur, stating reasons for non-concurrence. Bureau commanders may return the matter to the unit commander for further investigation and may add comments to the report and recommendations before returning them.

The earlier section of the general order states that "Reviewing officials may order further investigation. *However, no official shall change any investigation officials' recommendation.*" The later section referenced by Chief Ramsey states that bureau commanders shall *state* "reasons for non-concurrence" and may "*add*" comments to the report and recommendations before "*returning them*" to the investigating official [emphasis added]. The language infers a scenario in which the reviewing official either concurs or does not concur with the recommendations or, if necessary, denotes any comments or suggested changes in writing and returns the report to the investigating official for further work. Indeed, Chief Ramsey himself described this very scenario as proper procedure during a deposition in *International Action Center, et al v. United States of America, et al.* He testified that "any member in the chain of command can send an investigation back for further investigation if they feel that's appropriate or of they don't agree with the findings, they can put a cover sheet on that particular investigation, laying out their reasons for not agreeing with the findings of the investigator."

The general order may well not have anticipated the situation that occurred with the Pershing Park report, in which reviewing officials directed changes in content and in recommendations verbally, obtained an electronic version of the report, then made further changes, without the final text being reviewed by the investigating officials and signed by them.

It is also instructive, when evaluating the appropriateness of what occurred, to review the actual changes made to the report. Following is a chart that compares the first report finished by Captain Klein with the final report provided to the Mayor and Council:

| Final internal MPD version | Official version delivered to Mayor and Council |
| --- | --- |
| **Captain Andrew Solberg**<br>Captain Solberg related that once he arrived at Pershing Park, he met with Assistant Chief Brian Jordan and Assistant Chief Peter Newsham. Captain Solberg explained that he was then instructed to position his CDU platoon in such a way that it blocked off access to and from the south and east sides of the park. He was informed that everyone inside Pershing Park would be arrested. | **Captain Andrew Solberg**<br>Captain Solberg related that once he arrived at Pershing Park, he met with Assistant Chief Brian Jordan and Assistant Chief Peter Newsham. Captain Solberg explained that he was then instructed to position his CDU platoon in such a way that it blocked off access to and from the south and east sides of the park. He was informed that everyone inside Pershing Park would be arrested. **The parade was conducted without a permit, and in violation of Title 18 of the DCMR (Vehicles and Traffic).** |

| | |
|---|---|
| **Arrest -**<br>"Based on the testimony of the complaints in this case, it is **probable** that there were numerous individuals in the park that were not part of any groups headed toward the park under a continuous observation by the police**. In other words, there is a strong possibility that persons were already in the park and had not committed any illegal acts prior to arrival of police units who proceeded to block off the area and prevent anyone from leaving. There is no evidence to support a claim that every person in the park had been involved in an unlawful advancement toward the park- either on foot or on bicycle."** | **Arrest -**<br>"Based on interviews and other facts gathered in this case, it is **possible** that there were individuals in the park that were not part of any groups headed toward the park under continuous observation by the police. There is no evidence that the park had been cleared before the larger group of protestors was allowed to enter the park." |
| **Arrest -**<br>"Based on Assistant Chief Newsham's explanation, the protestors in Pershing Park had committed violations before entering the park. Groups of protestors were marching in the street and were supposedly warned by officers to get back on the sidewalk. Assistant Chief Newsham essentially used the park as a roadblock of sorts, in which protestors who had already broken the law were stopped and arrested." | **Arrest -**<br>"Based on Assistant Chief Newsham's explanation, the protestors in Pershing Park had committed violations before entering the park. Groups of protestors were marching in the street and were supposedly warned by officers to get back on the sidewalk. **Moreover, a group of bicyclists had illegally traveled in a large group from Union Station toward the park, in violation of District of Columbia traffic laws.** Assistant Chief Newsham essentially used the park as a roadblock of sorts, in which protestors who had already broken the law were stopped and arrested." |
| **Analysis –**<br>"The decision to arrest everyone in Pershing Park **was not sound**." | **Analysis –**<br>"It **appears that** the decision to arrest everyone at the park **was based on incomplete information.**" |
| **Analysis –**<br>"It is **more than probable** that numerous persons inside the park had arrived there lawfully **with no intent to commit any violations of the law.** Several clusters of demonstrators that committed separate violations were all combined into one large group in the park and charged with Failure to Obey a Police Officer. **To further** | **Analysis –**<br>"It is **possible** that numerous persons inside the park had arrived there lawfully. Several clusters of demonstrators that committed separate violations were all combined into one large group in the park and charged with Failure to Obey a Police Officer." |

| | |
|---|---|
| **support this assumption, at least five members of the Press were released on the Detention Journal later that afternoon, indicating an improper arrest.  Furthermore, every case in which demonstrators did not elect to forfeit and had his or her case presented to the Office of Corporation Counsel was dismissed by that office.  (footnote: Each of these cases was dismissed because none of the officers could properly attest to which demonstrator was warned – none of the arresting officers could provide testimony to support the claim of failure to obey.)** | |
| Analysis –<br>"However, it cannot be established that all of those persons in the park were part of any particular group engaged in unlawful behavior.  **The fact that command officials and arresting members could not make a distinction between those that were engaged in unlawful behavior and those that were not, tainted those arrests that were timely and proper."** | Analysis -<br>"However, it cannot be established that all of those persons in the park were part of any particular group engaged in unlawful behavior." |
| "The examination of the Pershing Park arrests has **conclusively** revealed that no warnings were given to demonstrators at the park." | "The examination of the Pershing Park arrests has revealed that no warnings were given to demonstrators at the park." |

As the chart shows, the original report's strong language condemning MPD's actions at Pershing Park was weakened in several instances in the final version.  Of particular interest is the manipulation of the report's characterization of the bicycle demonstrators who were corralled and arrested in Pershing Park along with those demonstrators allegedly guilty of blocking traffic and turning over newspaper boxes prior to their arrival at Pershing Park (Assistant Chief Newsham testified that he had given the second group of demonstrators warnings to get out of the street some time earlier that morning.  The bike demonstrators were not present when Assistant Chief Newsham apparently gave those warnings).

The final report states that the bike demonstration was illegal and emphasizes that the bike demonstrators broke the law by obstructing traffic.  It is true that the bike demonstration was not permitted, but un-permitted demonstrations by themselves are not suitable grounds for arrest.  It is further true

that Captain Solberg, who commanded the CDU that followed the bike
demonstrators around the city that morning, stated during his OPR interview:

> A: I would think that the bicycle protestors, although they were
> bicycling fairly slowly along the streets, at no point near Pershing
> Park, ever stopped and blocked an intersection or created a mass
> demonstration, focal point, and they were never that I heard,
> addressed as a group and told that they were infringing any laws.

> Q: Were they disruptive when you arrived with them?

> A: Certainly disrupted traffic, but that's, I think they were, I don't
> think they were breaking any laws other than the bicycle laws
> maybe of riding, and that any riding against the red light or
> anything like that, I think they followed all applicable bike
> regulations for the city.

While obstructing traffic may be a violation of the law, during his
deposition before the Committee, Captain Solberg characterized the bike
demonstrators as peaceful and not violent in any way, a characterization
confirmed by the testimony of Sergeant Darrick Ross, who also commanded the
officers following the bike demonstrators.  Further, the only law the bike
demonstrators were arrested for violating was Failure to Obey a Lawful Order.
Captain Solberg never heard any orders given to the bike demonstrators.

Finally, Captain Klein's original recommendations were changed
between the first and final versions, a direct violation of General Order 1202.1.
For example, a recommendation that command staff officials receive additional
CDU training was changed to a recommendation with an entirely different
meaning, that the command structure be re-examined to ensure that officials
receive "timely and accurate information from which to base decisions on."  Chief
Ramsey testified that he asked for this specific change because he disagreed with
Captain Klein's opinion on this issue, and that the command staff would not
benefit from the same kind of training received by CDU rank and file officers.

Captain Klein's original recommendation was based on the investigation
conducted by Sergeants McCoy and McGuire, which found an Assistant Chief
without standard CDU training making a decision in violation of MPD policy,
resulting in the improper arrest of hundreds of demonstrators.

Chief Ramsey's March 13, 2003 memo to Mayor Williams delivering the
final version of the report states "I reviewed the January 25, 2003 report prepared
by the Civil Rights & Force Investigations Division of the Office of Professional
Responsibility and concurred with the findings."  An ironic statement considering
the fact that some of the findings were directed by Chief Ramsey to be changed
into a form with which he could agree.

*Findings*

**The Metropolitan Police Department violated its own general orders by failing to promptly initiate a formal investigation of the wrongful arrests and detention when questions about their legality were raised immediately by MPD officials, the Office of Corporation Counsel, the media, and the Council.**

General Order 1202.1, Disciplinary Procedures and Processes, Part I. A. g. 7., states that "Upon observing or becoming aware of a violation of Departmental regulations, officials shall initiate an immediate preliminary investigation." This was not followed in the Pershing Park case, and according to MPD testimony is routinely violated insofar as demonstrations are concerned. According to the deposition testimony of Inspector Stanly Wigenton, Director of MPD's Office of Internal Affairs, it is not standard practice for his office to review after action reports following mass demonstrations. Inspector Wigenton testified that the office of Assistant Chief Alfred Broadbent, Special Services, has this responsibility, and any violations reported in after-action reports are supposed to be reported to the Office of Internal Affairs to be properly tracked and investigated. The testimony of Inspector Josh Ederheimer confirmed this interpretation of MPD practice. Inspector Ederheimer testified that the Office of Professional Responsibility is essentially "re-active" in its investigations, typically starting an investigation only after receiving a complaint. Despite the strong denunciation of the arrests by MPD officials in after-action reports the department failed to investigate its own actions until forced to do so by Mayor Williams following repeated requests by the chairman of the Judiciary Committee.

**At the direction of Chief Ramsey and in violation of MPD general orders, changes were made to the investigative report after it was completed by the Office of Professional Responsibility. The changes served to weaken criticism of the Department and the nature of the arrests.**

The Committee finds this chain of events for a confidential OPR investigative report to be extremely problematic and a violation of MPD general orders. Chief Ramsey's involvement in the production of an internal investigative report regarding a situation in which he was personally involved is highly unusual, inappropriate, and degrades the overall integrity of the investigation itself.

Further, if Chief Ramsey simply did not concur with the recommendations of the report, then he had the option of not acting on its recommendations while permitting the integrity of the report itself to stand. Unfortunately, this did not occur and Chief Ramsey instead directed that his opinions take the place of the findings of the investigating officials.

Again, the only appropriate place for Chief Ramsey's opinion on this matter is whether or not to accept the recommendation of the investigating officials, *not* whether or not to let the recommendation, based on their investigation, stand in the report.

**The decision to have Executive Assistant Chief Fitzgerald interview Assistant Chief Newsham was a clear conflict of interest given EAC Fitzgerald's role during the arrests. It also appears to have violated a general order giving the right to interview officials to the investigating officers as well as the MPD's Memorandum of Agreement with the Department of Justice on use of force.**

EAC Fitzgerald was on the scene of Pershing Park before, during and after the arrests were made and engaged in conversations with Assistant Chief Newsham prior to Assistant Chief Newsham's order to arrest the demonstrators at Pershing Park. Therefore, EAC Fitzgerald, who testified to having approved Assistant Chief Newsham's actions on the scene at Pershing Park, had an obvious conflict of interest with respect to the subject being investigated, and should therefore have not been involved in the investigation.

EAC Fitzgerald and Chief Ramsey testified that they did not have conversations about what questions to ask Assistant Chief Newsham. But EAC Fitzgerald's selectivity with respect to the questions asked rendered the investigation incomplete, at best.

MPD General Order 1202.1, Disciplinary Procedures and Processes, states that "any official who conducts an internal investigation (hereinafter referred to as the investigating official) may require any other member to cooperate in such an investigation" (Part I. E, Internal Investigations). Part I. E. 2. Investigative Procedures states that:

"In addition to any other authorized methods, investigating officials shall utilize the following investigative procedures when appropriate:

a. Interviewing departmental members.
        (1) Members may be ordered to appear before the investigator at a reasonable time and place to submit to questioning and investigation."

This language indicates that internal affairs investigators have the authority to interview officials regardless of rank, and knowledgeable investigators, not the second in command in the department, clearly should have interviewed Assistant Chief Newsham in this instance. Not only would the interview have been more comprehensive, it would have precluded the conflict that exists given EAC Fitzgerald's presence during the arrests and the subsequent perception that the

role of his superior, Chief Ramsey, in the arrest order was off limits to the investigation.

In addition, EAC Fitzgerald's involvement in the investigation was a violation of MPD's Memorandum of Agreement with the Department of Justice on use of force. Section 80 of that agreement states:

> MPD shall prohibit any officer who has a potential conflict of interest related to a pending investigation from participating in any way in the conduct of review of that investigation.

**The interview conducted by EAC Fitzgerald was incomplete.**

As indicated in the text above, Fitzgerald failed to ask questions drafted by the investigative team, including failing to bring forward the complicity of other senior officials in the decision to arrest individuals at Pershing Park.

**The investigation and release of the final report were marked by evasions and misstatements by senior officials including Chief Ramsey, giving rise to the appearance of an attempt to cover up Chief Ramsey's role in ordering the Pershing Park arrests.**

As indicated above, the evening of the Pershing Park arrests Chief Ramsey was asked by reporters about charges that the arrests were mishandled. In his written deposition issued October 10, 2003, Ramsey was asked, "When did you first become aware that citizens and arrestees were complaining about the legality of MPD actions surrounding the September 27, 2002 mass arrests at Pershing Park?" His response:

> I became aware of the complaints concerning MPD's actions at Pershing Park after some members of the public testified at an October 23, 2002 hearing of the Committee on the Judiciary of the Council.

This answer fails to recall concerns brought directly to Chief Ramsey's attention at the September 27, 2002 press conference, as transcribed above, and the extensive media coverage that followed the arrests.

In response to another question from the October 10, 2003 written deposition, "Prior to the Council Committee on the Judiciary's receiving testimony on this matter on October 24, 2002, did you request or order any review of or investigation into MPD actions at Pershing Park?," Chief Ramsey replied: "A review is conducted after every major event in order to identify and solve any problems that occurred during the event."

This answer belies the fact that the after-action reports written following the Pershing Park arrests did not result in any official investigation. Chief Ramsey did not actually direct OPR to investigate allegations of illegal arrest and excessive force until November 12, 2002, after a November 6, 2002 written directive from Mayor Williams. The fact that OPR was not asked to investigate the Pershing Park arrests until after the testimony before the Judiciary Committee was substantiated by the deposition testimony of the officials who supervised and conducted the OPR investigation, including Inspectors Stanly Wigenton and Josh Ederheimer, Captain Matthew Klein, and Sergeant James McGuire.

This delay, in addition to questionable aspects regarding the conduct of the investigation itself, raises serious questions about MPD's ability to investigate allegations of misconduct in a timely, honest, and thorough manner.

**The Department created a conflict of interest by assigning Assistant Chief Newsham, Director of the Office of Professional Responsibility, to an operational role during the September 2002 demonstrations, a conflict that continues to exist.**

Despite the obvious conflict created by Assistant Chief Newsham having both operational and internal investigation responsibilities, since the Pershing Park investigation he has continued to have an operational role during demonstrations. In fact, Assistant Chief Newsham was an area commander during an anti-war demonstration on April 12, 2003, a day that generated five excessive force complaints to the Office of Citizen Complaint Review and another complaint to the Committee, the complaint from Margaret Luck that is discussed in the "Inauguration, Pepper Spray, and Self-Policing" section of this report. The Committee recommends that the practice of assigning the Assistant Chief of the Office of Professional Responsibility to operational duties during demonstrations cease immediately.

*Recommendations:*

**Any questions about the legality of mass arrests, excessive force, or information indicating a violation of MPD policies contained in mass demonstration after-action reports should be automatically referred to the Office of Professional Responsibility and investigated immediately and thoroughly. This likely requires a more formalized interaction between the office of the Assistant Chief, Special Services, and the office of the Assistant Chief, Office of Professional Responsibility, following a mass demonstration.**

**Investigations of actions of Assistant Chiefs and the Chief of Police should be referred to the Office of the Inspector General and not handled internally by the Department.**

**The Assistant Chief of the Office of Professional Responsibility should not have an operational role during mass demonstrations.**

**MPD units and individuals outside of the Office of Professional Responsibility (OPR) should not participate in OPR investigations in any operational way.**

**Officials reviewing investigative reports should denote, in writing, their comments and recommended changes to reports and requests for further investigation, pursuant to MPD policy.**

## EMERGING ISSUE: SURVEILLANCE AND INFILTRATION OF DEMONSTRATION ORGANIZATIONS

At the time of the inspection of the convergence center described earlier in this report, MPD was just beginning to use undercover officers to monitor the planning and activity of individuals and organizations involved in demonstrations. MPD's use of undercover officers to monitor political activists has been controversial and is currently the subject of litigation. In the civil action, *Alliance for Global Justice, et al v. District of Columbia*, et al, the plaintiffs allege that "[a]gents posing as political activists infiltrated the demonstrators' organizations and informal groups." Plaintiffs object to this tactic as an unconstitutional form of domestic spying, reminiscent of the Federal Bureau of Investigation's COINTELPRO program during the Vietnam war and creation of the so-called "Red Squads."

This MPD practice has received surprisingly little public scrutiny beyond the current litigation and this Committee investigation. Both constitutional and public resource issues arise from the use of MPD officers to infiltrate and collect data on political organizations and represent serious public policy questions. As described earlier in this report, in 1975 and 1976, it was discovered that MPD was conducting surveillance of and maintaining files on local political activists, including former Councilmembers. The Council at that time held public hearings and introduced legislation on the matter, and MPD implemented reforms, including a new general order governing the practice.[23] The Council today, as it did then, has a responsibility to examine MPD's policies and practices in this area, consider the practices in a public forum, and determine and establish the appropriate policy for the District of Columbia.

The Committee examined MPD's use of undercover officers through the issuance of document subpoenas and by conducting depositions of Intelligence Unit officers and employees, including Sgt. Jeffery Madison; former Detective Neil Trugman; Craig Broyles, a civilian analyst; and Assistant Chief Alfred Broadbent. The Committee also conducted depositions of MPD officers who formerly worked undercover[24] in order to collect information on the plans and activities of political activists engaged in demonstrations.

*Nature of Surveillance by Undercover Officers*

The Committee found that the MPD conducted and does conduct surveillance of political organizations for the purpose of learning the nature and details of plans for upcoming demonstrations. MPD does this in different ways, but primarily by monitoring information that is publicly available on the Internet

---

[23] It appears that this general order is no longer in effect at MPD.
[24] The Committee has not released from executive session the names or any identifying characteristics of the former undercover officers deposed by the Committee.

and through other media; sending "plain" or "casual"-clothes[25] or undercover[26] officers to open meetings of organizers; and by conducting surveillance of organizations through the use of undercover officers.

In both his deposition and public testimony, Assistant Chief Broadbent objected to the Committee's characterization of the work of undercover officers as "infiltration" or surveillance. Assistant Chief Broadbent testified that undercover officers were merely attending public meetings, and that some undercover officers became friends with the organizers and stayed involved with activist groups because of those friendships.

Notwithstanding Assistant Chief Broadbent's effort to minimize the act of infiltration by referring to it as "attending public meetings," undercover officers participated in meetings and activities not as police officers, but as individuals pretending to be activists. They were instructed to and did create false names and fictional personal histories, and dressed in a manner to make them appear sympathetic to the various causes of activists. Using these false identities, they became active members of the organizations – attending meetings, sometimes taking on organizing responsibilities, and participating in demonstrations. Undercover officers, in the words of those former undercover officers interviewed by the Committee, were instructed to "absorb," "infiltrate," or "burrow" themselves into organizations. After undercover officers attended any event in the guise of their false identity, or had any other encounter with an organization, they documented information about the event, including what occurred, what was discussed and who had participated. Within twenty-four hours of the event or activity, this information was summarized in an "undercover officer report" or "UC report" that was then transmitted to MPD's Intelligence Unit. UC reports were then summarized by Craig Broyles and Sgt. Madison and submitted to their chain of command, including Assistant Chief Broadbent and Chief Ramsey.

