UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PAUL BAME, et al.,                    )
                                      )
          Plaintiffs,                 )
                                      )
                                      )     Civil Action No. 05-1833 RMC
                                      )
JOHN F. CLARK, et al.,                )
  Acting Director,                    )
  U.S. Marshals Service,              )
                                      )
          Defendants.                 )
_____ )

REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND RESPONSE TO
PLAINTIFFS' MOTION TO TAKE DISCOVERY PURSUANT TO FRCP RULE 56(f)
AND STAY CONSIDERATION OF DEFENDANTS' MOTION TO DISMISS

INTRODUCTION

The Defendant Dillard[1] hereby presents this reply to Plaintiff's Memorandum Of Points

And Authorities In Opposition To Defendants' Motion To Dismiss Or In The Alternative For

Summary Judgment ("Plaintiffs' Opp.") and opposes Plaintiffs' request for discovery in advance

of dismisal.  The named Plaintiffs do not dispute that they refused to provide their names to the

authorities when they were arrested on September 27, 2002, during the mass protests in various

locations in downtown DC.  See Amended Complaint, ¶ 17; Plaintiffs' Opp. at 18.[2]  Yet they

_____

[1]  Plaintiffs have consented in writing to the dismissal of the claims against John F. Clark
and Steve Conboy, who were only named in their official capacities.  See Plaintiffs' Opp. at 1;
Amended Complaint, ¶¶ 7-8.  Thus, those claims have been properly abandoned.  See
Memorandum Of Points And Authorities In Support Of Defendants' Motion To Dismiss Or, In
The Alternative, For Summary Judgment ("Defendants' Mem.") at 2-16; Local Civ. R. 7(b).

[2]  Nor could the named Plaintiffs credibly complain that they require discovery into
whether they refused to provide their names when arrested, because they would have had first-
hand knowledge had they properly identified themselves.

seek to challenge the bases for searches of all other men arrested outside of Pershing Park on that occasion. Their claim is that the searches were made in the absence of particularized or individualized reasonable suspicion that the arrestees were concealing drugs or contraband, since "[t]hey were not arrested for possession of drugs, weapons, involvement in prostitution, or any other crime which might form [the] basis for a strip search." Plaintiffs' Opp. at 3. Yet, the fact that the named Plaintiffs refused to provide their identities when the law requires places each of them outside of the class they seek to represent, because it offers a reasonable law enforcement officer a basis to believe that they are wrongfully seeking to conceal something. At the very least, it places them easily into a category of persons for whom there was no clearly established right that would preclude the search of a "John Doe" arrestee who a reasonable law enforcement officer could conclude was attempting to hide something. Because an analysis of the then-existing law with these undisputed facts is dispositive in this case, Defendant's motion should be granted.

Similarly, an analysis of the law reveals that a United States Marshal acts under color of federal -- not state -- law, precluding application of 42 U.S.C. § 1983 here. And the limitations period for a strip search can be most closely analogized to that for an assault. Thus, the one-year limitations period should be applied here.

Particularly given the significant public interest in disposing of such claims as these without discovery and its attendant disruption to the litigants, see Crawford-El v. Britton, 523 U.S. 574, 590 (1998), discovery should not be permitted. In short, and for the reasons previously set forth, what remains of this action should be dismissed.

ARGUMENT

I. Qualified Immunity

Federal Defendant Todd Dillard is entitled to qualified immunity.  See Anderson v. Creighton, 483 U.S. 635, 638 (1987); Davis v. Scherer, 468 U.S. 183, 191 (1984); Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982).  Individually-named federal defendants sued for money damages for violations of constitutional rights are immune from suit under the doctrine of qualified immunity if, *inter alia*, the complaint fails to allege facts that give rise to the violation of a clearly-established constitutional or statutory right of which a reasonable person would have known.   Saucier v. Katz, 533 U.S. 194, 196 (2001); Harlow, 457 U.S. at 818 (government officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known); Farmer v. Moritsugu, 163 F.3d 610, 613 (D.C. Cir. 1998); see also Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."); Zweibon v. Mitchell, 720 F.2d 162, 168 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984) ("once the trial judge determines the law was not clearly established at the time the contested conduct occurred, the inquiry ceases.").

The fact that the protest for the particular day in question had ended should not be considered an attenuating circumstance regarding the plaintiffs in this instance.  The cases where the courts have required individualized reasonable suspicion to believe that an arrestee is carrying weapons, contraband, or other drugs to justify a search generally involved "new" arrests in which police took arrestees directly to the jail and subjected them to strip searches.  The John

-3-

Doe plaintiffs as a class in this case were not arrested by USMS personnel and taken directly to the Superior Court cellblock.  They were delivered into USMS custody from the custody of the MPD.  Under the circumstances, USMS personnel have no knowledge of the contacts the protesters may have had prior to delivery into USMS custody or whether the arrestees have been searched prior to their arrival in the USMS cellblock.  Furthermore the lack of names makes the receipt of any discoverable criminal history unlikely.  Thus, the only reliable way to ensure security under the circumstances is to take reasonable steps to ensure security.

Although the Court in Helton v. District of Columbia , 191 F.Supp. 2d 179, 185 (D.D.C. 2002), cited a line of cases from other circuits that found searches unconstitutional, the issue of whether the search was justified was not before the Court.  As an action under the Federal Tort Claims Act for invasion of privacy violation of the common law tort of intrusion upon seclusion, Helton arguably concerned one of the other Bell[3] balancing tests for reasonableness of the search, i.e., whether the scope, manner and place of the search were reasonable.  In addition, there is no support for the claim that the Morgan consent decree should be treated as binding on the non-party USMS or its employees.  The law does not expect a public official, faced with the need to make an objectively reasonable, real-world judgment, to anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review.   See Wilson v. Layne, 526 U.S. 603, 617 (1999).  The District of Columbia Superior Court cellblock is substantially similar to the maximum security prison situation at issue in Savard v. State of Rhode Island, 338 F.3d 23 (1st Cir. 2003).

