UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAUL BAME, et al., | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 05-1833 RMC |
| | ) |
| JOHN F. CLARK, et al., | ) |
| Acting Director, | ) |
| U.S. Marshals Service, | ) |
| | ) |
| Defendants. | ) |

PLAINTIFFS' RESPONSE TO
FEDERAL DEFENDANTS' FIRST DISCOVERY REQUESTS

Plaintiffs Paul Bame, Greg Keltner, Ivan Welander, John Joel Duncan, and Nicolas

Church hereby respond as follows to Federal Defendants' First Discovery Requests.

OBJECTIONS

Plaintiffs respond to Defendants' discovery requests subject to the accompanying

objections and also submit these responses to the document request subject to, without intending

to waive, and expressly preserving: (a) any objections as to competency, relevancy, materiality,

and admissibility of any of the responses; and (b) the right to object to other discovery

procedures involving and related to the subject matter of the document requests to which they

responds herein.  Plaintiffs object to Defendants' discovery requests to the extent that they seek

attorney work product, trial preparation material, or communications protected by the attorney-

client privilege, or any applicable privilege.  Moreover, Plaintiffs object to the extent that

Defendants' discovery requests could be read to require an additional effort to search for or

uncover responsive information on the basis that the requests are overly burdensome and unlikely

to lead to the discovery of admissible evidence.  Each and every response to these discovery

requests is made subject to the foregoing General Objections, regardless of whether a General

Objection or a specific objection is stated in the response. The explicit reference to a General

Objection or the making of a specific objection in response to a particular request for documents

is not intended to constitute a waiver of General Objections that are not specifically referred to in that response.

INTERROGATORIES

Interrogatory No. 1.

Identify what, if any, harm those named Plaintiffs or putative class members suffered as to whom the USMS had reasonable suspicion or probable cause to search.

RESPONSE:

USMS personnel had no reasonable suspicion or probable cause for any search of any member of the proposed class, and no member of the proposed plaintiff class was searched by USMS staff pursuant to a reasonable suspicion or probable cause to search.

Interrogatory No. 2.

Indicate whether any of the following characteristics describe, or whether any of the following actions were taken by, you or any of the named Plaintiffs or putative class members, and for each that applies, describe in detail the applicable circumstances:

Interrogatory No. 2 .a. Used or gave a false name or failed to identify themselves.

RESPONSE:  All named plaintiffs refused to identify themselves to MPD personnel or the USMS personnel.  There are class members who provided their names to MPD personnel prior to being strip searched by the USMS personnel, and their names are included in the lock up list.

Paul Bame states that he refused to provide his name to MPD personnel, but did provide his name to attorneys representing him at arraignment and to the court before and during his court hearing prior to his release following the arrest for the protest.

Greg Keltner states: At the protests on September 27, 2002, I was arrested early that morning, then brought to the overflow facility (Police Academy building), at which I was processed—written a citation, had my picture and fingerprints taken, and so on. Around

-2-

midnight, we were taken from the overflow facility to a courthouse downtown, where we spent the night. I was "booked", in the late morning or early afternoon of September 27, 2002 by the District of Columbia Metropolitan Police Department (MPD), together with other men arrested with me. I did not provide my name to the MPD. During my booking, the MPD staff relieved me of my backpack which did not contain any personal identification materials, as well as the backpacks and any personal identification of all the arrestees with me. Our backpacks were later returned to me and to the other arrestees by the MPD officers. I was permitted to be released by a judge of the Superior Court on the evening of September 28, 2002 in part because the police officials said that my arrest records had been misplaced or lost. The deputies misplaced the arrest documents and other papers needed for processing by the court of my case and so I was simply released without any obligation to return. In fact, I never was asked to appear before a judge, but was instead simply released by the deputy marshals.

Ivan Welander states: When I was booked by the MPD, I did not give my name and they listed me as a John Doe. Later, I did give my name to an attorney seeking to represent me in the court hearing, while I was in the custody of the USMS. I never appeared before a judge, but was released on September 28, 2002 in part because the police officials said that my arrest records had been misplaced or lost. The deputies misplaced the arrest documents and other papers needed for processing by the court of my case and so I was simply released without any obligation to return.

Nicholas Church states: I did not ever provide my name to MPD or the USMS staff. Following my arrest in downtown D.C. by MPD staff, while on the bus, a fellow-arrestee stood and announced that many of us were going to do jail solidarity, refusing to give our names. On the bus, there were only the two of us who were going to do jail solidarity. When we arrived at the strange school, an MPD guard came on the bus and warned us, something to the effect of "This is D.C. If you think you're going to get out of jail without giving your name, think again. We'll throw you in jail forever with some huge guy named Bubba.", threatening that if we didn't

-3-

give our names, we would be raped by some fictitious cellmate. Once off the bus, we joined

hundreds of people. When a cop tried to fill out some paperwork referring to me, he asked me

where I had been arrested and I told him honestly that I did not know.  It was clear to me that

they were disorganized. They left us John and Jane Does, about 100 of us it seemed, to sit outside

for many hours (we were outside until after night fell), while they processed us.

John Joel Duncan states: From the buses taking us from where we were arrested, we were

let out onto the lawn of the Metropolitan Police Academy. I had decided beforehand that I was

not going to give my name to the MPD police. There was a desk in one of the entrances to the

Academy where an officer sat in front of piles of dollar bills. From what I understood people

were paying for their release and going home. Being a "John Doe" I was amidst the last group to

be brought into the Academy.  I did not provide my name to MPD staff.


Interrogatory No. 2 b. Misrepresented your or his identification by relying on false
identification.

RESPONSE: Named plaintiffs are not aware of any protester misrepresenting his or her
identification.


Interrogatory No. 2 c. Upon being subject to the search process in the Superior Court
cellblock, activated the magnetometer because of the presence of a
metal object in their bodies, on your or his person or in clothing
(including shoes or any type of footwear).

RESPONSE: No person of whom named plaintiffs are aware activated the magnetometer.

Defendants have provided no records of any activation of a magnetometer while members of the

class were entering the Superior Court cellblock.  Named plaintiffs already had been searched

hours previously while in MPD custody.

Interrogatory No. 2 d. Upon being subject to a pat-down search (that is, not the strip or

squat search) in the Superior Court cellblock had suspected contraband (including but not limited to drugs, drug paraphernalia, weapons, cigarettes, ink pens, etc.) on your or his person or in their clothing (including shoes or any type of footwear).

RESPONSE: No named plaintiff had any form of contraband on them during the search, and the named plaintiffs are not aware of any contraband being found on the person of any class member.

Interrogatory No. 2 e. Upon being subject to the search process in the Superior Court cellblock, your or his body bore the apparent signs of drug usage, that is, any sign including but not limited to needle "track" marks, runny or irritated nose or other nasal problems, an enlarged hand or hands or withdrawal symptoms, such as nausea, tremors or sweating.

RESPONSE:  No named plaintiff had such signs on them, and the named plaintiffs are not aware of any such signs being found on the person of any class member.

