UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PAUL BAME, *et al.*, | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 05-1833 (RMC) |
| TODD WALTHER DILLARD,[1] | ) ) ) | |
| Defendant. | ) ) | |

MEMORANDUM OPINION

Named Plaintiffs Paul Bame, Gregory Keltner, Ivan Welander, Nicolas Church, and John Joel Duncan were arrested for non-violent, non-felony offenses while protesting International Monetary Fund ("IMF") and World Bank policies in Washington, D.C. Plaintiffs claim that, under the direction and authority of Defendant Todd Walther Dillard, former United States Marshal for the Superior Court of the District of Columbia, they were strip searched by U.S. Deputy Marshals upon being processed into holding cells at the D.C. Superior Courthouse. Plaintiffs claim that these searches were without justification and thus unconstitutional under the Fourth Amendment, and seek damages. Defendant Marshal Dillard responds that the searches were justified by the reasonable suspicion of finding contraband and/or weapons and that, in any event, he is entitled to qualified immunity. Plaintiffs have moved for summary judgment as to liability, while Defendant Marshal Dillard has moved for summary judgment on the issue of qualified immunity. For the reasons

---

[1] Pursuant to the Court Order granting in part and denying in part Plaintiffs' Motion to Amend the Complaint [Dkt. # 56], the only Defendant remaining in this case is Todd Walther Dillard. *See* Second Am. Compl. for Compensatory and Punitive Damages [Dkt. # 57] ¶ 8.

explained herein, both motions for summary judgment will be denied.

## I. FACTS

**A.     Lead-up to the International Monetary Fund/World Bank Protests**

The IMF and World Bank planned to hold their annual Fall meetings on September 27 through September 30, 2002 in Washington, D.C. In what one website described as an effort to "Shut Down the City," a group of protesters, ultimately numbered in the low thousands, planned to mass in Washington, D.C. in order to protest IMF and World Bank policies for what they believed was maltreatment of poor persons around the globe. Deposition of Paul Bame ("Bame Dep.") at 6-8. Plaintiffs traveled from around the country to join in this protest. *Id*. Prior to the protest, Plaintiffs discussed among themselves the idea of not carrying any form of identification on their persons and refusing to provide identification or give their true names to law enforcement. *Id*. at 60-64. Nonetheless, Mr. Bame has testified that no protester intended to be arrested during the protest. *Id*. at 63.

Such protests are not uncommon and are, in fact, almost routine in the nation's capital. Deposition of Marshal Todd Dillard ("Dillard Dep.") at 67; Deposition of Deputy Marshal James Rowe ("Rowe Dep.") at 27. Local law enforcement, which in this instance includes Metropolitan Police Department ("MPD") and federal officials, had developed plans of their own to deal with the concerns of traffic congestion, mass arrests, and safety. In advance of the IMF/World Bank protests planned for September 27 – October 4, 2002, the United States Marshals Service ("USMS") prepared an operations plan entitled "Operation Safe Courts" (the "Operation"). Def.'s Statement of Material Facts Not in Dispute ("Def.'s SMF") at 4; Dillard Dep., Ex. 1 (Operation Safe Courts). The Operation noted an increase in the level of violence directed at law

enforcement in connection with similar protests and estimated that 5,000 to 15,000 protesters could descend upon city streets. Def.'s SMF at 5. The Operation also specified how the USMS would aid local police by detaining arrestees pre-arraignment in the Superior Court and warned that many arrestees would refuse to provide identification as a method of non-compliance with law enforcement orders. *Id*. Most relevant to the case at hand, the Operation provided that Marshals would search arrestees prior to detaining them for presentment to the court. *Id*.

The Operation did not provide specific guidance on how the searches were to be conducted, but the USMS's own search policy had evolved over the prior few decades. Searches were to take place as soon as incoming arrestees arrived at the Superior Court cellblock, with the overriding institutional security goal of preventing arrestees from hiding contraband and/or weapons. Rowe Dep. at 17-21. Such searches involved a pat-down of the arrestee's entire body (while the arrestee was clothed), use of a magnetometer (the familiar metal detectors at airports), use of wands to detect metal objects, and, at issue here, the use of "strip searches." *Id*.