In his deposition before the Committee, Assistant Chief Broadbent testified that he was aware that this activity took place, but that he does not believe it constitutes infiltration or surveillance. Assistant Chief Broadbent and

_____

[25] A "plain-clothes" or "casual-clothes" officer, according to MPD policy and practice, is a police officer who does not wear a uniform but identifies himself or herself as a police officer. MPD general order 308.13 states that "members of casual clothes units must be identified as police officers by the general public, as well as other officers…Should it become necessary for casual clothes/non-uniform members to overtly exercise their responsibilities as police officers they shall, as soon as practicable, affix the standard recognition device, the yellow or orange MPD arm band, on the sleeve of their outer garment…Casual clothes members should also have in their possession their identification card and badge." Plain clothes officers may spend some of their time in uniform and some of their time out of uniform.

[26] Undercover officers assume false identities for the purpose of collecting information. Their identity as police officers is not known to the individuals they are monitoring or investigating or to a majority of MPD employees, and they are prohibited from having any contact with MPD facilities and employees, with the exception of a small number of Intelligence Unit officers. There is no MPD general order governing the conduct or operations of undercover officers.

Sgt. Madison testified that undercover officers were used not to collect information on the political beliefs or personal details of individuals, but to find out whether activists were planning illegal activity or activity that would affect public safety. Assistant Chief Broadbent testified that "the only information I'm seeking is information that would impact public safety…Police officers are told to attend the meetings to listen and observe and hear if there's anything that's going to have an impact on public safety in Washington because my goal is to keep the citizens of this city safe and to avoid a Seattle in Washington."

One former undercover officer testified that the goal of attending meetings was to get into meetings, see if groups were planning civil disobedience "or any other type of criminal activity" and to then focus efforts on those groups. Another former undercover officer testified that "the instructions were to attend the meetings, try to make friends, and try to find out who the key players are and keep our eyes and ears open for activity."

But the nature of the undercover officers' assignments, in reality, was much more intrusive than the limited purpose articulated by Assistant Chief Broadbent and Sgt. Madison. Undercover officers' monitoring of demonstrators was not limited to periods of time immediately before demonstrations or to events related to demonstrations. They monitored the activities of groups for up to a year at a time, and they monitored activities that went beyond the scope of planning for demonstrations or civil disobedience. Because they formed relationships with activists under the guise of their false identities, undercover officers often accompanied individuals on other group activities not related to demonstrations, and reported to the Intelligence Unit on these activities as well. One former undercover officer described the extent of its monitoring of activists this way:

> A: There's many groups. And the same people frequent the different groups. You can have one person…[who] would be in four or five different groups. And once you make friends with the key people, they expect you to enter all the different groups with them…

> Q: Let's say hypothetically, so I can understand this, you're in an undercover capacity so you have an identity that you have to maintain and you've developed friendships that you have to maintain. And this is beyond the meetings, you have to have social activities and so forth?

> A: You become one of them.

> Q: And if you're friendly with some of them, and let's say they go to an organization, I'm just going to throw this out there, say Martha's Table that provides food for people in the city and it's not

affiliated [with demonstrations].  But you would go with them to a place like that?

A: Yes, ma'am.

Q: And when you would go to these places, like homes and places that are plainly not affiliated…when you would make your reports about what you did that day, would you include all of these other references, even if they weren't directly related?

A: Yes ma'am.  It's a running resumé of what I did for that day. Because I'm still accountable for what I do.  Although I'm not at a district and I'm not pushing a scout car for eight hours, I'm still being paid for eight hours, and you still keep account of what you've done for that entire day.

Q: And in that account would you include, for example, new people that you met?

A: Yes.

Q: And you wouldn't necessarily know these people to be involved in or planning to be involved in a protest but you would still include them in the running resumé?

A: Yes, ma'am.

This exchange illustrates the broad scope and intrusiveness of the undercover officers' surveillance of individuals.  It created a situation where the every day activities of individuals were reported to law enforcement, unbeknownst to them, regardless of whether the every day activities were criminal or even relevant to the planning of upcoming demonstrations.

*No Policy Guidance Given to Undercover Officers*

Despite the complex legal questions and extensive constitutional case law surrounding the surveillance of political activists in this country, each undercover officer interviewed by the Committee testified that such officers do not undergo any relevant training before beginning their assignments as undercover officers. Sgt. Madison confirmed that undercover officers do not receive any training before being deployed.  In addition, between 2000 and December 2002, undercover officers were not provided with any written guidelines, general orders or other policy documents to follow while conducting surveillance.  This is despite the fact that according to press reports from 1975 to 1976, then-Chief Maurice Cullinane issued a general order specific to this kind of activity.  The

following is an excerpt of deposition testimony of former undercover officers received relative to this issue:

> Q: So, to help me understand this, I want to see how much preparation you were given before you started…It was very minimal?

> A: You were thrown in there.

> Q: So they simply identified a group and said – Go.

> A: Basically, yes…

> Q: I take it then by what you said that neither Sgt. Madison nor your control officer told you about limitations in terms of not going into peoples' houses or things of that nature?

> A: Oh no.  Limitations were never discussed.

Sgt. Madison also testified that undercover officers were not given any written or even oral guidelines about what sort of activity or non-criminal information would be inappropriate to pursue, including, for example, personal information or information about religious beliefs.

Another former undercover officer was asked similar questions:

> Q: Were you given any guidelines, written or oral, about the kinds of things you should be looking for or the activities you should be engaging in when you attended these meetings?

> A: I was not provided anything in written guidelines.  The only really oral guidelines that I received …[included to] document any information that I had as a result of those meetings…I was told to participate at a level to where I would be accepted into the groups.

This testimony is supported by MPD's responses to document subpoenas issued by the Committee.  The Committee requested all current policy documents, general orders and regulations relevant to handling demonstrations, as well as any relevant written policies that came out of litigation related to the May Day demonstrations in 1971 and the Council policy debate related to MPD's surveillance of political activists in the mid-1970s.  Only one document provided to the Committee governs the activity or behavior of undercover officers, standard operating procedures (SOP) issued in December 2002.

This SOP was issued approximately two years after MPD began to use undercover officers to prepare for demonstrations.  In public hearing testimony on

December 18, 2003, Chief Ramsey acknowledged that the SOP had not been formalized as a general order and that that step should occur.

*Surveillance in the Absence of Criminal Activity*

The December 2002 SOP also does not include policy guidance regarding the circumstances under which it is appropriate to use undercover officers to conduct surveillance. For example, there is no policy requirement that undercover officers be used for surveillance purposes only when there is a reasonable suspicion that individuals or a group of individuals are engaged in or planning criminal activity, though Sgt. Madison testified that this was the deciding factor in practice. While Assistant Chief Broadbent testified that undercover officers were only used for the purpose of collecting information about suspected illegal activity or activity that would affect public safety, testimony received by the Committee indicates that undercover officers were also used for months at a time to monitor nonviolent activists not engaged in criminal activity. The Committee further found that there was often no distinction made by MPD management and officers between minor acts of civil disobedience and criminal activity.

The Committee interviewed one former undercover officer who monitored the activities of a group of activists for several months, during which time the officer did not observe any criminal activity:

Q: When you were attending these meetings…did you ever have occasion to observe criminal activity?

A: No ma'am.

Q: At any point did you question whether your continued involvement with these groups made much sense?

A: Yes ma'am.

Q: And can you tell us what the reaction to your questioning was?

A: I went and met with the command staff of the intelligence division and explained to them … other than civil disobedience I was not uncovering any criminal activity, such as what was seen in Seattle. I was not uncovering any plans for things of that nature.

On the other hand, each former undercover officer interviewed by the Committee clarified that there were several groups that they monitored that were nonviolent and not involved in criminal activity, but that associated with or supported individuals or groups involved in criminal activity. For example:

Q: At what point did you pretty much establish the fact that the group you infiltrated was not involved in any criminal activity, approximately?

A: The group as a whole was not, per se, involved in criminal activity other than civil disobedience, blocking the street, things of that nature. But, as a whole there were parts to that whole that I believed were either planning or capable of planning to carry out much greater acts of criminal activity. And that's where I was attempting to kind of feed myself and it just never matured.

Another former undercover officer testified about infiltrating a group that planned and implemented acts such as blocking sidewalks and intersections, slashing tires of police cars, and rushing businesses for the purpose of breaking windows and damaging merchandise. The same officer described a group's plan to take over a building, a plan that was ultimately foiled by MPD because of the information provided in advance by the officer. Each of the former undercover officers interviewed by the Committee testified that they believed that through their assignments, they were able to prevent disruption of the city during demonstrations by providing MPD with information that would not have been otherwise publicly available.

Nonetheless, the former undercover officers interviewed by the Committee testified that they never observed any violence or any criminal activity beyond minor property damage. They testified that they never observed the use of or planned use of explosives, molotav cocktails or weapons, either during demonstrations or at any other time. The one exception with respect to weapons was that some individuals were observed by the witness carrying the knives that were used to slash tires in the incident described above.

Assistant Chief Broadbent testified that the information gained through the use of undercover officers prior to the January 2001 Presidential Inauguration helped to prevent a "catastrophic event" in the District, but he declined to provide any additional details of this event or any other event prevented through the use of undercover officers, citing law enforcement privilege[27]. More broadly, he testified that MPD was able to prevent planned property damage and violence to individuals by sending police officers to specific locations or individuals that were alleged to be targeted. Sgt. Madison testified that he believed the use of undercover officers prevented millions of dollars worth of property damage in the District, as well as the disruption of people's lives. He also said the work of

---

[27]    The law enforcement privilege is an evidentiary privilege that does not apply to the Council of the District of Columbia, a coordinate branch of government, when it is acting pursuant to its investigative authority under section 413 of the District of Columbia Home Rule Act (D.C. Official Code § 1-204.13).

undercover officers prevented minor criminal acts from escalating into serious violence.

*Maintenance of Information on Activists*

Among the constitutional concerns related to law enforcement surveillance of political activists, in addition to concerns about the invasion of individuals' privacy, are concerns about what kind of information is collected on individuals and how that information is maintained. After revelations about the FBI's COINTELPRO program became public, it was discovered that the FBI was maintaining files on political activists based on constitutionally protected content, for example, political ideology, in the absence of criminal activity. Through the use of document subpoenas and deposition testimony, the Committee attempted to establish whether MPD has a policy of or is in the practice of maintaining files on individual political activists.

In response to requests through a subpoena for "All documents related to MPD's policy on the collection of information and maintenance of files of demonstrators," MPD responded that "We have not located any documents that are responsive to this request." In response to a request for copies of all records or dossiers on specific activists, MPD responded, "We have not located any responsive documents. If these persons were arrested, the department might have records of their arrests." The SOP on the use of undercover officers does not include any policy guidance on how to maintain information, or about what methods of maintaining information would be unconstitutional.

The former undercover officers interviewed by the Committee testified that the extent of their maintenance of files was limited to the UC reports that they submitted to their chain of command, as described above, and that they did not know what happened to those UC reports once they were submitted to the Intelligence Unit. They testified that they would record names of individuals involved in certain organizations in a general sense, but that they were not in the practice of identifying individuals and recording identifying information in detail. One former undercover officer testified to paying particular attention to and recording the activity of "key players" in the organization, or of individuals particularly antagonistic to the government and likely to cause "trouble" during demonstrations.

The Committee did receive testimony about a manual or book maintained by the Intelligence Unit that contains information, including some photographs, of demonstrators arrested during the April 2000 IMF/World Bank demonstrations. Both Craig Broyles and Sgt. Madison testified, however, that the information was limited to people with arrest records and that this practice was not repeated after April 2000 because it was too labor-intensive to do regularly.

Both Sgt. Madison and Craig Broyles testified repeatedly that the Intelligence Unit does not maintain files or dossiers on individual political activists. Mr. Broyles testified that the only files he keeps related to activists and demonstrations are in the form of UC reports or "source material," including, for example, information from the Internet. Sgt. Madison gave similar testimony. They both testified that the information collected by the Unit in relation to demonstrations is event-driven and focused on activities, planned or actual, of activists. Sgt. Madison testified that after a demonstration has taken place, these files may be purged, depending on space needs in the office.

The Committee did review a sample of redacted memos submitted by the Intelligence Unit through the chain of command that were presumably based on UC reports. These memos listed general information about plans for demonstrations, including for example, the number of people expected to participate and whether any civil disobedience was being planned. Some memos do appear to include information about the activity of key organizers in certain groups.

Assistant Chief Broadbent also testified that the information he maintains is related to specific events, and that he does not keep track of individual activists. In his prepared testimony, however, he referred to a conference on civil disobedience held at American University in January 2000 which featured speakers who, he said, had been leaders of the demonstrations in Seattle the previous December. Asked by Special Counsel Mary Cheh how he knew that these individuals were leaders of the demonstrations when MPD did not keep dossiers on such individuals, Broadbent said, "We had met with Seattle authorities…We had discussed with Seattle who some of their key players were, and what worked, what didn't work for them. So we could learn from their mistakes and implement things they thought did work." With regard to the conference, he said police officers attended in plain clothes, "and from that they brought back information from individuals who said that they were involved in Seattle, what they did in Seattle, what you can do to overcome law enforcement, how you can bottleneck law enforcement."

Notwithstanding the testimony by MPD leadership that the department does not keep files on individuals engaged in demonstrations, the department's operational planning documents name specific leaders of specific organizations. While this information is already in the public domain (media, Internet) it also apparently is or was maintained in some form in order to be included in department planning documents. In the operational plan for the April 2000 IMF-World Bank meeting, the department described "Reclaim the Streets" as an international organization with local chapters pressing for more walking, cycling and use of public transportation. "Washington D.C. does not have a chapter, however, a representative from the New York City chapter, Chuck Reinhardt, has attended meetings of the Mobilization for Global Justice and plans to continue coming down on a regular basis," the plan notes. It also listed "key organizers" of

each major organization involved in the April 2000 demonstrations, noting in each case "no photo at this time."

In addition, a briefing for Councilmembers on March 29, 2000, included a handout with a page that listed a total of 10 names and affiliations of "key organizers" of the anti-globalization protests. Finally, an instruction also included in the April 2000 planning documents with reference to an event the weekend before the international meetings, states: "Photographs and video will be taken of individuals believed to be coordinators of the upcoming IMF/World Bank event."

*Allegations of the Use of Agent Provocateurs*

Another concern about the constitutionality of the use of undercover officers relates to the potential for undercover officers to disrupt protected political organizing, either through their mere presence or through their actions. In civil action *International Action Center, et al v. United States, et al* (including the District of Columbia), the plaintiffs allege that MPD has a policy and practice of disrupting protected First Amendment activity through the use of *agents provocateur*. Related allegations have included the use of plain-clothes officers to initiate physical violence during demonstrations; and the use of undercover officers to pose as organizers and either encourage illegal activity within organizations, or take on organizing responsibilities that would then not be fulfilled.

Through testimony and a review of MPD policy documents, the Committee did not find any evidence substantiating that MPD has a policy of using undercover officers to disrupt political organizations in this manner. In fact, MPD policy as articulated in deposition and public hearing testimony is for undercover officers to observe rather than to participate.

Some of the deposition testimony of former undercover officers substantiated this policy directive in practice. One officer testified:

Q: So would that mean, if someone asked you to participate in planning, that you might do something like that?

A: …Just a mild or medium level of participation. We were told not to participate in the actual tooth and nail planning of any type of civil disobedience or criminal activity but to gather information on those things.

The former undercover officers testified that they were never instructed by MPD officials, nor did they ever on their own, encourage illegal activity within the organizations they infiltrated. They also testified that they never intentionally disrupted organizations by not carrying out organizing responsibilities, though

one officer testified to being instructed by MPD officials to not undertake or fulfill any responsibilities that required illegal activity or acts of civil disobedience.

Sgt. Madison did testify that there was one incident in which an undercover officer made a statement in a meeting encouraging illegal behavior. Sgt. Madison testified that when this incident came to his attention through a UC report, he counseled the officer in question and instructed the officer to refrain from similar behavior in the future.

Beyond this example as described by Sgt. Madison, the Committee was not able to confirm with certainty whether there have been instances of *agent provocateur*-type behavior on the part of MPD officers in practice, as has been alleged. But the Committee has not investigated each of the allegations that has been made, nor was doing so part of the scope of the Committee investigation, which was more focused on questions of policy and general practice than on specific instances of misconduct. The Committee, nonetheless, is concerned that allegations of the use of *agents provocateur* have not been taken seriously or thoroughly investigated by MPD.

Findings:

**MPD assigned undercover officers to conduct surveillance of political organizations and activists in the absence of criminal activity.**

Though plans for some minor criminal activity, primarily property damage and plans to disrupt traffic, were uncovered through the use of undercover officers, the question remains for policymakers whether the extent or degree of activity justified the invasion of privacy and dedication of resources required to conduct the undercover operation. The Committee also found a troubling tendency of MPD officials and officers to equate nonviolent civil disobedience with serious criminal acts and threats to public safety.

The Committee has received testimony about the profound chilling effect the use of undercover officers has had on local activists in recent years, activists who have opened their homes and lives to police officers who subsequently reported on their daily activities. Considering the amount of serious violent crime that continues to plague the District and the overwhelming concern in neighborhoods about the need for a more visible police presence, the questions for policymakers must be: Should MPD officers be used in this way? And is it worth it? Having established that MPD did use undercover officers to conduct surveillance of political activists, the Council now has a responsibility to answer these questions with legislative remedies.

**MPD assigned undercover officers to conduct surveillance of political organizations and activists without giving those officers any relevant training**

or policy guidance.  **MPD did not issue any guidelines in this area until December 2002, over two years after it started using undercover officers for this purpose.  Current guidelines are not sufficient.**

Given the constitutional complexities and history associated with the surveillance of political activists, including a policy debate in the District in the mid-1970s spurred by similar MPD tactics, it was a significant failure on the part of MPD management to initiate such an operation without any policy guidance or instruction to those officers assigned to work undercover.

In addition, the two-page SOP issued in December 2002 is not as comprehensive as is called for given the legal complexities.  There is no threshold provided as to when undercover surveillance of an organization is warranted, for example, that it should be conducted only when there is reasonable suspicion that an individual or organization is planning or participating in illegal activity.  There are no instructions on what kind of information should be maintained on groups and individuals, including what methods of maintaining information are acceptable or may be unconstitutional.

**The Committee found no clear evidence that MPD maintains dossiers on individual political activists, but MPD does document political activity in the absence of policy guidance.**

MPD does maintain "running resumés" on the activities of individuals, in the form of reports that track the interaction of undercover officers with political activists.  These reports summarize daily activities of individuals beyond planning for demonstrations without regard for whether the activities are criminal.

In addition, as noted above, there are no safeguards in place to prevent inappropriate collection of information on individuals.  There is also no standardized method of purging information on individuals not related to criminal activity or plans for criminal activity.

Finally, notwithstanding MPD testimony on this point, it is not clear what the Intelligence Unit's policy is with respect to the maintenance of information on individuals actually engaged in serious criminal activity.  MPD simultaneously claims that the Unit collects information by events, but also claims that some individuals are of concern because they engage in criminal activity.  In the event that MPD has a legitimate concern about a particular individual it is not clear how information is stored in an easily accessible way to achieve MPD's stated goal of protecting public safety.

**The Committee found no evidence that MPD has a policy of using agents provocateur, though specific allegations of this kind of activity have not been sufficiently investigated.**

The most compelling allegation of the use of agents provocateur was the pepper spray incident described earlier in this report (see "Inauguration, Pepper Spray and Self Policing" section of this report). That instance alone should have prompted a thorough examination of individual officers' actions in this area.

Recommendations:

**MPD should conduct intelligence operations solely for a legitimate law enforcement purpose.**

**Before police undertake surveillance of any group engaging in constitutionally protected expression or freedom of association, there should be reasonable suspicion to believe that the group is engaging in, planning to engage in, or about to engage in criminal activity.**

**MPD should be prohibited from using undercover officers to conduct surveillance of individuals or organizations based solely on the content of their political speech or ideology.**

**Surveillance in this context should be expressly approved by the Assistant Chief for Special Services, be time-limited in duration, and be conducted in a manner that is not more extensive or intrusive than is justified by its purpose.**

**MPD should be required to have an internal oversight mechanism once an undercover operation is underway that, on a regular basis, reviews the activity of and information gained by undercover officers and determines whether undercover surveillance is still warranted.**

**Officers engaged in surveillance should report regularly to the Assistant Chief for Special Services. MPD should immediately cease such surveillance once facts made known to them no longer support reasonable suspicion.**

**MPD should be prohibited from maintaining files or dossiers on individuals in the absence of criminal activity and be required to purge files unrelated to criminal activity.**

**MPD should be prohibited from using *agents provocateur*.**

**EMERGING ISSUE: FAILURES IN LEADERSHIP ACCOUNTABILITY**

One of the most serious findings of the Committee's investigation is a pattern of evasion and misrepresentation by Chief Ramsey and senior members of his command staff. In statements made on the public record over the last three years, in deposition testimony, in answers to questions posed in the course of U.S. District Court litigation, and in responses in the panel's public hearings in December, members of the senior ranks in the Department sought to evade direct answers to important questions and, in some instances, misrepresented the record and their role in Departmental actions.