The cases upon which the Plaintiffs rely are distinguishable in yet another salient respect.

---

[3]  See Bell v. Wolfish,  441 U.S. 520, 558 (1979).

-4-

Those cases do not gainsay that the security concerns arising out of the intermingling of inmates are a significant counterweight in the balance that must be struck between personal rights and practical necessities.  Read for all they are worth, the Plaintiffs' cases at most deny that this counterweight is a sufficient justification in particular circumstances (invariably, circumstances attending an arrestee's typical detention at facilities such as jails and police stations).  Id. at 31. (citing Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989); Hill v. Bogans, 735 F.2d 391, 394-95 (10th Cir. 1984); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981).  Qualified immunity should be granted in this case given the security needs of the D.C. Superior Court, which were only heightened on the day that hundreds of people bent on shutting down the government were being processed through the Court system.  See Plaintiff's Opp., Exhibit 2 at 55 (Docket No. 34-3 at page 65 of 166); see Goyco de Maldonado v. Rivera, 849 F.2d 683, 688 (1st Cir. 1988) (stating that an official "need show no more than that [the question is close] to prevail on his qualified immunity defense");  Vazquez Rios v. Hernandez Colon, 819 F.2d 319, 328 (1st Cir.1987) (noting that "the closeness of the call suggests that [the law] could not have been 'clearly established'").

The validity of the qualified immunity analysis "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson, 483 U.S. at 639.  At the first stage of the inquiry, "courts must not define the relevant constitutional right in overly general terms, lest they strip the qualified immunity defense of all meaning."  Butera v. District of Columbia, 235 F.3d 637, 646 (D.C. Cir. 2001); see International Action Center, 365 F.3d 20, 25 (D.C. Cir. 2004).  As the Butera Court explained:

For example, the right to due process of law is quite clearly established by the Due

> Process Clause, and thus there is a sense in which any action that violates that
> Clause (no matter how unclear it may be that the particular action is a violation)
> violates a clearly established right. Much the same could be said of any other
> constitutional or statutory violation. But if the test of "clearly established law"
> were to be applied at this level of generality, it would bear no relationship to the
> "objective legal reasonableness" that is the touchstone of Harlow.  Plaintiffs
> would be able to convert the rule of qualified immunity that our cases plainly
> establish into a rule of virtually unqualified liability simply by alleging violation
> of extremely abstract rights.

Id. (citing Anderson, 483 U.S. at 639).  Thus, it is not enough for Plaintiffs here to claim that the

searches to which they were subject violated their constitutional rights.  Rather, the claimed

constitutional right "must be identified 'at the appropriate level of specificity' for a court to

determine the second prong of the inquiry:  whether the right was 'clearly established.'" Wilson

v. Layne, 526 U.S. at 615.  As the Supreme Court stated in Anderson, "[t]his is not to say that an

official action is protected by qualified immunity unless the very action in question has

previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness

must be apparent." 483 U.S. at 640 (citation omitted).   Given the state of the law concerning

blanket strip searches, and the fact-based analysis associated with existing case authority, the

Complaint here does not allege the violation of constitutional or statutory rights that were clearly

established under law, or sufficiently clear or apparent at the time of the alleged violation.

Defendant Dillard submits that, even assuming the truth of the allegations of the Amended

Complaint, "the state of the law [at the relevant time did not give officials] fair warning that their

alleged treatment of [the plaintiffs] was unconstitutional."  Hope v. Pelzer, 536 U.S. 730, 741

(2002).

Any analysis of the constitutionality of prisoner searches necessarily begins with the

United States Supreme Court's landmark decision in Bell v. Wolfish, 441 U.S. 520.  In that case,

pretrial detainees challenged the constitutionality of numerous conditions of confinement and practices at the New York Metropolitan Correctional Center, a federally-operated, short-term custodial facility in New York City designed primarily to house pretrial detainees. One of the challenged practices the Court addressed was the strip and visual body cavity search conducted on all inmates **after every contact with an outside visitor**.

In its analysis, the Court strongly emphasized that "maintaining security and preserving internal order and discipline [were] essential goals that may require limitation or retraction of the retained constitutional rights of . . . pretrial detainees." Bell, 441 U.S. at 546. "Central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." Id. at 546-47 (citations omitted). "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry," and "[t]he Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees." Id. at 540, 546-47 (citations omitted). "[E]ven when an institutional restriction infringes a specific constitutional guarantee, such as the Fourth Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Id. at 547.

This evaluation, however, according to the Bell Court, was an extremely deferential one. The Court stated that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve the internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547 (citations omitted). "'Such considerations are peculiarly within the province and professional

-7-

expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" Id. at 547-48 (quoting Pell v. Procunier, 417 U.S. 817, 827 (1974)).  The Court noted that "judicial deference [was] accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." Bell, 441 U.S. at 548 (citation omitted).

The Court held that such a strip search procedure was not an unreasonable search prohibited by the Fourth Amendment.  The Court noted that "[t]he test of reasonableness under the Fourth Amendment [was] not capable of precise definition or mechanical application" and that "each case . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Bell, 441 U.S. at 549.  The factors that must be considered, the Court held, were "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. at 559.

The Court of Appeals for the D.C. Circuit has not rendered a decision addressing whether a blanket strip search policy violates the Fourth Amendment.   Accordingly, the lead federal court in this Circuit has not ruled on the question.  Nonetheless, in the years since Bell, a number of federal courts have ruled that the Fourth Amendment precludes these types of searches on arrestees charged with misdemeanors or other minor offenses brought to the jail after arrest unless officials have reasonable suspicion that the specific arrestee is concealing weapons, drugs

or other contraband.[4]  However, other federal courts have considered the practice in various

contexts and determined that there were permissible bases for conducting the searches.  And,

each case is considered on its own facts and circumstances.