Interrogatory No. 2 f.  Upon being subject to the search process in the Superior Court cellblock, your or his behavior displayed the apparent signs of drug usage, that is, any sign including but not limited to (1) exhibiting a desire or making attempts to remove all clothing, (2) talking incoherently or making inappropriate remarks or (3) displaying behavior characterized by angry outbursts, mood swings, irritability or manic behavior.

RESPONSE:  No named plaintiff diplayed such signs, and the named plaintiffs are not aware of any such signs being found on the person of any class member.

Interrogatory No. 2 g.  At the time of your or his arrest, or any time thereafter, but before being admitted to the Superior Court cellblock, had a suspected weapon or suspected drugs or drug paraphernalia on the person or in your or his clothing (including shoes or any type of footwear).

RESPONSE:  No named plaintiff had any form of contraband on them during the search, and the named plaintiffs are not aware of any contraband being found on the person of any class member.

Interrogatory No. 3.    Identify whether, at the time of the arrest and search in the Superior Court cellblock named Plaintiffs or putative class members had pending cases in any court for any type of assault, weapons offense or drug offense, including possession of drug paraphernalia.

RESPONSE: No named plaintiff had any pending cases at the time specified and they are not aware that any class member had any such pending cases.

Interrogatory No. 4.

State whether, in the last ten years, you, the named Plaintiffs or putative class members have been arrested or charged with any type of criminal offense, describing in detail the circumstances of the arrest, the location of any criminal proceedings and the resolution of the charges.

RESPONSE: Named plaintiffs are not aware of the arrest and charge histories of members of the plaintiff class who are not named in the complaint.

Paul Bame states that he had had no arrests prior to the arrest on September 27, 2002. In November, 2003 he was arrested in Miami, Florida during an FTAA protest for "obstructing a sidewalk", and the charges dropped. In October, 2004 he was arrested in Denver, Colorado during a Columbus Day protest for "blocking street, disobeying", and the case dismissed. In October, 2007 he was arrested in Denver, Colorado for a Columbus Day protest, for "blocking street, disobeying, impeding a lawful assembly", and the case is still case pending as of the date of these responses.

Greg Keltner states that he has been charged with two misdemeanor criminal offenses. The first relates to a protest in Miami, Florida, November 20, 2003. He was charged with "resisting [arrest] without violence." He returned to Miami the following March for his trial. As the arresting officer did not appear in court, the charges were then dropped. He states that the charges were made up in the first place. The second criminal offense was in Winona County, Minnesota, in April of 2004. He was arrested for misdemeanor trespassing (for riding a freight

-6-

train). He returned the following month for court hearing. There, he pled guilty to a "petty misdemeanor" tampering with motor vehicles, which is not a criminal charge.

Ivan Welander states that he had never been arrested for any offense prior to his arrest by the MPD on September 27, 2002. Since then, he was arrested April 2, 2003 at a demonstration in Madison, Wisconsin on the charge of Resisting or Obstructing an Officer and those charges were later dismissed. On November 20, 2003 he was arrested at a demonstration in Miami, Florida and the charges were later dismissed. On August 29, 2004 he was arrested at a demonstration in New York, New York and the charges were later dismissed. On December 22, 2004 he was arrested on the misdemeanor charge of Retail Theft and he later pled no contest to a lesser ordinance violation and paid a fine.

Nicholas Church states he has never been charged, before or since that day.

John Joel Duncan states that he was arrested in Portland, Maine twice. Once in 1999 for violating a park curfew (civil disobedience, in what became a well publicized debate around spaces available for young people). Subsequently, probably 2000, he was arrested for obscuring a public way, after being told by the arresting officer that he was being arrested for making the comment 'This is what a police state looks like', which he chanted when the officer was hassling a middle-aged quasi homeless local who gave out politically charged literature on the street. In the first case (1999) the charges were he believes were effectively dropped, and he had a home visit from an officer instead, who had a conversation with himself and his mother, so that the illegality of the action for which he was arrested for would become clear to me. In the second case he performed community service for Peace Action Maine.

Interrogatory No. 5.

Identify and describe any information or evidence known to you or in your possession that the USMS had reasonable suspicion or probable cause to search you or putative class members as described in the pleadings in this action.

RESPONSE: There is no such information or evidence. Named plaintiffs were not queried by USMS personnel as to the nature of their arrests, or as to other matters that might serve as a reasonable, individualized suspicion upon which the USMS personnel might base any search.

Interrogatory No. 6.

Identify and describe in detail any and all methods used by you to determine that you and putative class members were searched by Marshals Service personnel without reasonable suspicion or probable cause.

RESPONSE: Defendants have produced no court issued warrants authorizing USMS staff to searching any member of the proposed class. Defendants discovery responses reveal no basis for an individualized suspicion with regard to any particular class member. No member of the plaintiff class was carrying any form of contraband. No member of the plaintiff class had been arrested on September 27, 2002 for, or charged with, anything more than a minor offense, such as "failure to obey".

Interrogatory No. 7.

Describe with specificity how the Plaintiffs and putative class members were placed in the custody of the U.S. Marshals Service by District of Columbia, Metropolitan Police Department (MPD) officers or other officers of the District of Columbia.

RESPONSE: As set forth in the first and second amended complaints filed herein, all the members of the plaintiff class were arrested by MPD personnel on September 27, 2002, and taken on that date to a prisoner holding facility, most often the Police Academy at Blue Plains, where they held were in the custody of MPD personnel. During the evening and night of September 27-28, MPD personnel then delivered all members of the class by bus to the Superior Court cell blocks and custody turned over, on the morning of September 28, to the USMS

personnel awaiting their appearance in D.C. Superior Court. Plaintiffs do not have the names and addresses of the USMS personnel who received them into custody from the MPD personnel. The names of the USMS personnel on duty that day are set forth in the USMS duty roster for that day.

Paul Bame states: I was arrested by officers of the Metropolitan Police Department of the District of Columbia or officers of police departments acting under the supervision of the D.C. Police at approximately 9 a.m. on September 27, 2002 at Connecticut Avenue and K Street, N.W. From there I was taken to a city bus to Blue Plains. On September 27, 2002 at about 2:30 p.m. I arrived at arrived MPD building B ("cell block B"). Our formal arresting officers were Christiansen and an African American woman, who said their shift should have been over at 2:30, but they were forced to stay until we were booked. They said they had duty the next day at 4 a.m. as they had had that day. By 11:45 p.m. and later, most of my bus was finally booked. On September 28, 2002, around five a.m. many detainees from Blue Plains arrived. At 9 a.m. on September 28, the USMS personnel took control of cell block B, where I was still being held. Later we were transferred to another facility where we were strip searched by the USMS staff.

Greg Keltner states: following my arrest at the protests on September 27, 2002, I was "booked" in the later morning or early afternoon of that day by the District of Columbia Metropolitan Police Department (MPD), together with other men arrested with me. During my booking, the MPD staff relieved me of my backpack which did not contain any personal identification materials, as well as the backpacks and any personal identification of all the arrestees with me. Our backpacks were later returned to me and to the other arrestees by the MPD officers. I was bused from the holding area after our arrest to the Superior Court cell block B, and handed over to the custody of the USMS personnel. I spent the night of the 27-28 at a certain facility. The following morning, we were taken to another facility, at which we were in the custody of the marshals, and ordered to drop our pants, squat, and cough.