Because the definition of a strip search may vary, it is necessary to provide the details of the exact procedure ("District Policy") used by the USMS at the D.C. Superior Court cell block. Colloquially referred to as the "Drop, Squat and Cough," male arrestees were required to pull their pants and underwear down to their ankles, squat down or bend over with their buttocks to the searching Marshals, and then cough to confirm that they were not hiding any contraband and/or weapons in their rectums. Dillard Dep. at 22; Pls.' Statement of Material Facts Not in Dispute ("Pls.' SMF") at 4. It is undisputed that under the District Policy, the USMS has discovered contraband, including drugs and drug paraphernalia, in connection with the Drop, Squat and Cough

searches of arrestees at the Superior Court, though the record is silent as to the nature and seriousness of the charges of those arrestees. Def.'s SMF at 7-9.

In July 1999, more than three years before the searches at issue here, USMS Acting Director George R. Havens issued Policy Directive 99-25 ("Policy 99-25"), which provided a specific set of instructions for the Marshals in order to conduct "both reasonable and legal searches" of arrestees. Def.'s Opp'n to Pls.' Mot. for Class Certification, Ex. B (Policy 99-25) at 1. Policy 99-25 generally refers to strip searches as "a complete search of a prisoner's attire and a visual inspection of the prisoner's naked body, including body cavities." *Id*. at 3. According to Policy 99-25, strip searches were only authorized when

> there is reasonable suspicion that the prisoner may be (a) carrying contraband and/or weapons, or (b) considered to be a security, escape, and/or suicide risk. Reasonable suspicion may be based upon, but is not limited to, one or more of the following criteria:
>
> a. Serious nature of the offense(s) charged, i.e., whether crime of violence or drugs;
> b. Prisoner's appearance or demeanor;
> c. Circumstances surrounding the prisoner's arrest or detention; i.e., whether the prisoner has been convicted or is a pre-trial detainee;
> d. Prisoner's criminal history;
> e. Type and security level of institution in which prisoner is detained; or
> f. History of discovery of contraband and/or weapons, either on the prisoner individually or in the institution in which the prisoners are detained.

*Id*. at 4. Policy 99-25 also stated that Marshals may perform their own strip search "as necessary based on the [above] factors" prior to accepting a prisoner from another facility. *Id*. at 5. Finally, the search was to take place: only by a Marshal of the same sex as the prisoner, only via visual

examination (i.e., no touching of skin surface), and only in a "professional manner, causing the prisoner as little embarrassment as possible." *Id.*[2]

In addition to Policy 99-25, the District of Columbia and its agents were subject to a consent decree resulting from litigation in the early 1980's over treatment of female arrestees. Pls.' Mot. for Summ. J., Ex. 12 ("Morgan Consent Decree"). Providing the same standard as Policy 99-25, the Morgan Consent Decree required "reasonable suspicion" before the use of a strip search on a female arrestee. *Id.* at 2. With certain exceptions (i.e., for movement around the same facility or for attorney or clergy visits), the consent decree also allowed strip searches if an arrestee were going to be placed into the general inmate population. *Id.*

USMS officials, including Defendant Dillard who had been Marshal since 1993 and Deputy Rowe who had worked in the Superior Court since 1996, received annual training on the constitutional and legal standards in regard to searches and strip searches. Dillard Dep. at 11; Rowe Dep. at 9. Moreover, Marshal Dillard and Deputy Rowe were familiar with the then-recent litigation against the District of Columbia challenging strip searches of female arrestee protesters. Rowe Dep. at 71-73.