Many of these examples have been described in earlier sections of this report. The gravity of this finding merits clear delineation of the record established by the Committee and that is the purpose of this section of the report.

Prohibited conduct for an officer of the Metropolitan Police Department includes making a false statement, an offense with a penalty ranging from 15 days suspension to removal. The definition of the offense, contained in the MPD General Order 1202.1 follows:

> Willfully and knowingly making an untruthful statement of any kind in any verbal or written report pertaining to his/her official duties as a Metropolitan Police Officer to, or in the presence of any superior officer, or intended for the information of any superior officer, or *making a untruthful statement before any court or any hearing.* [emphasis added].

The specifics findings of misrepresentation and evasion follow.

**In February 2003 testimony before the Council Chief Ramsey denied that he had a role in the decision to arrest individuals in Pershing Park in September 2002.**

Once it became clear that the mass arrests made at Pershing Park on September 27, 2002, were and would remain controversial and bring criticism to the Williams Administration, Chief Ramsey and his immediate subordinates sought to minimize the chief's own role in the decision and the outcome. The following outlines Chief Ramsey's changing public statements with regard to the arrests at Pershing Park – first his statement the day of the arrests, then his response to direct questions at a Judiciary hearing on February 25, 2003, and finally an exchange with Special Counsel Mary Cheh during the December 18, 2004 hearing.

At a press conference in front of MPD Headquarters the evening of September 27, 2002, the day 647 demonstrators were arrested, approximately 400 of them in Pershing Park, with Mayor Williams and Deputy Mayor Kellems present, this exchange took place between a reporter and Chief Ramsey:

Reporter:  "A number of the protestors have said they were never given warnings before they were corralled by your officers and arrested.  How do you answer that?"

Chief Ramsey: "Well, I mean we gave warnings.  I mean, when you've got large groups like that, obviously, I mean there's a lot of noise and things like that.  But we gave warnings, we followed everything by the book."

Reporter: "Did your officers use bullhorns at 15[th] and Pennsylvania Avenue?" [southwest corner of Pershing Park]

Chief Ramsey: "I wasn't there at the time but we gave verbal commands…people to get out of the street.  But remember, they had no business being in the street.  There was no parade.  You can't just take over Pennsylvania Avenue, you can't just take over 15th Street… "

At a February 25, 2003 hearing before the Judiciary Committee Councilmember Patterson asked,  "And whose decision was it to make the arrests in Pershing Park that day?"  This exchange followed:

Chief Ramsey: "Assistant Chief Newsham was assigned to that particular sector that we had, that area that we had.  All the assistant chiefs were given areas of responsibility and that happened to be his area."

Councilmember Patterson: "And you were not a part of that decision making yourself?"

Chief Ramsey: "No. When I came up on the scene, actually, that was already practically in progress.  I was all over the various locations where we had incidents taking place…But I was there when the arrests were taking place."

Finally, Chief Ramsey was questioned about the arrests and the decision-making by the Committee's Special Counsel, Professor Mary Cheh, during the December 18, 2003 investigation hearing. The entire exchange is included.

Q: Assistant Chief Newsham describes his conversation with you as informing you and seeking your approval which he then got.  Is that correct?

A: Well obviously, I have the authority to be able to override any decision that's made.  Again, he did not have to seek it, but since I

was getting the briefing, part of that process would be if I felt something was amiss, I certainly would at that time tell him that's not the appropriate response for the Department and we wouldn't move forward.  I didn't hear anything in that respect at all. Ultimately, I'm responsible for everything.  And the reason, when you're talking to a superior officer, the fact that they don't tell you to not move forward can be meant to mean that it's appropriate. It's ok.

Q: Well, it's nice to acknowledge, you know that generally you're the head of the department, and responsible for everything, the 'buck stops here' and that sort of thing.  But I'm talking about the circumstances at that particular time.  He told us that he informed you fully.  He told us that he sought your approval.  He told us that you gave your approval.  Are you saying that you just stood there passively and didn't countermand it?  Did you give approval to make the arrests?

A: Excuse me, Ma'am.  I think there's a need for me to just get one thing clear.  I'm not generally in charge of the Department; I am in charge of the Department…

Q: Did you give approval to make the arrests?

A: And I would appreciate it, Ma'am.  Excuse me, Professor…

Q: No, excuse me.  Did you give the approval to make the arrests?

A: There's no…You're being rude Ma'am, and there's no need for that.  I'm just simply responding to something that you said that I thought was a bit out of line.  I've spent a considerable amount of my life getting to where I am right now and I refuse to let you or anyone else define me as a person or define this Department. That's why we're having this discussion.  I told him that I thought that arrests were okay.  That there was nothing wrong with what he was doing.  Based on that at the time, I did not disapprove the arrests.  Ultimately, the buck stops with me.  He made a decision, I supported that decision and I didn't have the benefit of some of the information now.  But based on what I saw at the time, I supported his decision 100%.

Q: So then, let me phrase it the way I wanted to phrase it.  Did you approve of his decision to arrest the persons at Pershing Park?

A: Yes.

98

Chief Ramsey's final heated testimony on December 18, 2003, that he approved-the order to arrest as commanding officer on the scene at the time, is something that he expressly denied nine months earlier. That admission has not been accompanied by any acknowledgment of the illegality of the arrests. Nor has the chief's superiors, including Deputy Mayor Kellems and Mayor Williams, taken action to hold the chief of police accountable for his role in what will likely be a costly as well as unconstitutional action, or for his misrepresentation of that role in earlier public statements.

**There has been a persistent effort by MPD leadership to exaggerate the numbers of and threat posed by anti-globalization demonstrators.**

Prior to the September 2002 IMF/World Bank demonstrations, Chief Ramsey told the Council and media that MPD expected 20,000 to 30,000 demonstrators that weekend.  MPD's own operational plans indicate that MPD expected no more than 4,000 demonstrators (see "Pershing Park Arrests" section of this report).

After Fire/EMS and MPD shut down the demonstrators' convergence center in April 2000, Chief Ramsey and then-Executive Assistant Chief Terry Gainer told reporters that demonstrators were making homemade pepper spray and molotov cocktails.  During an April 17, 2000 television story by *The News with Brian Williams,* Chief Ramsey stated "They were making homemade pepper spray."  An April 15, 2000 Associated Press story reported "officers seized a plastic container with a rag stuffed inside and what looked like a wick, said executive assistant chief Terry Gainer.  He said it 'looks like a Molotov cocktail."  These statements are not corroborated in the Fire/EMS records on materials actually recovered at the convergence center, or by the testimony of MPD and Fire/EMS witnesses (see "Convergence Center" case study section of this report).

**Both Chief Ramsey and Assistant Chief Alfred Broadbent, Jr. expressly denied that the Department directed protesters into Pershing Park, yet the record shows that the opposite is the case.**

In testimony December 18, 2003, Chief Ramsey several times asserted that the Department had no information on plans for demonstrators to congregate in Pershing Park. "We don't know why they went to the park," he said, and, "We don't have any knowledge of where they were going to be."

Chief Broadbent, asked specifically if "the police were in any way funneling them or directing them" to Pershing Park, responded, "No we were not."

These statements contradict the intelligence included in the operational plan for the weekend and information shared by Chief Ramsey with

Councilmembers a week before the trade meetings that indicated that MPD knew the exact schedule of the demonstrators that morning. The statements are also contradicted by the Committee's investigation which found that a significant number of demonstrators were directed into Pershing Park by MPD officers (this finding is discussed in detail in the "Pershing Park Arrests" section of this report), as well as the record of MPD's own internal report on the Pershing Park arrests, in which officers interviewed described their own actions that morning to direct marchers and bicycle riders into Pershing Park. The version of the investigative report submitted to Chief Ramsey by the Force Investigation Team described police actions using the words "shepherded," "escorted," and "directed," which were changed to "monitoring," "followed," and "allowed" to reflect the absence of direction.

**Chief Ramsey testified that following the Office of Professional Responsibility investigation into the Pershing Park arrests, he implemented certain requirements in MPD policy and procedure, but some of those requirements have existed in MPD policy since 1978.**

At the Committee's December 18, 2003 hearing, Chief Ramsey testified that he directed that ten actions be taken "in order to more fully address the deficiencies identified during our internal investigation." The actions listed by Chief Ramsey included "tighter procedures on issuing warnings for crowds to disperse," and "the use of an operations log to document all actions taken during an event."

Yet the May 2003 SOPs on demonstrations issued by Chief Ramsey has language concerning both the issuance of warnings for crowds to disperse and the commander's event log is *identical* to the language on both subjects contained in the 1978 demonstrations handbook.

**Assistant Chief Brian Jordan testified he did not participate in discussions among command staff members prior to the arrests at Pershing Park, information contradicted by four witnesses, including three MPD officials in their sworn testimony.**

Several officials who were present at Pershing Park, including Assistant Chief Peter Newsham, Captain Andrew Solberg, Captain Ralph McLean, and U.S. Park Police Captain Rick Murphy, testified that Assistant Chief Brian Jordan was an active participant in discussions and operational orders given before and after the order to effect the mass arrest

U.S. Park Police Captain Rick Murphy, who was on the scene of the arrests at Pershing Park, was interviewed during the MPD Force Investigation Team (FIT) investigation into the Pershing Park arrests. Captain Murphy told FIT Sgt. James McGuire that he participated in discussions with Assistant Chiefs Newsham and Jordan before and after the decision was made to make a mass

arrest at Pershing Park. He stated that after the decision was made, Assistant Chief Jordan asked Captain Murphy to use his horses to push the protesters to the north side of the park, a request that Captain Murphy denied.

During the same FIT investigation, Captain Solberg told FIT Sgts McGuire and McCoy that upon arriving at Pershing Park, he met with Assistant Chiefs Jordan and Newsham and was told to take his CDU platoons and shut down the south and east sides of the park.

Assistant Chief Jordan testified, however, that he had no role in operations or discussions at Pershing Park. He testified that after arriving at Pershing Park from an earlier mass arrest scene at Vermont Avenue and K Street, NW:

> I asked Chief Newsham did he need anything. He said no. I stood up there talking with Deputy Superintendent Huberman from Chicago for a while and then after that I got in my car and I left.

Assistant Chief Jordan was asked specifically about the statements of Captain Solberg and USPP Captain Rick Murphy, and he denied participating in those conversations. He testified that "the only conversation I had was, significant conversation was with Deputy Superintendent Huberman."

**Chief Ramsey and Assistant Chief Broadbent in Council testimony denied or sought to diminish the seriousness of alleged violations of the rights of political activists.**

During his deposition and public hearing testimony, Assistant Chief Broadbent refused to characterize the work of undercover officers assigned to monitor political activists as "infiltration." He testified that officers were merely "attending public meetings" to learn about the plans of demonstrators. Assistant Chief Broadbent's characterization of the work of undercover officers fails to acknowledge the extent or invasive nature of surveillance of activists. Former undercover officers testified before the Committee that, for months at a time, they assumed false identities as activists and became members of political organizations. In their words, they "infiltrated" organizations and reported to the Intelligence Unit on the daily activities of individuals. These reports were sent up their chain of command, including to Assistant Chief Broadbent.

In a November 14, 2003, deposition in the litigation, *International Action Center, et al, v. United States of America, et al*, Chief Ramsey repeatedly refused to answer a direct and straightforward question about ensuring that undercover officers do not violate civil rights. With apologies for the repetition, the efforts by the plaintiffs' lawyer, Mara Verheyden-Hilliard, to secure an answer are included here verbatim:

Q: What safeguards are put in place to make sure that the Constitutional rights of political activists are not violated by the use of intelligence officers infiltrating their organizing meetings and activities?

A: We're only concerned with any unlawful activities that may be taking place or being planned.

Q: But what safeguards are put into place with regard to the intelligence operations conducted by the MPD that involve assigning officers to infiltrate political meetings or assemblies?

A: Our officers are interested only in any unlawful activities that might be taking place or being planned by an individual or a group of individuals. Anything beyond that, we aren't concerned about.

Q: I'm going to ask you again, however, what safeguards are put into place by the Metropolitan Police Department to ensure that intelligence operations using Metropolitan Police Department officers to infiltrate political organizing activities do not violate the rights of political activists?

A: Again, we aren't concerned with the political positions of any group or individual. We are only concerned with unlawful activities that an individual or a group might be engaged in.

Public officials are responsible for their actions including providing information concerning the performance of their duties when questions are raised within a legitimate fact-finding setting, whether that setting is a D.C. Council hearing or a court proceeding. In the deposition quoted above, Chief Ramsey failed to meet even minimal standards for responding to legitimate questions. The end result: the chief of police of the District of Columbia presents himself as someone who dismisses the importance of safeguarding the Constitutional rights of political activists, fails to recognize the legitimacy of the judicial process, and fails to hold himself accountable for providing information in a legitimate setting.

**Senior officials in the Department displayed a pattern of evasion in their depositions by claiming not to recall certain events – claims that are implausible on their face.**

The same failure to perform the duty of a public official to account for himself and his actions within a legitimate fact-finding setting is evident in the next set examples as well. Some MPD witnesses persistently refused to answer even the most innocuous questions.

*Executive Assistant Chief Michael Fitzgerald*

Executive Assistant Chief Michael Fitzgerald, second in command in the Department, conducted the interview of Assistant Chief Peter Newsham about the arrests at Pershing Park as part of the FIT investigation. The inappropriateness of EAC Fitzgerald having conducted this interview, since he is outside of the Office of Professional Responsibility and since he was present and approved of the arrests at Pershing Park at the time of that decision, is discussed in the "Pershing Park Investigation" section of this report.  The investigating officials provided EAC Fitzgerald with a series of questions to ask Assistant Chief Newsham during the interview. Several of his responses to questions about the decision for him to do the interview, and whether he received questions prepared by the sergeants who conducted the investigation, follow:

> Q: Did you have a meeting that included the Chief of Police to discuss the taking of a statement from Assistant Chief Newsham?
>
> A: I don't remember having a meeting with the Chief of Police, although that may have taken place because the Chief of Police is the only one who can – he had to instruct me to take a statement from Chief Newsham…
>
> I remember – what I remember is not having a meeting about that….
>
> But I don't know whether the Chief told me to take the statement or I got it from Terry Ryan, and I don't want to make assumptions that the Chief would tell me because Terry wouldn't tell me. But I don't recall the meeting. I'm not saying it didn't take place….
>
> Q: Now, did anyone prepare for you a set of questions to use during that interview?
>
> A: I don't remember getting any questions for the interviews. I'm not saying I didn't get questions, I just don't remember these questions.

*Commander William Ponton*

Commander William Ponton is Chief Ramsey's chief of staff, essentially controlling the paper flow into and out of the chief's office. He was asked about the meeting called by Chief Ramsey and attended by several senior officials at which Captain Klein of the FIT was directed to make changes and additions to the investigative report about Pershing Park. Exchanges with Commander Ponton follow:

Q: At that meeting you say you discussed Captain Klein's report. Could you recall the substance of those conversations?

A: No, ma'am.

Q: Do you know whether the report was gone over in detail or was it just gone over in general?

A: I don't recall the discussions at this point.

Q: Do you know how long the meeting lasted?

A: No. I don't recall that either.

Q: Did you recall yourself participating at all or were you just sitting there sort of observing?

A: I sat in the meeting. I don't recall having anything to say in the meeting. I did sit in the meeting. I simply don't recall what was discussed.

Q: So this is a meeting that was in January of this year on this report and you have no recollection of any matter that was discussed?

A: I don't recall the specific discussions.

Q: Well, could you recall the general discussions?

A: The report was discussed.

*Sergeant Michael Thornton*

Sgt. Michael Thornton also works in the chief's office as an administrative sergeant handling correspondence. He occasionally accompanies the chief of police as his driver, and, during recent demonstrations, as a provider of personal security for Chief Ramsey. He accompanied Chief Ramsey on September 27, 2002, including stops at two sites of mass arrests, at Vermont Avenue and K Street, and at Pershing Park. Questions and his responses to counsel questions about Pershing Park follow:

Q: Did you go from that location [Vermont Avenue and K Street] to Pershing Park?

A: I went to Pershing Park. The sequence of events I don't remember…

Q: Would you have walked from Vermont and K to Pershing Park?

A: Could be.

Q: Did you go back into the car?

A: From Vermont and K?  I don't remember.  I mean at some point I would have had to go, but I don't remember from that location or where we went next…

Q: At some point you left Pershing Park, did you not?

A: Yup.

Q: How did you leave Pershing Park?

A: I don't remember.

Q: When you got to Pershing Park you said one of your assignments was to keep an eye on the crowd, right?

A: Uh-huh….

Q: And you would do it to the best of your ability, correct?

A: I would, yes, ma'am.

Q:  And you would be alert, right?

A: Uh-huh.

Q: And attentive, correct?

A: Uh-huh.

Q: Okay. So now you're at Pershing Park and tell us having been alert and attentive, what do you see?...

A: Demonstrators standing around, police officers standing around, and a lot of horses. I was in back of the horses… I wasn't right beside the Chief there. So, you know, I felt like it was a safe situation, that I didn't feel like that he was, his personal safety was in, I didn't feel his personal safety was in danger at the location...

Q: Was it an unruly crowd?

105

A: Was it – what do you mean unruly?  What do you mean?

Q: Were there skirmishes?  Were people pushing and shoving?  Was it loud?  Did it seem out of control?  What was your assessment?  You're a police officer, I assume you can make assessments about the nature of circumstances you find yourself in, so I'm asking you to describe them for us.

A: I was behind the line of horses and I did not feel that there was a threat to the Chief of Police…

Q: Did you see him confer with others?

A: He was standing in close proximity to other police officers but I don't know who they were.  I mean, they could have been line officers, they could have been park police.  I mean, I don't know.  I don't remember who they were.  I don't recall any specific person that he spoke to at that location.

Sgt. Thornton also was asked about the arrests.  Despite the fact that approximately 400 people were arrested while he stood at the corner of 14th Street and Pennsylvania Avenue, Sgt. Thornton testified that he could not remember any specific details about those events.  His responses:

Q: When you arrived there – were arrests being effected yet?

A: I don't recall any arrests, being on the scene for arrests…

Q: You don't recall any arrests at Pershing Park on Friday September 27th?

A: You know, I've learned through the media reports that, yeah, there was numerous arrests, but I don't recall seeing anyone being arrested…

Q: We've see news footage of you and Chief Ramsey removing the bicycle of an arrested demonstrator from Pershing Park.  Do you remember that?

A: Me removing a bicycle from Pershing Park?  No.  But, okay.

Q: You were removing it from someone who had been arrested and I ask to see if that would jog your memory to see if you remembered people being arrested at Pershing Park.

A: [no answer]

In closing, it should be noted that the Committee did receive testimony from several MPD officers and officials who took the Department's guidelines on false statements and the role of the Council's investigation very seriously.  These witnesses provided truthful and careful testimony, some perhaps at risk to themselves and their careers and despite a climate of fear within the department that does not encourage such cooperation.  To those witnesses, the Committee extends its admiration and gratitude.

## EMERGING ISSUES: DEPARTING FROM BEST PRACTICE IN MANAGING DEMONSTRATIONS

From the late 1970s until 2000 the Metropolitan Police Department enjoyed a reputation for professionalism in handling the hundreds of demonstrations that took place in the nation's capital. In their testimony December 17, 2003, former Deputy Chief of Police AND Commander, Special Operations and Traffic Division, Robert Klotz and former ACLU legal counsel Ralph Temple recounted the history of difficult, challenging events monitored and managed by MPD without major controversy during that period: the "tractorcade" of farmers camped on the Mall for close to a month in 1978; marches by Iranian students in the 1980s in the midst of strong anti-Iranian sentiment in this country; the Million Man March in 1995 that was a major public concern based on the sheer number of participants. These large-scale events were opportunities for the department to present itself as a best-in-class agency, well-trained and well-lead. A major conclusion by the Committee, underscored by the two witnesses, is that the Metropolitan Police Department today is not what it was in the immediate past, with potential repercussions for the future. Temple's testimony on this point:

> If you go back to May Day, 1971, they had a real difficult thing to deal with. A hundred thousand demonstrators, threatening to close down -- that's darn tough; it can be done; but it is tough. This current police management hasn't had a tough one to deal with. April 2000 there were 15,000 demonstrators; September 2002, only two or 3,000 demonstrators. It would have been such an easy demonstration to do it right…But they couldn't restrict themselves to arresting only violators of the law.