This caselaw has developed in the context of allowing blanket prisoner strip search

policies, without individualized assessment, in circumstances where individualized assessment is

not readily practical and the risks are substantial.  Thus, courts in certain circumstances have

upheld the constitutionality of strip searches of detainees, even for those who were charged only

with misdemeanors, minor offenses, or crimes not involving violence.  These courts have

focused on the fact that the detainees searched had already been intermingled with all other

prisoners; that they had access through attorneys or others to possible contraband; and that the

facility had a history of attempts to introduce contraband.

Thus, in Richerson v. Lexington Fayette Urban County Government, 958 F.Supp. 299

(E.D. Ky. 1996), the plaintiff had been arrested for a non-violent traffic offense and taken to the

County Detention Center where he was held in the general population as a pretrial detainee.

Afterward, Mr. Richerson was taken to the County District Court for arraignment.  The

---

[4]  See Wilson v. Jones, 251 F.3d 1340 (11th Cir. 2001); Skurtenis v. Jones, 236 F.2d 678 (11th Cir. 2000); Swain v. Spinney, 117 F.3d 1 (1st Cir. 1997); Wachtler v. County of Herkimer, 35 F.3d 77 (2d Cir. 1994); Chapman v. Nichols, 989 F.2d 393 (10th Cir. 1993); Justice v. City of Peachtree City, 961 F.2d 188 (11th Cir. 1992); Masters v. Crouch, 872 F.2d 1248 (6th Cir.), cert. denied, 493 U.S. 977 (1989);  Watt v. City of Richardson Police Department, 849 F.2d 195 (5th Cir. 1988); Walsh v. Franco, 849 F.2d 66 (2d Cir. 1988); Weber v. Dell, 804 F.2d 796 (2d Cir. 1986), cert. denied, 483 U.S. 1020 (1987); Ward v. San Diego County, 791 F.2d 1329 (9th Cir. 1986); Jones v. Edwards, 770 F.2d 739 (8th Cir. 1985); Stewart v. County of Lubbock, 767 F.2d 153 (5th Cir. 1985), cert. denied, 475 U.S. 1066 (1986); Giles v. Ackerman, 746 F.2d 614 (9th Cir. 1984), cert. denied, 471 U.S. 1053 (1985); Hill v. Bogans, 735 F.2d 391 (10th Cir. 1984); Mary Beth G. v. City of Chicago, 723 F.2d 1263 (7th Cir. 1983); Logan v. Shealy, 660 F.2d 1007 (4th Cir. 1981), cert. denied, 455 U.S. 942 (1982).

arraignment was held in the District Court Building, which was connected to the Detention

Center by a pedway. The pedway opened into a holding cell adjacent to the courtroom. Plaintiff,

along with other detainees, walked across the pedway and was placed in the holding cell, where

he had access to his attorney. He was then arraigned in the courtroom, where members of the

general public were present. After his arraignment, plaintiff was placed back into the holding

cell until all arraignments were completed.

Following his arraignment, Mr. Richerson was subject to a strip search. This search

involved Plaintiff removing his jumpsuit and any other clothing. While naked, he and other

detainees were made to lift up their arms, open their mouths, lift their tongues, run their fingers

through their hair, turn from side to side, lift their genitals and turn around, bend over and spread

their buttocks for inspection, and show the bottoms of their feet. Mr. Richerson was then

returned to the Detention Center, where he was placed back in the general population.

The Court noted that the County strip searched prisoners only after they had intermingled

with other prisoners and had outside access to attorneys and others. The Court upheld the

constitutionality of the blanket strip search policy. The Court held that,

> in circumstances like those presented here, where pretrial detainees, including
> those charged with minor, nonviolent offenses, **are kept in a detention center's**
> **general population prior to arraignment, and are thereafter put in a position**
> **where exposure to the general public presents a very real danger of**
> **contraband being passed to a detainee**, a policy of strip searching the detainees
> upon their return from the courthouse and prior to their being placed back in the
> general population of the detention center is both justified and reasonable. The
> Court determined that the detention center's legitimate security interests
> outweigh[ed] the detainees' privacy interests in such a situation.

Richerson, supra, at 307 (emphasis added). See also Dobrowolskyj v. Jefferson County, 823

F.2d 955, 959 (6th Cir. 1987)(upholding constitutionality of strip search of non-serious offenders

because County's policy was "a more narrowly drawn policy of searching only those detainees who were required, by force of circumstance, to be moved into the general jail population. . . . The security interests of the jail in conducting a search at this point were strong. [Plaintiff] was about to come into direct contact with the general jail population, including prisoners who would then be moved into all sections of the jail.  The jail had legitimate interests in preventing the flow of contraband into the other sections of the jail."); Simenc v. Sheriff of DuPage County, 1985 WL 4896, slip op. at *3 (N.D. Ill. 1985) ("The policy considerations for conducting strip-searches when detainees have had outside contacts are more compelling than in the case of initial searches of traffic and misdemeanor detainees.  When detainees are being transferred from detention facilities to make court appearances there is a legitimate interest in locating contraband that might threaten the safety of transferring police officers or the court." Simenc at *3 (citing Dougherty v. Harris, 476 F.2d 292 (10th Cir. 1972), cert. denied, 414 U.S. 872 (1972)).

In a similar case, Roscom v. City of Chicago, 570 F.Supp. 1259 (N.D. Ill.1983), Ms. Roscom was charged with deceptive practice when she wrote a number of checks that had been dishonored by her bank.  She was taken to the City jail but later transferred to the County jail, where she was subjected to a strip search pursuant to the County's policy.  The policy allowed such searches either when there was a reasonable suspicion that the inmate might have a weapon or contraband, **or when inmates were moving into or out of "high risk areas,"** e.g., from the holding cells to the general jail population.  She was taken to a room with other females, all of whom were ordered to line up in single file and take off their clothes.  After a frontal visual search by the matron, Ms. Roscom was instructed to turn around, spread her legs and bend over for a visual genital area search.  Only women were in the room when the searches took place, and

at no time during the search did anyone touch Ms. Roscom.