Ivan Welander states: that on the morning of September 27, 2002, he was arrested by the

-9-

D.C. MPD at Vermont Avenue and K Street, N.W. He was put on a city bus and brought to the police academy in Virginia. He waited on the bus and sidewalk outside the facility until he was booked and fingerprinted at around 2 a.m. on the morning of September 28. He remained at the facility until mid-morning on September 28 when he was put on a bus with several other arrestees and transferred to an underground parking ramp at a jail. At the underground facility they were taken into custody by the US Marshals. He was directed to another room with several other male arrestees where the Marshals ordered them to face a wall, pull down their pants, squat and cough.

Nicholas Church states that: the next morning after our arrest on September 27, 2002, the guards or cops or whoever came through and read out some names, looking at pictures to identify people. These people, I presumed, were the John and Jane Does who had been identified by means of their finger prints. Then they came through with pictures of the remaining Does and lined us against a wall. After awhile, they put us on a different bus and drove us somewhere else. We weren't given any information about what was going on. They drove us into a basement, the USMS staff unloaded us, separated out the men, and then put five or ten of us in a room at a time and strip-searched us.

John Joel Duncan states that: inside the Police Academy we were brought to a gymnasium where we were put on plastic mats in groups of maybe between 5-10 persons. I had another set of plastic handcuffs tied around my ankles and a third set of cuffs connecting my ankles to my wrists. I was "hog-tied". The situation was humiliating. I felt the worst of the day must have been over and I recall lying on my back, (not being able to be in any other position), and communicating to friends in similar positions on other mattresses. The general sense was that we were in an absurd situation. I was after I know not how long taken out of the academy and put onto another bus. I remember the windows being very small. These were police, not city, busses. We were then taken to a jail and turned over to USMS staff. It might very well be that there were only males on my bus, because at the jail males were separated from females. The

-10-

males were led into the jail along a wall by the USMS staff and told to face the wall, draw down their pants and to squat while coughing.

Interrogatory No. 8.

Describe in detail the circumstances of your arrest, detention and release from custody in September 2002, including but not limited to the date and time of arrest, the date and time you were transferred into the custody of the U.S. Marshals Service, the date and time during your detention that you provided your true name to the government, the date and time you were subjected to a search that involved exposing your buttocks, and the date and time you appeared before, and were released by, a judge of the Superior Court for the District of Columbia, or, if released without appearing before a judge, the date, time and circumstances of release.

RESPONSE:

Paul Bame states:  On September 27, 2002 at approximately 9 a.m. - 9:40 a.m., I was arrested at Connecticut Avenue and K Street, N.W. and put on city bus, taken to Blue Plains.  At approximately 2:30 p.m., I arrived by bus at MPD building B ("cell block B").  At 11:45 p.m. and later, most of my bus was finally booked.  On September 28, at about 5 a.m., many detainees from Blue Plains arrived.  Two or three buses from the Police Academy unloaded at cell block B before mine.  Many people posted and forfeited as soon as they could be processed, leaving only a dozen in my cell prior to the new 5 a.m. arrivals from the Police Academy.  I have no reason to believe any were arrested at Pershing Park.  At 5:30 a.m. or so a light "breakfast" was served.  At 9 a.m., federal marshals took control of cell block B.  At about 11:30 a.m., the first bus load left Cell Block B for the court house.  After 2:00 p.m. the last bus load left for the court house.  On September 28, 6:05 p.m. deputies made the announcement in the court cell block that judge would throw out any cases remaining unheard at 6:30 p.m.  However, this did not happen.  At the court house cell block, all the men, including me, were all strip searched by having them lower their trousers and underwear, and squat down and cough.  At around 7-8 p.m., I was led to

the courtroom where I wait a long time, until I am released around 9 p.m. from the court room.

Greg Keltner states: following my arrest at the protests on September 27, 2002, I was "booked" at around midday or early afternoon of that day by the District of Columbia Metropolitan Police Department (MPD), together with other men arrested with me. During my booking, the MPD, I did not state my name, and staff relieved me of my backpack which contained no my personal identification materials, as well as the backpacks and any personal identification of all the arrestees with me. Our backpacks were later returned to me and to the other arrestees by the MPD officers. I was permitted to be released by a judge of the Superior Court in the evening of September 28, 2002 in part because the police officials said that my arrest records had been misplaced or lost. The deputies misplaced the arrest documents and other papers needed for processing by the court of my case and so I was simply released without any obligation to return. In fact, I never was asked to appear before a judge, but was instead simply released by the U.S. deputy marshals. While in the custody of U.S. Marshal Service deputies on the morning of September 28, 2002, I was ordered by the deputies to strip off all my clothes for purposes of being searched. The search involved my removal of my clothing, and squatting and coughing while being watched from behind by USMS deputies. While I was being strip searched, several other men were in the same area with me and also underwent strip searches at the same time. The area seemed to be some kind of a corridor. From my observation made while I was awaiting being strip searched, during my being searched, and immediately after the completion of my being searched, the deputies conducted strip searches of all the men arrested at the protest in several batches.

Ivan Welander states that on the morning of September 27, 2002 at approximately 9 a.m., he was arrested by the D.C. MPD at Vermont Avenue and K Street, N.W. He was put on a city bus and brought to a police academy in Virginia. He waited on the bus and sidewalk outside the facility until he was booked and fingerprinted at around 2 a.m. on the morning of September 28. remained at that facility until mid-morning on September 28 when he was put on a bus with

several other arrestees and transferred to an underground parking ramp at another jail. At the underground facility they were taken into custody by the U.S. deputy marshals. He was directed to another room with several other male arrestees where the marshals ordered them all to face a wall, pull down their pants and underwear, squat and cough. They were then put into cells with other demonstrators who had arrived at this location earlier. Around mid day he was brought with others to another smaller cell block. Here in the afternoon or early evening he saw an attorney that was appointed to him, in addition to many others, and he gave her his name. Others were being brought to a courtroom to see a judge. Later that evening on the 28th, he was transferred to yet another cell where he was told he was being released because his paperwork had been lost or misplaced. He never saw a judge, but hewas released between 8-9 p.m. on September 28, 2002 without obligation to return.

Nicholas Church states: On Saturday, September 28, 2002, he and other men were made to lower their trousers and underwear and squat down and cough while one or more USMS guards looked on. The guards burned incense in the room, making jokes and telling the protestors how horribly they smelled. He and others had numbers written on their hands. He cannot recall what his number was, but he believes it was 40 something or 50 something. Their shoelaces had been taken away from them, and they were put into remarkably small cells, each cell was about 4x8 feet, with a single bench. There were 6 or 8 of these cells in the hallway, and they stuffed all 50 or so of the John Doe protester arrestees into these cells. He shared his cell, standing room only, with probably 5 or 6 other people. Here he and the others were kept for a long number of hours. The protesters sang songs. At one point, guards came in and sprayed aerosol room- freshener, again trying to pick on Nicholas and the other protesters and demoralize them.