**B.     Plaintiffs are Arrested and Transported to a Holding Facility**

On Friday, September 27, 2002, at around 7 a.m., protesters gathered at Connecticut Avenue and K Street in Northwest D.C. to protest the IMF and World Bank policies. Pls.' SMF at 2. Some protesters were dressed in "earthy hippie like sort of attire," while others had painted faces (Plaintiff Bame had a white question mark painted on his face), and still others partially covered their

---

[2] Policy 99-25 was replaced by USMS Directive 9.3 "Body Searches" effective October 6, 2003. *See* Declaration of William E. Bordley, Asst. General Counsel for USMS [Dkt. # 29-2 at 2].

faces with bandanas. Def.'s SMF at 3-4; Bame Dep. at 17-18. Soon thereafter, at around 9 a.m., these protesters, including Plaintiffs, were arrested by MPD officers and charged with non-violent, non-felony offenses such as "incommoding" (blocking traffic) and failure to obey law enforcement orders. Pls.' SMF at 2; Def.'s SMF at 1-2.

The group of protester-arrestees from Connecticut Avenue and K Street, the exact number of which is unknown but is estimated to be over a hundred, was taken by bus to the MPD Academy at Blue Plains — a holding facility used for larger numbers of protesters arrested from elsewhere in the District. Pls.' SMF at 2 ; Def.'s SMF at 4. On the bus ride, Plaintiffs were handcuffed. Deposition of John Joel Duncan ("Duncan Dep.") at 29-31. On disembarking from the bus at Blue Plains, Plaintiffs were left outside in a grassy area and allowed to socialize. *Id*. at 30-33. Upon entering the Blue Plains facility, Plaintiffs had their feet cuffed, with an additional cuff connecting their wrists to their ankles. *Id*. While at Blue Plains, the protester-arrestees were exclusively detained with each other, were not asked for identification, and were not yet booked. Pls.' SMF at 2-3.

Later on September 27, 2002, MPD officials transported the entire group of arrested protesters to Cell Block B, another MPD facility. Pls.' SMF at 3; Bame Dep. at 24-33. At this point, male arrestees were separated from female arrestees for booking and detention. Bame Dep. at 33-34. A few protesters provided their true names, posted bond, and were released. Pls.' SMF at 3. But the majority of protesters, including Plaintiffs, declined to give the MPD their true names or provide any identification. Def.'s SMF at 1-2. The protesters were, again, held all together, while some were allowed to keep certain personal belongings, including backpacks. *Id.* at 3. MPD officials then

transferred this group, including Plaintiffs, to USMS custody at the Superior Court. *Id.* at 4; Pls.' SMF at 2-3.

## C.   U.S. Marshals Strip Search Plaintiffs

The following facts are undisputed for purposes of Defendant Dillard's motion for summary judgment.[3] Plaintiffs were turned over to USMS custody late at night on Friday September 27, 2002 or early in the morning of Saturday, September 28, 2002. Pls.' SMF at 3. By this time, the protester-arrestees had been in custody and cuffed for many hours and had not been detained with any other group of inmates besides fellow protesters. *Id.* In addition to delivering the arrestees, MPD officers also provided the receiving USMS officials with a "lock up list" of the arrestees transported, containing the names of the arrestees (almost all "John Does") and the charges (all non-violent, non-felony) of each arrestee. *Id.*

The arrestees were placed in a special receiving cell in the basement of the Superior Court holding facility. *Id.* Each arrestee went through a magnetometer metal detector and was subject to an extensive pat-down search while clothed. *Id.* at 4; Bame Dep. at 54. No contraband was found during these precursor searches. Immediately thereafter, pursuant to the District Policy, all were strip searched by USMS staff in cells dedicated solely for such purposes. Pls.' SMF at 3. Although closed-circuit cameras watched over most of the facility, there were no cameras that had a view of the search cells. Dillard Dep. at 41-42. The facility also had a fingerprinting machine and

---

[3] The Court notes that Defendant Dillard, in his opposition to Plaintiffs' Motion for Summary Judgment, contests whether these strip searches actually took place. *See* Def.'s Opp'n at 5. That contention is addressed below in deciding whether Plaintiffs are entitled to summary judgment as to liability on their own motion, as opposed to relying on these facts for purposes of Defendant's motion.

a computer terminal for background checks right next to these cells, which could be used to identify arrestees. Rowe Dep. at 63-65.