If the MPD was faced tomorrow with managing a controversial political protest event that drew close to 100,000 persons – as was the case on May Day, 1971 – there is nothing in the record of the last four years to indicate the department could respond successfully. This is a serious concern for District residents and a serious concern for all who wish to exercise their First Amendment rights in the nation's capital. A discussion of the specific issues in managing demonstrations follows.

*Command and Control*

Prior to the IMF/World Bank meetings in April 2000, MPD rarely mobilized the full department to prepare for demonstrations. Since mass demonstrations requiring full mobilization have become more regular in recent years, Chief Ramsey has implemented changes in the command and control structure to accommodate full mobilization. The overall effect of these changes has been the dilution of civil disturbance unit (CDU) expertise and a weakening of effective incident command and management.

108

According to deposition and public hearing testimony, over the last twenty years, it was typical to have the Special Operations Division (SOD) Commander act as the field commander during mass demonstrations. The SOD Commander typically had extensive career CDU experience[28] and fulfilled the role of incident commander during demonstrations, making final decisions about the deployment of manpower and the initiation of mass arrests. The SOD Commander also typically relied on assistance from captains and lieutenants with similar career CDU experience.

More frequent full mobilization of the Department since 2000 has lead MPD to rely on the entire command staff during demonstrations, and Chief Ramsey has designed a command and control structure in which the demonstration area is divided into quadrants, with each quadrant and its civil disturbance officers and officials being commanded by an assistant chief. This has resulted in incident commanders being designated as a result of their rank, rather than the extent of their CDU experience.

The original version of the report of MPD's Force Investigation Team investigation into the Pershing Park arrests contained a finding, noting that:

> Currently, most commanders and assistant chiefs are placed in charge of quadrants in which mass arrests are likely to take place. Numerous command officials do not possess the experience in handling complex civil disturbance events. Moreover, the majority of officers graduating from the Institute for Police Science undergo a weeklong training curriculum in civil disturbance. In some cases, this leads to an undesirable, even detrimental situation in which many officers and supervisors possess more knowledge and training than the official in command.

This recommendation was removed from the report prior to its transmittal to the Mayor and Council. Nonetheless, the Committee reached the same conclusion. Asked about this phenomenon of relatively unseasoned command staff members making important tactical decisions in the absence of extensive CDU training, Assistant Chief Alfred Broadbent indicated that the CDU captains and lieutenants have a responsibility to speak up and advise assistant chiefs on field decisions on the basis of their own CDU training and experience during mass demonstrations. This assertion during his deposition belies the environment that exists within the department such that challenges to a superior officer are not merely ignored but could be punished, formally or informally. For inexperienced command officials to routinely rely on more experienced subordinates requires agency management that is more open and self-critical than is the case with MPD today.

---

[28] The use of the term "career civil disturbance unit experience" means officials who, throughout their careers, were members of CDU platoons, regularly were assigned to handle mass demonstrations, and participated in annual blocks of CDU training.

The change in command structure instituted under Chief Ramsey has also, according to after action reports dating back to April 2001, resulted in general command and control confusion, and what has been labeled by many witnesses as akin to the "too many cooks in the kitchen" syndrome. Also, as one commander put it, the command structure has become so tall, that the upward flow of information from officers to command officials gets distorted. Contributing to this problem is the expansion of MPD's Joint Operations Command Center, where an incident commander, typically the Assistant Chief of Special Services, manages support resources and the movement of CDUs. An after action report submitted by Commander Willie Dandridge after the September 2002 Pershing Park arrests is typical of other comments on this issue from after action reports and testimony. Commander Dandridge noted:

> Command and control are essential during details, especially during a tactical response. I was unsure of who was actually in charge. Deployments and assignments were generated from the JOCC yet would be countermanded by the A/C in charge of a specific area, reiterated by the command bus, and countered by the A/C in charge. Though a definitive answer as to whose decision would stand may have been predetermined, the contradictions lead to doubt as to how to react.

*Crowd Management/Arrest Procedures*

As described in more detail in the "Demonstrations in the District of Columbia" section of this report, in 1978, following the May Day litigation, MPD issued guidelines on mass demonstrations. In addition to these guidelines, MPD uses an operational plan for each mass demonstration that outlines policy and detailed operations for specific events.

The Committee reviewed several versions of MPD's guidelines in place during the last 25 years, as well as various operational plans, and examined their implementation through the case studies described earlier in this report. The Committee drew three major conclusions from this review. First, the tone of MPD's policy has shifted in recent years towards the assumption that demonstrators are likely to break the law or cause civil disturbances, and in some instances has moved away from court recommendations in the 1970s. Second, the primary elements of MPD's *articulated* policy for handling demonstrations, which emphasize the protection of First Amendment rights, the use of arrests as a last resort, and de-escalation with respect to crowd management, are generally sound. Third, MPD has strayed from its articulated policy in recent years during mass demonstrations where there is a potential for civil disobedience.

During his public hearing testimony, Robert Klotz, who served as deputy chief of police of the Special Operations and Traffic Division following the May Day era litigation, expressed concern about a tendency of police departments in

recent years to blur the line between protecting demonstrators' rights to demonstrate and managing civil disturbances. "A parade and a demonstration is not a civil disturbance," he said during the December hearing, "and a civil disturbance is not a parade or a demonstration." He indicated that the effect of this blurring has been to encourage overreaction by police and an escalation of tension. He said using a show of force, such as a large number of officers or a police line, is a legitimate tactic in a civil disturbance. "But a show of force in a demonstration is ill-advised," Klotz said. "If you use a show of force in a relatively peaceful demonstration you are actually setting a tone that I don't think the police should be setting."

This concern was reiterated by Timothy Lynch, Director of the Cato Institute's Project on Criminal Justice, who testified that American police departments over the twenty years have become more "militarized" and the rights of individuals have suffered as a consequence. The military mission, he said, is to maximize use of force, while the police mission is, or should be, to use the least amount of force.

The shift referenced by Mr. Klotz and Mr. Lynch is evident in the evolution of MPD's mass demonstration policy between 1978 and the present, and can be demonstrated by comparing the 1978 handbook and the current SOP. This is most obviously reflected in the change of the names of the documents. The 1978 manual is called the *MPD Handbook for the Management of Mass Demonstrations*. The 2003 SOP issued by Chief Ramsey is called the *MPD Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances & Prisoner Processing*.

The introduction to the guidelines, their articulated purpose, and their statements of policy reflect this same shift. For example, the following is the statement of policy in the 1978 handbook:

> It is the statutory responsibility of the MPD to preserve the public peace, to prevent crime and arrest offenders, and to protect the rights of persons and of property. It is the policy of the Metropolitan Police Department during mass demonstrations to preserve the peace while protecting the rights of demonstrators to assemble peacefully and exercise free speech. In fulfilling its responsibilities during mass demonstrations in which demonstrators engage in unlawful conduct, the MPD will make reasonable efforts to employ non-arrest methods of crowd management as the primary means of restoring order. Should such methods prove unsuccessful, arrests shall be made for violations of the law. All arrests shall be based on probable cause, and arresting officers shall use only the minimum necessary force to make and maintain arrests. To the extent possible under the circumstances, arrests shall be made in an organized manner by units at the direction of an official, and shall be fully documented. Prisoners

shall be safeguarded and adequately cared for, and shall be expeditiously processed for court or released.

The statement of policy of the 2003 SOP is almost identical to the statement above, yet has subtle and significant changes, which are noted inside the text below. Note the deletion of the qualifier included in the 1978 document that crowd management is necessary when there is unlawful conduct within a mass demonstration, changed to an inherent assumption that, during mass demonstrations, MPD will have to manage the crowd and restore order:

> It is the statutory responsibility of the MPD to preserve the public peace, to prevent crime, ~~and~~ arrest offenders, and to protect the rights of persons and of property. ~~It is the policy of the Metropolitan Police Department during~~ <u>As part of this responsibility, the department provides trained personnel to respond to the scene of</u> mass demonstrations <u>and civil disturbances in our city in order</u> to preserve the peace while protecting the <u>First Amendment</u> rights of <u>people</u> ~~demonstrators~~ to assemble peacefully and exercise free speech. In fulfilling ~~its~~ <u>these</u> responsibilities, ~~during mass demonstrations in which demonstrators engage in unlawful conduct,~~ the MPD will make reasonable efforts to employ non-arrest methods of crowd management as the primary means of restoring order. Should such methods prove unsuccessful, arrests shall be made for violations of the law. All arrests shall be based on probable cause, and arresting officers shall use only the minimum necessary force to make and maintain <u>the</u> arrests. To the extent possible under the circumstances, arrests shall be made in an organized manner by units at the direction of an official <u>the Chief of police or his/her designee</u>, and shall be fully documented. Prisoners shall be safeguarded and adequately cared for, and shall be expeditiously processed for court or released.

It appears that these specific changes occurred some time between 1978 and 1996, as they are also reflected in the 1996 edition of the handbook, the *MPD Manual for Mass Demonstrations and Responding to Civil Disturbances.*

The Committee also found instances of new language inserted into the 2003 manual that appears to stray from the intent of May Day era court rulings. For example, there is new language in the 2003 SOP regarding the documentation of information surrounding mass arrests. One of the courts' most significant criticisms of MPD during the May Day litigation concerned MPD's suspension of the use of its field arrest forms during mass arrests in 1971. The 2003 SOP makes repeated references to the importance of this issue of documentation. But it also includes new language that allows this process to be suspended:

Documentation.  During mass demonstrations and civil disturbances, every reasonable effort shall be made to document every arrest to the extent allowable under the circumstances and consistent with the department's responsibility to protect life and property and to prevent unlawful conduct.

(1) Under normal circumstances Field Arrest Forms or other administrative devices or procedures, as ordered by the Field Commander, shall be used by members for recording information necessary to establish probable cause.

(2) The Field Commander may delegate to unit commanders the authority to temporarily abbreviate or suspend normal field documentation procedures, when such action is the only available resource for the protection of lives and the prevention of major property damage.  As soon as conditions allow, however, the Field Commander or the unit commander, as the case may be, shall direct the reinstitution of normal field documentation procedures.

The 2003 manual also includes language, dating back to 1978, requiring unit commanders to keep "commander's event logs." This reflects another policy regarding documentation that has been ignored in practice in recent years. These logs are required to record occasions requiring "the use of force; tactical orders issued to personnel; orders received from higher authority; significant acts on the part of the demonstrators; incidents involving mass arrests; and complaints alleging serious police misconduct."  The only commander who maintained an event log during the September 2002 demonstrations was Assistant Chief Brian Jordan.  In response to a written deposition issued by the Committee that asked whether commander's event logs were used during mass anti-globalization demonstrations in recent years, Chief Ramsey stated:

The Mass Demonstration Event Logs were not used for the listed events.  Commander's Mass Demonstration Event logs have taken the form of the running resumés produced by the department's Joint Operations Command Center.

The running resumé produced in the Joint Operations Command Center does not provide an eye-witness account of the circumstances surrounding a mass arrest, a form of record-keeping that is required of commanders and arresting officers in order to establish probable cause and to defend arrests in court.

Aside from the overall shift in tone and questionable additions to the 2003 SOPs, several aspects of MPD's articulated policy for handling mass demonstrations are sound.  As the statement of policy quoted above states, non-arrest methods of crowd management are preferred.  This policy was re-iterated by the deposition and public hearing testimony of several MPD witnesses.

113

MPD's use of force policy, consistent with the 1978 policy, states that "in managing a crowd, the policy of this department is to use the least stringent force necessary…The application of force by a unit or element of it shall be immediately discontinued upon a determination by the ranking official on the scene that the condition, which required the use of force, has been alleviated." The 2003 SOP requires that all instances of use of force be documented.

The 2003 manual also includes language dating back to 1978 that requires the collection of information necessary for advanced planning for demonstrations, and encourages negotiations and communication with demonstration organizers as far in advance of demonstrations as possible.  It emphasizes using only the level of manpower that is necessary for the threat level associated with the demonstration, and encourages officers to remain neutral and not engage in "demonstration-related discussion with participants" or to respond to verbal harassment from demonstrators.  It warns that officers who "attempt to avoid identification through removal of the badge or name plate will be considered a violation of department orders and will be dealt with accordingly."

Finally, the 2003 SOP includes language identical to language in the 1978 handbook that allows use of a police line:

> Whenever it becomes necessary to isolate an area in which large scale unlawful activity is occurring or has the potential of occurring … A police line may be established at the direction of a unit commander to prevent damage to a specific target, such as a building, a utility or a business area…Police lines shall not be used to impede the movement of a crowd when there is no potential for unlawful activity.

The manual only allows for crowd dispersal:

> When the intensity level of a crowd rises and unlawful disruption, either through violent or passive means, is occurring to the extent that the field commander determines there is a need to make a positive police response, he/she will instruct the affected unit commanders, where time and circumstances permit, to issue warnings to the crowd to disperse.

As described earlier this report, MPD policy requires a series of clearly audible warnings before officers can make arrests.

While MPD may have articulated sound policies in important areas, including in the area of crowd management, the department has violated its own policies on several occasions in recent years, usually during mass demonstrations with a potential for civil disobedience.  For example, as already discussed in the "Pershing Park Arrests" section of this report, MPD did not give warnings before conducting mass arrests of nearly 600 demonstrators in 2002.

114

Also, according to the testimony of public witnesses and some MPD witnesses, MPD increasingly has used police lines to surround and detain demonstrators over the last four years as a means of crowd control, rather than as a means of controlling the potential for violence, or as a means of conducting a mass arrest. This tactic of "trap and detain," has at times kept demonstrators detained for considerable lengths of time, against their will. It should never be used on nonviolent demonstrators or in the absence of the potential for unlawful activity. To do so is a violation of current MPD policy and is arguably tantamount to, at best, disruption of individuals' First Amendment rights to demonstrate and, at worst, false arrest.

*Command Staff Attitude*

Another element in the movement by the department away from best practices has to do with attitudes adopted or learned toward demonstrators themselves. Senior leaders, notably Assistant Chief Alfred Broadbent and Assistant Chief Peter Newsham, made startling comments in their deposition testimony when describing the political activists who lead and participate in demonstrations. Assistant Chief Newsham described the briefings prior to the September 2002 demonstrations: "There was a lot of talk and a lot of information that was shared with us regarding the anarchists. They're out on the West Coast and they were largely responsible for the problems that they had in Seattle."

Assistant Chief Broadbent essentially said in his deposition that he could tell by looking at a demonstrator that he or she will commit a criminal act. He testified:

> A: This is where we talk about the face of demonstrations changing. Because if you want to come to protest in Washington, why are you bringing the gas mask. Why are you bringing the bandana to cover your face. Why are you wearing garments to conceal your identity. If you're doing those type of things, you're not coming to protest, you're coming to engage in some type of civil disobedience.

> Q: You're saying that those attributes target that person as a person who is likely to commit a criminal act?

> A: There's a reason why they're hiding their identity. And it's not because it's hot or cold. Someone who wears a bandana over their face and covers everything but their eyes is doing that for a reason.

There are two points here. Demonstrators have had cause in the past to fear police use of pepper spray and will explain that they are advised, and advise others, to wear or carry scarves and other apparel to cover the face if necessary to

avoid inhaling chemicals. Second and more significant: basing a police decision to arrest or detain merely on the appearance of one or more individuals represents a form of profiling and runs counter to departmental policy as well as case law.

In his deposition and public testimony, Assistant Chief Newsham said he believed the crowd at Pershing Park was dangerous. Other contemporaneous descriptions indicated otherwise. A television reporter, in a live report as the bicyclists arrived at Freedom Plaza and officers surrounded Pershing Park, said, "They've surrounded this group here…We have a lot more police officers than demonstrators…No violence, no incidents here other than chanting and placard carrying here at Pennsylvania as reinforcements come in to help police officers surround and contain this group[29]."

The department's own videotape of the scene at the park showed a number of persons to be colorfully dressed, but gave no indication of any menace present in the crowd, either through the presence of any kind of weapons or angry expressions on those in the crowd. To the contrary, the MPD tape repeatedly shows participants anxiously asking to be released from the park. During his deposition, Assistant Chief Newsham was asked to explain his belief that there was danger present in Pershing Park.

> Q. Let's just take 2002, the people that were arrested, they were not exhibiting the behaviors as far as you know that you saw on those films in Prague or Seattle.
>
> A. Right. I think they were very close to exhibiting those behaviors. I really do. The crowd that I dealt with that Friday seemed a lot more aggressive. They seemed a lot more reluctant to obey police direction. They had actually engaged in some destructive behavior. They had broken a window that I knew of. They had been turning over newspaper things and trash cans. I had never seen that in any of the other ones, not me personally. I had not…..
>
> Q. Were they peaceful?
>
> A. Not particularly aggressive.
>
> Q. Did you notice any violence?
>
> A. No.

A few minutes later in the deposition Chief Newsham asked to go back to recount other thoughts he had during the Pershing Park arrests:

---

[29] Dave Statter, Channel 9, WUSA News, September 27, 2002

I pictured in my mind because of the things I had seen, the things that I had heard, that we would have a situation very similar to the things that I saw in Seattle because if you watch the films from Seattle, that's what you see. You see small splinter groups of people coming through the street very aggressively and doing types of things like knocking over and what happened [in Seattle] was I think the police didn't react to that at all and it built up and a mob mentality developed and the next thing you know we had all kinds of destruction of property. And I felt that the same things were going to happen in the District so I thought I had probable cause to make the arrests….and I still think that if they had been allowed to leave the park that we would have had a lot of problems in the city.

Assistant Chief Newsham's own perception of danger inherent in the scene at Pershing Park indicates a lack of knowledge and expertise in crowd management – a lack of the level of expertise former SOD Commander Robert Klotz brought to the job, for example.

Other images of MPD officers captured on videotape of demonstrations in September 2002 and April 2003 show officers visibly nervous – repeatedly rapping a palm with a baton, for example, or shifting from one foot to another while manning a police line. That image contrasts with the description former SOD Commander Klotz provided of MPD officers holding up even when hit with eggs and other missiles aimed by onlookers at Iranian students engaged in protest marches in the 1980s. To be sure, the videotape images do not represent the vast majority within the Department who take their CDU training seriously and perform professionally. But the possibility that unseasoned officers are made anxious by command staff rhetoric is worrisome. "If you don't have competent officials, and competent, well-trained officers, your plans are relatively worthless," Klotz testified.

*Findings*

**Under current leadership, the Metropolitan Police Department has failed to effectively manage controversial political demonstrations, giving rise to concern about its ability to manage these events in the future.**

*Recommendations*

**Consistent with the original office of Professional Responsibility Pershing Park report as submitted to Chief Ramsey, all police executives need to be CDU trained or re-trained. It is important that those charged with incident command during demonstrations be those most experienced in crowd management.**

**MPD should streamline its communication structure during mass demonstrations so that one Incident Commander is consistently making field command decisions.**

*Prisoner Processing & Use of Restraints*

Ideally, MPD would not conduct mass arrests on a regular basis. But in the event large numbers of arrests are necessary, MPD should have the capacity to process prisoners in a reasonable amount of time. According to after action reports dating back to April 2000, technological problems have consistently plagued MPD's mass arrest prisoner processing, resulting in unreasonable lengths of detention for those arrested during demonstrations.

Most recently, a breakdown in the Criminal Justice Information System (CJIS) caused delays in the release of those arrested on September 27, 2002, and some prisoners who chose citation release as a release option were detained for up to 36 hours. The Committee reviewed the after-action reports of MPD's IT staff following the September 2002 protests. There was no consensus on the exact cause of the problem, but based on the after-action reports, it seems to have been narrowed down to a routine test of the CJIS system conducted that night, a damaged wireless antenna, or an overload caused by the media feed in the Joint Operations Command Center. Obviously, routine technology tests should not be conducted at a time when there is the potential for mass arrests. In any event, the exact cause of the problems needs to be diagnosed and addressed so unreasonable delays are not repeated in the future.