The Court applied the Bell balancing test and, noting that the strip search procedure was a legitimate one to insure the security of the County jail, upheld the search.  The Court stated that "[i]rrespective of the crimes [with which the detainees were charged], [the] County [jail] may reasonably consider any of them could be carrying weapons or contraband, either brought with the detainee into the County Jail or procured from other persons in the holding cell."  Roscom, supra, at 1262.  The Court also noted that the County had a legitimate interest in the security of its jail, the strip search was carried out by same-sex personnel, and in a separate room.  The strip search was, therefore, constitutionally permissible.

In balancing the government's need for a particular search against the invasion of personal rights that the search entails, courts have consistently recognized that the general threats posed in the jail context may outweigh an individual's privacy interests.  In other words, these courts have recognized that jail officials are not necessarily required to have a particularized suspicion that a specific arrestee is concealing weapons, drugs, or other contraband before a search will be found reasonable and constitutional.

For example, in Gary v. Sheahan, 1998 WL 547116 (N.D. Ill. 1998), the Court examined the constitutionality of strip searches conducted on female detainees after they had been ordered released from custody by a judge.  The Court explained the balancing test as follows:

> [I]f jail security is to justify the search the detainee must present some threat to jail security.  The facts in the cases where searches have been upheld suggest some reasonable cause on the part of the authorities to suspect that the detainees might be trying to smuggle weapons or contraband into the jail. . . .  A person detained for violent crime may presumptively be suspected of carrying a weapon.  However, when an arrestee is being detained briefly awaiting the posting of bond on a traffic or misdemeanor offense, generally a strip-search can be made only on

reasonable suspicion that the arrestee is carrying or concealing a weapon or contraband **unless authorities can demonstrate that misdemeanants regularly pose a threat to jail security**.

Gary, 1998 WL 547116 at *13 (citing Simenc v. Sheriff of DuPage County, 1985 WL 4896 at *3) (emphasis added).  See also N.G. v. Connecticut, 382 F.3d 225 (2nd Cir. 2004) (upholding strip search of juveniles upon initial admission to a detention facility); Smith v. Montgomery County, 643 F.Supp. 435, 439 (D. Md. 1986) ("This 'blanket risk' approach implicit in the Fourth Amendment balancing test makes particular sense in the jail context because of the magnitude of risks involved."); Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir. 1984) ("the County has not demonstrated that its security interests warrant the serious invasion of privacy inflicted by its policy" – implicitly recognizing class versus individualized suspicion analysis), cert. denied, 471 U.S. 1053 (1985); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1273 (7th Cir. 1983) (same).

This Court has upheld the policy requiring a reasonable suspicion to strip search detainees.  Citing various authorities, the Court has said "'strip searches are violative of the Fourth Amendment when applied to *all* arrestees, Stewart v. Lubbock County, Texas, 767 F.2d 152 (5th Cir. 1985), or if only females are subjected to strip search, when similarly situated males are not searched, Mary Beth G. 723 F.2d at 1263, or if all arrestees, even those charged with minor traffic offenses, are routinely searched, Giles v. Ackerman, 746 F.2d 614 (9th Cir. 1984), cert. denied, 471 U.S. 1053 (1985).'"  Doe v. Berberich, 704 F.Supp. 269, 271 (D.D.C. 1988) (search following arrest for possession of marijuana did not violate Fourth Amendment).  The Court went on to say that there must be a "reasonable suspicion that the category of offenders subject to strip searches might possess weapons or contraband." Id.  In the Doe case, even though

-13-

the offense (possession of a controlled substance) was a misdemeanor, there was reasonable cause to believe that the detainees possessed contraband, therefore, a strip search was within the bounds of the Fourth Amendment. Id. at 272. Further, the Court followed Bell v. Wolfish, and said that "even 'visual' body cavity searches of federal pretrial detainees can be conducted on less than probable cause so long as the search is conducted in a reasonable manner." 441 U.S. at 560 (emphasis added).

Thus, under applicable case law, although individualized suspicion is required for prisoner strip searches in many circumstances, it is not clear that a blanket strip search policy is unconstitutional where the circumstances indicate a real security risk if all prisoners are not searched. Based on the decisions discussed above, although individualized suspicion is required for prisoner strip searches in many circumstances, a blanket strip search policy is deemed constitutional where the circumstances indicate a real security risk unless all prisoners, or a certain category of prisoners, are searched. Therefore, Defendant Dillard submits that it was not apparent that a blanket strip search policy was unconstitutional.

In light of the case-specific nature of the fourth amendment analyses undertaken in these cases, and the unique circumstances of the D.C. Superior Court cellblock, Mr. Dillard respectfully submits that it was not clearly established that the search policy at issue violated the Fourth Amendment. The foundation for this conclusion is as follows:

Assuming the truth of the allegations of the Amended Complaint, the searches conducted were consistent with the Bell factors of reasonableness in scope, manner, justification and place. Plaintiffs do not allege that the arrestees searched were required to remove all of their clothing, but instead to lower only that clothing sufficient to determine that he was not secreting weapons

-14-

or contraband.  Amended Complaint, ¶ 23.  The searches were conducted is a manner so as to

unnecessarily to embarrass or humiliate the arrestee to the extent that only men were in the area,

and were as minimally intrusive as possible consistent with jail security.  The searches were

conducted only by same-sex personnel.  Id., ¶¶ 10, 22-23.

     The facts and circumstances surrounding the searches, as alleged in the Amended

Complaint, were unique and distinguishable from those cases in which the courts have required

individualized reasonable suspicion to believe that an arrestee is carrying weapons, contraband,

or other drugs to justify a search.  Those cases generally involved new arrests in which police

took arrestees directly to the jail and subjected them to strip searches.  In contrast, here MPD

delivered hundreds of arrestees to the D.C. Superior Court after hours of being intermingled with

other arrestees, many of whom attempted to hide their identities from the police, and prisoners

had had a lengthy opportunity to secret contraband in the orifices of their bodies.  See Amended

Complaint, ¶¶ 1, 4a, 5a, 6a, 11-12, 17-20, 23a, 23e.