John Joel Duncan states: On Friday, September 27, 2002, he joined a gathering in a small park or square in the morning. The intent of the gathering was to hold a demonstration through the financial centre of Washington, D.C., so as to draw attention to our criticism of the

-13-

International Monetary Fund and the World Bank as enacting "poverty reduction" policies in the interests of large corporate interests. The gathering was small, no more than a few hundred people. The idea was to have a "snake march" through the financial district which would be highly mobile and festive. A sort of "snaking" street party. He remembers very little of the actual march itself. It did not last very long and there was generally a high level of tension due to their small numbers and the massive police presence. He is not sure if it was because it was early in the morning, or that many had been advised to take off work that day, but the demonstration felt very lonely as regards the amount of people in proximity. He remembers being apprehensive and having a sense of claustrophobia nevertheless because of the amount of law enforcement vehicles everywhere. His next memory is of being pressed up against a glass window, presumably that of a bank, on the corner of Vermont Avenue & K Street, N.W. There was a group of maybe 20 of him and the other protesters. The demonstration had at that point effectively been dispersed, or they were broken into small groups. The group he was with were held against the bank and surrounded by police. He remembers the situation being very tense. At one point a firecracker went off, and colored gas began to fill the air. The police were nevertheless aggressive but this made things worse. A projectile had pierced the window of the building they were cornered against. Those directly pushed up against the building started to shout that the glass was breaking and might fall on top of him and the other protesters. The police arrested the group one at a time. He remembers being very afraid because the people arrested before him were treated very roughly and in some cases wrestled to the ground. He was wearing a white t-shirt and sneakers. Some people were wearing all black and had their faces covered. There was also a group of people who had called themselves (somewhat jokingly) "the geek bloc" and were dressed in flannel shirts. He does not remember the details of being taken from the group except that he was not treated as roughly as he had feared. He remembers being impressed by the police operation in that they stopped city busses on the spot, evacuated all the passengers, and then placed us onto them. There was no doubt in his mind that his mass arrest

was pre-empted and coordinated in advance. His group was never going to be allowed to have a proper demonstration. The plastic handcuffs he was secured with were incredibly tight and while he was on the bus he complained of this to one of the officers. On his bus were some of the members of the "Pagan Bloc" who had twigs made into wreaths on their heads, green face paint, and baggy, earth-toned clothing. His whole group was all taken to the Metropolitan Police Academy. There were rows of buses lined up outside and more came after his. One of his friends, Josh Davidson, was further back on the same bus with him. He and Josh had been together at various points during the demonstration and had been arrested in the same place. Yet he does not remember his presence during his arrest. At one point, presumably before leaving the bus, he complained further of the pain the handcuffs were causing him and they were changed. From the busses his group was let out onto the lawn of the Metropolitan Police Academy. He had decided beforehand that he was not going to give his name to the police. Considering the failure of the demonstrations that day, he remembers being frustrated that people did not take the chance to protest their arrest en mass by not giving their names. There was a desk in one of the entrances to the Academy where an officer sat in front of piles of dollar bills. From what he understood people were paying for their release and going home. Being a "John Doe" he was amidst the last group to be brought into the Academy. There were maybe 20 of these John Does at that point. The atmosphere waiting on the grass was relaxed to an unexpected degree. People were making phone calls, smoking cigarettes and sleeping. Inside the Academy they were brought to a gymnasium where they were put on plastic mats in groups of maybe between 5-10 persons. He had another set of plastic handcuffs tied around his ankles and a third set of cuffs connecting his ankles to his wrists. He was "hog-tied". The situation was humiliating, but he also remembers humorous as well. He felt the worst of the day must have been over and he recalls lying on his back, (not being able to be in any other position), and communicating to friends in similar positions on other mattresses. The general sense was that they we were in an absurd situation—a sort of field trip (being in a school) gone somehow awry. He was after he knows

not how long taken out of the academy and put onto another bus. He remembers the windows being very small. These were police, not city, busses. His group was then taken to a jail. It might very well be that there were only males on his bus, because at the jail males were separated from females. The males were led into the jail along a wall and told to face the wall, draw down their pants and underwear and to squat while coughing. He remembers having the sense that this was done primarily for intimidation. The area where the search took place seemed to be some kind of a corridor. At some point he remembers someone complaining of their treatment. A police officer answered by stating something to the effect of that "You should not be treated differently to anyone else because you are children of white, middle class parents. The salience of this comment though was that of course white, middle class individuals were treated differently than say poor people of color, and this therefore exhibited some sort of contradiction, by virtue of being treated in such a dehumanizing fashion. They were put into group cells, with as many as 20 people in each cell. He was in a section of the jail with at least four of these types of cells. He remembers a greater sense of solidarity in the jail than in the Academy. They were mostly (if not all) John Does there in the cells and there was a great sense of commonality. This was expressed at one point in everyone starting to sing together a well-known punk song by a group called "Against Me". About the second verse into the song a large police officer, not in normal police attire but plain clothed, rushed violently into the cell and dragged one arrestee out. His group stopped singing in shock and fear. This one individual was taken away. At one point there was a female lawyer who took his group's names. He gave her his name for her records although he was reticent to do so as she was a (he believed) state-appointed lawyer and he did not know if he could trust her. This was the only time he gave his name during his arrest and detention. He vaguely remembers being assured by the lawyer that her notes would later be destroyed. His group attempted to ascertain the whereabouts of the individual who had been rushed away. The groups was exasperatingly told that he was fine. He believes the lawyer was in a rush because she was going before a judge before a certain time. He and the others were later

-16-

released onto a concrete square outside. It was there or nearby where he met again some friends from whom he had been separated during the demonstration.

Interrogatory No. 9.

Describe in detail the basis for and meaning of the term "were in close physical proximity to other arrested persons" as used in paragraph 22(e) of the Second Amended Class Action Complaint.

RESPONSE: The Superior Court holding cells, where class members were placed by USMS personnel, are within view of other cells, but named plaintifffs did not see any non-protestors in the other cells while they were there. Bame states that he was a late arrival to Superior Court building and that he saw no non-protesters in custody there while he was there.

Interrogatory No. 10.

Describe with specificity whether Plaintiffs, at any time following their arrest, were quarantined in segregated holding cells away from other persons held at the Superior Court cellblock while awaiting presentment.

RESPONSE: Named plaintiffs are not familiar with the detailed layout of the Superior Court cell block and have no knowledge as to the location of any other persons held awaiting presentment. Named plaintiffs, and members of the plaintiff class, were not held in cells with non-protestors, and, in this senses, were quarantined from non-protestors.

Interrogatory No. 11.

Describe in detail the factual basis upon which you base your contention in the complaint and elsewhere that the proposed class(es) satisfies (satisfy) all the requirements of numerosity, commonality, typicality, and adequacy of representation, including a detailed description of any

and every investigation undertaken by Plaintiffs to support these contentions.

RESPONSE:  As to numerosity, the lock-up list contains  approximately ninety male names.

Paul Bame states that he personally saw at least eighty men in the Superior Court holding cells with him or in the cells around him, who had all been strip searched on their way to being placed in the cells with him.

Greg Keltner states that the number of protesters strip searched with him was more than twenty, and perhaps less than forty. Everyone in the group, from what he  saw or gathered, was strip searched in the same manner.