According to Plaintiffs' sworn affidavits and depositions, all protesters were placed in the search cells in groups of eight to twelve men, with at least two U.S. Marshals (always male) in supervision. Pls.' SMF at 4. Standing next to one another, the Marshals ordered the group to drop their pants and underwear down to their ankles, squat or bend over with their backsides toward the Marshals, and cough. Bame Dep. at 50-52. Each arrestee in the group of eight to twelve could see or glimpse every other arrestee during the search. *Id*. The strip search of each group took about one to three minutes and no arrestee was touched. *Id*. When asked whether the District Policy of performing the Drop, Squat and Cough searches would have been used on these protesters on September 27-28, 2002, Defendant Marshal Dillard responded, "As far as I know, that's what happened the entire 13 years I've been there." Dillard Dep. at 108. In Deputy Marshal Rowe's words, these "thorough" searches were performed upon every arriving arrestee as "that was the policy." Rowe Dep. at 27-28 ("All prisoners were to be searched thoroughly. All prisoners. When we receive all prisoners from outside sources, they all get searched thoroughly. That was the policy."). No contraband was found on any of the protester arrestees and no documentation of the searches was made. Pls.' SMF at 6.

Plaintiffs admit that former Marshal Dillard performed none of the searches himself. Pls.' SMF at 5. But Marshal Dillard did testify that it was his practice to walk along the search cells every day he was at work. Dillard Dep. at 132-37. Defendant Marshall Dillard also described himself as an active supervisor, noting that he always wanted to know what was going on, wanted

to know of any problems, and that he was in continual contact with his Deputy and line Marshals. *Id*.

After being strip searched in groups, the protesters were placed in holding cells again, exclusively with one another. Pls.' SMF at 4; Def.'s SMF at 10. They were not commingled with the general inmate population. Throughout the day of Saturday, September 28, 2002, each protester had an arraignment hearing before a D.C. Superior Court Judge and was released with a small ($50-$100) fine. Pls.' SMF at 3-4. Some were released without any fine or other consequence. *Id*. In response to related litigation, the District, the USMS, and Defendant former Marshal Dillard represented that, as of April 28, 2003, they had implemented "new security policies and practices that will (i) permit 'drop, squat and cough' searches or a strip search only, at the least, upon an individualized finding of reasonable suspicion, if not probable cause, and with the approval of a supervisor; and (ii) insure that such searches will be applied even-handedly to both men and women arrestees and detainees." *See Johnson v. District of Columbia*, Civil No. 02-2364 (D.D.C.), Fed. Defs.' Consent Mot. to Hold Mots. in Abeyance Pending Settlement Discussions ¶ 2 [Dkt. # 24].

## II.  LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S.

at 248.  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id*. at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  The nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id*.

### III.  ANALYSIS

Marshal Dillard, the only remaining Defendant, is sued in his individual capacity under both *Bivens v. Six Unknown Named Agents of Federal Bureau of Investigation*, 403 U.S. 388 (1971) and 42 U.S.C. § 1983.  As this Court already has recognized, however, Superior Court Marshals act under color of federal law, and thus do not qualify as state actors for purposes of 42 U.S.C. § 1983.  *See Johnson v. District of Columbia*, 584 F. Supp. 2d 83, 89-93 (D.D.C. 2008).  What remains, then, is analysis of Plaintiffs' Fourth Amendment claim under *Bivens*.  Defendant Marshal Dillard argues, following the two-step sequence as laid out in *Saucier v. Katz*, 533 U.S. 194, 200-02 (2001), that:  1) the District Policy of strip searching without reasonable suspicion was not

unlawful; and 2) in any event, he is entitled to qualified immunity because the law was not clearly established at the time of the alleged constitutional violation in September 2002. Although no longer mandatory, the Court follows the two-step protocol in evaluating the defense of qualified immunity. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2008) (concluding that *Saucier* two-step sequence is "often appropriate" and "beneficial," but no longer mandatory); *see also Johnson v. District of Columbia*, 528 F.3d 969, 973 (D.C. Cir. 2008) (applying *Saucier* in Fourth Amendment context, determining first if official conduct violated constitutional right, and, if so, whether that right was "clearly established.").