Beyond technology problems, individuals arrested for misdemeanor offenses, the vast majority of whom will opt to post and forfeit or choose citation release, should never be detained for more than a few hours.

The Committee received testimony from multiple public witnesses and numerous other complaints alleging that MPD offered either an incomplete range of release options or inconsistent fines for those arrestees opting to post and forfeit. During the processing of prisoners in September 2002, according to testimony, arrestees were either presented with no choice but to post and forfeit, or urged by MPD officers to choose the post and forfeit option as a matter of convenience. Arrestees were also apparently told to pay inconsistent fine amounts.

MPD's revised mass demonstrations SOP released in May 2003 has detailed instructions on prisoner processing, including instructions tailored to each release option. In the future, this policy should be closely followed. In addition, clear, written guidance should be given to both MPD officers and civilian staff running the prisoner processing sites, as well as to those arrested. This guidance also should be clearly posted in prisoner processing sites where prisoners can see the information.

MPD's mass demonstrations SOP also has detailed instructions regarding prisoner property, presumably based on District of Columbia law and regulation. It requires a system in which a prisoner's property essentially follows the prisoner and is tracked through the use of field arrest forms.  Unfortunately, this policy was not followed in September 2002 and many pieces of prisoners' property at the end of the detail were either missing or destroyed.  Again, in the future, MPD policy and District law in this area should be closely followed.

In November 2003, the Citizen Complaint Review Board released a "Report and Recommendations regarding Disorderly Conduct Arrests Made by Metropolitan Police Department Officers."  Among the reports findings was that the post and forfeit process, through which an arrestee pays a fine and forfeits his or her opportunity to appear in court to answer the charge, "is not specifically authorized by statute, regulation, or court rule," and that:

> The consequences of collateral forfeiture are not clear…the Department does not appear to have [a general order] that sets out the procedures for processing a collateral forfeiture.  Other than a receipt for payment of the collateral, the station staff does not complete any paperwork, require any acknowledgement by the arrestee of the choice to post and forfeit collateral, or give the arrestee any paperwork that explains the collateral forfeiture process or any related information[30].

Implementation of CCRB's recommendation that MPD clarify its post and forfeit process would provide more explanatory information to arrestees about their rights, and greater accountability for MPD in terms of tracking the large amount of cash that is collected as a result of post and forfeiture during mass demonstration situations.

In September 2002, arrestees were held in the prisoner processing center with their strong wrist tied to the opposite ankle in such a way that they were not able to stand up or stretch out.  The length of time individuals were retained exacerbated the discomfort of arrestees.  Retired Lieutenant Colonel Joseph Mayer, who was 69 years old at the time of his arrest, was held in this manner from approximately 3 a.m. Friday night until 1 p.m. Saturday.

MPD's investigation into the Pershing Park arrests found that this method of handcuffing prisoners was justified because officials at the prisoner processing center needed a way to maintain control over hundreds of demonstrators whom they believe had the potential to start to protest or become unruly.  MPD further found that the handcuffing technique was not a violation of general order 502.1 (Transportation of Prisoners), because arrestees' arms and legs were not tied

---

[30] p. 16,  "Report and Recommendations regarding Disorderly Conduct Arrests Made by Metropolitan Police Department Officers," Citizen Complaint Review Board, 2003

together in such a way that they could not sit up or move. General order 502.1 states, in part:

> Members shall not attach handcuffs to leg restraints in such a fashion that forces the legs and hands to be close to one another (i.e. hog-tying), or place a person in a prone position, lying face down.

The Committee, nonetheless, finds this method of restraint to be insupportable and particularly so in circumstances when nonviolent, misdemeanant arrestees are held for unreasonable lengths of time. Former Interim Corporation Counsel Arabella Teal defended the use of restraints on prisoners binding wrist to ankle following the September 27, 2002, arrests based on the large number of persons arrested and the shortage of officers to stand guard at the detention center to assure their safety. While a justification from the police department's perspective, use of uncomfortable restraints against nonviolent demonstrators is not a substitute for effective law enforcement planning and sufficient manpower to provide reasonable supervision of arrestees.

*Recommendations:*

**MPD should evaluate its technological capacity for handling a large volume of prisoners, include information technology staff in planning prior to events with a potential for mass arrests, and periodically conduct exercises to test this capacity.**

**MPD should release people charged with offenses for which citation and immediate release are appropriate within a reasonable period of time. If prisoners are held beyond four hours, MPD should document the reasons for the delay.**

**MPD should provide arrestees with written descriptions of release options that include a complete range of options provided by District of Columbia law and regulation, arrestees' rights under the law, and accurate information about fine amounts.**

**MPD should follow its policy and District of Columbia law regarding the collection, maintenance and distribution of prisoner property.**

**The Committee endorses the Citizen Complaint Review Board's recommendation that MPD modify its arrest procedure to ensure that all citizens who pay to resolve their arrest through post and forfeit are provided with written notice about the collateral forfeiture process and its consequences and that they sign an acknowledgment of their choice to pay the collateral.**

**MPD use of physical restraints against individuals arrested during mass demonstrations should be limited to what is reasonably necessary to secure and control them.**

*Role of the Office of Corporation Counsel*

Given the litigation against the city that has followed mass demonstrations in recent years, it is critical that an attorney familiar with MPD mass arrest protocols and related legal and constitutional thresholds be on the ground with MPD commanders during demonstrations. When practical, attorneys should participate in decisions about mass arrests. According to Robert Klotz, it was MPD practice during the late 1970s and early 1980s to have attorneys present during mass demonstrations. MPD's 2003 mass demonstration SOP states that the MPD General Counsel "shall provide field assistance to the Chief of Police and other field commanders, and perform liaison functions with the courts, the Office of the U.S. Attorney, the Office of the Corporation Counsel, bar associations, and other legal organizations as applicable."

The Committee received public hearing testimony on this point from D.C. Corporation Counsel Robert Spagnoletti. Mr. Spagnoletti testified that, in the future:

- Office of Corporation Counsel (OCC) attorneys in the Torts & Equity Division will be active in "providing advice and guidance to the police – before the demonstration begins – on how to minimize the common liabilities that occur during protests."

- OCC attorneys will "participate in reviewing the operational plans of MPD before each protest to suggest ways to avoid lawsuits that might arise from the implementation of these plans."

- OCC attorneys will "participate in the debriefing process immediately following a mass demonstration to help analyze the lessons learned and to ensure that we have current information on what happened during a protest that might lead to litigation."

- OCC will "continue to ensure that we have experienced criminal and civil lawyers available during the actual protest to answer legal questions as they arise to minimize the implications of uninformed decisions."

**Recommendation: The MPD General Counsel and an attorney from the Office of Corporation Counsel should be on the scene of mass demonstrations that have the potential for mass arrests.**

*Media*

During mass demonstrations in recent years, a number of journalists, including journalists with MPD press credentials, have been swept up and arrested during mass arrests.  According to a September 30, 2002 Reporters Committee for Freedom of the Press article, 17 journalists were arrested during the September 2002 mass arrests.  The article noted:

> Two washingtonpost.com reporters and a United Press International intern were arrested, detained and released without charges in a matter of hours.  Student journalists and independent media were detained anywhere from 10 to 27 hours, slapped with a $50 'post and forfeit' fee for early release and returned to their respective newsrooms with a criminal charge of failing to obey the police.

In the same article, washingtonpost.com reporter Michael Bruno commented "The more well known your press outlet, the more secure you'll be…I feel sorry for reporters who don't have that benefit and who are essentially doing the same job." The inference of the article is that mainstream reporters may have been released through MPD's detention log process, through which any official evidence of their arrest is eliminated by MPD on the same day as the arrest.

During the course of its investigation, the Committee received complaints alleging such disparate treatment between mainstream media and independent media.  The Committee deposed Sergeant Joe Gentile, MPD's Public Information Officer, to get information on MPD's media credentialing policy.  Sgt. Gentile explained that journalists can apply for and receive MPD media credentials as long as they can prove that they are from a "bonafide" press outlet.  MPD verifies this by contacting the supervisors of the applicants.  Sgt. Gentile testified that MPD has often granted media credentials to student and independent journalists. He also testified that MPD typically does recognize press passes from other police departments and jurisdictions, and that the policy during demonstrations is to treat all bonafide passes the same way.

According to Sgt. Gentile's testimony, a bonafide press pass allows journalists to cross a police line when the commanding official on the scene says it is safe to do so.  When asked about specific instances of journalists being arrested during demonstrations in recent years, Sgt. Gentile testified that he could only assume that those journalists had broken the law.  When asked why some journalists in September 2002 were released through the detention log while others were not, Sgt. Gentile said he could not explain how that happened.

Although MPD's policy may be to treat equally all members of the media with bonafide media credentials, this policy has not been implemented equitably in recent years. For example, the names of Michael Bruno and the UPI intern referenced above are not included in arrest records from September 27, 2002, while the names of some student and Independent Media Center journalists are. Two groups of student journalists filed civil suits[31] against the District based on their arrests that day.

One of the reporters arrested that day at Vermont Avenue and K Street was Larry Towell, an internationally renowned Magnum photographer. According to Mr. Towell, despite having three cameras around his neck and press credentials from Magnum, the New York City Police Department, and the Israeli government, and despite repeatedly telling police officers that he was a journalist, he was arrested and detained for six hours.

Finally, the Committee has received troubling testimony that suggests MPD officers may be making judgments on the ground about who among journalists are "legitimate." For example, the following is an excerpt from the deposition testimony of Sgt. Keith DeVille, who supervises MPD's civil disturbance training unit:

> Q: There are a lot of people that are not members of the legitimate press. It's called the Independent Media Center, they'll give anybody a paper thing that says 'I'm a photographer, I'm a reporter.' When in fact that they're a protester. They protest, they yell at the police, they do everything else, and then when it comes time to be arrested they say no, I'm the media.
>
> A: Well how do you know who is and who isn't?…
>
> Q: They carry media credentials. And not issued by the Independent Media Center, not issued by the University of Maryland frat house or something that they're reporting for. We recognize legitimate media personnel that are their doing their job and not participating in the demonstration…
>
> A: Let's say I claim I'm a member of the media, OK, and I have a police press pass. Would that do it for me?
>
> Q: You would not…you should be allowed to leave, if you choose to leave.

Contrary to Sgt. DeVille's statement, MPD does issue media credentials to journalists from the Independent Media Center and from universities. According to MPD's media policy as articulated by Sgt. Gentile, the judgment that should be

---

[31] *Chang, et al v. U.S.,* et al and *Jones, et al v. D.C., et al*

123

made on the ground during demonstrations should be based on two clear factors: 1) whether the journalist has bonafide credentials, in which case those credentials are given deference and 2) whether the individual has broken the law, in which case police action can be taken irrespective of credentials.

The policy as articulated by Sgt. Gentile is not in MPD's SOP on handling mass demonstrations. In fact, the only relevant policy in the SOP is a section that describes the Office of Public Information's responsibilities during a mass demonstration. The same section has new language added to the SOP in May 2003 requiring MPD members to report "media misconduct" to the Office of Public Information, but it does define what constitutes such misconduct.

*Recommendations:*

**MPD should issue a clear, written policy on the treatment of media during mass demonstrations and this policy should be incorporated into the SOPs and training curriculum on mass demonstrations.**

**Consistent with MPD policy, police officers should honor press credentials and not make ad hoc judgments as to press legitimacy. As is the case with other persons, credentialed reporters should not be arrested unless they are specifically observed breaking the law.**

124

# V. CONCLUSION:
## THE NEED FOR STATUTORY GUIDELINES

As noted earlier in this report, the May Day litigation ended based on the belief by the U.S. Court of Appeals that new leadership of the Metropolitan Police Department would address the serious issues raised by litigants and sustained in the U.S. District Court ruling. Judge Levanthal noted that the department "has been advancing its low-key approach" and that there were "reasonable expectations" that the department would address the issues raised, particularly concerning mass arrests. And for at least a period of time the Court's decision not to rehear the case was justified. That justification ended with the events and police actions of April 2000 and in actions taken by the MPD during major demonstrations over the last several years.

The Committee recommends legislation containing guidelines for Metropolitan Police Department practice in two areas: conducting surveillance and infiltration of political organizations and handling problematic mass demonstrations (using the ACLU definition of problematic, i.e. where civil disobedience is expected). It is the intent of the Committee to introduce legislation this spring to reflect these recommendations. The legislation will likely take the form of regulations that, once in place, can be amended by the Executive branch with approval of the Council.

*Guidelines on Intelligence*

As the Gilmore Commission noted in its final report in December 2003, definitions are changing for what constitutes legitimate law enforcement activity, including what purpose may be served by surveillance of political organizations. In the aftermath of the terrorist attacks of September 11, 2001, there is a strong and legitimate public interest in careful scrutiny of any and all intelligence that might prevent terror, whether that terror takes the form of violent attack based on ideology or gang-related violence that occurs in the streets of American cities. The elected legislature has a responsibility to draw the line between what is legitimate law enforcement purpose and what violates the civil rights and civil liberties of District residents.

Legitimate law enforcement purpose includes acting to prevent crime and pursuing information that can assist in preventing crime. It is the latter that gives rise to intelligence directed at individuals and organizations based on what, in other contexts, is protected First Amendment activity. The Committee has reviewed policies recently adopted in Chicago, New York City, and the State of California governing intelligence operations. These documents offer useful models and the Committee has included some aspects of these law enforcement policies in recommendations that follow. For these purposes surveillance is defined as the systematic, on-going undercover monitoring of a group's activities and includes police attendance at public meetings or social activities.

126

**The Metropolitan Police Department should conduct intelligence operations solely for a legitimate law enforcement purpose.**

**Before police undertake surveillance of any group engaging in constitutionally protected expression or freedom of association, there should be reasonable suspicion to believe that the group is engaging in, planning to engage in, or about to engage in criminal activity.**

**MPD should be prohibited from using undercover officers to conduct surveillance of individuals or organizations based solely on the content of their political speech or ideology.**

**Surveillance in this context should be expressly approved by the Assistant Chief for Special Services, be time-limited in duration, and be conducted in a manner that is not more extensive or intrusive than is justified by its purpose.**

**MPD should be required to have an internal oversight mechanism once an undercover operation is underway that, on a regular basis, reviews the activity of and information gained by undercover officers and determines whether undercover surveillance is still warranted.**

**Officers engaged in surveillance should report regularly to the Assistant Chief for Special Services._Police should immediately cease such surveillance once facts made known to them no longer support reasonable suspicion.**

**MPD should be prohibited from using agents provocateur.**

*Guidelines for Mass Demonstrations*

The Committee recommends legislative guidelines for the Metropolitan Police Department in handling mass demonstrations to include the following. "Current MPD policy" refers to written policies contained in MPD's *Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances and Prisoner Processing.* As noted earlier in this report, the policies contained in the manual are generally sound but have been violated by the Department in recent years.

**Prior to each mass demonstration, the police chief should issue a directive saying that MPD's overall mission during mass demonstrations is to protect demonstrators' First Amendment right to assemble and protest, and that in the event that individuals engage in unlawful behavior, those individuals shall be arrested without abridging the rights of others lawfully assembled.**

127

Consistent with current MPD policy, MPD should not disperse nonviolent demonstrators in the absence of unlawful activity.

Consistent with current MPD policy, MPD should not arrest nonviolent demonstrators for failure to disburse or failure to obey an order without first giving multiple and clearly audible warnings and an opportunity for demonstrators to comply with police orders.

MPD should not arrest nonviolent demonstrators solely for failure to have a parade permit unless 1) there is another permitted demonstration planned for the same location 2) the demonstrators are blocking buildings or traffic 3) the demonstrators are acting disorderly.

MPD should not use police lines to surround and detain nonviolent demonstrators.

Consistent with current MPD policy, when conducting arrests during a mass demonstration, MPD should, through the use of field arrest forms and commander event logs, contemporaneously record facts necessary to establish probable cause for the arrests.

Individuals arrested during mass demonstrations should receive copies of their field arrest forms.

Consistent with current policy, when conducting mass arrests, when practical, MPD should film police actions in their entirety, including giving warnings and dispersing or arresting demonstrators, in accordance with existing regulations governing the use of Closed Circuit Television cameras.

MPD should not conduct a mass arrest based on the unlawful conduct of a few demonstrators. When arrests are necessary, MPD should only arrest those demonstrators responsible for the unlawful conduct.

MPD should follow its current use of force policy that: 1) the use of force, including riot batons, OC spray and chemical agents be used according to strict standards; 2) force should only be used as authorized by the highest ranking official on the scene, or, in the case of chemical agents, only as authorized by the chief of police; 3) the use of force should be documented and such documentation should be made available to the public consistent with the reporting requirements of MPD's Memorandum of Agreement with the Department of Justice.

MPD should follow its current policy of using riot gear only at the authorization of the highest ranking official on the scene and only when there is reason to anticipate violence.

During mass demonstrations, all uniformed officers should be plainly identified by their badge numbers, which should be displayed in large numbers emblazoned on their jackets so as to be clearly visible to the public.

Uniformed officers should never remove their badges or any other identifying emblem, and supervisors should never authorize such removal, or be subject to disciplinary action.

Consistent with current MPD policy, plain-clothes officers should be required to identify themselves before taking any police action.

MPD should notify the Office of Citizen Complaint Review (OCCR) in advance of demonstrations in which mass arrests may be reasonably anticipated.  OCCR should monitor each such demonstration, and should then issue a public assessment of police performance, identifying any police misconduct.

## COMMITTEE ACTION

The Committee on the Judiciary met on March 4, 2004, to consider and mark up its report on the Investigation of the Metropolitan Police Department's Policy and Practice in Handling Demonstrations in the District of Columbia. Present and voting were Chairperson Patterson and Councilmembers Sharon Ambrose and Jack Evans.

Chairperson Patterson briefly went over the findings and recommendations of the report, including the need to enact statutory guidelines for managing demonstrations and conducting surveillance of political organizations, and moved for Committee consideration of the report. She then called for discussion.

Councilmember Ambrose congratulated Chairperson Patterson and Committee staff on the investigation and report. She made two recommendations concerning the legislation envisioned in the Committee report. She said the legislation should provide policies for the department, and be written in such a manner that when circumstances change, the rules might be changed without requiring a full legislative process. She also said the closing of the convergence center in 2000 and the use of undercover officers to infiltrate political groups raise the need for drawing a "bright line" between what are the proper duties of the Metropolitan Police Department and what are the responsibilities of the Federal Bureau of Investigation, particularly as it concerns persons who come into the District from other parts of the country expressly to cause disruptions. She also said that the events recounted in the committee report, particularly concerning the need to discipline officers behaving in "an egregiously unconstitutional manner" were "chillingly familiar" and comparable to the events of the 1970s.

Councilmember Evans congratulated and thanked the Committee staff on the comprehensiveness of the report and said the investigation represents, "what the Council committees are supposed to do." He said there are many hard-hitting conclusions in the report; some he agrees with and some he does not. He said the report presents an "excellent roadmap" of issues for further consideration with respect to future demonstrations. He said it's clear the Metropolitan Police Department "fell short" in handling the Pershing Park demonstrations, but noted that it is "a difficult line to draw" given the large volume of demonstrations that occur in the District. "This report should be required reading for every officer," he said. Turning to the events of 2000, also recounted in the report, Councilmember Evans said that regardless of what caused the damage in Seattle in November 1999, it was evident that protestors "were coming here next" and it was important for the Metropolitan Police Department to prepare to make certain "that this community not get busted up." He noted that "hindsight is 20/20" and that legislation in these areas "maybe makes sense; maybe not." He concluded that the report serves as a model of how all Committees should operate.

130

Councilmember Patterson then moved for approval of the report, with leave for staff to make technical corrections.  The Committee voted as follows:

YES:        Chairperson Patterson, Councilmember Ambrose and
            Councilmember Evans

NO:

PRESENT:

ABSENT:     Councilmember Harold Brazil and Councilmember Kevin Chavous

131

### APPENDIX A: SUMMARY OF PUBLIC HEARINGS

The Committee on the Judiciary held a 2-day public oversight hearing on the Judiciary Committee Investigation on current policies and practices of the Metropolitan Police Department related to demonstrations with the District on December 17– 18, 2003.  Copies of the public testimony are included in Attachment **xx.**  A summary of the hearing follows.