     To say that "[a] detention facility is a unique place fraught with serious security dangers

[and that] [s]muggling of money, drugs, weapons, and other contraband is all too common an

occurrence," Bell 441 U.S. at 559, is to understate drastically the conditions at the D.C. Superior

Court.  The amount and nature of contraband recovered at the USMS cellblock, including from

body cavities, is staggering and the danger is real.  The prisoners received at the USMS cellblock

run the gamut from "protester" to violent sociopath.  They invariably have had contact with each

other and even the most innocent looking can be preyed upon or be a threat. See e.g., Amended

Complaint, ¶ 23e ("Plaintiffs. . . were in close physical proximity to other arrested persons as

well as law enforcement over a period of hours prior to the strip search. . ."). Likewise, the

-15-

USMS is informed little about the history or character of each prisoner received.[5]  Thus, the only

reliable way to assure security in this high-risk environment is to take reasonable steps to ensure

security.  On the unique facts presented here, Defendant Dillard believes that the circumstances

in the cellblock pose a sufficient danger to justify the blanket squat searches of prisoners utilized

at the USMS cellblock of the District of Columbia Superior Court, even if specific additional

facts are not yet known to provide more of an individualized suspicion that a particular prisoner

was secreting weapons, drugs, or other contraband.

The searches allegedly conducted, which were less than full strip searches, were

reasonable, such that the officials involved could not be found to have been violating a "clearly

established federal statutory or constitutional right" of the detainees. The officers were following

clearly established USMS procedures.

## II.  Statute of Limitations

Plaintiff contend that the three-year statute of limitations applies here, because all Bivens

claims are like personal injury claims.  Plaintiffs are correct that "Bivens claims are not a form of

claim grounded in statute, but solely in case law."  Plaintiffs' Opp. at 16.  This is precisely why

the Supreme Court's statutory analysis in Wilson v. Garcia, 471 U.S. 261, 271-72 (1985), does

not apply outside of a Section 1983 claim.  See also Defendants' Mem. at 15 fn.4.

Plaintiffs claim that they were strip searched without lawful authority while they were in

---

[5]  As Plaintiffs seem to recognize, see Amended Complaint, ¶ 27 (excluding violent
arrestees from class), the Courts have held that it is proper to search a violent criminal.  If
plaintiffs refuse to provide their names, the Marshals cannot rule out the possibility that they
have violent criminal histories, regardless of what the arresting charge is.  At the least, the
absence of clearly established law in this area is determinative of the qualified immunity issue.

physical custody of the defendants.  <u>See</u> Amended Complaint, ¶¶ 19-25.

> A defendant is liable for assault if he (1) acts intentionally (2) to cause harmful or offensive contact with another person or imminent apprehension of such a contact, and (3) the other person is thereby put in such imminent apprehension.  <u>Rogers</u> v. <u>Loews L'Enfant Plaza Hotel</u>, 526 F.Supp. 523, 529 (D.D.C. 1981).  Defendants contend that the plaintiff failed to state a cause of action for assault since the record revealed that the strip search and visual body cavity search were consensual.  The plaintiff's affidavit states that she refused to consent to either search.  Whether the search was consensual is immaterial to the Court's analysis given the Court's conclusion that the search was reasonable and, therefore, the defendants had authority to conduct the search. Legal authority to conduct the search is a valid defense to a claim of assault.  The Court, therefore, shall dismiss the plaintiff's claim for assault.

<u>Profitt</u> v. <u>District of Columbia</u>, 790 F.Supp. 304, 310 (D.D.C. 1991).  Under District of Columbia law, an assault is an intentional and unlawful attempt or threat, either by words or acts, to do physical harm.  <u>Haim</u> v. <u>Islamic Republic of Iran</u>, 425 F.Supp.2d 56, 70 (D.D.C. 2006).  Such a threat is apparently what Plaintiffs seek to rely on to support their claim that they were forced to undergo a strip search.  <u>See</u> Amended Complaint, ¶¶ 23-25.  Thus, although an assault claim for a strip search cannot succeed if the search was authorized, this Court has suggested that an unlawful strip search could otherwise constitute an assault.  <u>Profitt</u> v. <u>District of Columbia</u>, 790 F.Supp. at 310.  This is precisely why the claims that Plaintiffs put forth are most like the tort of assault.[6]  Because Plaintiffs' allegations constitute actions for assault, they may not be brought after the expiration of the one-year period specified in D.C. Code § 12-301(4). <u>See</u> <u>Doe</u> v. <u>United States Department of Justice</u>, 753 F.2d 1092, 1114 & n.28 (D.C. Cir. 1985) (likening Due Process claim to defamation, and applying one-year limitations period).  Plaintiffs attempt to

---

[6]  Indeed, Plaintiff have recognized precedent calls for the Court to assess whether "the nature of the <u>Bivens</u> claim is closely analogous to a claim specified elsewhere in the D.C. [statute of limitations]" Plaintiffs' Opp. at 16 (<u>citing</u> <u>Hobson</u> v. <u>Wilson</u>, 737 F.2d 1 (D.C. Cir. 1984)).

liken this case to a dissimilar Fourth Amendment case, Weaver v. Bratt, Civil Action No. 00-

01099 RCL (D.D.C.).  See Plaintiffs' Opp. at 16-17 .  Weaver, did not involve a forced "strip

search" of a person, but a search of an office.  Weaver v. Bratt  421 F.Supp.2d 25, 37 (D.D.C.

2006).  Weaver thus offers no insight on whether a strip search is or is not most closely

analogous to a common law assault, a tort against the person rather than property.  See Palmer v.