Ivan Welander states that while in custody of the USMS he was with at least 50 other male protestors, probably more.  People weren't talking too much about the strip search, but nobody he talked with there said they were not strip searched by the Marshals.

Nicholas Church states that he witnessed  protesters in the Superior Court holding cells numbering in the forties or fifties of protestors.

In addition, plaintiffs have the names of a total of thirteen men who were strip searched by USMS personnel following the protest.  Their names and contact information are provided in response to Interrogatory 16, infra.

In addition, USMS staff member McKenna testified in his deposition of in Chang v. U.S.A. that there were at least twenty protestors in the USMS custody on that day.

As to commonality and typicality, the factual bases for commonality and typicality are set forth in the Second Amended Complaint and in the plaintiffs' motion for class certification.

As to adequacy of representation, plaintiffs' factual bases are set forth in the complaint and in the plaintiffs' motion for class certification.


Interrogatory No. 12.

Describe in detail the alleged questions of law and fact common to the class(es) and the individual questions referenced by Plaintiffs in the complaint and describe in detail the factual

basis upon which Plaintiffs allege in the complaint and elsewhere that there are questions of law and fact common to the class that predominate over individual questions and a detailed description of any and every investigation undertaken by Plaintiffs to support these contentions.

RESPONSE: Plaintiffs have set forth in the proposed second amended complaint and in the plaintiffs' motion for class certification the questions of law and fact which support their motion for class certification. There is no additional detail available.

Plaintiffs' counsel has reviewed the following pleadings, court opinions, and depositions and documents described in their responses to defendants' requests for production of documents.

Interrogatory No. 13.

Describe in detail the factual basis upon which Plaintiffs rest their contentions in the complaint and elsewhere that the claims advanced by each named Plaintiff are typical of those of the proposed class, including a detailed description of any differences in the nature of the claims and allegations advanced by the Named Plaintiffs from those of each other and/or any proposed class member as well as any and every investigation undertaken by Plaintiffs concerning this subject.

OBJECTION: This interrogatory is repetitious of interrogatory number 11, above.

RESPONSE: Every named plaintiff and every member of the proposed class was arrested on the same day, in two groups in two places, either at Vermont Avenue and K Street, N.W., and at Connecticut Avenue and K Street, N.W. under substantially similar circumstances. All protesters were held in custody by the same MPD, delivered by the MPD on the same bus or buses on the same day to the custody of the USMS, and strip searched in the same manner by USMS personnel within a few hours of each other.

USMS has provided no basis for an individualized suspicion upon which to base the search of any member of the proposed class. There are not any differences among the class members, other than their individual identities, which might be used to defeat typicality.

-19-

Plaintiffs' counsel bases his position on the investigations of the documents referenced in the responses below to defendants' requests for production of documents. The individual responses of the named plaintiffs describing their experiences during the custody of the USMS is described above.

Interrogatory No. 14.

Describe in detail the factual basis upon which Plaintiffs rest their contentions in the complaint and elsewhere to the effect that the interests of the named Plaintiffs are consistent with or in harmony with the interests of the proposed class, without evidence of any conflicts of interest, such that class members have suffered similar injuries and require the same relief, including a detailed description of any and every investigation undertaken by Plaintiffs to support these contentions.

OBJECTION: To the extent Interrogatory 14 calls production of attorney work product, plaintiffs make no response. To the extent interrogatory 14 calls for information pertaining to the damages phase of this litigation, plaintiffs make no response.

RESPONSE: Plaintiffs have identified no facts upon which to distinguish among the liability claims of various members of the proposed class. All members of the class were arrested during protests outside of Pershing Park. All members of the class were initially detained by MPD officers, held at an MPD facility, then delivered by the MPD to the custody of the USMS staff at the Superior Court, then strip searched by the USMS staff. All strip searches of class members were conducted in batches of about ten men each, and the searches followed a set routine.

Named plaintiffs have identified no conflicts between themselves and the proposed class.

Interrogatory No. 15.

Describe in detail the method by which you contend members of any proposed class or

sub-class can be identified in this matter and describe in detail how you contend to ensure accuracy in the method you will employ to identify any and every member of the proposed class.

OBJECTION. Case law in the District of Columbia concerning class actions does not require the named plaintiffs to identify each and every member of a proposed class.

RESPONSE: The description of the class in the plaintiffs' pending motion for class certification is sufficiently specific so as to avoid any confusion with regard to which persons are members of the proposed class.

Plaintiffs have provided identifying information for the five named plaintiffs. Each of the named plaintiffs is prepared to testify personally as to their involvement in this matter.

Members of the class who are not named in the complaints may be identified when they come forward in response to notice from the Court and state that they were present at the strip searching addressed in this lawsuit. The Court and the class administrator will use methods provided in the final judgment for preventing the payment of false claims.

The lock-up list contains the actual names of at least thirty-seven males who were delivered to the USMS personnel on the date.

The protesters have some access to each other through email list serves, and websites where information about protests can be shared. Should this matter resolve with a judgment in favor of the class, the judgment will be publicized on these list serves and web sites, as well as through other means, and class members invited to contact the class administrator.

All, or nearly all, members of the plaintiff class were fingerprinted by the MPD, according to the eyewitness accounts of several of the named plaintiffs. The FBI or other federal agency may have retained records of the fingerprints of those persons held in custody by the MPD on September 27, 2002.

Interrogatory No. 16.

Identify all persons directly or indirectly involved in, or who have personal knowledge of,

facts or evidence relevant to all claims and allegations raised in the pleadings in this action, providing a description of the knowledge you believe that each person has or may have, any oral or written statements or communications by such persons pertaining to the matters, the person's relationship, if any, to a named Plaintiff or proposed class member and any criminal convictions and charges that the person may have in his or her history. Your response should include, but not be limited to, any Plaintiff or Defendant whom you contend was present when you were searched, as described in paragraph 22 of the Second Amended Complaint.

RESPONSE:

The named plaintiffs have provided above the information which they have about this matter.

The following are individuals who appear to have been subjected to the strip searches addressed in this lawsuit. Their contact information, so far as known to named plaintiffs, is provided next to their names. Named plaintiffs have no knowledge as to criminal charges or convictions attached to any of them.

Joel Diamond, 4 Flagpole Lane, East Setauket, NY 11733

Haplo Ghan, formerly known as Charles Wlliams, C/O Diana's Grove Bunker, MO 63629, email: charles@dianasgrove.com.

Paul Gilman, 32-46 83rd Street, East Elmhurst, NY 11370

Joshua Davidson, friend of John Joel Duncan.

John B Hopkins, P.O. Box 1188, Truro, MA 02666, cell 774-836-6403; jbrewsterhopkins@comcast.net

Paul Kuttner, 2143 W. Potomac Avenue, #1, Chicago, IL 60622

Tom Madden, 220 W. 111th Street, Oak Lawn, IL 60453, 708/499-6431 (Home), TomPilgrim@aol.com.

Andrew Paik, 765 W 91st St., Apt. #F-2105, Playa del Rey, CA 90293, (310) 570-3662. andrew.paik@verizon.net.

Michael Rice, 67 Nine Mile Lane, Delmar, NY 12054.