**A.     Reasonableness of the Searches under the Fourth Amendment**

Plaintiffs claim that their constitutional rights were violated because U.S. Deputy Marshals, at the direction of Defendant Marshal Dillard and pursuant to the District Policy, strip searched them without any justification. The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend IV. The Fourth Amendment generally requires law enforcement to have probable cause before conducting a search. *See Safford Unified Sch. Dist. # 1 v. Redding*, 129 S. Ct. 2633, 2639 (2009). In certain settings, however, a standard short of probable cause, often referred to as "reasonable suspicion," is enough to justify a search. *Id*.

The Supreme Court's seminal case on the constitutional dimensions of arrestee strip searches is *Bell v. Wolfish*, 441 U.S. 520 (1979). *Bell* involved a class action suit by pre-trial detainees challenging numerous practices of the Metropolitan Correctional Center, a federally operated short-term custodial facility in New York City, including body-cavity searches of detainees

following contact visits with persons outside the institution. *Id*. at 523. The Supreme Court found that the body cavity searches did not violate the Fourth Amendment because probable cause was not required and the searches were not unreasonable under the circumstances. *Id*. at 558-60. In justifying this conclusion, the Court noted that "this practice gives us the most pause." *Id*. at 558. The Court went on to lay out four factors that should be considered in balancing institutional security against inmate rights:

> In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider [1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted.

*Id*. at 559. The Court held that such strip searches, after contact visits from outside visitors and before return to the general detention population, may be conducted on "less than probable cause." *Id*. at 560.

Until 2008, every federal circuit court to have faced the issue (ten out of twelve) ruled that, under *Bell*, suspicionless strip searches of pre-trial arrestees charged with non-violent, non-drug crimes was unreasonable and thus unconstitutional. *See Wilson v. Jones*, 351 F.3d 1340, 1343 (11th Cir. 2001); *Swain v. Spiney*, 117 F.3d 1, 7 (1st Cir.1997); *Masters v. Crouch*, 872 F.2d 1248, 1250 (6th Cir. 1989); *Weber v. Dell*, 804 F.2d 796 (2d Cir. 1986); *Stewart v. Lubbock County*, 767 F.2d 153, 156 (5th Cir. 1985); *Jones v. Edwards*, 770 F.2d 739 (8th Cir. 1985); *Giles v. Ackerman*, 746 F.2d 614, 616-18 (9th Cir. 1984) (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 (9th Cir. 1999); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984); *Mary Beth G. v. Chicago*, 723 F.2d 1263 (7th Cir.1983); *Logan v. Shealy*, 660 F.2d 1007,1013 (4th Cir. 1981); *but cf. Powell v. Barrett*, 541 F.2d 1298 (11th Cir. 2008) (en banc) (allowing county jail's

blanket policy of strip searching all arrestees that were *detained with the general inmate population*). In other words, at the time of the searches at issue here (September 2002), all these courts, some for nearly twenty-five years, required at least reasonable suspicion to strip search a pre-trial or pre-arraignment arrestee charged with a non-violent, non-drug crime.

These precedents, led by the Supreme Court's four-factor balancing test in *Bell*, guide the Court's analysis here. The first *Bell* factor, scope of the intrusion, clearly falls on Plaintiffs' side. It is difficult to imagine a more intrusive procedure than the Drop, Squat, and Cough searches in which Plaintiffs had to pull down their pants and underwear, squat in front of other arrestees and two male Marshals, and cough. *See Bell*, 441 U.S. at 558 (invasive nature of strip search gives most pause); *Redding*, 129 S. Ct. at 2643 (the "degradation" and intrusive nature of strip search places it in category of its own). The second and fourth factors (manner of conducting the searches and place of searches) point less clearly toward either side. As Defendant Marshal Dillard argues, the Drop, Squat and Cough searches did not require touching, Plaintiffs were in a room without closed-circuit cameras, and the searches were relatively short lasting only one to three minutes. But in Plaintiffs' favor, the searches were nothing close to private, having been conducted in batches of eight to twelve arrestees in full view of one another.