In opening the two days of hearings in December, Councilmember Patterson recounted the events of April 2000 and read from a letter to Mayor Williams and the then-chair of the financial control board written by constituents, both attorneys. Ross Eisenbrey and Barbara Somson wrote, they said, "to express our deep dismay over the manner in which the Washington Metropolitan Police Department handled the anti-IMF protest over the weekend of April 15. We request a thorough investigation into the actions of the MPD, which, as reported by the news media, appear to be unconstitutional and illegal."

The letter noted the apparently preemptive closing of the demonstrator's convergence center "allegedly because of fire violations." Noting their experience, as parents, with fire code violations in public schools, the writers said "we cannot recall a single instance when a building was closed because of initial findings of fire code violations. We believe the actions of the MPD were nothing more than a pretext and plainly illegal."  They also requested an investigation of hundreds of arrests that, according to press accounts also appeared preemptive "to prevent them from protesting at the opening of the IMF/World Bank meetings on Sunday, April 16."

Finally, they wrote,

Regardless of whether we agree with the message or the tactics of the protesters, we believe there is evidence that the MPD trampled on protesters' constitutionally protected rights and interfered with academic freedom. In so doing, the MPD has jeopardized the rights of all of us.  Reports of these police actions are beamed around the world, and risk making a mockery of the freedoms of speech and assembly that symbolize our nation.  We urge you, as Chief Ramsey's superiors, to conduct a thorough investigation of these charges and to report to District residents and to the world the results of your investigation, with recommendations for assuring that our constitutional rights are safeguarded here in the nation's capital.

In her opening statement at the hearing, Councilmember Patterson also recounted testimony given to the Judiciary Committee on October 24, 2002. At that time the ACLU presented three witnesses who recounted their experiences

during anti-war and anti-globalization demonstrations on September 27, 2002. All were arrested and detained for 24 hours or more. A young woman attorney, a computer programmer, and a retired Army lieutenant colonel shared their experiences with this committee (and subsequently became plaintiffs in one of the class action lawsuits against the District.).

Patterson noted that Joseph L. Mayer, the retired Army officer, said: "On Friday, September 27, in Washington D.C., my sense of my own place in society was stunned when I was arrested for the first time at the age of 69. This experience shook my confidence that our Constitution and my adherence to that rule of law, made me safe and secure on the streets of our capitol." The three witnesses were among the 400 or so individuals wrongfully arrested in Pershing Park that Friday morning in September.

We have seen police abuses in the past, here, and across the country. It is the job of elected policymakers, through oversight of the police department, to question, and, as necessary, to legislate parameters to make sure our department is protecting, and not jeopardizing, Constitutional rights.

### Arthur Spitzer, Legal Director, American Civil Liberties Union of the National Capital Area ("ACLU-NCA")

Mr. Spitzer, on behalf of the ACLU-NCA, commended the Judiciary Committee for holding public hearings about the policies and practices of MPD relating to demonstrations. "[W]e believe this investigation will show the need for the Council to provide more detailed and effective guidance to the police with regard to their handling of demonstration activities," said Mr. Spitzer. He noted that while MPD is effective in handling routine demonstrations, the department has over-reacted when faced with demonstrations in which some sponsors announced the occurrence of civil disobedience. "We are not suggesting that there is any legal right to engage in civil disobedience…but non-violent civil disobedience does not justify police violence, and it certainly does not justify the arrest of hundreds of people who have not violated any law…". In addition, Mr. Spitzer presented to the Committee a ACLU-NCA report entitled, "The Policing of Demonstrations in the Nation's Capital: A Misconception of Mission and a Failure of Leadership." The report contained 20 recommendations for Council action regarding policies and practices related to demonstrations.

### Mara Verheyden-Hilliard, Partnership for Civil Justice and National Lawyers Guild Mass Defense Committee ("PCJ")

Ms. Verheyden-Hilliard, on behalf of PCJ, testified that the litigation by the PCJ has revealed, in their opinion, the systematic police abuse of demonstrators. She also testified that, in the organization's opinion, MPD is engaged in an ongoing illegal domestic spying operation on political activists. Finally, Ms. Verheyden-Hilliard noted that PCJ has four pending First

Amendment cases on behalf of demonstrators in Washington against the District government.  A chart detailing the pending lawsuits as of December 15, 2003 is included as Appendix C.

**Mark Goldstone, Chairman of the Demonstration Support Committee of the D.C. Chapter of the National Lawyer's Guild- DC Chapter**

Mr. Goldstone, on behalf of Demonstration Support Committee of the D.C. Chapter of the National Lawyer's Guild- DC Chapter, testified that Chief Ramsey has implemented a plan – "The Ramsey Plan" – to thwart individuals demonstrating in the District.  According Mr. Goldstone, the Ramsey Plan included scaring the media and the residents of the District with the potential for protestor violence and conducting mass arrests of protestors, sometimes preemptively, in order to disrupt the protestors plans.  "…the Ramsey Plan has a chilling effect on people's interest and motivation in speaking out against the government, of attending protests and rallies, and of even visiting downtown during demonstrations," said Mr. Goldstone.

**Kristinn Taylor, Co-Leader, DC Chapter of FreeRepublic.com**

Ms. Taylor testified on behalf of DC Chapter of FreeRepublic.com, an independent, grassroots conservative group that was established in September 1998.  She testified that members of the FreeRepublic.com has held over 200 protests and demonstrations in the District and never had the alleged behavior of the MPD against the leftist groups directed at them.  Ms. Taylor also testified that she has a hard time disagreeing with the department's decision to arrest the 400 people in Pershing Park on September 27, 2002.

**Beth Caherty, DC Chapter of FreeRepublic.com**

Ms. Caherty testified that she believes in freedom of speech and expression for everyone, but did not believe that freedom of expression included the right to damage and destroy public or private property, riot, threats and intimidation.  She noted that in more than three years of participation in peaceful demonstrations on the streets of DC, she never witnessed or been involved in an incident where any law enforcement agency has used excessive force or violated a person's civil rights.

**Adam Eidinger**

Mr. Eidinger testified that the Council should take action to ensure that the rights of political demonstrators are not violated by MPD.  He noted that MPD, as well as other law enforcement agencies, needs to end the routine infiltration, disruption, mass arrests and intimidation of local political activists.  He recommended that the city leaders and MPD agree on new rules for how demonstrations are served.

"For the record I was arrested on September 27, 2002 in Pershing Park while attempting to express my opposition to war on Iraq…The arrests were terrifying and a despicable violation of basics constitutional rights. Police forcibly removed us from the park even though we posed no threat to anyone and were never ordered to leave…I was in jail for about 26 hours, during that time I began to question, and to his day question, if this country is really free," said Mr. Eidinger.

**Robin Bell**

Mr. Bell, a journalist with Washington DC Independent Media Center, as well as a freelance videographer, testified that MPD targeted and indiscriminately arrested journalists, including himself, on September 27, 2002.  He also brought videotape that he believes illustrated this action.

**John Brodkin, Americans for Deomcratic Action, Greater Washington Chapter**

Mr. Brodkin testified on behalf of Americans for Democratic Action, Greater Washington Chapter, the nation's oldest independent liberal political organization.  He said that Americans for Democratic Action commends the Judiciary Committee's decision to investigate MPD practices during political demonstrations.  He noted that current policies of preventive arrests, massive police presence, and announcements hyping possible violence at demonstrations infringe on the fundamental rights of District residents and that Pershing Park arrests are a prime example of this type of action.

**Dr. Lucy G. Barber, Author, *Marching on Washington: the Forging of an American Tradition***

Dr. Barber, a historian, was invited by the Judiciary Committee to provide a historical context of political protests in Washington, D.C. and how the police department handled the demonstrations.  Dr. Barber described how MPD's officers and their advisors responded to three different national protests in Washington between 1874 and 1971.  She started with first "march on Washington" in 1894 by a group called Coxey's Army where the police practiced a "line in the sand" strategy.  The next march described was Bonus Army in 1932.  In this protect, District's officers used a policy called "forceful courtesy" towards the demonstrators.  The final demonstration that Dr. Barber described was Mayday Protests of 1971.  It was these protests where protestors threatened to "shut down" Washington and where MPD responded by preemptively disrupting protest events and by using mass arrests, resulting in over 12,000 arrests over a three-day period.

**Robert Klotz, former Commander, Special Operations Division, Metropolitan Police Department**

Mr. Klotz was invited by the Judiciary Committee to testify because he served as SOD commander in the late 1970s and early 1980s. He stated that the police must respect the rights of the demonstrators as well the rights of the people in the city. He also said that if the public could not tell whether police officer were supportive or not of the demonstrators that means the police have managed the event well.

Note: More information on the Klotz and Temple testimony is included in the *Departing From Best Practices* section.

**Ralph Temple, former Legal Director, ACLU-NCA**

Mr. Temple was invited by the Judiciary Committee to testify because he participated in the extensive litigation that followed the May Day 1971 arrests. He praised the leadership of Mr. Klotz when he lead the department's work on demonstrations and said, "except for Bob Klotz's reign, it's never been done right by the Metropolitan Police Department." In commenting on the trade meetings and protests in Seattle, Temple said there were large peaceful demonstrations that did not get any press attention. On the political side, he said, "There were much greater political benefits to the nation and to the world from the Seattle demonstrations than the downsides. It changed the whole world consciousness of trade issues, and it changed the political agenda for the world trade organizations." He presented the policy proposals of the American Civil Liberties Union, including a recommendation that police officials be disciplined for misrepresenting facts on police actions. "I'd go farther than the ACLU," he said. "I'd make it a prosecutable felony for a law enforcement official to publicly lie about a law enforcement action."

**James Short, Deputy Fire Chief, Department of Fire and Emergency Medical Services ("FEMS")**

Deputy Fire Chief Short provided testimony to clarify the role of FEMS in inspecting 1324 Florida Avenue, NW, known as the convergence center. Deputy Fire Chief Short noted that at the time, he was assigned as the Battalion Fire Chief at the Fire Prevention Bureau, which had responsibility in the enforcement of the Fire Prevention Code. In addition, he was tasked with supervising filed operations of the Mayor's Nuisance Abatement Task Force.

Deputy Fire Chief Short testified that he first became aware of the convergence center when he viewed a local new broadcast that depicted activities that were unusual for that location. He said that he was contacted by MPD after the airing of the broadcast. After some research that revealed no permits for the premises, he conducted on April 15, 2000 a fire inspection of the property that revealed numerous fire code violations, including the use of propane gas and

overcrowding.  Deputy Fire Chief Short said that the occupants of the building were given approximately two hours to abate the fire code violations and when they failed to do so, the building was closed as authorized by the Fire Prevention Code.

**Alfred J. Broadbent, Sr., Assistant Chief, Special Services Command, Metropolitan Police Department**

Assistant Chief Broadbent, who is responsible for the management of the Special Services Command and coordinating and preparing the department for major events and demonstrations that occur in Washington, provided testimony on MPD's philosophy regarding demonstrations within Washington.  He said that MPD's underlying philosophical principle related to managing and responding to demonstrations is to ensure that demonstrators have full opportunity to voice their First Amendment right, without fear.  He noted that department's purposed dedication to managing safe large scale demonstrations met a new challenge after the events in Seattle, WA in November 1999.

During those demonstrations surrounding the WTO, there was widespread looting, uncontrolled civil disobedience and over $3 million in property damage and destruction to downtown Seattle.  Because of the unrest in Seattle, Assistant Chief Broadbent said that MPD was uncertain what to expect at the protests in April 2000 at the IMF/WB Conference.  Therefore the department prepared for the worst possible scenario because it had received intelligence that the demonstration organizers wanted a repeat of Seattle in Washington, DC. Assistant Chief Broadbent noted because of the policies and procedures utilized by MPD, April 2000 demonstration proceeded in an orderly fashion and there was no destruction of property like in Seattle.  In his final comments, Assistant Chief Broadbent said that he has traveled around the world as a consultant to share "best practices" with the respective law enforcement authorities and assist them in preparing for large-scale events.

**Peter Newsham, Assistant Chief, Office of Professional Responsibility, Metropolitan Police Department**

Assistant Chief Newsham, who is responsible for the Office of Professional Responsibility that encompasses the Office of Internal Affairs, the Civil Rights and Force Investigation Team, the department's Disciplinary Review Office, the Compliance Monitoring Team, and the department's Diversity Compliance and Equal Employment Opportunity Office, testified about his decision to arrest protesters in Pershing Park on September 27, 2002.  He said that he was responsible for the geographical zone that included Pershing Park and the park was significant in terms of management of any large demonstration because of its proximity to the White House and to the 14th Street Bridge.  He noted that since the attacks of September 11th, security has been heightened in the immediate

area of the White House, and MPD must be concerned with ensuring that the security of the White House is not threatened or compromised in any way.

Assistant Chief Newsham said that he was aware that no parade permits had been issued for September 27, 2002 and therefore any street demonstrations would be, *per se*, unlawful. He also was aware that that some of the demonstrators in his zone who were unlawfully marking through the streets were knocking over trash containers and newspaper vending machines, and that at least one store window had been smashed by the demonstrators. He said that when he arrived at Pershing Park, he observed demonstrators converging on the park from every direction and disregarding traffic laws. Assistant Chief Newsham said that after observing the demonstrators for 45 minutes, he concluded that they had not intention of concluding their demonstration and dispersing, but would continue their unlawful demonstrations in the streets. He said that it was his determination, in the interest public safety, he should not allow this to occur.

Assistant Chief Newsham said that at some point he conferred with Chief Ramsey and Executive Assistant Chief Fitzgerald at Pershing Park. He said that he informed them that the demonstrators had already violated several laws and that he believed that there was probable cause to arrest the demonstrator. He also told Chief Ramsey and EAC Fitzgerald that the demonstrators should be arrested before they left the park so as to prevent further unlawful acts and potential violence. Assistant Chief Newsham said that he did not give orders for the demonstrators to clear the park for two reasons. First, he believed that probable cause already existed to arrest the demonstrators because of their unlawful actions prior to converging on Pershing Park. Second, he was concerned that if orders were given to clear the park, the demonstrators would leave the park as on organized group, and unlawfully take to the streets as they had previously done.

"Under the circumstances that occurred on September 27, 2002 in Pershing Park, I believed that his actions were lawful, reasonable, appropriate and that course of action that I took was necessary to minimize the likelihood of violence," said Assistant Chief Newsham.

**Matthew Klein, Captain, Director of the Civil Rights and Force Investigation Division, Metropolitan Police Department**

Chairperson Patterson asked Captain Klein questions about his role in the MPD investigation of the mass arrests at Pershing Park. Please see *Pershing Park Investigation* section.

**Joshua Ederheimer, Captain, Deputy Director of the Institute of Police Sciences, Metropolitan Police Department**

Chairperson Patterson asked Captain Ederheimer questions about his role in the MPD of the mass arrests at Pershing Park. Please see *Pershing Park Investigation* section.

**Margret Nedelkoff Kellems, Deputy Mayor for Public Safety and Justice**

"It is not the policy of this [Williams] Administration to stifle the free speech or assembly rights of demonstrators. It is not the policy of this Administration to preemptively arrest protestors because we think they might say something wrong. It is the policy of this Administration to protect (1) the rights of individuals to speak their piece, (2) the rights of individuals to be safe in their persons and in their property, and (3) the rights of organizations to gather and meet to discuss programs and policies that my be abhorrent to others," testified Deputy Mayor Kellems. She noted, contrary to some assertions, that there has not been fundamental change in MPD policies and practices regarding large-scale demonstrations. She said that MPD operations and practices are driven by information, intelligence, and experience.

**Charles H. Ramsey, Chief of Police, Metropolitan Police Department**

Chief Ramsey testified that he was extremely proud in the way the department has handled demonstrations. "[W]hen it comes to managing demonstrations and supporting the First Amendment rights of large number of people, espousing the whole spectrum of ideas and causes, the Metropolitan Police Department is among the very best – and we continue to get better," he said. He noted that in addition to upholding the rights of demonstrators, MPD has the equally important responsibility of protecting the lives and property of residents, business owners and others who are not associated with the protests. He also noted that demonstrations have changed since Seattle 1999.

Regarding the arrests of Perking Park in September 2002, Chief Ramsey testified that he directed MPD's Office of Professional Responsibility to conduct a thorough review of the incident and the actions of department and produce a report on its findings. The report identified management and operational deficiencies that occurred during the Pershing Park incident. "The report also suggested three important changes related to our mass demonstrations procedures. In accepting these three areas for improvement, I also directed that 10 additional actions be taken in order to more fully address the deficiencies identified during our internal investigation," he said.

**Thea Lee, Chief International Economist, AFL-CIO**

Ms. Lee testified about the planning involved in the march and rally on "global justices issues" that occurred on November 20, 2003 in Miami Florida. She noted that AFL-CIO worked for months with the Miami officials over arrangements for the permitted march and rally, and that those arrangements were

clearly ignored by the Miami police. She noted the importance of discipline among police officers, and said when police leaders permit a situation to escalate, "that trains activists to hate the police." On the issue of accountability, she said if there is evidence of police brutality, as she indicated there was in Miami, "there have to be consequences." More information on Lee's testimony is included in the *National Context* section.

**Timothy Lynch, Director, Project on Criminal Justice, The Cato Institute**

Mr. Lynch expressed his concerns about the recent blurring of distinctions between military and police missions, a phenomenon he said began with the "drug war." This has included a greater level of training by law enforcement agencies as military units. He said the number of "SWAT" teams within police departments has skyrocketed, even in small town departments. The danger in blurring the military and the police mission is that the military represents the use of force, while the police mission is to assure public safety with the least amount of force possible. He said the Committee's hearings were appropriate, and stressed the importance of police agencies avoiding "the military mindset." He described "good police work" as "making distinctions," including distinguishing between law-breaking vandals and demonstrators who may be unpleasant but not violating the law.

**Frederick D. Cooke, Jr., Esq., former Corporation Counsel of the District of Columbia**

Asked whether the Council should enact legislative guidelines for the Metropolitan Police Department, Mr. Cooke said yes, and said there has been too little interaction recently between the Office of the Corporation Counsel and MPD. In earlier years, including his tenure as Corporation Counsel, there was greater interaction between both the OCC and the U.S. Attorney and the police department. In discussing the issue of training and attitude with other panelists, Mr. Cooke said it is critical that police "not give in to fear" noting that a judgment that there is danger present "doesn't mean everyone is dangerous."

**Robert Weiner, Esq., former President, District of Columbia Bar Association and Senior Counsel to the White House Counsel**

Mr. Weiner noted that some protesters may expressly seek a reaction from police in order to call attention to themselves and their casues, something police need to be careful to avoid. He emphasized the need for good training, including a grounding in constitutional law, and the need for adequate resources, including support from the federal government as needed. He said there is a legitimate purpose for undercover police work, including when there is reason to expect criminal behavior, and emphasized using the "least intrusive means" for a limited amount of time in undercover work to gather information.

**Robert Spagnoletti, Corporation Counsel, Office of Corporation Counsel ("OCC")**

Mr. Spagnoletti explained the role OCC has played in the District's response to planned mass demonstrations.  He said that when the District anticipates large-scale demonstrations, OCC works closely with District and federal agencies during the preparation phase, the operational phase, and the post-demonstration phase.  He noted that there are where OCC could be more proactive in providing advice and guidance to embers of law enforcement and work to better control the District's potential liabilities.

**James Jacobs, Director, Office of Risk Management**

"Given that decision making is at the center of the risk exposures associated with demonstrations, the most effective risk control strategies center on established and acceptable police and related training, supplemented by adequate supervision and continuous operational improvement," Mr. Jacobs said.  He noted that MPD has a mass arrest manual as well as an event-specific manual to guide MPD activities.

COUNCIL OF THE DISTRICT OF COLUMBIA
**Committee on the Judiciary**
**Councilmember Kathleen Patterson**
**John Wilson Building**
**1350 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20004**

Memorandum
**To:**       Kathy Patterson
**From:**    Alina Morris
**Date:**     November 25, 2003
**Subject:** MPD Investigation: Prior Restraint and First Amendment Issues

---

## I. PRIOR RESTRAINT

The doctrine of prior restraint holds that an attempt to prevent publication or broadcast of any statement is an unconstitutional restraint on free speech and free press. The ban on prior restraint allows publication of libel, slander, obvious untruths, anti-government diatribes, racial and religious epithets, and almost any material, except if public security or public safety is endangered and some forms of pornography. (*See* law.com dictionary, *available at* http://dictionary.law.com). Free speech in public forums can be limited by time, place, and manner regulations, which take into account such matters as control of traffic in the streets, the scheduling of two meetings or demonstrations at the same time and place, the preventing of blockages of building entrances, and the like. (FindLaw for Legal Professionals, *available at* http://www.findlaw.com; *see also Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 -50 (1981); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984)). Preventive limitations must be content-neutral, serve a significant governmental interest, and leave open ample alternative channels for communication of information. (*See generally Ward v. Rock Against Racism*, 491 U.S. 781 (1989); *Clark v. Community for Creative NonViolence*, 468 U.S. 288(1984)). For example, a requirement of one day advanced notice and registration of a demonstration and advance disclosure of the "sponsoring" group or individual was held to be prior restraint. *Rosen v. Port of Portland*, 641 F.2d 1243, 1247-50 (9th Cir. 1981).