King  41 App.D.C. 419, 422, 1914 WL 21732  (D.C. Cir. 1914)  (discussing claim that U.S.

Marshal pushed the plaintiff, and noting that "[t]he suit is not for trespass *quare clausum fregit*,

but for trespass upon the person of the plaintiff").  Thus, Plaintiffs' Bivens claims are most

closely analogized to an assault, which would be governed by a one-year limitations period.

## III.  Standing

The named Plaintiffs suggest that they would have standing to represent others, even if

the named Plaintiffs' refusal to reveal their names upon arrest subjected them to lawful strip

searches.  The case they cite is distinguishable from the instant action.  Although Friends of the

Earth v. Laidlaw Environmental Services, 528 U.S. 167 (2000), mentions the three prong-test

identified by plaintiffs, the facts of the case involved an association which the Court determined

to have standing to bring a "suit on behalf of its members when its members would otherwise

have standing to sue in their own right, the interests at stake are germane to the organization's

purpose, and neither the claim asserted nor the relief requested requires the participation of

individual members in the lawsuit."  Id. at 181.  Here, however, the named plaintiffs are not

members of an association and cannot so easily establish a common interest or claim with

persons who did not hide their identities to the marshals when the law requires otherwise.

Consequently, the Supreme Court's holding in Hansberry v. Lee, 311 U.S. 32, 45 (1940), is more

applicable.  There, the Court concluded that the "selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent, does not afford that protection to absent parties which due process requires." Id.; cf. In re Mutual Funds Fee Litigation, 388 F.Supp. 2d 451, 461 (D.N.J. 2005) (plaintiffs bringing suit against defendant as a result of being the shareholders in three funds lacked standing to assert claims on behalf of other investors involved with any of the defendant's 100 other funds).  If the named Plaintiffs cannot bring a valid claim because they were properly searched, then they cannot represent others who were allegedly improperly searched.

## IV.  Section 1983

Plaintiffs argue that proceeding against the marshals under 42 U.S.C. § 1983 is permissible, because the marshals were acting at all relevant times under color of District of Columbia law.  Plaintiffs assert the erroneous proposition that the marshals acted in concert with, or as agents of, the District of Columbia in keeping custody of pre-arraignment detainees in the D.C. Superior Court system.  With respect to the custody of detainees, under these circumstances, the Marshal's authority stems from federal law.  The Marshals Service was created by act of Congress as a bureau within the United States Department of Justice and the Marshal for the Superior Court of the District of Columbia  serves "under the authority and direction of the Attorney General." 28 U.S.C. § 561(a).  The Marshal's "primary role and mission [are] ... to provide for the security and to obey, execute, and enforce all orders" of the federal courts.  28 U.S.C. § 566(a); 28 C.F.R. § 0.111.  While Marshals Service deputies are responsible for custody of District of Columbia prisoners and the safety of court officers, see 28 U.S.C. §

566(e)(1)(A), their day-to-day operations remain under the supervision of the federal government.  Congress also has prescribed by legislation specific duties and powers of the Marshal in conjunction with operations of the correctional and judicial systems within the District of Columbia.  The Act of July 29, 1970, Pub. L. 91-358, codified as D.C. Official Code § 11-1729 (2001 ed.) (hereafter "D.C. Code"), provides that the Marshal for the District "shall continue to serve the courts of the District of Columbia, subject to the supervision of the Attorney General of the United States" (emphasis added).  The Act of March 3, 1901, 31 Stat. 1379, ch. 854, § 1193, codified as D.C. Code § 24-201.13, provides that nothing in certain cited statutory provisions (not otherwise pertinent to the present case) "shall be construed to impair or interfere with the authority of the Marshal of the District to commit persons to the Jail or to produce them in open court or before any judicial officer when thereto required".  The same 1901 Act of Congress, in § 1194, as amended (according to the codifier's note) 201.14, provides that it shall be the duty of the jailer, "to receive prisoners and to deliver them to the Marshal or his duty authorized deputy, on the written request of either, for the purpose of taking them before any court or judicial officer," as provided in the immediately preceding subsection.  Nothing in these statutes undid the Federal authority under which the USMS operates in the Superior Court.  See 28 U.S.C. § 561(c) ("The President shall appoint, by and with the advice and consent of the Senate, a United States marshal for each judicial district of the United States and for the Superior Court of the District of Columbia . . .") (emphasis added).  Section § 561(c) clearly has applicability outside of the District of Columbia; indeed, it has applicability in "each judicial

district. . . ."  28 U.S.C. § 561(c).[7]  Thus, the statute cannot be considered an "Act of Congress

applicable exclusively to the District of Columbia," such that it would qualify as a statute of the

District of Columbia for purposes of 42 U.S.C. § 1983.

Taken together, the above-cited provisions authorize the Marshal to take custody of

detainees and to exercise custody over them once they are delivered to his care for conveyance to

the court.  The transportation of such prisoners has historically included their transportation to

locations outside of the District of Columbia.  See e.g., United States v. District of Columbia,

897 F.2d 1152, 1156 (D.C. Cir. 1990) (noting that DC prisoners were typically transported to the

workhouse at Occoquan, and the reformatory at Lorton for the express purpose of housing those

persons convicted of crimes in the District and those persons detained prior to trial in the courts

of the District of Columbia).  Accordingly, even if authority were somehow deemed to be limited

to the provisions set out in the District of Columbia Code, those provisions would have

applicability outside of this district and would not qualify as a statute of the District of Columbia

for Section 1983 purposes.

Significantly, no provision is made in any of the foregoing statutory provisions for the

District's control or participation in the exercise of custody over persons thus committed to the

Marshal's custody.  Nor does the District of Columbia have any authority over the Marshal's

handling of security for detainees in the Superior Court cellblock.