James Robinson, 328 North 42nd Street, Philadelphia, PA 19104. 215/382-8849 (Home)

> tikigod@temple.edu.

Zack Schulman, 50 Ridge Street, Rye, NY 10580. 914/967-2182 (Home). zschulma@umich.edu.

Andy Simon, 501 Pettingill Road, Essex Junction, VT 05452. 802/879-5439.

> rubyruth@surfglobal.net

Charles Williams, 70 Farm & Wilderness Road, Plymouth, VT 05056. whoa9@yahoo.com.

In addition there are thirty seven men named in the lock-up list and nearly all their names are also found in the records of the traffic court for September 28, 2002. Their names are as follows:

Harper, Trenton

Schulman, Zachary

Rhodes, Anthony

Venarx, Paul

Ohern, Shawn

Doe, John (Gildea, Jeremiah)

Heimburg, Matt

Ingram, Joshua

Doe, John (aka Makusta, William)

Hayman, John

Lemos, Carlos

Larsen, Jeremiah

Samter, Joshua

Barlow, Ryan

Daniel, Matthew

Brauer, Peter

Zielinski, Michael

Johnson, William

Stella, Jason

Atkinson, Gentry

Christian, David

Kurtz, Ryan yes

Doe, John (aka Richey, Christian)

Hanna, Jonathan

Yates, Devon

Gilluly, David

Wierzbowski, Robert

Campbell, Matt

Foster, Anthony

Bartlett, William

Knoof, James

Doe, John (aka Arman, David)

Lavhmvani, Begjal

Ketcham, Richard

Boerer, Eric

Hall, Tyson

Maher, Ryan

In addition, all named defendants, and USMS personnel listed on the roster.

Mark Goldstone, Esq., mglaw@comcast.net, is a Washington, D.C. attorney who may have interviewed one or more members of the plaintiff class while they were in custody, prior to their release.

In addition, named plaintiffs recall that there were various D.C. public defender attorneys who met with the class members in Superior Court on that day, but do not recall their names.

Interrogatory No. 17.

Describe in detail and identify every expert witness Plaintiffs intend to call in support of their motion for class certification or at a trial of this matter, including but not limited to: the expert's name; area of expertise; subject matter on which each such expert is expected to testify; substance of the facts and opinions to which each expert is expected to testify; summary of the grounds for each opinion of each such expert; whether a report was made by the expert and, if so, an identification of any and all reports; the educational and employment background of the expert; and all publications of such expert witness in the field of expertise in which he or she may or will be offered in this case.

RESPONSE:

Plaintiffs do not intend to call expert witnesses during the liability phase of this litigation or with regard to the motion for class certification.

Interrogatory No. 18.

Identify all aliases and social security numbers that the Plaintiffs have ever used, including but not limited to instances when each alias and social security number was used and for what purpose. Please specify which aliases were used in conjunction with which social security numbers.

RESPONSE:

Plaintiffs have not used aliases. Their social security numbers have been transmitted by separate email directly to Mr. Nebeker in order to minimize the risk of inadvertent disclosure as a result of inclusion in these discovery responses.

Interrogatory No. 19.

Identify and report whether the named Plaintiffs have ever used drugs or suffered an addiction to drugs. Please specify in what time period this drug usage and/or addiction occurred and what drug was involved.

OBJECTIONS:

Plaintiffs object, pursuant to the Fifth Amendment to the U.S. Constitution, to this interrogatory on the grounds that it requests information that might tend to self-incriminate members of the plaintiff class. Plaintiffs also object to the form of the interrogatory, since it uses the vague term "drugs", which is a term which could refer either to over the counter medications, or controlled substances under federal law.

RESPONSE: No response provided.

Interrogatory No. 20.

Describe in detail any criminal charges that were pending against you at the time of any arrest in the District of Columbia when an allegedly improper search was conducted.

RESPONSE:

No criminal charges were pending against any of the named plaintiffs at the time of the arrest on September 27, 2002. Named plaintiffs have no knowledge as to any criminal charges that may have been pending against any member of the class.

Interrogatory No. 21.

Describe in detail any weapons, drugs, drug paraphernalia, contraband, or other items in your possession or the possession of anyone else detained with you when your were searched as described in paragraph 22 of the Second Amended Complaint.

RESPONSE:

None were in the possession of named plaintiffs. Named plaintiffs have no knowledge of

what was in the possession of unnamed class members, but named plaintiffs did not see or become aware of any such contraband in the possession of any male protester held in the cells with them. According to defendants' responses to discovery, the USMS searches found no such items on any person searched.

Interrogatory No. 22.

Describe in detail any drug testing conducted on you or attempted to be conducted on you in 2002, including but not limited to the date(s) of such testing or attempted testing, the entity or person who conducted the test or attempted test, the results of the test (specifying for what drug(s) you tested positive). If the drug test or attempted drug test took place on September 27, 2002 or September 28, 2002, whether the test, any efforts to conduct the test, and the results were completed before the search described in paragraph 22 of the Second Amended Complaint.

OBJECTION: The interrogatory is vague since it does not state whether it is addressed to controlled substances or over the counter medications.

RESPONSE: No testing was conducted on any named plaintiff in 2002. Named plaintiffs have no knowledge as to any drug testing that may have been conducted on members of the plaintiff class in 2002.

Interrogatory No. 24.

Describe in detail any action taken or statement (written or oral) made by any Plaintiff, Defendant, potential class member, or agent or employee of the United States Marshals Service that involves or is relevant to the allegations in the Second Amended Complaint, including but not limited to any instructions given by United States Marshals Service personnel to effect any search as alleged in paragraph 22 of the Second Amended Complaint.

RESPONSE: USMS personnel issued verbal instructions to members of the plaintiff class, standing in batches, when the class members were bunched up in custody on the way to being placed in the court holdingcells. The instructions by the USMS personnel were to the

effect, to face a wall in the Superior Court cell block, to lower their trousers and undergarments, and expose their buttocks and genitalia to observing USMS personnel, and then to squat down and to cough. Then, the class members were instructed to replace their clothing, and move into the cells, where they were to be held until appearances before the court.

John Joel Duncan states that his only recollection, in addition to the statement just made in the preceding paragraph was the comment to his batch of protestors by a USMS officer about "not being treated special because you are white, middle-class kids."


## REQUEST FOR PRODUCTION OF DOCUMENTS

Document Request No. 1.

Copies of any and all documents that the named Plaintiffs or the putative class identified in responses to, consulted in answering, and/or that relate in any manner to, the above interrogatories or allegations in the pleadings in this action.

RESPONSE: Plaintiffs have compiled into one PDF file, with subparts for ease of handling, all documents which are responsive to these requests for production, except for certain depositions taken in other cases and the photos provided by plaintiffs. The documents in the file are will be Bates stamped for ease of access at a later time. The PDF file will be referred to in this discovery response as "Plaintiffs' Compilation of Discovery Documents as of 2/11/2008", or "Pltfs' Compilation", for short.

The depositions taken in other cases, which have been reviewed by plaintiffs' counsel, are as follows. These depositions are all of members of the USMS staff, and the depositions are in the possession of defendants' counsel:

Deposition of Mark A Shealey taken in Johnson v. Government of the District of Columbia, taken May 8, 2007

Deposition of Clyde B. Afman in Chang v. U.S.A., taken November 9, 2004.