The most important factor here is justification for the search — or in this case, the lack thereof. Defendant does not seriously contend that no justification was required for the search. As nearly every court has found,[4] some level of justification, whether it is labeled "reasonable

---

[4] The only decision otherwise is the aforementioned *Powell v. Barrett* in 2008. That case, unlike this one, involved strip searches of pre-trial arrestees who were to be commingled with the general inmate population charged with various serious offenses. 541 F.2d 1298. No other court, as far as this Court can tell, has found it reasonable to perform strip searches of non-violent, non-felony arrestees without any justification. *Powell v. Barrett* is analyzed in greater detail below.

suspicion" or not, is required to strip search pre-arraignment arrestees charged with non-violent, non-felony offenses. Here, the Marshals did not develop any justification for strip searching the protester-arrestees, despite the balancing called for in the USMS Policy dating back to 1999. *See* Policy 99-25 at 4 (strip searches only authorized on "reasonable suspicion" of finding weapons or contraband). In Defendant Marshal Dillard's own words, the District Policy was to perform strip searches of all detained arrestees during the entire thirteen years he was Marshal. *See* Dillard Dep. at 108. This practice based on the District Policy, a violation of the national USMS Policy, is unreasonable and unlawful under the Fourth Amendment.

Defendant, post-hoc in this litigation, makes a half-hearted argument that there was reasonable suspicion because the Marshals did not have the names of the arrestees, there was mention of "shutting down the city," and prior strip searches had turned up contraband such as drugs. It is true that an arrestee's failure to provide identification may be one factor that goes into the *Bell* balancing test as to justification. *See Kelly v. Foti*, 77 F.3d 819, 821-22 (5th Cir. 1996). However, this is not what the record shows happened here. U.S. Deputy Marshals, under direction and authority of Defendant Marshal Dillard, strip searched these arrestees without pause or individualized consideration. Moreover, record evidence from the Defendant strongly suggests that the lack of identification argument is a red herring. To repeat, both Defendant Marshal Dillard and his long-time Deputy Rowe testified that the strip searches would have (and should have) occurred in the normal practice under the District Policy, no matter the charge or identity of the arrestee. *See* Dillard Dep. at 108; Rowe Dep. at 27-28.

Strip searching under these circumstances is not reasonable without some justification, even a standard less than probable cause, to suggest that Plaintiffs were hiding

contraband and/or weapons in their rectums. That justification is not found in the nature or seriousness of the crime charged (non-violent, non-felony violations), not found in the characteristics of the arrestees, and not found in the circumstances of the particular arrests at issue. *See, e.g.*, *Allison v. GEO Group, Inc.*, 611 F. Supp. 2d 433, 455-56 (E.D. Pa. 2009) (citing factors that go into reasonableness and reasonable suspicion standard). Plaintiffs were arrested for peaceful protests, transported only with fellow protesters, and held only to appear in front of a Superior Court judge and pay a small fine or be released.

The Court need not linger further on this point. The facts, as conceded by Defendant Marshal Dillard for purposes of his motion for summary judgment, show that at his direction and without any particularized justification, Plaintiffs were strip searched using the Drop, Squat and Cough procedure pursuant to the District Policy.[5] These strip searches were unreasonable under the Fourth Amendment. The next question is whether the law was clearly established at the time of the unlawful acts in September 2002. The answer is yes.

**B.     Qualified Immunity**

"The doctrine of qualified immunity shields government officials from civil liability to the extent their alleged misconduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rasul v. Myers*, 563 F. 3d 527, 529 (D.C. Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Generalities will not do, as the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*,

---

[5] As explained below in Section III.C. of this Opinion, Defendant Marshal Dillard, in response to Plaintiffs' Motion for Summary Judgment on Liability, contests that the Plaintiffs were actually strip searched on the relevant dates.