Statutes requiring permits for demonstrations are not prior restraint, to the extent that there exists a neutral procedure for approving or denying the permit with response within a reasonable time. This is to prevent a deciding body from using dilatory tactics to prevent or selectively deny political speech. However, an ordinance requiring all speakers, demonstrators, and entertainers to obtain a permit before making use of the public parks was held unconstitutional. *Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1994). The District of Columbia Parks and Recreation *Permit Procedures Manual* specifies that a notice of availability will be mailed to the applicant within 10 business days after receipt

142

of application, and requires registration and insurance for events at city parks with more than 250 people in attendance. DC Parks and Recreation *Permit Procedures Manual* (January 2003) at 2, 5-6.

    The Metropolitan Police Department via the DC Emergency Management Agency issues "special events" permits, which include protests and demonstrations. The MPD website says,

> The DC Emergency Management Agency (DCEMA) has the final word on special event planning in the Nation's Capital. According to the 1990 District of Columbia Special Event handbook of the DCEMA: "Special events are activities for which licenses and permits are required within the District of Columbia and where large numbers of persons may gather or participate. Such events may include parades, cultural programs, festivals, musical rock concerts, religious gatherings, block parties, community activities, and *First Amendment Rights activities*."

*See* Metropolitan Police Department—Services—Special Events In DC, *at* http://mpdc.dc.gov/serv/events/specialevents.shtm (last visited July 10, 2003) (emphasis added). The requirements include meeting with the Special Events Task Group at least 60 days prior to the proposed event, submitting 12 copies of a plan of action, and making a presentation about the event. *Id.* The MPD Web site suggests, "due to the large number of events held in Washington, DC, and the District's extensive regulations that govern event planning, you should contact the Task Force at least 120 days in advance of an event." *Id.* Such a process may be violative of the First Amendment if it serves to systematically prevent certain groups from assembling and speaking, such as those without the resources or organization necessary to conform to these regulations. Additionally, the site does not specify response time to the application of approval or denial of the permit.

    Section 22-1307 of the D.C. Code deals with unlawful assembly, profane and indecent language, and states that

> It shall not be lawful for any person or persons within the District of Columbia to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or inclosure [sic], or any park or any park or reservation, or at the entrance of any private building or inclosure [sic], and engage in loud and boisterous talking or other disorderly conduct, or to insult or make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct, or incommode, the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or inclosure [sic]; it shall not be lawful for any person or person to curse, swear, or make use of any profane language or indecent or obscene words, or engage in nay disorderly conduct in any street, avenue, alley, road, highway, public park or inclosure [sic], public building, church, or assembly

room, or in any other public place, or in any place wherefrom the
same may be heard in any street, avenue, alley, road, highway,
public park or inclosure [sic], or other building, or in any premises
other than those where the offense was committed, under a penalty
of not more than $250 or imprisonment for not more than 90 days,
or both for each and every such offense.

D.C. Code §22-1307 (2003). Arrests made under this statute must be
pursuant to probable cause. If this statute withstands constitutional
scrutiny, in the context of a large protest situation there would seem to be
a low bar for individual probable cause, but less so for a mass arrest, as it
would be difficult to determine whether every person there was engaging
in the prohibited activity, or may be trying to leave or just observing.

## II. OFFICERS' ACTIONS AND QUALIFIED IMMUNITY

The standard governing police conduct is composed of two elements, the
first being subjective and the second objective. *Tatum v. Morton*, 402 F.Supp.
719, 723 (D.C. 1974). Thus, the officer must prove not only that he believed in
good faith that his conduct was lawful and also that his conduct was reasonable.
*Id.*

The District of Columbia and a police officer acting in his individual
capacity were liable for First Amendment damages in *Tatum v. Morton* after the
officer arrested demonstrators for failing to obey an order for dispersal of a
peaceful, permitted vigil outside the White House. 562 F.2d 1279 (D.C. Cir.
1977). In *Tatum*, a peaceful Quaker group scheduled a prayer vigil regarding
Richard Nixon and Vietnam to be held outside the White House from noon to
midnight. *Id.* at 1280. When persons thought to be "outsiders" joined the vigil,
police lines were established and the vigil participants were ordered to disperse.
*Id.* Police testified that they thought these outsiders were from a disorderly group
observed the night before on the grounds of the Washington Monument. *Tatum,*
402 F.Supp. 719, 721. When the plaintiffs refused, they were arrested. *Tatum,*
562 F.2d 1279, 1280. Approximately three to four hours of confinement went by
before any plaintiffs were offered the opportunity to post collateral. *Id.* at 1281.
The district court found the officer's establishment of police lines and ordering of
dispersal objectively unreasonable. *Id.*

In *Gregory v. Chicago*, the Court found that demonstrators were arrested
not for disorderly conduct, as the police cited, but for demonstrating, which is a
violation of due process. 394 U.S. 111 (1969). Justice Warren described it as a
"simple case." *Id.*

Petitioners, accompanied by Chicago police and an assistant city
attorney, marched in a peaceful and orderly procession from city
hall to the mayor's residence to press their claims for
desegregation of the public schools. Having promised to cease
singing at 8:30 p.m., the marchers did so. Although petitioners and
the other demonstrators continued to march in a completely lawful
fashion, the onlookers became unruly as the number of bystanders

144

increased. Chicago police, to prevent what they regarded as an impending civil disorder, demanded that the demonstrators, upon pain of arrest, disperse. When this command was not obeyed, petitioners were arrested for disorderly conduct.

*Id.* at 111-12. He continued that "[h]owever reasonable the police request may have been and however laudable the police motives, petitioners were charged and convicted for holding a demonstration, not for a refusal to obey a police officer." *Id.* at 112.

A. *Reasonable Conduct and Restraint on Speech*

Restraint on speech must be narrowly tailored, but government and police officers have a duty to protect the citizenry from violence. Thus, strict requirements govern when a state actor can restrict speech without harming the First Amendment. The Supreme Court articulated three requirements in *Brandenburg v. Ohio*, all of which must be met before a peace officer can lawfully abridge speech. 395 U.S. 444 (1969). First, the speaker must promote "imminent" lawless action. This would include, for example, a contemporaneous exhortation for a lynching, assault, mayhem, etc. Second, the imminent lawless action must be highly "likely" to occur. Speaking to a highly angered or charged crowd that is susceptible to such suggestion would make the action likely to occur. Third, the speaker must *intend* to produce imminent lawless action; the speech must be "directed to inciting or producing imminent lawless action." In *Cox v. Louisiana*, a civil rights leader's exhortation to the assembled crowd to stage "sit ins" at uptown lunch counters resulted in police dispersal and arrest. 379 U.S. 536 (1965). The Court held this action was an unconstitutional abridgement of the demonstrators' First Amendment rights, "this part of Cox's speech obviously did not deprive the demonstration of its protected character under the Constitution as free speech and assembly." *Id.* at 459. Moreover, there was "no indication that the mood of the students was ever hostile, aggressive, or unfriendly." *Id.* at 479. Applied to some of the facts in recent globalization demonstrations in the District of Columbia, *Brandenburg* may show that the police were not justified in restraining speech. Exhortations on a website to "shut down the city," a scavenger hunt with points for certain types of destruction and assault, or windows broken blocks away from a central gathering, may not satisfy the requirement of imminence.

The best argument the police would have for the validity of their actions is that they reasonably did think violence was imminent. Although exhortations were made on a Website and property damage may have happened a distance away, today's society is more mobile and technically savvy than at the time of *Brandenburg*. Thus, groups may mobilize quickly via electronic technology. Further, in *Planned Parenthood of the Colombia/Willamette, Inc. v. American Coalition of Life Activists*, the 9th Circuit held that "wanted" posters targeting abortion providers were illegal threats of violence. 290 F.3d 1058 (9th Cir. 2002) *cert. denied* 123 S. Ct. 715 (2002). Thus, it would be a question of fact whether online statements, particular specific details of a violent "scavenger hunt" may count as exhortations of violence.

*B. Previous Violence is not Grounds for Banning Demonstrations*

In *United States v. Baugh*, the court pointed out that, "[o]rganizers of protests ordinarily cannot warrant in good faith that all the participants in a demonstration will comply with the law. Demonstrations are often robust. No one can guarantee how demonstrators will behave throughout the course of the entire protest." 187 F.3d 1037, 1043 (9th Cir. 1999). A complete ban on First Amendment activity cannot be justified simply because past similar activity led to violence. *Id.* at 1043-44. The case of *Collins v. Jordan* dealt with demonstrations and police action in the wake of the Rodney King verdict. 110 F.3d 1363 (9th Cir. 1997). The day after the Rodney King verdict, a demonstration in downtown San Francisco led to a number of violent injuries. The next day, the mayor issued an order for officers, among other things, to implement a policy of custodial arrests (instead of citations) to disperse all gatherings whenever the officer has reason to believe the gathering endangers or is likely to endanger persons or property. *Id.* at 1367. That day, a group assembled in downtown San Francisco. The police ordered dispersal. As people moved away from the central area, people were encircled and arrested. *Id.* at 1368. The arrestees were held up to 55 hours. *Id.* at 1369. The court held that the earlier violence fell far short of "the type of occurrence that could have led any reasonable official to believe that it would be constitutional to impose a city-wide ban on all demonstrations and that the law to that effect was clearly established. *Id.* at 1373. Moreover, the police officer who ordered the dispersal of the gathering was not entitled to qualified immunity against claims that he violated the First Amendment rights of demonstrators. *Id.* at 1379.

*Collins* stands for the principles that unlawful conduct must be dealt with after it occurs, acting before demonstrators have broken the law is presumptively a First Amendment violation, and that keeping demonstrators in custody to keep them from demonstrating violates their individual First Amendment rights. 110 F.3d 1363. These ideas may be extended to the actions taken in the District of Columbia. In particular, vague fears of violent demonstrations in the wake of Seattle and Genoa on the part of police are legitimate reasons to curb demonstrators' speech and assembly. Moreover, MPD has been dealing with the same group of protestors since April 2000 (and probably earlier; one of the complaints says they've been protesting since 1996); these groups have been demonstrating twice a year for the past three years without serious unrest or any cause for preemptive action. As a matter of fact, no major problems with protests in the city had occurred between the May Day riots in the early 1970s, and the present disturbances beginning in 2000. Further, officers at the scene and officers involved in creation of orders and policy to disperse demonstrators may not be entitled to qualified immunity from suit.

*C. Probable Cause and Arrest*

The case of *Sullivan v. Murphy* was a class action arising out of mass arrests made during May Day anti-war demonstrations. 478 F.2d 938 (D.C. Cir. 1973), *cert. denied* 414 U.S. 880 (1973). The arrestees challenged the procedures used in effecting the arrests, the disposition of criminal charges, and the maintenance of arrest records. The court held that disorderly conduct arrests were

presumptively invalid if they were not accompanied by a contemporaneous photograph and field arrest form. This presumption could be rebutted upon an affirmative showing that any particular arrest was based on probable cause. *Id.* Moreover, the court held that it was unconstitutional to arrest demonstrators for disorderly conduct at the scene of anti-war demonstrations, without probable cause determinations made at the time of arrest, in hope that evidence uncovered during the process of detention would serve as the basis for some prosecutions. *Id.* This may be analogized to alleged MPD practices of intelligence-gathering on protesters. Videos showed police, upon raiding the convergence center in April 2002, taping not just the fire hazards cited for shut-down, but also names and identifying information posted on a communal message board.

    *D. Application*

    Looking at the alleged record of events in the demonstration and arrest in Pershing Park in September of 2002, prior restraint may well have occurred. Many of the alleged infractions happened far away in time and space from the arrest. For example, a group of bicycle protesters were riding from Union Station to downtown, and were guided and herded into Pershing Park by police officers. The two most popular reasons for arrest for people were "failure to obey a police order" and "parading without a permit." While if the protesters indeed had blocked traffic and were walking in the streets (instead of on the sidewalks), they can be arrested, the police must notify them right away and arrest them as soon as possible, instead of allowing them to keep walking, but guiding them into the park for a mass arrest.

## III. VIEWPOINT DISCRIMINATION

    In *Sammartano v. First Judicial District,* an unwritten policy at the Carson City Public Safety Complex directed security personnel not to permit individuals if they were wearing "clothing having symbols, markings or words indicating an affiliation with street gangs, biker, or similar organizations which could be disruptive and/or intimidating. 303 F.3d 959, 963 (9th Cir. 2002). Plaintiffs, wearing biker apparel, were denied admission. *Id.* The court agreed that the rule banning this type of clothing was unreasonable, and the risk asserted by defendants was unreal. Any Metropolitan Police policy, written or otherwise, targeting anarchists and those "dressed in black" may likewise be unconstitutional viewpoint discrimination.

    We have observed in some of the training videotapes and protest footage that the police may indeed have targeted people dressed in all black, who may have identified themselves as anarchists. However, police may also have observed discrete identifiable groups instigating violence. In particular, the April 2000 video footage shows a crowd milling around the Navy Memorial, when anarchists dressed in black started attacking other protesters in the crowd. It is proper for the police to take action upon a particular group, identified as anarchist, in this type of situation. However, an incident like this would not empower the police to crack down on a different anarchist group several blocks away.

147

**COUNCIL OF THE DISTRICT OF COLUMBIA**
**Committee on the Judiciary**
**Councilmember Kathleen Patterson**
**John Wilson Building**
**1350 Pennsylvania Avenue, N.W.**
**Washington, D.C.  20004**

**Memorandum**
**To:  Amy Mauro**
**From: Josh Harris**
**Date: 8.7.03**
RE: Excessive Force: Overview

The **Use of Force Model** was designed as an instructional method developed by
Professor Greg Connor of the Police Training Institute at the University of
Illinois, a nationally renowned expert in the field of police training in the use of
force.  The Model's stated purpose is to provide a template for the standardization
of police force utilization in confrontational situations.  In the *Integrated Force
Management Training Manual*, Professor Connor systematically outlined the
theory behind the Use of Force Model**.**  Additionally, it should be noted that
Professor Connor's theory is the basis of the Metropolitan Police Department's
new General Orders relating to Use of Force.

The Use of Force Model establishes three factors in order to objectively support
the reasonable use of force: (1) the nature of the risk, ranging from strategic to
lethal; (2) the officer's perception of the subject's action, ranging from compliant
to actively resistant; and (3) the force used by the officer in order to gain control
and compliance, ranging from verbal communication to lethal force.

Additionally, the Model recognizes the fluidity of a real-life situation.  As such,
an officer's use of force based on the above-mentioned factors can escalate, de-
escalate or stabilize in response to changing conditions.  This process is known as
**Tactical Transition.**

**Nature of the Risk**

The Nature of the Risk is classified according to a **Threat Perception Color
Code** that assigns a color to the various levels of threat perception: blue, green,
yellow orange and red.  These categories include strategic, tactical, volatile,
harmful and lethal.   A *Strategic* threat level is identified by the color blue and is
the lowest level of threat assessment.  The *Tactical* threat level is indicated by the
color green and represents an increase in threat potential.  The *Volatile* category,
represented by the color yellow, requires the officer to increasingly focus on the
actions of the subject and the safety of those nearby.  The *Harmful* category,
orange, represents an increase in the threat level due to the subject's 'assaultive
actions.'  The *Lethal* category, represented by the color red, is the most hazardous
level.  This level is activated after a potentially lethal assault has been initiated.

**Perceived Subject Action**

148

There are five categories of Perceived Subject Action. *Compliant* is the most common category and requires only verbal communication throughout the encounter. *Resistant (Passive)* involves a subject who is noncompliant but may be brought into compliance without physical or mechanical defiance by the officer. *Resistant (Active)* also addresses a noncompliant subject, but here, the level of noncompliance requires "enhanced physical or mechanical defiance." *Assaultive(Bodily Harm)* refers to an actual assault on the officer. This level does not support the use of lethal force. However, in the *Assaultive (Serious Bodily Harm/Death)* category, the officer may conclude that lethal force is necessary based on the subject's actions.

**Response Categories**

The Response Categories includes Cooperative Controls, Contact Controls, Compliance Techniques, Defense Tactics and Deadly Force. *Cooperative Controls* are most commonly employed when the Perceived Subject Action is *Compliant*. Accordingly, the officer is to, "capitalize upon the acceptance of authority" by the use of a variety of communication and body language skills. *Contact Controls* are to be employed in the first instance of non-compliance when the Perceived Subject Action is *Resistant (Passive)*. Here, the officer employs non-pain contact measures to establish control. *Compliance Techniques* refers to the response to be used when the Perceived Subject Action has reached a level of *Resistant (Active)*. At this stage, 'balanced force' is to be used to overcome non-compliance, including pain compliance, joint restraints and chemical irritants. *Defensive Tactics* are those directed to toward a subject that has reached the *Assaultive (Bodily Harm)* level of Perceived Subject Action. At this point, the officer is justified in taking action to halt the assault, including weapons strikes, and canine apprehension measures. *Deadly Force* is the final and most severe responsive measure, to be used when the Perceived Subject Action level has risen to the *Assaultive (Seriously Bodily Harm/Death)* level. This response is to be used only when "absolute and immediate tactics must be deployed to stop the lethal risk" and may include those acts that may lead to permanent disability or death.

**Force Indexing**

Finally, the Integrated Force Management Program utilizes a 'Force Indexing Form' to allow the agency to track and survey the force response employed in each situation. Accordingly, an officer must identify the appropriate categories of Threat Perception, Perceived Subject Action and Response Used in a standardized form provided by the Department.

COUNCIL OF THE DISTRICT OF COLUMBIA
**Committee on the Judiciary**
**Councilmember Kathleen Patterson**
**John Wilson Building**
**1350 Pennsylvania Avenue, N.W.**
**Washington, D.C.  20004**

**MEMORANDUM**
**To: Investigation Staff**
**From: Josh Harris**
**RE: Administrative Searches and Pretext**
Date: 10.01.03

I.  Facts

On April 15, 2000, 1328 Florida Ave, N.W. was inspected by the District of Columbia Fire and Emergency Medical Services Department, Fire Prevention Bureau, in pursuant to District of Columbia Municipal Regulations Title 12D, Chapter 1, §108.1, which reads, in part

The code official shall inspect all structures and premises, except single-family dwellings and dwelling units in two-family and multiple family dwellings, for the purposes of ascertaining and causing to be corrected any conditions liable to cause fire, contribute to the spread of fire, interfere with fire fighting operations, endanger life or any violations of the provisions or intent of this code or any other ordinance affecting fire safety.

The building, designated as a commercial warehouse rather than a residence, was being used as a 'convergence center' for the Mobilization for Global Justice, an umbrella organization that consisted of several groups including the American Friends Service Committee, City at Peace and the Washington Artist's Group.  The building was leased from the Douglas Development Corporation for a period of two weeks.  Inspector Ronald P. Elam was listed as the authorized representative of the District of Columbia.  The authority for such inspections is found in §108.3 of the Municipal Regulations, which provides the right of entry, "whenever necessary for the purpose of enforcing the provisions of this code, or whenever the code official has reasonable cause to believe that there exists in any structure or upon any premises, any condition which makes such structure or premises unsafe."  Pursuant to this authority, Inspector Elam cited the following 29 violations he observed while inspecting 1328 Florida Ave:

F 107.2: No Permits for Propane
F107.1: No Permits for Place of Assembly
F3606.1: Improper Storage of Propane
F309.1: No Hood System for Kitchen

F310.6: Electrical Box Open w/o "Face"

F402.2: Unsafe Use of Lighting Equipment, Inside and Out

F601.5: No Egress Plans

F406.2: Cooking w/ Propane Grill inside Building

F519.6: Fire Extinguishing not mounted

F3601.2: Permit Required

F110.1: People Sleeping Inside Electrical Room

(No Citation Provided) No Smoke Detectors

F110.1: Flammables stored throughout building (paint, paint thinner, etc.)