The Memorandum Of Understanding ("MOU") alluded to by Plaintiffs does not provide

the legal authority for the Marshal to provide security for the Superior Court cellblock, and could

---

[7]  It bears noting that the judges in Superior Court are also appointed by the President of the United States.  See D.C. Code § 11-1501.

not constitute "law" such that the Marshal could be said to act under color of state law when he acts under an MOU. The District of Columbia has not contracted its authority or retained the Marshal to act as the District's agent. Nor do the acts of Congress make any provisions for the District's exercise of control over security practices. And, the Marshals Service advises that Defendants have already provided the only relevant policy to maintenance of security with respect to detainees in the Superior Court cellblock, i.e., USMS Policy Directive 99-25. There is no basis from which to conclude that the defendants acted in concert with or conspired with the District in establishing or implementing this policy, and Plaintiffs do not allege that Policy Directive 99-25 was instituted in concert with the Government of the District of Columbia.

Plaintiffs seek to rely on Estate of Brooks ex rel. Brooks v. United States, 197 F.3d 1245 (9th Cir. 1999), for the proposition that Section 1983 claims have proceeded against U.S. deputy marshals. See Plaintiffs' Opp. at 19. In Brooks, however, the Court specifically noted that a settlement had been reached with the United States on at least one claim, and that the claims against the deputy marshals had been dismissed. 197 F.3d at 1247. It offers Plaintiffs no support to say that a Section 1983 claim has been filed against federal employees acting under color or federal law if the claim is dismissed. The second case cited by Plaintiffs on this point (see Plaintiffs' Opp. at 19) actually stands for the opposite proposition. See Wilson v. Blankenship, 163 F.3d 1284, 1288 (11th Cir. 1998) ("a Bivens case challenges the constitutionality of federal officials' conduct, while § 1983 challenges the constitutionality of state officials' conduct."). Similarly, Plaintiffs' reliance on Cunningham v. Eyman  11 F.Supp.2d 969, 975 (N.D. Ill. 1998) is misplaced. That Court was never called upon to address the application of Section 1983, and in the case the Plaintiff also relied upon a Bivens theory of liability. See 11 F.Supp.2d at 975

("Cunningham asserts, that in <u>Bivens</u> v. <u>Six Unknown Named Agents of the Federal Bureau of Narcotics</u> the Supreme Court permitted lawsuits against federal officers for constitutional violations. . .").   Plaintiffs concede that the <u>McNally</u> case upon which they rely, applied only because the Federal marshal was found to have acted outside of his federal duties.  Plaintiffs' Opp. at 19-20 (<u>citing</u> <u>McNally</u> v. <u>DeWitt</u>, 961 F.Supp. 1041 (W.D. Ky. 1997)).  Here, however, Plaintiffs specifically allege that the defendants were "acting in their capacity as U.S. Marshal for the District of Columbia  Superior Court and deputy U.S. Marshals. . ."  Amended Complaint, ¶ 33.  Thus, <u>McNally</u> would not apply.  Finally, Plaintiffs rely on dicta in <u>Brown</u> v. <u>Stewart</u>, 910 F.Supp. 1064 (W.D. Pa. 1994), another case in which the Court's analysis again noted that the claim was also supported by a <u>Bivens</u> theory.  <u>Brown</u>, 910 F.Supp. at 1069.[8]  The great weight of authority does not support a Section 1983 claim when a federal actor is acting under color of federal law.

> There is no valid basis for a claim under section 1983, in that [plaintiff's] allegations are against federal officials acting under color of federal law. Section 1983 provides a remedy only for deprivation of constitutional rights by a person acting under color of law of any state or territory or the District of Columbia.  <u>See</u> <u>Broadway</u> v. <u>Block</u>, 694 F.2d 979, 981 (5th Cir. 1982).  Thus, the only possible action is an action under the authority of <u>Bivens</u>.

<u>Daly-Murphy</u> v. <u>Winston</u>, 837 F.2d 348, 355 (9th Cir. 1987); <u>accord</u> <u>Broadway</u> v. <u>Block</u>, 694 F.2d 979, 981 (5th Cir. 1982) (The individual defendants in this suit are federal officials, acting under color of federal law rather than state law, and are not subject to suit under § 1983); <u>Billings</u> v. <u>United States</u>, 57 F.3d 797, 801 (9th Cir. 1995) (assuming that federal employees, like private individuals, can act under color of state law if they conspire or act in concert with state officials

---

[8]  The Docket Sheet in the <u>Brown</u> case shows that the claims were later dismissed.  <u>See</u> January 31, 1997 Docket Entry in <u>Brown</u> v. <u>Stewart</u>, Civil Action No. 2:95-cv-00863-RJC (W.D. Pa.).

to deprive a person of her civil rights, federal agents act under color of state law only when the wrongdoer is clothed with the authority of state law, and here the action was initiated and effected solely by the Secret Service Agents pursuant to the procedures and protocols of their agency, allowing for no Section 1983 action).

Plaintiffs appear to concede that "U.S. Marshals are federal agents who are employed, supervised, and paid by a federal agency." Plaintiffs' Opp. at 21. Still, they attempt to argue that defendants acted under color of DC law by reliance on several provisions of the District of Columbia code. See id. at 22; Amended Complaint, ¶ 41. A review of those statutes, however, makes clear that they offer no support for Plaintiffs' assertion. The first such statutes, D.C. Code §§ 13-302 and 16-703, simply deal with service of process in civil and criminal cases respectively. A statute that assigns duties to an individual does not necessarily cloak them with authority as is required for Section 1983 liability, but Mr. Dillard is not alleged to have been serving process at the time of the events at issue in the Amended Complaint anyway. Nor does D.C. Code § 23-501 apply to the allegations in the Amended Complaint; rather it defines a law enforcement officer for purposes of determining who may apply for a search warrant (subchapter II of the Chapter of the Code), to whom an arrest warrant may be directed (subchapter IV), and who may make arrests without an arrest warrant (subchapter V). See D.C. Code §§ 23-521, 23-561(c), and 23-581. Mr. Dillard is not alleged to have applied for or been provided any arrest warrants, nor is he alleged to have arrested plaintiffs without a warrant. Thus, D.C. Code § 23-501 does not apply. Finally, Plaintiffs cite D.C. Code §§ 561 and 581, the provisions referenced in § 23-501, but as noted above, those sections apply only to a law enforcement officer receiving or making arrests. Defendants are not alleged to have arrested the plaintiffs, but only to have assisted in "police operations" (Amended Complaint, ¶ 40) by "assum[ing] and retain[ing] custody of the plaintiffs . . . following their custody of the D.C. Police." Amended Complaint, ¶ 46. These actions simply do not fall under the District of Columbia laws relied upon by the Plaintiffs. Accordingly, Plaintiffs' 1983 claim should be dismissed.