-28-

Deposition of John O. McKenna in Chang v. U.S.A., taken November 9, 2004.

Document Request No. 2.

Copies of each and every document that you used, consulted or referenced in formulating your answers to the interrogatories above.

RESPONSE:  See, "Pltfs' Compilation".

Document Request No. 3.

Copies of any and all records or depositions consulted by you or obtained in any manner that relate to the operation of the D.C. Superior Court cellblock, or the practices, policies or methods of conducting searches in the Superior Court cellblock.

RESPONSE:  The depositions taken in other cases, which have been reviewed by plaintiffs' counsel, are as follows.  These depositions are all of members of the USMS staff, and the depositions are in the possession of defendants' counsel:

Deposition of Mark A Shealey taken in Johnson v. Government of the District of Columbia, taken May 8, 2007

Deposition of Clyde B. Afman in Chang v. U.S.A., taken November 9, 2004.

Deposition of John O. McKenna in Chang v. U.S.A., taken November 9, 2004.

Document Request No. 4.

Copies of any and every document that refers or relates to the allegations in the Second Amended Complaint.

RESPONSE:  See, "Pltfs' Compilation".

Document Request No. 5.

Copies of any and all documents (including notes) created or produced by the Plaintiffs, whether in hard-copy or in computer files, detailing or describing either communications between a Plaintiff and anyone arrested during the large-scale mass protest in Washington, DC,

during the period from September 27, 2002 to September 30, 2002.

RESPONSE: See, "Pltfs' Compilation".

Documents which are attorney work product of attorney investigations will not be produced.
These documents which are not produced consist of notes of interviews between plaintiffs'
counsel and, variously, individuals who are named plaintiffs, members of the potential class,
potential members of the proposed class.

Document Request No. 6.

Copies of any and every communication by, from, and/or between a Named Plaintiff
(and/or anyone on behalf of a Named Plaintiff) and one or more agents and/or employees of the
United States of America and/or the USMS, that constitute, relate to, or refer to the claims in this
lawsuit.

RESPONSE: None.

Document Request No. 7.

True and correct copies of all exhibits you may seek to introduce at a trial of this cause.

RESPONSE. See, "Pltfs' Compilation".

Document Request No. 8.

True and correct copies of all demonstrative exhibits you may seek to use at a trial of this
case.

RESPONSE: If any are prepared, they will be provided.   Photos taken by named
plaintiffs are provided as part of these responses.  See, "Pltfs' Compilation".

Document Request No. 9.

Copies of any and all documents supporting, refuting, or relating to the contention that
the Plaintiffs or putative class members were subjected to an improper search.

RESPONSE:   See, "Pltfs' Compilation".

Document Request No. 10.

For each expert identified in your responses to interrogatories above, produce copies of

any and all: retainer or fee agreements, contracts, bills, statements, time-sheets, reports written

for the purpose of this case; all articles written in the area of expertise, a resume and curriculum

vitae; affidavits or transcripts of all testimony given by the expert in prior litigation; and

materials provided to each expert.

RESPONSE:  None

REQUESTS FOR ADMISSION

Request for Admission No. 1.

The United States Marshals Service ("USMS") is a federal entity, specifically a

component of the United States Department of Justice, that has nationwide federal statutory

authority.

RESPONSE:  Admit, except aver that USMS has special authority over prisoners in D.C.

Superior Court pursuant to federal and D.C. statutes.

Request for Admission No. 2.

During all times relevant to the pleadings in this action, no District of Columbia

governmental department, agency or official actually determined or had the power or authority to

control how or in what manner the USMS secured persons detained in the cellblock of the

Superior Court of the District of Columbia during the relevant time period encompassed by the

complaint in this case.

RESPONSE:  Denied.

Request for Admission No. 3.

While in the Superior Court Cell Block, each of the named Plaintiffs and each of the

putative class members were subject to the control of the United States Marshals Service, which

decided how to safeguard and secure such prisoners, including, for instance, the making of such

determinations as whether such prisoner suffered a medical condition that prevented the person

from being taken to court and the making of such determinations as whether such prisoner

-31-

required additional processing by the Metropolitan Police Department before being taken before the court.

RESPONSE: Denied, except that USMS had a form of control of the class members which control was subject to the District of Columbia agency oversight and Superior Court judicial oversight.

Request for Admission No. 4.

While in the Superior Court Cell Block, some of the arrestees in close physical proximity to the named plaintiffs engaged in behavior or displayed characteristics under circumstances which gave a United States Marshals Service employee the ability to make an individualized determination that lawful authority existed to subject them to a strip search and/or squat search.

RESPONSE: Denied.

Request for Admission No. 5.

Searching detainees for contraband in the cellblock of the Superior Court of the District of Columbia helped provide a safer environment for all staff and detainees of the cellblock.

RESPONSE: Denied with regard to the named plaintiffs and members of the class. Named plaintiffs have no knowledge with regard to the procedures for the USMS to maintain a "safer environment" in the cell block.

Request for Admission No. 6.

Todd Dillard did not personally conduct searches of persons detained in the cellblock of the Superior Court for the District of Columbia, including the plaintiffs and putative class members.

RESPONSE: Denied. Plaintiffs did not know at the time the identities of the USMS personnel present at the searches. Plaintiffs assert that the searches were conducted under Mr. Dillard's direct authority and direction.

Request for Admission No. 7.

Todd Dillard did not personally observe searches of persons detained in the cellblock of

the Superior Court for the District of Columbia, including the plaintiffs and putative class members.

RESPONSE: Denied.  Plaintiffs had no knowledge at the time of the searches of which USMS personnel, including Mr. Dillard, were personally observing the searches either in person, via any type of closed circuit television, or otherwise.

Request for Admission No. 8.

The United States Marshals Service found contraband on detained persons brought to the cellblock of the Superior Court of the District of Columbia by MPD and other law enforcement agencies.

RESPONSE:  Denied. Plaintiffs have requested USMS records of all contraband found in D.C. Superior Court Cellblock by USMS staff during the time relevant to the claims herein, and no records were produced by defendants.

Request for Admission No. 9.

The layout and size of the cellblock of the Superior Court of the District of Columbia causes detained persons who are charged with different levels of offenses – from traffic offenses to serious crimes of violence such as murder – to be held in such proximity to one another that contraband could be transmitted from a prisoner in one location to a prisoner in another area.

RESPONSE: Denied. Plaintiffs have no knowledge of the general layout and size of the cellblock beyond their observations made on September 28, 2002. Plaintiffs have no recollection of detainees who were not protesters present in any cells within sight of the class members.

Request for Admission No. 10.

The photographs contained on the CD that accompanies Federal Defendants' First Discovery Requests are true and correct depictions of the areas within the District of Columbia Superior Court Cellblock and are, in material respects, as those areas appeared on or about September 27, 2002 and September 28, 2002.

RESPONSE: Admit, except as to photographs numbered 2798, 2800, 2802, 2803, 2806,

2807, and 2808, which represent areas that named plaintiffs would not have entered, such as cellblock control bubbles.

Request for Admission No. 11.