533 U.S. at 202. The test is one of "objective legal reasonableness." *Harlow*, 457 U.S. at 819. The inquiry in the Fourth Amendment context may seem redundant because "reasonableness" comes into play at both *Saucier* steps. Our Court of Appeals has offered this distinction: step one asks whether it was reasonable for the official to act the way he did, while step two asks whether it was reasonable for the official not to know that his actions were unlawful. *See Johnson*, 528 F.3d at 976.

The Court looks to cases from the Supreme Court, the D.C. Circuit Court of Appeals, and other courts for principles "exhibiting a consensus view." *Id*. Such precedent need not even involve "materially similar facts" as long as "'the state of the law [at the time of the incident] gave [the officer] fair warning that [his alleged misconduct] . . . was unconstitutional.'" *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). These guiding principles were reaffirmed in the Supreme Court's most recent discussion of qualified immunity. *See Redding*, 129 S. Ct. at 2643-44 (even in novel factual circumstances, "'officials can still be on notice that their conduct violates established law'" although that conduct might be "less than an outrage") (quoting *Hope*, 536 U.S. at 741).

The specific question here, then, is whether it was reasonable for Defendant Marshal Dillard not to know that it was unlawful to strip search Plaintiffs (via Drop, Squat and Cough procedure under the District Policy) who had been arrested on non-violent, non-felony, non-drug offenses; held together at all times and not commingled with the general inmate population; and as part of the pre-arraignment booking process brought into Superior Court cells for a short period of detention before release with a small fine. The answer is it was not reasonable for Defendant Marshal Dillard to believe these actions were lawful given the known facts and the state of the law. The Court need not repeat the facts in detail. Suffice it to say that, at the time of the strip searches, the record shows that the Marshals knew they had a group of non-violent, non-felony protesters, held

together at all times, never commingled with the general inmate population, who had already gone through metal detectors, wand searches, and pat-down searches and were only going to be held long enough to appear before a Superior Court judge to receive a small fine. Even if the Marshals paused to consider these factors in balancing the need for the search with the intrusion on the individual, which they did not do, these factors would not have created the makings of reasonable suspicion for a Drop, Squat and Cough search.

As to the law, although the D.C. Circuit Court of Appeals had not ruled on the precise issue, the precedent was overwhelming. At the time of the incidents in question, September 2002, every circuit court to have considered the issue, some for a few decades, had held that at least reasonable suspicion is required to strip search non-violent, non-felony offenders. *See infra* Part III.A. (cataloging cases in ten of twelve circuits); *see also Pearson*, 129 S. Ct. at 823 (officer may rely on out-of-circuit cases, even if own federal circuit has not yet ruled on issue, in good faith effort at complying with law). The Supreme Court's 1979 *Bell* decision itself required, at a minimum, some balancing of the governmental justification versus the intrusion of the search upon the individual. *See* 441 U.S. at 559 ("In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."). It is not possible to find that Defendant Marshal Dillard was unaware of these legal requirements. As the testimony shows, every year, he and his deputies received legal training on the constitutional standards as applied to strip searches. *See* Dillard Dep. at 11.

Even more telling, the USMS's *own policy*, in place since 1999, required the exact balancing laid out in *Bell* and the circuits. Policy 99-25 expressly provided that strip searches were only authorized when "there is reasonable suspicion that the prisoner may be (a) carrying contraband

and/or weapons, or (b) considered to be a security, escape, and/or suicide risk." *See* Policy 99-25 at 4. Multiple factors go into the reasonable suspicion inquiry under Policy 99-25 (i.e., nature and seriousness of offense, circumstances surrounding arrest and detention, and type of institution). But it is untenable for Defendant Marshal Dillard to argue, as he now does, that the law was unclear as of September 2002. Not only did the law give him "fair warning" that the District Policy of blanket strip searches of non-violent, non-felony offenders is unconstitutional, but USMS Policy 99-25 did so as well.