F111.1: Evacuation

F110.3: Unsafe Conditions

F607.1: Fire Door Removed from corridor

F306.1: Combustible Material hanging throughout

F504.1: Fire Alarm System not installed as to Code

F310.5: Improper Use of Extension Cords

F610.2: Exit lights defected throughout, "all defected"

F609.2: Maintenance

F110.1: Excessive storage of combustibles around open electrical box

F110.1: Faulty wiring from electrical box to truck

F601.3: Means of Egress; Owner Responsible

F601.8: Overcrowding

F605.1: Exit Doors Stairway and Passageways obstructed

F609.1: Bars on windows

F608.1 Doors knobs missing on "exit door"

 In an April 17, 2000 letter to Deputy Fire Chief Adrian Thompson, Paul Millstein of the Douglas Development Corporation advised that he "had no idea of the actual activities of persons occupying the above address." Millstein stated that he was led to believe that the tenants were organizing a training workshop for puppet making. "We are outraged at this misrepresentation," Millstein said, adding, "had we been aware of the true motives of this group, we would never have permitted their assembly at any or our properties."

*II. Case Law*

In 1967, the Supreme Court expressly recognized the constitutionality of 'warrantless administrative searches.'  In Camara v. Municipal Court of San Francisco, 387 U.S. 523 (1967), the defendant was charged with violating the San Francisco Housing Code when he refused to allow a warrantless inspection of his home.  Id.  The Court held that the probable cause requirement of the Fourth Amendment could be established if, "a valid public interest justifie[d] the intrusion contemplated."  Id. at 539.  The Court identified such factors as, "the passage of time, the nature of the building (e. g., a multi-family apartment house), or the condition of the entire area," as examples of sufficiently valid public interests.  Id.  Such a finding makes clear that the Fourth Amendment probable cause requirement should not be uniformly applied to all types of searches.  The 'probable cause' necessary to support a warrantless administrative is to be measured by the state interest in effectuating a particular regulatory scheme rather than actual suspicion of a legal violation.

In Donovan v. Dewey, 452 U.S. 594 (1981), the Supreme Court further explained the justification for this more relaxed 'probable cause' requirement, specifically as applied in the commercial setting.  The appellant, a federal mine inspector was denied access to conduct an administrative mine inspection as per Section 103(a) of Federal Mine Safety and Health Act of 1977.  Id. at 596.  Accordingly the Secretary of Labor filed a civil action to enjoin the mining company from refusing such administrative searches.  Id. at 597.  The Court held that legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment, reasoning that the "greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections."  Id. at 598.

In New York v Burger, 482 US 691 (1987), the Supreme Court again addressed the issue of administrative searches.  In Burger, police officers performed an administrative search on respondent's auto junkyard pursuant to a New York State law.  Id. at 693.  In the course if this search, the police uncovered several stolen vehicles.  Id. at 694.  The Court of Appeals held that the statute was unconstitutional as it authorized warrantless searches in order to uncover criminal activity.  Id. at 697.  The Supreme Court reversed, holding that auto junkyards were a "closely regulated industry."  Id. at 701.  Accordingly, such industries have a reduced expectation of privacy.

The Court held that a state must satisfy three separate requirements in order to justify this form of privacy reduction.  First, a state must have a "substantial interest that informs the regulatory scheme pursuant to which the inspection is made." *Id.* at 702.  Second, the search must be "necessary to further that regulatory scheme."  Id.  Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally

adequate substitute for a warrant." *Id.* at 703. In this case, the Court held that preventing motor vehicle theft satisfied the requisite state interest. *Id.* at 708.

However, precedent also makes clear that administrative searches cannot be used to circumvent the probable cause standard required in a criminal search. The Supreme Court has held that 'pretextual searches,' in which the justification given for the search is valid but is used for invalid purposes, are unconstitutional abuses of the Fourth Amendment. In *Scott v. United States*, 436 U.S. 128 (1978), the Supreme Court announced that alleged Fourth Amendment violations can only be resolved using the objective reasonableness of the conduct in question instead of attempting to determine the subjective motivations of the officer. *Id.* at 138. "The fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.*

Several years later, the Supreme Court elaborated on the "objective reasonableness requirement" announced in *Scott*. In *United States v. Villamonte-Marquez,* 462 U.S. 579 (1983), the Supreme Court held that a stop and boarding of a vessels was constitutional when made in furtherance of vessel documentation laws. The defendants' attempted to establish pretext using both the stated subjective and objective manifestations of intent. The defendants' argued that customs agents were merely investigating in response to a tip that the vessel in question contained narcotics. *Id.* at 584. Moreover, the defendants' argued that the accompanying police officers were not a necessary incident to such a routine administrative document check. *Id.*

The Court quickly disposed of these pretext arguments, holding, "this line of reasoning was rejected in a similar situation [Scott]… and we again reject it. *Id.* While *Villamonte-Marquez* does not offer an express formulation of what type of evidence would objectively establish pretext, it makes clear that the mere presence of law enforcement or the receipt of a 'tip' cannot suffice absent more concrete evidence.

Finally, in *United States v Whren*, 517 U.S. 806 (1996), the Supreme Court held rejected the defendants argument that a police stop, pursuant to an actual traffic violation should be viewed as a pretextual attempt at finding illegal narcotics. According to the Court, outside the limited context of administrative and inventory searches, an officer's motivation to act cannot invalidate what was an otherwise justifiable search predicated on probable cause under the Fourth Amendment. *Id.* at 812. As such, *Whren* reaffirms that pretext is still a legitimate invalidating principle in administrative searches.

Analysis

The Florida Avenue search was clearly administrative in nature, established both by the statutory authority cited by the presiding officials at the scene and by the nature of the search itself. Accordingly, the case law reviewed above has repeatedly affirmed the use of pretext as a way to invalidate such searches.

However, this same case law has also limited the ways in which such pretext can be established.  As *Villamonte-Marquez* makes clear, subjective manifestations of intent will not suffice.  This leaves 'objective' manifestations as the sole means of establishing intent.

While the Court has routinely struck down any attempts to establish motive through subjective intent, circumstantial objective evidence may be permissible.  Examples of such evidence may include the video footage recorded incident to the Florida Avenue search, in effect a record of police interest in the building.  Similarly, any correspondences between the Fire and Police Departments may also prove useful in establishing the law enforcement interest in the building.  Given the degree of coordination between the two Departments in conducting and documenting the search, there would most likely be a paper trail between the two, either by way of formal notification from one department to the other or a request for police assistance in conducting the search.

The pretext argument may also be buttressed by the number of times an administrative search has been conducted at 1328 Florida Avenue in the past as well as the number of administrative searches conducted annually.  Similarly, it may be useful to find out if any notice was given to the tenants of the Florida Avenue address, and, if not, if this is in keeping with usual practice.  Additionally, if notice was given to any representative of the Douglas Development Corporation, if there was ever any request on behalf of the Police or Fire Departments not to inform their tenants.  As such, in our next document production request, we should consider obtaining copies, if they exist, of any of the foregoing communications in an effort to establish an objective manifestation of an pretextual and thus illegal administrative search.

154

**COUNCIL OF THE DISTRICT OF COLUMBIA**
**Committee on the Judiciary**
**Councilmember Kathleen Patterson**
**John Wilson Building**
**1350 Pennsylvania Avenue, N.W.**
**Washington, D.C.  20004**

Memorandum
**To: Investigation Staff**
**From: Josh Harris**
**RE: Domestic Spying Case Law**
**Date: 7.15.03**

Summary

In arguing against the legality of police surveillance, a plaintiff must first demonstrate that they have actually been injured by the surveillance.  Most commonly, suits alleging unconstitutional government surveillance of lawful political activity allege that the "chilling effect" of police surveillance on speech establishes the requisite injury-in-fact.      As the following cases make clear, the "chill" must be more than speculative.  Litigants must demonstrate that the government action actually created an injury-in-fact.  If plaintiffs fail to meet this burden, the case will not reach the merits.

However, once standing has been established, the government may still justify the intelligence gathering methods in question by demonstrating a compelling government interest.  Justifications such as public safety and crime prevention have been judged to meet this standard.  However, if the government fails to meet this burden, courts will order declaratory or injunctive relief.  Such relief usually takes the form of a consent decree, tailored to remedy the constitutional violation.

In one of the earliest applications of this rationale, *Anderson v. Sills*, 56 N.J. 210 (1970), the New Jersey Supreme Court rejected the "chilling effect" rationale as a basis for standing, holding that

[t]he question in the case is not merely whether there are some individuals who might be "chilled" in their speech or associations by reason of the police activity here involved. Rather the critical question is whether that activity is legal, and although the amount of "chill" might in a given case be relevant to the issue of legality, the fact of "chill" is not itself pivotal. Indeed, the very existence of this Court may "chill" some who would speak or act more freely if there were no accounting before us for trespassers against others.  (*Anderson v Sills* 56 N.J. 210, 226 (1970)).

Supreme Court Decisions

In *Laird v. Tatum*, 408 U.S. 1 (1972), the United States Supreme Court held that plaintiffs must demonstrate that they sustained or were immediately in danger

155

of sustaining a direct injury as a result of the challenged state action. *Id.* The Court ruled that the plaintiffs, activists challenging the constitutionality of the United States Army's surveillance of political events, failed to meet this requirement. According to the Court, "in order to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action." *Id.* at 14. Thus, *Laird* makes clear that allegations of a speculative chill on speech are not enough to establish a justiciable injury.

Two years later, the Supreme Court elaborated the *Laird* rationale in *Socialist Workers Party v. Attorney General*, 419 U.S. 1314 (1974). In distinguishing this case from Laird, Justice Marshall explained that

> In this case, the allegations are much more specific: the applicants have complained that the challenged investigative activity will have the concrete effects of dissuading some…from participating actively in the convention and leading to possible loss of employment for those who are identified as being in attendance. Whether the claimed "chill" is substantial or not is still subject to question, but that is a matter to be reached on the merits, not as a threshold jurisdictional question. The specificity of the injury claimed by the applicants is sufficient, under *Laird*, to satisfy the requirements of Art. III. *Id.* at 1320.

Regardless, Marshall denied the plaintiffs' request for injunctive relief, citing the limited nature of the FBI's investigation, the limited dissemination involved, and the potential injury to their investigative efforts. *Id.* Thus, Marshall's opinion makes clear that once the justiciability threshold is met, the conduct in question should be measured against the nature of the government's interest.

In *Meese v. Keene*, 481 U.S. 465 (1987), the Court again took the occasion to elaborate when standing to challenge police conduct is established. In *Meese*, a film exhibitor filed a lawsuit to enjoin the designation of several Canadian films as "political propaganda" under the Foreign Agents Registration Act of 1938, 22 U.S.C.S §§611-621. Appellee argued that this designation would injure his, "personal, political, and professional reputation." *Meese* at 472. The Court re-iterated the *Laird* standard requiring, "a claim of specific present objective harm or a threat of specific future harm." *Laird* at 14.

However, in this case, the Court agreed that appellee's allegations established a justiciable injury, beyond a mere "subjective chill." *Meese* at 472. In contrast to *Laird*, the Court held that harm to a plaintiff's reputation in the community constitutes a cognizable injury that suffices to establish standing.

This line of Supreme Court precedent establishes a two-prong analysis in determining whether a police surveillance activity violates Constitutional rights. First, a cognizable injury must be demonstrated. Injury sufficient to satisfy this prong includes specific allegations of a concrete harm, or concrete injury to one's reputation in the community. Second, it must be established that the injury was the result of action outside the scope of legitimate state interests. Any surveillance activity that chills speech or injures reputation can only be sustained if the defendant can demonstrate a 'compelling' state interest that cannot be achieved by any less intrusive means. The subsequent lower court treatment

establishes precedent for resolving the conflict between First Amendment liberties and the compelling state interests associated with political intelligence gathering.
Second Circuit Court of Appeals

In *Fifth Avenue Peace Parade Committee v. Gray*, 480 F.2d 326: (1973), the Second Circuit upheld the FBI's collection and dissemination of information from a political organization's bank records. The court ruled that it was, "[b]eyond any reasonable doubt the FBI had a legitimate interest in and responsibility for the maintenance of public safety and order during the gigantic demonstration planned for Washington, D.C. In fact, had it been ignored the agency would be properly chargeable with neglect of duty." *Id.* at 332.

The court distinguished this case from *Laird*, stating that, "[t]he ongoing and pervasive military surveillance of civilian activity alleged in [*Laird*] would seemingly create a more understandable apprehension of inhibition of First Amendment rights, than the *ad hoc* response of a civilian agency here to a major and massive demonstration in Washington, D.C." *Id.* at 331. As such, the Court ruled that the plaintiffs failed to state a cognizable injury and that the state actions were in pursuance of a legitimate interest in public safety. *Id.* at 333.

**Second Circuit: District Court for the Southern District of New York**

In *Handschu v. Special Services Division*, 349 F. Supp. 766 (1972), the District Court for the Southern District of New York held that the New York City Police Department's intelligence gathering operations involving political activists *did* establish a justiciable injury by creating a chilling effect on the group's First Amendment activities. The court held that the allegations regarding the use of police infiltrators and provocateurs constituted charges of direct injury, "beyond the pale of *Laird*."

While the court acknowledged that informers and infiltrators constitute a valid investigative technique, the court placed clear limits on their use. "[T]hose so engaged may not overstep constitutional bounds; the Bill of Rights protects individuals against excesses and abuses in such activities. . . . [T]he initiation and inducement of criminal activity by government agents is proscribed." *Id.* at 770. Specifically, the court took note of an allegation involving a police informer who urged demonstrators to participate in unlawful conduct. *Id.* As a result of the named informer's conduct, the demonstrators disbanded. As such, the Court ruled that the allegations established an injury as a result of activity, beyond passive observance, outside of legitimate state interests[32].
Third Circuit Court of Appeals

In *Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate*, 519 F.2d 1335 (1975), the Third Circuit ruled that plaintiff's challenge to the intelligence activities of the Philadelphia Police Department created a chilling effect on First Amendment Rights. Like the Second Circuit in *Gray*, the Court found that sharing information with other governmental agencies "having a

---

[32] In subsequent litigation, the parties agreed to a consent decree, known as the *Handschu Guidelines*. These guidelines have since been modified pursuant to a March 2003 decision – more info forthcoming.

legitimate law enforcement function" was not unconstitutional in itself. *Id.* at 1338. Rather, the lack of dissemination standards created a justiciable injury.

In this case, the Police Department, "specifically identified the plaintiff organizations and four of the individual plaintiffs as being the subjects of police dossiers," on a national television broadcast. *Id.* The Court determined that this conduct created a chilling effect on speech and was beyond the scope of legitimate police interests. "It is not apparent how making information concerning the lawful activities of plaintiffs available to non-police groups or individuals could be considered within the proper ambit of law enforcement activity, particularly since it is alleged that plaintiffs are subject to surveillance *only* because their political views deviate from those of the establishment." *Id.* As such, this case establishes guidelines as to the limits of the constitutionality of intelligence dissemination.

Fourth Circuit Court of Appeals

In *Donohoe v. Duling*, 465 F.2d 196 (1972)**,** the Fourth Circuit held that police surveillance of political and religious gatherings did not create a deterrence effect on the exercise of first amendment rights. Reiterating the Supreme Court's rationale in *Laird*, the Court held that "[t]here must be a claim of specific present objective harm or a threat of specific future harm in order to support a justiciable claim for relief in a case of this type. Allegations of a subjective chill will not suffice. Nor may a plaintiff base his right to sue on injury to another." *Id.* at 202.

According to the Court, "the 'chilling' effect of executive actions, falling short of a direct restraint of First Amendment rights, would not give rise to a justiciable cause." *Id.* The mere fear that, "some *other* and additional action detrimental to that individual" might be taken will not establish a justiciable injury. *Id.*

Sixth Circuit Court of Appeals

In *Ghandi v. Police Department of Detroit*, 747 F.2d 338 (1984), appellants argued that illegal acts of a police informant violated their constitutional rights; including advocating a kidnapping scheme so as to allow for a police search of their headquarters. The Court reversed the lower court's summary judgment in favor of appellee because the alleged conduct constituted a direct injury, beyond mere surveillance activity.

However, on the merits, the Court dismissed the charges for lack of evidence. In so doing, the Court reiterated the rationale of the *Handschu* court, stating, "The use of secret informers or undercover agents is a legitimate and proper practice of law enforcement and justified in the public interest -- indeed, without the use of such agents, many crimes would go unpunished and wrongdoers escape prosecution. It is a technique that has frequently been used to prevent serious crimes of a cataclysmic nature." *Id.* at 347. In this case, the Court found no facts to support an allegation of any conduct beyond "mere surveillance." *Id.*

**Seventh Circuit Court of Appeals**

In *Alliance to End Repression v City of Chicago*, 237 F.3d 799 (2001), the Seventh Circuit reversed a consent decree governing police surveillance operations. Citing changed circumstances, the Court agreed to modify, "the

draconian regulations" (established in *Alliance to End Repression v. Chicago*, 561 F. Supp. 537 (1982)). This agreement was the product of litigation arising from *Alliance to End Repression v. Rochford*, 407 F. Supp. 115 (1975). In that case, the District Court held that the Chicago Police Department's political intelligence gathering practices created a justiciable injury.

> Plaintiffs allege that said activities are carried out under the auspices of a vague and overly broad mandate contained within a general order of the Chicago Police Department directing its Intelligence Division to gather intelligence on organizations and individuals who pose "a threat to the security of the country, state or city." It is alleged that as a result of the above mandate, the defendants have engaged in a continuing pattern and practice involving the following activities: (1) surveillance and intelligence-gathering on individuals and organizations engaged in lawful activities; (2) unlawful wire-tapping and other forms of electronic surveillance; (3) unlawful entry and seizure; (4) dissemination of derogatory information concerning plaintiffs; (5) summary punishment and harassment, and (6) infiltration of private meetings and political organizations by informers and provocateurs. *Id.* at 116.

The *Rochford* court ruled that the allegations, if proven, "would establish a course of conduct which would substantially more intrusive than the conduct engaged in by the defendants in [*Laird v Tatum*, 408 U.S. 1 (1972)]." *Id.* at 119.

Tenth Circuit Court of Appeals

In *Riggs v Albuquerque*, 916 F.2d 582 (1990), the Tenth Circuit Court of Appeals ruled that plaintiffs, political activists and organizations, established a justiciable injury when they alleged the Intelligence Unit of the Albuquerque Police Department kept improper investigative files on them.

The Court noted that a plaintiff seeking prospective relief must establish continuing harm as a result of the conduct. *Id.* at 586. As such, the Court ruled that an allegation of past harm or speculative future harm alone does not confer jurisdiction to seek prospective relief. *Id* The Court determined that because, "plaintiffs in this case allege that defendants continue to conduct illegal surveillance of plaintiffs' activities…they have alleged a cognizable, continuing injury which presents a case or controversy for the court to consider." *Id.*

In distinguishing this case from *Laird,* the Court held that plaintiffs were alleging more than a generalized "chill." Instead, plaintiffs were alleging, "harm to their personal, political, and professional reputations." *Id.*

DC Court of Appeals

In, *Hobson v Wilson,* 737 F.2d 1 (1984), The Court of Appeals for the DC Circuit reversed a district court judgment against the MPD and D.C, while affirming liability against the FBI. Plaintiffs, several Washington-area protestors, alleged members of the MPD Intelligence Division served undercover in their organizations, in furtherance of its stated mission to gather information on "persons, groups, and organizations whose activities might be detrimental to the proper functioning of local, state, or national governments." *Id.* at 13. A demonstrator who was identified later as an MPD officer, urged a crowd to disobey parade instructions and instead to march to an area where police awaited.

Further, MPD encouraged informants to take private mailing lists and membership lists, and in one instance to break into an office at night to take a metal strong box.

The Plaintiffs alleged that the FBI, MPD and DC conspired with each other, "to impede plaintiffs' efforts to associate with others for the purpose of publicly expressing opposition to the Vietnam War, national and local Government race relations policies, and other Government actions." *Id.* at 2. These alleged activities fell under the auspices of COINTELPRO, an FBI program that ran from 1967 until the early 1970s. Ultimately, the court reversed a district court judgment against the MPD and D.C. based on sufficiency of evidence grounds. *Id.* at 97. However, the court affirmed liability against the FBI, affirmed the award of punitive damages, and remanded the expungement of records and damage issues. *Id.*