V.  Discovery.

Rule 56(f) is intended to provide "an additional safeguard against an improvident or

premature grant of summary judgment . . . ."  10A Wright, Miller, & Kane, Federal Practice and

Procedure, § 2470 at 532 (1983).  To succeed in delaying consideration of a motion for summary

judgment to permit discovery pursuant to Rule 56(f), a party must, inter alia, "articulate a

plausible basis for the belief that discoverable materials exist which would raise a trialworthy

issue."  Price v. General Motors Corp., 931 F.2d 162, 164 (1st Cir. 1991).  The decision of

whether to permit further discovery before ruling on a motion for summary judgment is

committed to the discretion of the district court.  See White v. Fraternal Order of Police, 909 F.2d

512, 517 (D.C. Cir. 1990).  But, as noted above, discovery in this action should not be permitted,

particularly in the face of the qualified immunity issue under consideration and the significant

interests in avoiding the disruption that discovery causes.  See Crawford-El, 523 U.S. at 590.

To satisfy Rule 56(f), a non-movant must describe a need for "facts essential to justify the

party's opposition" to a motion for summary judgment.  Fed. R. Civ. P. 56(f).  See also Exxon

Corp. v. FTC, 663 F.2d 120, 128 (D.C. Cir. 1980) (upholding district court's denial of motion

under Rule 56(f), court explained that "[plaintiff] has failed to show the requested discovery was

necessary to oppose [defendant's] summary judgment motion.  It is not the intent of Rule 56 to

preserve purely speculative issues of fact for trial . . . .");  see also Union City Barge Line, Inc. v.

Union Carbide Corp, 823 F.2d 129, 136-38 (5th Cir. 1987); Ortiz Cameron v. DEA, 959 F. Supp.

92, 93-94 (D.P.R. 1997) (requiring plausible basis to believe that discoverable materials exist

that would likely raise genuine issue of material fact), aff'd, 139 F.3d 4 (1st Cir. 1998); Mason

Tenders Dist. Council Pension Fund v. Messera, 958 F. Supp. 869, 894 (S.D.N.Y. 1997)

(opponent of motion failed to identify what information  was sought and how it could be

obtained); City of Rome v. Glanton, 958 F. Supp. 1026, 1039 (E.D. Pa.), aff'd mem., 133 F.3d

909 (3d Cir. 1997) (court may deny continuance motion when it was based on speculation or

raises merely colorable claims); Theotokatos v. Sara Lee Personal Prods., 971 F. Supp. 332, 343

(N.D. Ill. 1997) (Rule requires specific assertions that could produce genuine issue of material

fact, not mere speculation).  And, the party seeking discovery must alert the Court to the need for

further discovery and demonstrate how additional discovery will enable it to rebut the movant's

allegations of no genuine issue of fact. Richardson v. NRA, 871 F.Supp. 499, 501 (D.D.C. 1994).

     The material facts posited in support of summary judgment in this action are limited to:

1) when the claim accrued, which is set forth in the Amended Complaint, 2) when this suit was

filed, of which the Court may take judicial notice, 3) whether the named Plaintiffs withheld their

true identities when arrested, and 4) whether when the named Plaintiffs were arrested, they had

been participating with hundreds of persons in a mass protest in the District of Columbia, which

had been touted as an effort to shut down the city.  Statement of Material Facts, ¶¶ 1-4.  Plaintiffs

have provided no basis upon which to conclude that they cannot offer evidence to contradict

these facts, if there existed any contradictory evidence.  The dates are in the pleadings, and the

named Plaintiffs were present when they were arrested and asked for their names.  The only

additional fact is that the demonstration was claimed to be an effort to shut down the city.

Plaintiffs' own exhibit buttresses the conclusion that statements were made that the city would be

shut down.  See Plaintiff's Opp., Exhibit 2 at 54-55 (Docket No. 34-3 at pages 64-65 of 166)

(noting that the Chief of Police stated to the press on the day of Plaintiffs' arrests:"For the last

four months, these folks been talking about shutting down the city.").  It is of no moment that the

claims were true or not true.  They were made, repeated by the Chief of Police and, thus, would

have been part of any law enforcement officer's concerns, if, as Plaintiffs allege, that law

enforcement officer was among those who "act[ed] as agents of, or in joint action with, the

District of Columbia for the purposes of assisting the D.C. police in the conduct of police

operations during the mass protests which occurred on September 27, 2002." Amended

Complaint, ¶ 40.

 Because the areas that Plaintiffs claim they require discovery are not essential to resolve

the pending motion, and given the interests in avoiding discovery in cases involving qualified

immunity, Plaintiffs' request for discovery should be denied.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, DC Bar #451058
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing Reply To Plaintiff's Opposition To Defendants' Motion To Dismiss Or, In The Alternative, For Summary Judgment And Response To Plaintiffs' Motion To Take Discovery Pursuant To FRCP Rule 56(f) And Stay Consideration Of Defendants' Motion To Dismiss has been made through the Court's electronic transmission facilities on this 21st day of July, 2006.

_____

W. MARK NEBEKER
Assistant United States Attorney
555 4th Street, N.W.
Civil Division
Washington, DC  20530
(202) 514-7230