The events described in the Complaint in this action took place on September 27 and 28, 2002. See Amended Complaint, ¶¶ 11-12.

RESPONSE: Admit.

Request for Admission No. 12.

The original complaint was not filed and this action was not commenced until September 15, 2005. Complaint at 1 (Docket Entry No. 1).

RESPONSE: Admit.

Request for Admission No. 13.

At the time of the events alleged in the Complaint, Paul Bame had been arrested, but had refused to provide his true name to law enforcement authorities, instead remaining identified to authorities only as "John Doe."

RESPONSE: Admit. Mr. Bame did not provide the name John Doe.

Request for Admission No. 14.

At the time of the events alleged in the Complaint, Gregory Keltner had been arrested, but had refused to provide his true name to law enforcement authorities, instead remaining identified to authorities only as "John Doe."

RESPONSE: Admit. Mr. Keltner did not provide the name John Doe.

Request for Admission No. 15.

At the time of the events alleged in the Complaint, Ivan Welander had been arrested, but had refused to provide his true name to law enforcement authorities, instead remaining identified to authorities only as "John Doe."

RESPONSE: Admit. Mr. Welander did not provide the name John Doe.

Request for Admission No. 16.

At the time of the events alleged in the Complaint, Nicholas Church had been arrested, but had refused to provide his true name to law enforcement authorities, instead remaining identified to authorities only as "John Doe."

RESPONSE: Admit. Mr. Church did not provide the name John Doe.

Request for Admission No. 17.

At the time of the events alleged in the Complaint, John Joel Duncan had been arrested, but had refused to provide his true name to law enforcement authorities, instead remaining identified to authorities only as "John Doe."

RESPONSE: Admit. Mr. Duncan did not provide the name John Doe.

Request for Admission No. 18.

At the time of the events alleged in the Complaint, the putative class members had been arrested, but had refused to provide their true names to law enforcement authorities, instead remaining identified to authorities only as "John Does."

RESPONSE: Admit, except as to those members of the proposed class who supplied their names to the enforcement authorities, as listed on the lock up list.

Request for Admission No. 19.

Before their arrests, Paul Bame, Gregory Keltner, Ivan Welander, Nicholas Church and John Joel Duncan had been participating with hundreds of persons in a mass protest of the International Monetary Fund policies in Washington, D.C., a protest that had been publically touted as an effort to shut down the city.

RESPONSE: Admit as to participation in the protest on September 27, 2002. Named plaintiffs deny that they and the persons arrested with them had any intent or desire to "shut down the city" of Washington, D.C.

Request for Admission No. 20.

Before their arrests, the putative class members had been participating among hundreds of persons in a mass protest of the International Monetary Fund policies in Washington, D.C., a

protest that had been publically touted as an effort to shut down the city.

RESPONSE: Admit as to participation in the protest on September 27, 2002. Named plaintiffs deny that they or any person arrested with them had any intent or desire to "shut down the city" of Washington, D.C. Using the protest in question to shut down the city of Washington, D.C., was not the intent or desire of the plaintiff class.

## VERIFICATION

I, Paul Bame, declare and state that:

1. I am a named plaintiff in this lawsuit.

2. I have read the above responses to Defendants' First Discovery Requests.

3. I hereby declare under penalty of perjury that the responses set forth above are true and correct to the best of my knowledge and belief, except as to those statements made by my fellow named plaintiffs.

Dated: February 11, 2008.  Signed: /s/ Paul Bame

## VERIFICATION

I, Ivan Welander, declare and state that:

1. I am a named plaintiff in this lawsuit.

2. I have read the above responses to Defendants' First Discovery Requests.

3. I hereby declare under penalty of perjury that the responses set forth above are true and correct to the best of my knowledge and belief, except as to those statements made by my fellow named plaintiffs.

Dated: February 11, 2008.  Signed: /s/ Ivan Welander

## VERIFICATION

I, Greg Keltner, declare and state that:

1. I am a named plaintiff in this lawsuit.

2. I have read the above responses to Defendants' First Discovery Requests.

3. I hereby declare under penalty of perjury that the responses set forth above are true and correct to the best of my knowledge and belief, except as to those statements made by my fellow named plaintiffs.

Dated: February 11, 2008. Signed: /s/ Greg Keltner

### VERIFICATION

I, John Joel Duncan, declare and state that:

1. I am a named plaintiff in this lawsuit.

2. I have read the above responses to Defendants' First Discovery Requests.

3. I hereby declare under penalty of perjury that the responses set forth above are true and correct to the best of my knowledge and belief, except as to those statements made by my fellow named plaintiffs.

Dated: February 11, 2008.  Signed: /s/ John Joel Duncan.

### VERIFICATION

I, Nicholas Church, declare and state that:

1. I am a named plaintiff in this lawsuit.

2. I have read the above responses to Defendants' First Discovery Requests.

3. I hereby declare under penalty of perjury that the responses set forth above are true and correct to the best of my knowledge and belief, except as to those statements made by my fellow named plaintiffs.

Dated:  February 11, 2008. Signed: /s/ Nicholas Church.

Respectfully submitted,


  /s/ Lynn E. Cunningham
LYNN E. CUNNINGHAM, ESQ.
ATTORNEY FOR PLAINTIFFS.


### CERTIFICATE OF SERVICE

I certify that service of the foregoing PLAINTIFFS' RESPONSES TO Federal Defendant's First Discovery Requests has been made by mailing a copy thereof to: W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, DC  20530

on this 11 th day of February, 2008.

  /s/ Lynn E. Cunningham
Lynn E. Cunningham, Esq.
Attorney for Plaintiffs

**Nebeker, Mark (USADC)**

| | |
|---|---|
| **From:** | Lynn Cunningham [lcunningham@law.gwu.edu] |
| **Sent:** | Monday, February 11, 2008 8:57 PM |
| **To:** | Nebeker, Mark (USADC) |
| **Cc:** | Bordley, Ed (USMS); zwolfe@peopleslawresourcecenter.org |
| **Subject:** | Bame - Pltf's respond to discovery |
| **Attachments:** | Plts' Final Respto Defs first rogs 2 11 2008.wpd |

Dear Mark,

Attached are plaintiffs' responses to defendants' initial discovery requests.

I am mailing to you via snailmail two large sets of files. One is a pdf file of all the documents that plaintiffs have referred to in preparing their responses to the discovery. The second set of files are photos taken by Paul Bame during and soon after the 9/27/02 protest in D.C.

These files are simply too large to send via email.

Best regards,

Lynn


The Rev. Lynn E. Cunningham, Esq.
P.O. Box 1547
Dubois, Wyoming 82513
307-455-3334/74
Rector, St Thomas Episcopal Church.

Of counsel, Terris Pravlik & Millian.
Professor of Clinical Law Emeritus,
 George Washington University Law School.
Bar Memberships: New York, Wyoming,
Washington, D.C., and U.S. Supreme Court

Important:  The information in this e-mail
is intended only for the use of the addressee.
If you are not the addressee, you are hereby notified that you have received this e-mail
in error,
and that any review, dissemination, distribution or copying of this message is strictly
prohibited.
 If you have received it in error, please notify me immediately and please destroy this
e-mail.