Defendant Marshal Dillard argues that the 2008 case of *Powell v. Garret* is his ace in the hole. *See Powell v. Garret*, 541 F.2d 1298 (11th Cir. 2008) (en banc). In *Powell*, the Eleventh Circuit considered a blanket policy of the Fulton County Jail, as part of its booking process, of strip searching all arrestees who would be detained with the general inmate population, no matter the severity or nature of the crime charged. *Id.* at 1301. Revisiting the Supreme Court's *Bell* decision, the Eleventh Circuit reasoned that *Bell*, properly interpreted, required courts to view the institutional security needs of the detention facility as the critical factor in the reasonableness analysis. *Id.* at 1306. And, since *Bell* categorically allowed strip searches after contact visits and before return to the detention facility's general population, the Eleventh Circuit found no violation in the type of search it was facing, even without reasonable suspicion. *Id.* at 1307.

Defendant Marshal Dillard argues that *Powell* muddies the waters as to the law on arrestee pre-arraignment strip searches so that he is entitled to qualified immunity. Not so. Even if it were possible for a decision coming six years after the incidents in question to affect the analysis, as directed by both the Supreme Court and the D.C. Circuit Court of Appeals, this Court's inquiry must focus on the specific facts and circumstances at hand, not on the facts other courts have

faced. *See Johnson*, 528 F.3d at 975-76. And the underlying facts here are crucially distinct from *Powell*. Plaintiffs, unlike those arrested in *Powell*, were detained together at all times and never commingled with the general inmate population. Moreover, USMS had an express policy (Policy 99-25) requiring reasonable suspicion to strip search arrestees, which Defendant Marshal Dillard's local practices ignored. *Compare Powell*, 541 F.2d at 1311 (jail had express blanket strip search policy).

This Court is well aware of the deference due to security institutions such as the USMS in managing arrestees at the Superior Court, but that does not absolve Defendant Marshal Dillard from complying with the law. Deference, in the facts at hand, would go to Policy 99-25 requiring reasonable suspicion, not to the apparent blanket practices of Defendant Marshal Dillard to strip search all arrestees no matter the crime charged or circumstances involved. Such an absolute rule does not comport with the balancing required by the Supreme Court in *Bell*.

In sum, Defendant Marshal Dillard is not entitled to qualified immunity because the law was clearly established that blanket strip searches of non-violent, non-felony arrestees were unlawful at the time of the searches at issue here, September 2002. Therefore, Defendant Marshal Dillard's motion for summary judgment will be denied.

**C.      Defendant's Denial of the Strip Searches**

The Court must tie up one last loose end. Although the above analysis focuses on, and ultimately denies, Defendant's motion for summary judgment, Plaintiffs also have moved for summary judgment as to liability. Defendant conceded the facts, including the occurrence of the strip searches as explained in Plaintiffs' testimony, for purposes of Defendant's own summary judgment motion. *See* Def.'s Mot. for Summ. J. at 1 [Dkt. # 74]. But, in a later, somewhat curious

filing, Defendant contends that the strip searches never even happened, referencing a sworn declaration from a Deputy Marshal who was allegedly on duty the weekend the searches were supposed to have taken place.  *See* Def.'s Opp'n at 5-6 [Dkt. # 78].  The Court must also deny Plaintiffs' summary judgment motion because genuine issues of material fact remain.[6]

### IV. CONCLUSION

For the reasons explained above, Plaintiffs' Motion for Summary Judgment on Liability [Dkt. # 72] will be denied.  Defendant Marshal Dillard's Motion for Judgment on the Pleadings, or in the alternative for Summary Judgment [Dkt. # 74] also will be denied.  A memorializing order accompanies this Memorandum Opinion.

Date: August 25, 2009               /s/
                                    ROSEMARY M. COLLYER
                                    United States District Judge

---

[6] The Court is aware of the Supreme Court's recent decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009), requiring a plaintiff to plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution."  That standard is met here, as record evidence supports Plaintiffs' allegations that Defendant Marshal Dillard was actively involved in authorizing, implementing, and approving the District Policy of strip searching pre-arraignment arrestees without justification, despite a contrary national rule in USMS Policy 99-25.